# Plaintiff's 5/12/06 deposition, with exhibits
## *Part 1*

**American Court Reporting**
**toll-free (877) 320-1050**

1 (Pages 1 to 4)

Page 1

IN THE UNITED STATE DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NUMBER
CV-2:05CV-1040-WKW

DORA DAVIS,
    Plaintiff(s),
vs.
ALBANY INTERNATIONAL, JEFF JOHNSTON,
    Defendant(s).

DEPOSITION TESTIMONY OF:
    DORA DAVIS

May 12, 2006
9:00 a.m.

COURT REPORTER:
DAVID L. MILLER, CSR, RMR

Page 2

S T I P U L A T I O N
    IT IS STIPULATED AND AGREED by and
between the parties throught their
respective counsel that the deposition of
DORA DAVIS, may be taken before David L.
Miller, Registered Merit Reporter and
Notary Pulbic, State at Large, at the law
offices of Toles & Williams, Montgomery,
Alabama, on May 12, 2006, commencing at
approximately 9:00 a.m.
    IT IS FUTHER STIPULATED AND AGREED
that the signature to and the reading of
the deposition by the witness is waived,
the deposition to have the same force and
effect as if full compliance had been had
with all laws and rules of Court relating
to the taking of depositions.
    IT IS FURTHER STIPULATED AND
AGREED that it shall not be necessary for
any objections to be made by counsel to
any questions, except as to form or
leading questions, and that counsel for
the parties may make objections and assign

Page 3

grounds at the time of trial or at the
time said deposition is offered in
evidence, or prior thereto.


I N D E X
EXAMINATION BY:        PAGE NO.
Mr. Powell        8
Certificate        286

Page 4

INDEX OF EXHIBITS
EXHIBITS        PAGE NO.
DEFENDANT'S 1 State court complaint  13
DEFENDANT'S 2 Albany's policies      40
DEFENDANT'S 3 Acknowledgment         41
DEFENDANT'S 4 I understand document  42
DEFENDANT'S 5 Training record        45
DEFENDANT'S 6 Disability statement  130
DEFENDANT'S 7 Handbook              136
DEFENDANT'S 8 Notice of decision    167
DEFENDANT'S 9 Employee documentation 241
DEFENDANT'S 10 Inter-office memo     247
DEFENDANT'S 11 Return to work letter 252
DEFENDANT'S 12 Exit interview        257
DEFENDANT'S 13 Voluntary resignation 261
DEFENDANT'S 14 Forget letter         261
DEFENDANT'S 15 Initial disclosures   265

**American Court Reporting**
**toll-free (877) 320-1050**

2 (Pages 5 to 8)

Page 5

```
 1        A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFF(S):
 4        Triana S. Williams
 5        Vicky U. Toles
 6        TOLES & WILLIAMS
 7        1015 South McDonough Street
 8        Montgomery, Alabama 36104
 9
10    FOR THE DEFENDANT, ALBANY:
11        Charles A. Powell, IV
12        BAKER, DONELSON, BEARMAN, CALDWELL
13        & BERKOWITZ
14        1600 SouthTrust Tower
15        420 20th Street North
16        Birmingham, Alabama 35203
17
18    FOR THE DEFENDANT, JOHNSTON:
19        Jennifer F. Swain
20        JOHNSTON, BARTON, PROCTOR & POWELL
21        2900 AmSouth/Harbert Plaza
22        1901 Sixth Avenue North
23        Birmingham, Alabama 35203
```

Page 6

```
 1        A P P E A R A N C E S
 2
 3    ALSO PRESENT:
 4        Jeff Johnston
 5        Ted Bryant
 6        Demonica Ritchison
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 7

```
 1          I, David L. Miller, a Registered
 2    Merit Report of Birmingham, Alabama, and a
 3    Notary Public for the State of Alabama at
 4    Large, acting as Commissioner, certify
 5    that on this date, pursuant to the Federal
 6    Rules of Civil Procedure, and the
 7    foregoing stipulation of counsel, there
 8    came before me at the law offices of
 9    Toles & Williams, Montgomery, Alabama,
10    commencing at approximately 9:00 a.m. on
11    May 12, 2006, DORA DAVIS, witness in the
12    above cause, for oral examination,
13    whereupon the following proceedings were
14    had:
15
16          DORA DAVIS,
17    Having been first duly sworn, was examined
18    and testified as follows:
19
20          COURT REPORTER:  Usual
21    stipulations?
22          MS. TOLES:  Yes.
23          MR. POWELL:  Yes.
```

Page 8

```
 1          MS. SWAIN:  Yes.
 2
 3    EXAMINATION BY MR. POWELL:
 4          Q.    How are you this morning,
 5    Ms. Davis?
 6          A.    A little bit tired.  I'm not
 7    feeling well today.
 8          Q.    I'm sorry to hear that.  My
 9    name is Charles Powell.  I'm the attorney
10    representing Albany International in the
11    lawsuit that you have brought against the
12    company and Jeff Johnston.  Jennifer Swain
13    is representing Mr. Johnston in the case.
14    I think he will be joining us in a little
15    while.
16          We are here to take your
17    deposition in your lawsuit today.  This is
18    my and Ms. Swain's opportunity to find out
19    what facts that you have that you believe
20    support your claims against Albany and
21    Mr. Johnston in this lawsuit.  For that
22    reason, I and Albany are going to rely on
23    your testimony, as well as Mr. Johnston
```

**American Court Reporting**
**toll-free (877) 320-1050**

Page 9

1 and Ms. Swain.
2        For that reason, it is
3 important for you to listen to my
4 questions carefully.  If you don't
5 understand the question, please tell me
6 and I will happy to repeat or rephrase the
7 question.
8        If you answer a question, I'm
9 going to assume that you understood it and
10 that the answer that you have given me is
11 to the best of your ability.  All right?
12        A.    (Nods head)
13        MS. TOLES:  He --
14        Q.    That instruction is coming
15 next.  For Mr. Miller's benefit, I need
16 you to answer orally, either yes or no or
17 in a narrative fashion.  He can take down
18 nods or shakes of the head, but it is not
19 always clear exactly what you meant.
20        So, mainly for Mr. Miller's
21 benefit, if you would either say yes or no
22 or give a narrative answer, it will make
23 it easier on Mr. Miller to take down the

Page 10

1 testimony.
2        A.    Yes.
3        Q.    All right.  You said that you
4 are not feeling well this morning.  Are
5 you on any kind of medication that you
6 think will affect your memory and your
7 ability to testify here today?
8        A.    No.
9        Q.    If you need a break at any
10 time, let me know and we can take a few
11 minutes.
12        A.    Okay.
13        Q.    All right.  You were with
14 Albany for roughly twenty-four years; is
15 that about right?
16        A.    Twenty four and a half years.
17        Q.    All right.  You are currently
18 Dora Davis.  Are there any other names
19 that you went by during your employment
20 with the company?
21        A.    Yes.
22        Q.    What were they?
23        A.    Jones and Iverson.

Page 11

1        Q.    I-V-E-R-S-O-N?
2        A.    S-O-N, uh-huh.
3        Q.    Did you do anything to get
4 ready for your deposition today?
5        A.    Yes.
6        Q.    What did you do?
7        A.    I talked to my lawyer.
8        Q.    Don't tell me what y'all
9 talked about.  Did you do anything else
10 besides talk to counsel?
11        A.    That was it.
12        Q.    Did you review any documents?
13        A.    I looked over the documents.
14        Q.    Do you remember which
15 documents you looked at?
16        A.    The response and my
17 complaints.
18        Q.    Okay.  When you say your
19 complaint, your complaint in this lawsuit?
20        A.    In this lawsuit.
21        Q.    Did you also look at your
22 complaint from your State court lawsuit?
23        A.    State court -- I don't

Page 12

1 understand.
2        Q.    In addition to this case, I
3 think you also filed a State court lawsuit
4 against the company with different
5 lawyers.
6        A.    Okay.  No, I didn't look over
7 that one.
8        Q.    Okay.  Well, if you would just
9 take a look at that for me real quick.
10        MR. POWELL:  Do you have a
11 copy of it?
12        MS. TOLES:  I don't think I
13 have got that.
14        MR. POWELL:  (Hands document)
15        MS. TOLES:  Thank you.
16        (Pause)
17        THE WITNESS:  Okay.
18        Q.    (BY MR. POWELL) All right.
19 Have you had a chance to review that
20 document?
21        A.    Yes.
22        Q.    Do you recognize it?
23        A.    Yes.

4  (Pages 13 to 16)

Page 13

1    Q.    Okay.  What is it?
2    A.    It's a complaint I filed
3  against the company for Workers' Comp with
4  -- I can't think of his name.
5    Q.    Would that be William Abell
6  who is listed on the last page?
7    A.    Yes.  William Abell.
8    Q.    All right.  And if you could,
9  look on page four of the document.  Are
10  those your signatures?
11    A.    Yes.
12    Q.    All right.  Did you authorize
13  Mr. Abell to file this complaint on your
14  behalf?
15    A.    Yes.
16    Q.    And did you have an
17  opportunity to review it before Mr. Abell
18  filed it in court?  Did you read over it
19  beforehand?
20    A.    I don't remember.  I don't
21  remember.
22    Q.    Take a look at the bottom of
23  page four for me.  That little paragraph

Page 14

1  above the second signature on the bottom
2  of the page.
3    A.    Yes.
4    Q.    Okay.  Now, are the facts
5  alleged in this complaint true and
6  accurate?
7    A.    They are.
8    Q.    Okay.  And that includes all
9  of the facts that you have -- the
10  allegations that you have made in count
11  two of that complaint?
12        (Pause)
13    A.    Yes.
14    Q.    Okay.  If you could, just give
15  that to Mr. Miller.  We will mark that as
16  Exhibit 1 to your deposition.
17        (WHEREUPON, a document was
18  marked as Defendant's Exhibit 1 and is
19  attached to the original transcript.)
20    Q.    What did you do for Albany?
21    A.    From the beginning?
22    Q.    That may be the easiest way to
23  do it.  You got hired in 1979?

Page 15

1    A.    1979.  I started as a worker
2  bee.
3    Q.    Okay.
4    A.    A seamer, I went to the
5  finishing as a helper bee, and then I went
6  back to the seaming as a seamer, then a
7  nap operator.
8    Q.    And how were you paid at
9  Albany?
10    A.    Hourly.
11    Q.    Were you an hourly worker
12  throughout your tenure with the company?
13    A.    Twenty-four and a half years,
14  yes.
15    Q.    Okay.  Are you a member of the
16  Union?
17    A.    Yes.
18    Q.    Which one?
19    A.    Teamsters, I believe.
20    Q.    Okay.  Was there a collective
21  bargaining agreement that -- in place when
22  you were employed by Albany?
23    A.    I believe so.

Page 16

1    Q.    How long did you work as a
2  worker bee?
3    A.    About a year and a half.
4  About a year and a half.
5    Q.    Is that your first job at
6  Albany?
7    A.    Yes.
8    Q.    Okay.  Is that in the weaving
9  department?
10    A.    The weaving.
11    Q.    How did you get from being a
12  worker bee to a seamer?
13    A.    We had a bidding system , so I
14  bidded to be a seamer.
15    Q.    Was there a job bid procedure
16  in place your whole time at Albany?
17    A.    Yes.
18    Q.    So if any hourly employee at
19  Albany wanted to move from one job to
20  another, did you have to bid on the job to
21  move?
22    A.    Once the job was placed on the
23  board, was opened up, then you bid for

**American Court Reporting**
**toll-free (877) 320-1050**

Page 17

1    that job if you wanted to be placed.
2        Q.    Okay.  And do you know,
3    generally, what the criteria were that
4    were considered once people applied for a
5    job that was posted on the board?
6        A.    Not really.
7        Q.    All right.  And did you bid on
8    the job to get from seaming to finish?
9        A.    Yes.
10       Q.    How long did you say -- let me
11   ask you this.
12            How long did you stay a seamer
13   that first time?
14       A.    About ten years.
15       Q.    Do you remember who your
16   supervisor was when you were a worker bee?
17       A.    Eric Thorington, I believe.
18   Eric.
19       Q.    Was Mr. Bryant in the plant
20   when you got hired?
21       A.    Yes.
22       Q.    Okay.  So you worked with Ted
23   Bryant the whole time that you were with

Page 18

1    the company?
2        A.    Yes.
3        Q.    Okay.  Do you believe
4    Mr. Bryant ever took any action against
5    you because of your race?
6        A.    I don't know.
7        Q.    Do you allege in this lawsuit
8    that Mr. Bryant did anything to you at
9    Albany because of your race?
10       A.    I don't know that either.
11       Q.    You filed the lawsuit, so I'm
12   confused how you don't know if you are
13   accusing Mr. Bryant of doing anything
14   because of your race.
15       A.    I know that a lot of racial
16   things was done and based racially, but I
17   don't know whether he personally did it.
18       Q.    Okay.  So, as you sit here
19   today, you cannot identify any particular
20   act by Mr. Bryant that you believe
21   occurred because of your race?
22       A.    No, I can't.
23       Q.    Okay.  During your twenty-four

Page 19

1    and a half years at Albany, did you ever
2    hear Mr. Bryant make any racially
3    inappropriate remarks?
4        A.    No.
5        Q.    Ever hear Mr. Bryant telling
6    any racially inappropriate jokes?
7        A.    No.
8        Q.    Okay.  During the time -- your
9    first time as a seamer, that roughly
10   ten-year stretch, who was your supervisor?
11       A.    Jewel Johnson, Bill Smith,
12   and, I believe, Barbara Smith at one
13   point.
14       Q.    Jewel Johnson?
15       A.    Yes.
16       Q.    Jewel like a diamond, Ruby?
17       A.    I know her name is Jewel.  How
18   is it, I don't know.
19       Q.    And Jewel Johnson, Bill Smith,
20   and Barbara Smith were your supervisors
21   during your first run in the seaming
22   department?
23       A.    Yes.

Page 20

1        Q.    Okay.  Are Bill Smith and
2    Barbara Smith related?
3        A.    No.
4        Q.    All right.  So how did you get
5    from being a seamer to the finishing
6    department?
7        A.    I bidded.
8        Q.    Bid on it.  How long did you
9    stay in finishing?
10       A.    Maybe two months.
11       Q.    All right.  Did you have to
12   bid back to seaming, or is there some
13   procedure in the collective bargaining
14   agreement that let you go get your old job
15   back within a certain period of time?
16       A.    I was injured.  I fell off of
17   a table.
18       Q.    Okay.
19       A.    And when I got back from off
20   -- recovering, I was allowed to go back to
21   the seaming department.
22       Q.    Okay.  Was that a Workers'
23   Compensation injury?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 21

1  A.  Yes.
2  Q.  What year?
3  A.  1991.
4  Q.  1991.  Who was your supervisor
5  during the time period that you were in
6  finishing?
7  A.  Joe Dean.
8  Q.  All right.  What was the
9  nature of your injury in 1991?
10  A.  I fell off a -- I don't know
11  what they call the table, but it was about
12  this high (Indicating).
13  Q.  About three and a half, four
14  feet?
15  A.  Four feet.  And I had to -- we
16  had something we called heat set -- a heat
17  set table.  So I was the helper.  And the
18  head told me to go up and take the bar and
19  put it so they could run the pan for the
20  heat set over it.
21      When I stood up -- got up on
22  the table to bend down to get the bar, I
23  didn't know the extent of the weight.  And

Page 22

1  I picked it up.  And when I picked it up,
2  I fell off the table.  And I hurt my lower
3  back and my right knee.
4  Q.  Did you get some medical
5  treatment for that?
6  A.  Not at first.  I went to my
7  own doctor.  I went to the company.  I was
8  denied Workers' Comp.  I went to my own
9  doctor.  I was treated.
10      So, eventually, after I had
11  gone back to work, it was recognized as a
12  Workers' Comp situation.
13  Q.  All right.  And I take it at
14  some point you were released to return to
15  work at full duty?
16  A.  Yes.
17  Q.  And when you came back, is
18  that when you went back to your prior job
19  in the seaming department?
20  A.  Yes.
21  Q.  Okay.  When you fell off the
22  table, who was your table head?
23  A.  Eddie Lane.

Page 23

1  Q.  Did you just pick up the bar
2  and lose your balance because of the
3  weight of the bar?
4  A.  When I picked up the bar, I
5  just felt pain in my lower back.  I -- I
6  guess I acknowledged the pain, and that's
7  when I fell.
8  Q.  Okay.  When you came back and
9  went back to the seaming department, who
10  was your supervisor?
11  A.  Jewel Johnson.
12  Q.  You said that you were a
13  seamer and then became a nap operator.
14  Are those both in the seaming department?
15  A.  Both in the seaming
16  department.
17  Q.  How did you get from being a
18  seamer to a nap operator?
19  A.  During that time we had where
20  we would be transferred from the -- they
21  were phasing the groscey (phonetic)
22  machine out and they were bringing the
23  M-3000s in.  It was another -- it was

Page 24

1  another machine, but I don't know the name
2  of that machine.  But it was similar to
3  the M-3000.  And we kind of like went
4  from -- according to seniority, we were
5  taken from one to the other one.  From the
6  groscey to the nap side.
7  Q.  Okay.  Just for my benefit,
8  because I have never run any of these
9  machines.  What is a -- a groscey?
10  A.  It was a manual.  You seam
11  manually.  You actually put the steam in
12  with your hand.
13  Q.  Okay.  And when you say put
14  the seam in, are you weaving the ends of
15  the fabric together?
16  A.  Yes.
17  Q.  Okay.  So you are taking woven
18  pieces of fabric and putting the ends
19  together to making a belt out of it?
20  A.  Yes.
21  Q.  All right.  Do you know how
22  you spell a groscey?
23  A.  No.  I don't remember that

**American Court Reporting**
**toll-free (877) 320-1050**

Page 25

1   much.
2       Q.   All right.  Do you remember,
3   roughly, when the company was
4   transitioning from the manual groscey
5   seaming machine to what, I guess, were
6   electronic seaming machines?
7       A.   It was around like '91, '92.
8   In that area -- that time frame.
9       Q.   You mentioned -- is it an
10  M-3000?
11      A.   Yes.  That's what we called
12  it.  We called it an M-3000.
13      Q.   What is the M-3000?
14      A.   It was an automatic seaming.
15      Q.   Tell me how the job was
16  different when you changed from manual
17  seaming to an automatic seaming machine.
18      A.   It was different because I was
19  doing it with my hand.  When you went to
20  the groscey -- to the M-3000, it was done
21  automatically.  But you had to sit the
22  fabric up and connect it to the machine
23  and you had to sit and watch it and look

Page 26

1   for mistakes and anything else that might
2   occur.
3       Q.   All right.  And how many
4   M-3000 machines were there in your
5   department?
6       A.   I forgot that.
7       Q.   I assume it was more than
8   one.
9       A.   It was -- I don't know.  Maybe
10  thirteen between the M-3000s and -- it
11  might have been thirteen.  I can remember
12  up to N-9.  But it was more.  I believe it
13  was more.
14      Q.   Okay.  You said N-9; is that a
15  machine number?
16      A.   That was a -- all of the
17  machines were numbered.
18      Q.   Okay.
19      A.   And I can remember N-9.  I
20  don't remember.
21      Q.   Okay.  Did Jewel -- you said
22  that Jewel Johnson was your supervisor in
23  seaming when you came back from

Page 27

1   finishing.  Did Ms. Johnson remain your
2   supervisor for the rest of your time with
3   the company?
4       A.   No.
5       Q.   Who else served as your
6   supervisor after Ms. Johnson?
7       A.   I don't know whether anyone
8   was between Jewel, but I think Jeff
9   Johnston was the next supervisor.  I
10  believe.
11      Q.   So Jeff Johnston is the next
12  seaming supervisor that you remember?
13      A.   I believe he was.
14      Q.   Okay.  And how long did
15  Mr. Johnston remain your supervisor?
16      A.   I don't know whether it was
17  maybe two years -- if it was two years or
18  three.  Something like that.  I don't know
19  exactly.
20      Q.   Do you recall when
21  Mr. Johnston became your supervisor in the
22  seaming department?
23      A.   I believe it was -- I don't

Page 28

1   know whether it was '94 or '95.
2       Q.   Okay.  And he would have been
3   your supervisor in that department till
4   '96, '97, somewhere in that time frame?
5       A.   I know it was up until '96.  I
6   don't know when he left the department.  I
7   don't know when he left the department.
8       Q.   Okay.  Who replaced
9   Mr. Johnston?
10      A.   Nat Jones, I believe.
11      Q.   And how long was Nat Jones
12  your supervisor in seaming?
13      A.   I believe it was -- I don't
14  know.
15      Q.   Okay.  Did Mr. Jones -- Nat
16  Jones remain your supervisor for the rest
17  of your time at Albany?
18      A.   No.
19      Q.   Who replaced Mr. Jones?
20      A.   Tim Woodward.
21      Q.   Do you know when Mr. Woodward
22  became your supervisor?
23      A.   No, because I don't know when

**American Court Reporting**
**toll-free (877) 320-1050**

8 (Pages 29 to 32)

Page 29

1  Nat Jones left.
2      Q.   How long was Mr. Woodward your
3  supervisor?
4      A.   Maybe two or three years, I
5  guess. I don't know.
6      Q.   Okay. And any supervisors in
7  seaming after Mr. Woodward?
8      A.   Barbara Smith.
9      Q.   Do you know when Ms. Smith
10  became your supervisor?
11      A.   It was after Tim Woodward
12  left. I don't know exactly.
13      Q.   Okay. Was Ms. Smith your
14  supervisor at the time that you stopped
15  working at Albany?
16      A.   It -- she was there at the
17  time I was terminated. She was there at
18  the time I was terminated.
19      Q.   Barbara Smith was?
20      A.   Barbara Smith.
21      Q.   So after Mr. Woodward, was
22  Barbara Smith your supervisor for the rest
23  of your time at the company?

Page 30

1      A.   Yes.
2      Q.   Okay. Do you recall the
3  actual last day that you operated a
4  seaming machine at Albany?
5      A.   I don't know the last day.
6      Q.   Okay. Do you know what month
7  it was?
8      A.   It probably was October,
9  because -- it probably was October.
10      Q.   Early October?
11      A.   I don't remember.
12      Q.   All right. I know you had a
13  meeting with Mr. Bryant and Jeff Johnston
14  around October the 29th of 2003.
15      A.   That's true.
16      Q.   Okay. We are going to talk
17  about that meeting in a little while. But
18  do you know how far in advance of that
19  meeting -- do you have a sense of how far
20  in advance of that meeting was the actual
21  last day that you did any work at Albany?
22      A.   On August the 21st I was
23  called at home, and I was told not to

Page 31

1  return to work.
2      Q.   August 21st of 2003?
3      A.   August 21st, yes, of 2003. I
4  was on and off at work up until October
5  the 29th.
6      Q.   You say that you got called at
7  home on August the 21st, 2003?
8      A.   Uh-huh (Nodding head).
9      Q.   Yes?
10      A.   Yes.
11      Q.   All right.
12      A.   I'm sorry.
13      Q.   Who called you?
14      A.   Ted Bryant.
15      Q.   Okay. What did Mr. Bryant say
16  during this call?
17      A.   He -- he suggested that I
18  didn't come to work until -- I don't even
19  remember why. He just suggested that I
20  didn't return to work.
21      Q.   Well, do you know what time of
22  day he called you on August the 21st of
23  2003?

Page 32

1      A.   No.
2      Q.   Do you remember what day of
3  the week it was?
4      A.   No.
5      Q.   Were you scheduled to work
6  that day?
7      A.   Yes.
8      Q.   Had you worked the day
9  before?
10      A.   If it wasn't a weekend, yes.
11  I don't remember what day it was.
12      Q.   Okay. Had you had any type of
13  work-related injury somewhere near that
14  date?
15      A.   Yes.
16      Q.   What was the injury?
17      A.   Okay. If you want me to back
18  up, because we skipped a lot of injuries.
19  In 1992 I was injured; in 1994 I was
20  injured.
21      Q.   Okay.
22      A.   In 1999 I was injured; in
23  2001, I was injured; in 2002 I was

**American Court Reporting**
**toll-free (877) 320-1050**

Page 33

1  injured.
2      Q.    Well, at the time Mr. Bryant
3  called you on August the 21st of 2003,
4  were you still receiving medical treatment
5  for any of these prior injuries that you
6  have listed?
7      A.    Yes.
8      Q.    All right.  We are going to
9  back up and kind of go through all of
10  that.
11      All right.  You say Mr. Bryant
12  called you on August the 21st of 2003 and
13  suggested that you not return to work.
14      A.    Yes.
15      Q.    Did he tell you that you were
16  being placed on any type of inactive
17  status?
18      A.    I don't remember that.
19      Q.    Do you recall what Mr. Bryant
20  said during this call?
21      A.    I don't know.  I just know
22  that he called and he told me not to
23  return to work.

Page 34

1      Q.    That day or ever?
2      A.    Until they -- until I see the
3  doctor or -- I don't know -- it was after
4  a certain appointment, but I don't
5  remember exactly.
6      Q.    And how long was it before you
7  returned to work after this call with
8  Mr. Bryant on August 21st?
9      A.    I don't know.
10      Q.    Okay.  You mentioned that you
11  worked on and off until October the 29th,
12  2003.
13      A.    Yes.
14      Q.    That would be between this
15  call with Mr. Bryant on August the 21st
16  and October the 29th, 2003?
17      A.    Yes.
18      Q.    You worked periodically?
19      A.    Yes.
20      Q.    All right.  Any time that you
21  worked, would you have clocked in?
22      A.    Yes, I would have.
23      Q.    And so then at the end of the

Page 35

1  shift, or whenever you left on any day,
2  you would also clock out?
3      A.    Yes.
4      Q.    All right.  During this call
5  with Mr. Bryant on August the 21st, 2003,
6  did he make any reference to your race?
7      A.    No.
8      Q.    Did you ask him why you were
9  being told not to return to work?
10      A.    He told me until I see the
11  doctor.
12      Q.    Well, at that time did you
13  have a doctor's appointment scheduled in
14  connection with one of your work
15  injuries?
16      A.    Yes.
17      Q.    And who would that doctor have
18  been?
19      A.    It would be Dr. Katz.  It
20  would be Dr. Katz.
21      Q.    Was he one of -- was Dr. Katz
22  one of your approved Workers' Compensation
23  treating doctors?

Page 36

1      A.    Yes.
2      Q.    And at that time were you
3  having difficulty working because of your
4  injuries?
5      A.    Yes.
6      Q.    Causing you to miss time at
7  work?
8      A.    It caused me at that time to
9  -- the only time I missed work during that
10  time was when Ted called me and told me
11  not to return, or whenever he said that
12  the doctor said, "You go to therapy."  So
13  I go to therapy a certain time of day.  I
14  would leave therapy and go to work.  That
15  was the only time that was missed.
16      Q.    Okay.
17      A.    Besides that, we had no work
18  days.  So we could take no work days.  I
19  did take no work days because of the
20  injuries.  I took vacation time because of
21  the injuries.
22      Q.    When you say no work days,
23  what does that mean?

**American Court Reporting**
**toll-free (877) 320-1050**

10 (Pages 37 to 40)

Page 37

1    A.    We would have slack day's,
2  work production -- no work to put out, so
3  they would declare it a no work day , and
4  they would allow you to take them.  Ted
5  Bryant or the company would allow you to
6  take it.
7    Q.    And that would apply to you
8  and everybody else in the plant?
9    A.    Yes.
10    Q.    Okay.  So you could just go
11  home for the day?
12    A.    Well, usually, you don't work
13  that day.  You let them know you don't
14  want to work that day, and you didn't work
15  that day.
16    Q.    Those days did not count as
17  attendance occurrences?
18    A.    No.
19    Q.    If you took a vacation day,
20  that didn't count as an attendance
21  occurrence?
22    A.    No.
23    Q.    All right.  I guess we will

Page 38

1  have a number of injuries to go through.
2  We will do that in a minute.  Let me ask
3  you a couple of quick questions.
4        During the time that you --
5  well, do you believe that Jewel Johnson
6  ever took any action against you because
7  of your race?
8    A.    I don't know.
9    Q.    Do you allege in this lawsuit
10  that Ms. Johnson took any action against
11  you because of your race?
12    A.    I don't remember.
13    Q.    You don't remember whether she
14  did or you don't remember whether you
15  allege --
16    A.    I don't remember whether I
17  allege it.  I don't remember.
18    Q.    Well, I am asking in the
19  lawsuit that you have brought against the
20  company, are you claiming in this lawsuit
21  that Ms. Johnson -- that Jewel Johnson
22  took any action against you because of
23  your race?

Page 39

1    A.    I would have to go over the
2  complaint.  I don't remember.
3    Q.    All right.  I can represent to
4  you that there is no reference to
5  Ms. Johnson in your complaint.
6    A.    I don't know.
7    Q.    Does that mean if there is not
8  a specific reference to someone in the
9  complaint, that you -- that you are not
10  claiming that that person took any action
11  against you because of your race?
12    A.    Yes.
13    Q.    Okay.  So you are not accusing
14  Nat Jones of taking any action against you
15  because of your race?
16    A.    No.
17    Q.    You are not accusing Tim
18  Woodward of taking any action against you
19  because of your race?
20    A.    No.
21    Q.    You are not accusing Barbara
22  Smith of taking any action against you
23  because of your race?

Page 40

1    A.    No.
2    Q.    Okay.  Well, what exactly is
3  it that you believe Mr. John --
4        THE WITNESS:  Can I take a
5  break?
6        MR. POWELL:  Do you want to
7  take a break?
8        THE WITNESS:  Yes.
9        MR. POWELL:  We can do that.
10        9:42 AM
11        (Short recess)
12        9:53 AM
13    Q.    (BY MR. POWELL) Are you ready?
14    A.    Yes.
15    Q.    All right.  When we took a
16  break, I was getting ready to ask you some
17  questions about Mr. Johnston.  We will put
18  that on hold for just a second.  We will
19  come back to Jeff in just a minute.
20        During your time at the
21  company, did Albany have a policy in place
22  regarding discrimination and harassment in
23  the workplace?

11 (Pages 41 to 44)

Page 41

1    A.    We had equal opportunity
2  posted on the bulletin board, like a board
3  where it was equal opportunity.
4    Q.    Do you recall going through
5  any training at the company about the
6  company's harassment and discrimination
7  policies?
8    A.    No.
9    Q.    Okay.  Take a look at that for
10 me.
11         Have you had an opportunity to
12 look over that document?
13   A.    Yes.
14   Q.    Do you recognize it?
15   A.    No, I don't recognize it.
16   Q.    So you don't recall receiving
17 any training on this while you worked for
18 the company?
19   A.    I don't remember.
20   Q.    All right.  We are going to
21 mark that as Exhibit 2 to your deposition.
22         (WHEREUPON, a document was
23 marked as Defendant's Exhibit 2 and is

Page 42

1  attached to the original transcript.)
2    Q.    Go ahead and mark this one,
3  also.
4         (WHEREUPON, a document was
5  marked as Defendant's Exhibit 3 and is
6  attached to the original transcript.)
7    Q.    I will ask, does that refresh
8  your recollection, what has been marked as
9  Defendant's Exhibit 3?
10   A.    Huh-uh (Shaking head).
11   Q.    Have you had a chance to look
12 over what has been marked as Exhibit 3?
13   A.    Yes.
14   Q.    Is that your signature on it?
15   A.    Yes.
16   Q.    Is that your handwriting where
17 your name is printed under your signature?
18   A.    Yes.
19   Q.    Does that look like your
20 handwriting on the rest of the document?
21   A.    Yes.
22   Q.    So does this refresh your
23 memory as to whether or not you received

Page 43

1  any training on a harassment policy at the
2  company?
3    A.    I -- this is my handwriting.
4    Q.    Okay.
5    A.    But I still don't remember
6  it.
7    Q.    You just don't remember it?
8    A.    I don't remember it.
9    Q.    Okay.  Well, in that case, you
10 may not remember this one either, but I'm
11 going to show it to you, and we will see.
12         (WHEREUPON, a document was
13 marked as Defendant's Exhibit 4 and is
14 attached to the original transcript.)
15   Q.    Now, this is several different
16 items -- it may not be several.  It is a
17 one-page document entitled I Understand.
18 Then there are three pages clipped
19 together behind it, and then there is a
20 booklet in this together clipped on the
21 back of it.
22         If you will, just take a
23 minute to look through all of that for me.

Page 44

1         (Pause)
2    A.    Okay.
3    Q.    Have you had a chance to look
4  over what we have marked as Exhibit 4 to
5  your deposition?
6    A.    Yes.
7    Q.    Do you recognize those
8  documents?
9    A.    Yes.
10   Q.    All right.  Do you recall
11 where you first say these documents?
12   A.    I remember the meeting now.  I
13 remember the meeting now.
14   Q.    Do you remember a group
15 training session?
16   A.    Yes.
17   Q.    Do you remember who else was
18 in the room with you?
19   A.    They were hourly employees.
20 And I believe the lady was brought from
21 Albany, New York.  I believe she was.  I
22 believe it was a lady.
23   Q.    Dana Champagne, does that

**American Court Reporting**
**toll-free (877) 320-1050**

Page 45

1  sound right?
2      A.   I just remember a lady.
3      Q.   So somebody that you
4  understood was from Albany's corporate
5  office came down and gave you a training
6  class?
7      A.   Yes.
8      Q.   Okay.  The first page of
9  that -- the document that is entitled, "I
10  Understand" -- is that your signature on
11  that page?
12      A.   Yes.
13      Q.   And do you recall, during this
14  training session, receiving all of those
15  materials that are clipped to the "I
16  Understand" page with your signature?
17      A.   I remember the meeting.
18      Q.   Okay.
19      A.   I don't remember receiving
20  these, but I have seen these documents.
21      Q.   And they are listed on that
22  page with your signature on it, correct?
23      A.   Yes.

Page 46

1      Q.   I have marked that one as
2  Exhibit 5.
3          (WHEREUPON, a document was
4  marked as Defendant's Exhibit 5 and is
5  attached to the original transcript.)
6      Q.   And just to make it easy for
7  you, I will represent to you that these
8  are sign-in logs for everybody who went
9  through the same type of training that you
10  did.  You can look through all of them if
11  you would like.  I think what looks like
12  your signature is on the fourth page.
13      A.   Okay.
14      Q.   Is that your signature at
15  number two on that page?
16      A.   Yes.
17      Q.   Okay.  Prior to this meeting,
18  had you ever met Dana Champagne?
19      A.   No.
20      Q.   Have you ever spoken with her
21  since then?
22      A.   No.
23      Q.   During the remainder of your

Page 47

1  employment with Albany, which would have
2  been during -- two years and nine or ten
3  months after this training -- did you ever
4  make any effort to contact Ms. Champagne
5  to complain about any issues in the
6  Montgomery plant?
7      A.   No.
8      Q.   After this training session,
9  did you ever contact Mr. Bryant to
10  complain about any act that you thought
11  was somehow discriminatory because of
12  race?
13      A.   I filed grievances, but I just
14  don't remember what I put on the
15  grievance.  I have no records of it.
16      Q.   So you filed grievances.  Do
17  you remember what you filed the grievances
18  concerning?
19      A.   I filed grievance on one
20  disciplinary action, one where a statement
21  was made by a department -- a department
22  manager about women as opposed to men.
23  And I don't know.  I can't remember.

Page 48

1      Q.   Other than -- now, these
2  grievances -- is there a grievance
3  procedure under the collective bargaining
4  agreement?
5      A.   Yes.
6      Q.   So how do you file a
7  grievance?
8      A.   You have a shop steward.  You
9  have a -- people who represent you in the
10  department.  So you go to that person, and
11  you get the paperwork and you write out
12  your grievance.
13      Q.   Okay.  And then does the Union
14  submit the grievance to the company?
15      A.   Yes.
16      Q.   What happens then?
17      A.   Then you wait for something
18  like a hearing.
19      Q.   A formal hearing, or do you
20  have a --
21      A.   A formal hearing like -- would
22  be me, the shop steward, Ted Bryant,
23  possibly Jeff Johnston.  Plant manager,

**American Court Reporting**
**toll-free (877) 320-1050**

Page 49

1   department manager, to that effect.
2       Q.   Who was your shop steward in
3   the steaming department?
4       A.   I had several.
5       Q.   Okay.  Let me see if I can do
6   it this way.  At the time of the grievance
7   over the disciplinary action, do you
8   recall who your shop steward was?
9       A.   I believe it was -- one was --
10  I remember Dot Collins.  The second -- I
11  don't remember who the second one was.
12      Q.   Okay.  Who was the department
13  manager that made some comments about
14  women versus -- male versus female
15  employees?
16      A.   It was Bob Hampsey.
17      Q.   What did Mr. Hampsey say?
18      A.   I don't remember, but I know
19  it was a grievance.  I know we wrote the
20  grievance out.  We went through the
21  grievance procedures.
22      Q.   How far in the grievance
23  procedure did you go?

Page 50

1       A.   We went to, I guess, the
2   arbitrary -- arbitrator -- where the --
3   the Union rep had to come down.  We went
4   to that.
5       Q.   You had a formal arbitration?
6       A.   Well, he was the person who
7   was like -- what -- we always say the man
8   from Birmingham.  When he had to come down
9   from Birmingham.
10      Q.   He works in the Union office
11  in Birmingham?
12      A.   In Birmingham, yes.
13      Q.   Okay.  Was that third step?
14      A.   It might have been.
15      Q.   Let me ask it this way.  Were
16  there any lawyers involved?
17      A.   No, I don't think so.
18      Q.   Then it wasn't an arbitration.
19      A.   Okay.
20      Q.   All right.  And what was the
21  resolution of this grievance involving
22  Mr. Hampsey?
23      A.   I don't remember.

Page 51

1       Q.   Okay.  Who was Bob Hampsey?
2       A.   He was a department manager
3   for the seaming department.
4       Q.   Would he have been above your
5   supervisor?
6       A.   Yes.
7       Q.   Okay.  And during what time
8   period was Mr. Hampsey department manager
9   for seaming?
10      A.   This was an occasion where it
11  was a male -- a male operator and we had
12  female operators.  So they brought this
13  male back -- well, he bidded for the
14  department, and they just made him -- I
15  don't even know what the position was.
16  But they just -- a position that women had
17  bidded for.  They didn't allow us, they
18  just placed him.
19      Q.   Well --
20      A.   He was working straight days,
21  and we had to rotate, stuff like that.  It
22  was somewhat to that effect.
23      Q.   Do you remember who the male

Page 52

1   operator was?
2       A.   It was Willie Reynolds.
3       Q.   Willie Reynolds?
4       A.   Yes.
5       Q.   Do you know what year this
6   occurred?
7       A.   I don't remember.
8       Q.   Is Mr. Reynolds white or
9   black?
10      A.   Black.
11      Q.   At the time, who was your
12  supervisor above you but below
13  Mr. Hampsey?
14      A.   I believe it was Nat Jones.
15      Q.   Did you ever hear Mr. Hampsey
16  make any racially inappropriate remark at
17  Albany?
18      A.   No.
19      Q.   Ever hear Mr. Hampsey tell any
20  racial jokes?
21      A.   No.
22      Q.   Do you believe Mr. Hampsey
23  ever took any action against you because

**American Court Reporting**
**toll-free (877) 320-1050**

Page 53

1   of your race?
2        A.    No.
3        Q.    Did you know how Willie
4   Reynolds got this particular job in the
5   seaming department?
6        A.    It was a bidding job, and the
7   reason I can remember it so -- because he
8   told me personally that George Kazalay --
9   that he was going to get that job.
10       Q.    Mr. Reynolds told you that
11  Mr. George Kazalay told him he was going
12  to get the job?
13       A.    Get the job.  Out of the other
14  bidders, he got the job.
15       Q.    Do you know who else bid for
16  the job?
17       A.    I believe Norma Heath was one
18  of the persons.
19       Q.    How do you know that Ms. Heath
20  bid on it?
21       A.    Because she made -- mentioned
22  it.
23       Q.    Ms. Heath told you that she

Page 54

1   bid on the job?
2        A.    Yes.
3        Q.    Did you bid on the job?
4        A.    No.
5        Q.    Did anyone besides
6   Mr. Reynolds or Ms. Heath tell you that
7   they bid the job?
8        A.    I don't remember the people.
9        Q.    Okay.  Do you know the level
10  of seniority of Mr. Reynolds and Ms. Heath?
11       A.    Yes.
12       Q.    Okay.
13       A.    Mr. Reynolds had seniority.
14       Q.    Mr. Reynolds had more
15  seniority than Ms. Heath?
16       A.    Yes.
17       Q.    In your experience at the
18  plant, when two -- when more than one
19  employee bids on the job, did the job
20  generally go to the employee with the most
21  seniority?
22       A.    On occasions.  Some occasions.
23       Q.    Okay.  Well, what occasions

Page 55

1   were you aware of where the job did not go
2   to the most senior employee?
3        A.    When they asked for
4   experience, they would ask -- they would
5   list experiences.
6        Q.    Okay.  On this occasion do you
7   know who -- well, do you know what the
8   criteria was for this job that
9   Mr. Reynolds was awarded?
10       A.    It was working the routing
11  table, bringing in and out fabrics out of
12  the department.  And Ms. Heath had been
13  doing it for two or three years.
14       Q.    Okay.  Had Mr. Reynolds ever
15  worked in the seaming department?
16       A.    He had worked earlier.  He had
17  worked years prior to that.
18       Q.    Okay.  Do you know if
19  Mr. Reynolds met the criteria on the
20  posting for the job?
21       A.    I don't know.
22       Q.    Okay.  Did you ever file --
23  while you were at Albany, did you ever

Page 56

1   file any grievances directly related to
2   the conduct of Mr. Johnston?
3        A.    Wow.  I don't remember.  Yes,
4   I did.  Yes.
5        Q.    Do you remember when that was?
6        A.    This was once when we were in
7   a meeting.  I don't remember what the
8   meeting was about, but -- I do.  It was
9   pertaining to the nap, the M-3000, the
10  fabric -- H-500 -- I think it was HE-500.
11       It was a new project, and we
12  were getting ready to train on it.  And in
13  the meeting he discussed whatever, and he
14  asked for questions.  During this time
15  another employee asked a question,
16  Katherine Davis.  He -- he accused her of
17  trying to run the company.
18       The second time was -- I asked
19  the question -- I don't know what the
20  question was -- but during that time -- he
21  told me after the meeting to meet him in
22  the office.
23       Q.    Now, you keep referring to

**American Court Reporting**
**toll-free (877) 320-1050**

15 (Pages 57 to 60)

Page 57

1  "he." Is the "he" you are referring to --
2      A.   Jeff Johnston.
3      Q.   Mr. Johnston?
4      A.   Yes.
5      Q.   Do you remember when this
6  meeting was?
7      A.   I don't remember.
8      Q.   What job did Mr. Johnston hold
9  at the time of this meeting?
10     A.   I believe it was department
11 manager.
12     Q.   Department manager?
13     A.   I believe it was.
14     Q.   Did Mr. Johnston move from
15 supervisor to department manager in
16 seaming?
17     A.   Yes.
18     Q.   And who replaced Mr. Johnston
19 as department manager?
20     A.   I believe it was Bob Hampsey.
21     Q.   Okay. Do you know what year
22 Mr. -- what years Mr. Johnston was
23 department manager in seaming?

Page 58

1      A.   No, I don't.
2      Q.   Okay. Was it prior to your
3  injury in 2001?
4      A.   Yes. Yes.
5      Q.   Okay. Do you remember who the
6  department manager was when you got
7  injured in 2001?
8      A.   The department manager -- I
9  believe it was Bob Hampsey.
10     Q.   Okay. So this meeting with
11 Mr. Johnston you have been describing
12 where Katherine Davis was there, you were
13 there, there may have been others, was
14 sometime prior to 2001?
15     A.   Yes.
16     Q.   All right. And at any point
17 during this meeting with Mr. Johnston, did
18 Mr. Johnston make any reference to
19 anyone's race?
20     A.   No.
21     Q.   Did he make any racially
22 inappropriate remarks?
23     A.   No.

Page 59

1      Q.   Did he tell any racial jokes?
2      A.   No.
3      Q.   Do you remember what the
4  question was that Ms. Davis asked?
5      A.   No, I don't.
6      Q.   And you said the meeting was
7  related to the M-3000, which is a seaming
8  machine.
9      A.   Yes.
10     Q.   All right. And you mentioned
11 a fabric.
12     A.   Yes.
13     Q.   What was the fabric?
14     A.   It was -- I believe it was the
15 HE-500. I believe that's what we called
16 it.
17     Q.   A as in apple, T as in Tom?
18     A.   HE.
19     Q.   HE, okay.
20          Do you know what that fabric
21 was for?
22     A.   I really don't know what they
23 used it for. I know it was a Proctor and

Page 60

1  Gamble project. We seamed it for Proctor
2  and Gamble.
3      Q.   At the time was this a new
4  fabric that you were working on?
5      A.   No, because I had worked it in
6  manual. Groscey.
7      Q.   You mentioned something about
8  training was involved.
9      A.   They were transferring it from
10 the groscey onto the M-3000.
11     Q.   Okay. So you were simply
12 moving the HE-500 fabric from a manual
13 seaming machine to the automatic?
14     A.   Yes.
15     Q.   Okay. Now, after the meeting
16 I think you said that Mr. Johnston told
17 you to meet him in his office.
18     A.   Yes.
19     Q.   Okay. Did you go?
20     A.   Yes.
21     Q.   Was anybody else present for
22 this meeting?
23     A.   Yes.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 61

1    Q.   Who?
2    A.   Jerelene Forest.
3    Q.   And who is Ms. Forest?
4    A.   She was a co-worker.
5    Q.   Also an operator?
6    A.   Yes.
7    Q.   Was she a nap seamer?
8    A.   Yes.
9    Q.   Other than Jeff Johnston,
10   Jerelene Forest, and yourself, anybody
11   else present for this meeting?
12   A.   No.
13   Q.   How long did this meeting last
14   with Mr. Johnston?
15   A.   I really -- I don't know.  I
16   don't know what time.
17   Q.   What did y'all discuss in this
18   meeting?
19   A.   I really don't know how it
20   came about, but I know that he was -- he
21   told me that he was going to take me
22   upstairs and it was for disciplinary
23   actions.  So in the process -- first, he

Page 62

1    told Jerelene that she couldn't come in
2    the meeting.  He told her she couldn't be
3    there.  She wasn't a shop steward.  So --
4    when a union steward is not present, we
5    also take another member with us.  That's
6    why I asked her to go in the meeting with
7    me.
8        So after we got in the
9    meeting, he threatened to take me
10   upstairs.  So I asked him could I use the
11   telephone, and he said yes.  And I called
12   Dot Collins, which was my union steward.
13   So I told -- explained to her what was
14   going on.
15       She asked me could she speak
16   with Mr. Johnston.  And, in turn, I gave
17   him the telephone.  And I don't know what
18   was said, but he just -- he left me
19   alone.  He said it was okay for me to go
20   back on the floor to work.
21   Q.   Okay.
22   A.   So after that, Dot Collins --
23   we filed a grievance, and she asked him to

Page 63

1    write me a letter of apology, and he did
2    write it.  And during that time he had
3    promised me that I would never work on a
4    project again.  So he -- he had to just
5    write me a letter of apology.  I don't
6    remember exactly what was on the note, but
7    he did.
8        Q.   During this meeting with
9    Mr. Johnston, did that take place in his
10   office?
11       A.   It was in the seaming
12   supervisor's office.
13       Q.   In the seaming supervisor's
14   office?
15       A.   Seaming department.  Seaming
16   supervisor's office.
17       Q.   At any point during this
18   meeting did Mr. Johnston make any
19   reference to your race?
20       A.   No.
21       Q.   Did he make any racially
22   inappropriate remarks?
23       A.   No.

Page 64

1    Q.   Did he tell any racial jokes?
2    A.   No.
3    Q.   Okay.  Could you overhear what
4    Ms. Collins was saying on the telephone
5    with Mr. Johnston?
6    A.   I only heard -- when -- when
7    she hung up from Jeff, she, in turn, asked
8    for me.  He gave me the phone back.  She
9    told me -- before I -- before I gave him
10   the phone, she said, "Dora, no matter
11   what, if you have to stay here until I get
12   there, do not go upstairs with him."  She
13   said, "He is getting ready to fire you."
14   I said okay, and I gave him the
15   telephone.
16       She told me she told him that
17   you -- told him to calm down.  You go
18   around the building -- you run around ten
19   times if you have to, but leave Dora
20   alone.
21   Q.   All right.  At any point in
22   this meeting did Mr. Johnston explain to
23   you why he was saying he was going to take

**www.AmericanCourtReporting.com**
**May 12, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 65

1  you upstairs?
2      A.   No.
3      Q.   At any point in this meeting
4  did Mr. Johnston tell you that he was
5  going to terminate your employment?
6      A.   No.
7      Q.   Okay.  Now, you say the
8  conclusion of all of this was that you
9  went back to work and finished your shift?
10     A.   Yes.
11     Q.   Then a grievance was filed
12  with Dot Collins' assistance?
13     A.   Yes.
14     Q.   While you were in this meeting
15  with Mr. Johnston, were you on the clock?
16     A.   Yes.
17     Q.   So you were paid for all of
18  your work that day?
19     A.   Yes.
20     Q.   And were paid for your time in
21  this meeting?
22     A.   Yes.
23     Q.   Okay.  And the conclusion of

Page 66

1  the grievance -- did the grievance go to
2  first step?
3      A.   It went to first step, because
4  -- in other words, first step is I filed
5  it.  But that's as far as it went, because
6  he did do the apology.
7      Q.   It was a satisfactory
8  resolution to you of the grievance to
9  receive the letter of apology for
10  Mr. Johnston?
11     A.   I didn't like what went on.  I
12  didn't like it, but I accepted the
13  apology.
14     Q.   Okay.  That was the end of the
15  grievance?
16     A.   Yes.
17     Q.   Okay.  So that matter was
18  resolved under the collective bargaining
19  agreement?
20     A.   I guess you could say that.
21     Q.   All right.  At the time this
22  meeting occurred, did you -- why did you
23  believe Mr. Johnston was taking this

Page 67

1  action against you?
2      A.   I don't know.
3      Q.   At the time this meeting with
4  Mr. Johnston occurred we have just been
5  discussing, did you believe Mr. Johnston
6  was taking this action against you because
7  of your race?
8      A.   No.
9      Q.   Okay.  Is this the only
10  grievance that you filed against
11  Mr. Johnston during the time that y'all
12  worked together at Albany?
13     A.   No.  Before this time --
14  before then -- it was beginning -- it was
15  shift change, and I was getting ready to
16  leave.  So at the end of the shift, I was
17  finishing a fabric.  But he asked me to
18  stay and take that fabric down.  That was
19  one of the processes -- procedures.  And I
20  did take the fabric down.
21          When I was on my way out the
22  door, two other operators -- two other
23  white operators started saying words --

Page 68

1  having words with me.  When I responded --
2  I responded, but I left -- I clocked out
3  and I went home.  Obviously, they stayed
4  and talked to Mr. Johnston.
5          The next day, when I got to
6  work, Mr. Johnston called me in the office
7  and he told me not to jump his employees.
8      Q.   Did he say anything else to
9  you?
10     A.   He said other things, but I
11  remember that distinctly.  He didn't give
12  me the opportunity to express myself.  He
13  asked me no questions.  He didn't ask me
14  anything.  He just assumed that I was
15  guilty.  He told me not to jump his
16  employees.
17     Q.   All right.  You say this
18  occurred prior to the other grievance,
19  which was sometime before 2001.
20     A.   Yes.
21     Q.   Do you remember what year this
22  issue with the shift change occurred?
23     A.   I don't know what year.  I

**www.AmericanCourtReporting.com**
**May 12, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 69

1 don't know exactly what year. He was a
2 supervisor at this time.
3     Q.    He was the seaming supervisor?
4     A.    Yes.
5     Q.    So at the time of this
6 incident with the shift change and
7 discussion, Mr. Johnston was the seaming
8 supervisor?
9     A.    Yes.
10     Q.    Who were the two white
11 operators that were involved?
12     A.    Shirley Thornton and Dottie --
13 I don't know what it was -- Brown, I
14 believe.
15     Q.    I believe you said as you were
16 leaving -- I guess they were coming to
17 work?
18     A.    They were leaving, too, but
19 they approached me. Some -- I don't know
20 -- I don't remember. All I know is that
21 they approached me when I was getting
22 ready to clock out.
23     Q.    What did they say to you?

Page 70

1     A.    It was that -- let me see how
2 they put it. It was pertaining to the
3 take down, and -- I don't remember what it
4 was, but it was pertaining to the -- to my
5 taking the wire down.
6     Q.    What did you say to them?
7     A.    I don't even remember. I know
8 that words were exchanged, and the next
9 day I got reprimanded.
10     Q.    When you say words were
11 exchanged, pleasant conversation,
12 argument?
13     A.    No. It was unpleasant.
14     Q.    Did anybody use any profanity
15 in this exchange?
16     A.    I don't remember that.
17     Q.    Did anybody in this exchange
18 make any references to your race?
19     A.    I don't remember that.
20     Q.    Did anybody in this exchange
21 make any racially inappropriate remarks?
22     A.    I don't remember.
23     Q.    Do you know whether or not

Page 71

1 Ms. Thornton or Ms. Brown went to make a
2 report to Mr. Johnston?
3     A.    I did know that.
4     Q.    You were not present for
5 any --
6     A.    No.
7     Q.    So you do not know what
8 Ms. Thornton or Ms. Brown may have said to
9 Mr. Johnston?
10     A.    No.
11     Q.    At any point during this
12 meeting with Mr. Johnston the following
13 day, did he discipline you in any way?
14     A.    He called me in the office and
15 he told me not to jump his employees.
16     Q.    Did Mr. Johnston write you up
17 on this occasion?
18     A.    No.
19     Q.    Did you receive any type of
20 formal disciplinary action under any of
21 Albany's plant rules?
22     A.    No.
23     Q.    Did Mr. Johnston at any point

Page 72

1 during this meeting make any reference to
2 your race?
3     A.    No.
4     Q.    Did he make any racially
5 inappropriate remarks?
6     A.    No.
7     Q.    Did Mr. Johnston tell any
8 racial jokes in this meeting?
9     A.    No.
10     Q.    Do you believe that
11 Mr. Johnston made these comments to you in
12 the office because of your race?
13     A.    I can't say why he did it.
14     Q.    Did Mr. Johnston tell you why
15 he did it?
16     A.    No, he didn't.
17     Q.    Okay. Did you file a
18 grievance arising out of this situation
19 with Shirley Thornton and Dottie Brown?
20     A.    In the meeting I had
21 remembered that George Kazalay said his
22 door was always opened. It bothered me
23 that -- why wasn't I asked a question.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 77

1   was really causing me not to be able to
2   operate it. And Tim told me to go get my
3   pill bottle, he wanted to see it.
4            He looked at the pill bottle.
5   He said, "Oh, you can run to the machine."
6   I went to the phone and I called
7   Mr. Kazalay. Mr. Kazalay told me that
8   there was a chain of command, and that was
9   the end of that.
10       Q.   So what happened after you
11  called Mr. Kazalay?
12       A.   He told me there was a chain
13  of command.
14       Q.   Did you go back to work?
15       A.   Yes. I went back to -- I went
16  back to the machine. And I went to
17  another operator, which was Mamie Long,
18  and I told her to watch out for me because
19  I had had medicine and I didn't know what
20  might happen in the process.
21       Q.   Did you finish your shift?
22       A.   Yes.
23       Q.   Did anything bad happen?

Page 78

1   A.   I was -- just druggish.
2   Q.   Well, you finished your shift?
3   A.   I finished my shift.
4   Q.   Any problems with the fabric
5   that day?
6   A.   No.
7   Q.   Were you able to finish out
8   your job duties for the day?
9   A.   Yes.
10  Q.   At any point while you worked
11  with Mr. Kazalay, did you ever go to
12  Mr. Kazalay and tell him that you thought
13  you were having issues with Jeff Johnston?
14  A.   No.
15  Q.   Did you ever go to Mr. Kazalay
16  and tell him you thought anybody at the
17  plant was treating you differently because
18  of your race?
19  A.   No.
20  Q.   Okay. Do you know who your
21  immediate supervisor was when Mr. Kazalay
22  became plant manager?
23  A.   Wow. I believe it was Jewel

Page 79

1   Johnson. Jewel Johnson, I believe.
2        Q.   Was Mr. Kazalay plant manager
3   when Mr. Johnston was your seeming
4   supervisor?
5        A.   Yes.
6        Q.   Was Mr. Kazalay, for lack of a
7   better way to describe it, the big boss in
8   Montgomery for most of the -- up until
9   close to the time that you left the
10  company?
11       A.   Yes.
12       Q.   Okay.
13            MS. WILLIAMS:  Do you need a
14  break?
15            THE WITNESS:  I'm getting
16  tired. I'm really getting tired.
17            MS. WILLIAMS:  Can we take a
18  break for a few minutes? Let's take a
19  break.
20            THE WITNESS:  Just tired. I
21  feel sleepy.
22            MS. WILLIAMS:  Let's take a
23  break.

Page 80

1            THE WITNESS:  I just feel real
2   sleepy.
3            MS. WILLIAMS:  Do you want to
4   get up?
5            THE WITNESS:  Just like I'm
6   going to fall asleep.
7            MS. WILLIAMS:  Let's walk
8   around and get some water. Are you okay?
9            THE WITNESS:  Uh-huh.
10           MS. WILLIAMS:  Are you sure?
11           THE WITNESS:  Uh-huh (Nodding
12  head).
13           10:35 AM
14           (Short recess)
15           10:53 AM
16       Q.   (BY MR. POWELL) Are you ready?
17       A.   Yes.
18       Q.   Okay. When we took a break,
19  we were talking a little bit about George
20  Kazalay. At any point during your
21  employment at Albany with Mr. Kazalay, do
22  you believe Mr. Kazalay took any action
23  against you because of your race?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 73

1  Why wasn't I asked what happened, you
2  know. I was -- somebody was accusing me.
3       So I asked -- I asked Nat
4  Jones. He came to the department, I asked
5  him what is -- I asked him for the number
6  -- how do I get in touch with George
7  Kazalay. He gave me the number.
8       When I dialed Mr. Kazalay, I
9  got -- I don't know his -- he know it was
10 John. He don't live there -- he had left
11 the company, and he was the production
12 manager at the time. So he didn't come
13 down right then. It took about two
14 weeks.
15      So finally he came and he
16 tried talking to me on the floor, but the
17 machines are noisy, I asked him -- "Let's
18 step in the cafeteria." We stepped in the
19 cafeteria and I explained to him what
20 happened. And he told me that he was
21 going to make Jeff apologize to me.
22      So one day Jeff came on the
23 floor, and he apologized to me.

Page 74

1       Q.   Okay.
2       A.   That was it.
3       Q.   All right. Now, you say --
4  who is George Kazalay?
5       A.   He was the plant manager at
6  the time.
7       Q.   Okay. And how long was
8  Mr. Kazalay the plant manager?
9       A.   I don't know.
10      Q.   Was Mr. Kazalay still the
11 plant manager at the time you left the
12 company?
13      A.   No.
14      Q.   Do you know how long -- how
15 far in advance of that -- the end of your
16 employment that Mr. Kazalay left?
17      A.   Approximately less than six
18 months.
19      Q.   Now, you say you went and
20 asked Nat Jones for Mr. Kazalay's
21 telephone number.
22      A.   Yes.
23      Q.   The phone number you were

Page 75

1  given rang to somebody else's office?
2       A.   Yes.
3       Q.   Did you leave a message on
4  that answering machine?
5       A.   Yes, I left a message.
6       Q.   For Mr. Kazalay?
7       A.   Yes.
8       Q.   Did you go back and tell
9  Mr. Jones he had given you the wrong phone
10 number?
11      A.   No, because -- I believe I
12 received -- anyway, I left a message. But
13 later on John called back for me in the
14 department. I explained to him what went
15 on. And then he came to the department
16 and we sat -- well, I told him that I was
17 the one who called. I was calling
18 Mr. Kazalay. He took the place of
19 Mr. Kazalay. He was the one that came to
20 the seaming department to talk to me.
21      Q.   Did you speak with Mr. Kazalay
22 directly?
23      A.   No. I never spoke to

Page 76

1  Mr. Kazalay.
2       Q.   I thought you told me a minute
3  ago that Mr. Kazalay said that he was
4  going to make Mr. Johnston apologize.
5       A.   John -- John did. I can't
6  remember his name -- his last name.
7       Q.   John told you that Mr. Kazalay
8  said --
9       A.   No. John told me that he was
10 going to have -- make Jeff apologize to
11 me.
12      Q.   At any point during your
13 employment, did you ever go directly to
14 George Kazalay to report any concerns at
15 work?
16      A.   I called Mr. Kazalay on the
17 phone, because I was under -- I had -- I
18 was taking medicine, and I was on the
19 machine running it. I was very light
20 headed and sleepy.
21      And I told Tim Woodward that I
22 believe the medicine -- I didn't need to
23 be on the machine, because the medicine

**www.AmericanCourtReporting.com**
**May 12, 2006**

21 (Pages 81 to 84)

Page 81

1    A.    No.
2    Q.    Did you ever make any
3  complaints directly to Mr. Kazalay about
4  Jeff Johnston?
5    A.    No.
6    Q.    You said at some point
7  Mr. Kazalay -- you had heard Mr. Kazalay
8  say that his door was always open.
9    A.    (Nods head)
10    Q.    Correct?
11    A.    Yes.
12    Q.    Do you recall when you heard
13  him say that?
14    A.    This was when he first came to
15  work for Albany in Montgomery.
16    Q.    Did he get there in 1989?
17  Does that sound about right?
18    A.    Did he get there in 1999?
19    Q.    '89.
20    A.    '89.  Possibly.
21    Q.    Okay.  But he was there for a
22  long time?
23    A.    Yes.

Page 82

1    Q.    And at the time Mr. Kazalay
2  first came to Montgomery, you heard him
3  say that his door was always open?
4    A.    Yes.
5    Q.    All right.  At any point
6  during the time that you worked with
7  Mr. Kazalay, did you ever go to
8  Mr. Kazalay to complain that you thought
9  you had been treated differently because
10  of your race?
11    A.    No.
12    Q.    Did you ever go tell
13  Mr. Kazalay you thought you were being
14  harassed in any fashion by anybody at the
15  company?
16    A.    Well, when I called his office
17  and he told me there was a chain of
18  command, that's what I wanted to do was
19  complain then.
20    Q.    That was related to you being
21  on some medication and --
22    A.    Yes.
23    Q.    Okay.  Where was Mr. Kazalay's

Page 83

1  office in the plant?
2    A.    I really don't know.  It was
3  up front upstairs, but I don't know.
4    Q.    Okay.  Now, when you say up
5  front --
6    A.    It --
7    Q.    -- is there an office area in
8  the front of the plant?
9    A.    Yes.
10    Q.    And from the seaming
11  department, can you see the area of the
12  plant where the business offices are?
13    A.    No.
14    Q.    Okay.  How far, just walk
15  wise, to get from where your work area was
16  up to the office area?
17    A.    I don't know.
18    Q.    Okay.  Did you ever try to
19  just go to Mr. Kazalay's office to report
20  any concerns about work?
21    A.    No.
22    Q.    Okay.  You mentioned an
23  individual named John, and you couldn't

Page 84

1  remember his last name.
2    A.    Last name, right.
3    Q.    And do you recall what John's
4  position was in the Montgomery plant?
5    A.    I believe he was the
6  production manager.
7    Q.    Do you believe that John ever
8  took any action against you because of
9  your race?
10    A.    No.
11    Q.    Do you believe that John ever
12  engaged in any harassing behavior towards
13  you?
14    A.    No.
15    Q.    Ever hear John make any
16  racially inappropriate remarks?
17    A.    No.
18    Q.    Ever hear John tell any racial
19  jokes?
20    A.    No.
21    Q.    Ever make any effort to
22  complain to John about any employee in the
23  Albany plant?

22 (Pages 85 to 88)

Page 85

1    A.   Once.  Jeff Johnston.
2    Q.   That was the time when you
3  thought you were getting Mr. Kazalay's
4  number from Nat Jones, but you got into
5  John's voicemail?
6    A.   Yes.
7    Q.   Then John came and met with
8  you?
9    A.   Yes.
10   Q.   And said that he would have
11 Jeff Johnston apologize to you?
12   A.   Yes.
13   Q.   All right.  Now, when you met
14 with John, did you indicate to him that
15 you thought your race in any way had
16 played a part in the events that led you
17 to make that phone call?
18   A.   I indicated that -- you know,
19 why would Jeff not question me and allow
20 the two white women to do that.
21   Q.   Did you tell John in this
22 meeting that you thought that the reason
23 Mr. Johnston didn't allow you to ask

Page 86

1  questions was because of your race?
2    A.   I didn't say he didn't allow
3  me to ask questions.  I wondered why Jeff
4  didn't ask me what happened or questioned
5  me as to what happened in that incident.
6  Just to assume that I was guilty, and just
7  ask me not to jump the employees -- his
8  employees.
9    Q.   Did you tell John in this
10 meeting that you thought Mr. Johnston had
11 taken that action because of your race?
12   A.   No, I didn't.
13   Q.   Did you believe Mr. Johnston
14 had taken that action because of your
15 race?
16   A.   At the time, I did.
17   Q.   All right.  Other than talking
18 to John, you didn't file a grievance under
19 the collective bargaining agreement over
20 that issue?
21   A.   No.
22   Q.   All right.  Did you make any
23 effort to complain to Mr. Bryant about

Page 87

1  that incident with Mr. Johnston?
2    A.   No.
3    Q.   Okay.  Make any effort to go
4  to George Kazalay?
5    A.   I did, but I got John in the
6  place.
7    Q.   All right.  Other than the
8  grievance related to the HE-500 fabric and
9  then this incident involving Shirley
10 Thornton and Dottie Brown, any other
11 complaints of any sort that you tried to
12 make concerning Mr. Johnston during your
13 employment with Albany?
14   A.   I don't remember.
15   Q.   Okay.  Now, given that you
16 filed a lawsuit, do you believe
17 Mr. Johnston ever took any action against
18 you because of your race?
19   A.   Yes.
20   Q.   What did he do?
21   A.   In these incidents he would
22 always chastise me.
23   Q.   What incidents?

Page 88

1    A.   Incidents in the meeting
2  room.  One morning I went to -- one
3  morning I was out of town and Tim Woodward
4  decided that I had -- insubordination.  I
5  got a -- I think I got a certified
6  letter.  I got a phone call saying that I
7  was to meet in his office.
8    Q.   Whose office?
9    A.   Jeff Johnston -- it wasn't his
10 office.  It was the supervisor's office.
11 And -- the next morning.  And the next
12 morning, when I tried to explain myself,
13 he just told me that I was given three
14 days off.
15   Q.   When did this three-day
16 suspension occur?
17   A.   I don't remember.
18   Q.   Do you remember what
19 Mr. Johnston's job was at the time?
20   A.   Department manager.  I believe
21 it was department manager.
22   Q.   Who sent you a certified
23 letter?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 89

1    A.    Albany International,
2  Montgomery plant.
3    Q.    What did it say?
4    A.    It -- wait.  I don't remember
5  exactly what it said.  But it was telling
6  me that because of disciplinary action, I
7  would have to be -- take three days off.
8  I would have to be off three days.
9    Q.    What were you disciplined for?
10    A.    I was getting off -- I was
11  fixing to get off.  I was on my way out
12  the door.  Tim Woodward, who was the
13  supervisor, he just ran up to me and he
14  said, "Dora, sign this ticket."  I said,
15  "Okay, Tim, I have already signed the
16  ticket."  He said, "Put on the ticket no
17  holes, no damage."  I said, "Tim, I can't
18  do that.  I can't say there is no holes
19  and no damage in that fabric."  He said,
20  "But I need you to sign the ticket."  I
21  said, "Tim, I can't sign the ticket,
22  because I can't say there is no holes and
23  no damage on that fabric."

Page 90

1        And I didn't sign the ticket,
2  and that was insubordination.  So that's
3  what I was told, it was insubordination,
4  and I was reprimanded for that.
5    Q.    So you were reprimanded for
6  not signing a ticket that Tim Woodward
7  asked you to sign?
8    A.    Yes.
9    Q.    During your conversation with
10  Mr. Woodward about this ticket, did he
11  make any reference to your race?
12    A.    No.
13    Q.    Did he tell you that he was
14  asking you to sign it because you are
15  black?
16    A.    No.
17    Q.    Do you know who made the
18  decision to discipline you for
19  insubordination?
20    A.    Jeff Johnston.
21    Q.    How do you know that?
22    A.    Because he was the one who I
23  had to go to and see.

Page 91

1    Q.    All right.  During your
2  meeting with Mr. Johnston, did he make any
3  reference to your race?
4    A.    No, he didn't.
5    Q.    Did he tell you that you were
6  being disciplined for insubordination
7  because of your race?
8    A.    No, he didn't.
9    Q.    Did you ask him if you were
10  being disciplined for insubordination
11  because of your race?
12    A.    No.
13    Q.    Did you believe that you were
14  being disciplined because of your race?
15    A.    Yes.
16    Q.    Did you make any effort to go
17  see Mr. Bryant after you were disciplined
18  and complain to him that you thought you
19  were being treated differently because of
20  your race?
21    A.    No.
22    Q.    Did you make any effort to go
23  complain to Mr. Kazalay about this

Page 92

1  discipline?
2    A.    No.
3    Q.    Did you file a grievance?
4    A.    No -- oh, yes.  A grievance
5  was filed about that insubordination.
6    Q.    And what was the outcome of
7  the grievance?
8    A.    You know, I don't remember
9  that either.
10    Q.    Do you remember who your union
11  representative was for the grievance?
12    A.    I think it was Dot Collins.
13    Q.    Do you remember how many steps
14  in the grievance process you went through?
15    A.    I don't remember.
16    Q.    Do you remember what year this
17  occurred?
18    A.    No.
19    Q.    Was it in the 1990s?
20    A.    It was in the 2000s.  Probably
21  2000.
22    Q.    You think it was around 2000?
23    A.    Yes.

**www.AmericanCourtReporting.com**
**May 12, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 93

1    Q.    And following the three-day
2    suspension, did you return to your job in
3    the seaming department?
4    A.    Yes.
5    Q.    Do you know of anyone else in
6    the Montgomery plant who has ever been
7    disciplined for insubordination?
8    A.    No.
9    Q.    Now, we got on that topic
10   because I asked you what it is you believe
11   Mr. Johnston had done towards you because
12   of your race.  You told me about this
13   three-day suspension involving
14   Mr. Woodward, and then you mentioned that
15   he would chastise you.  But I want to make
16   sure that I get from you a complete list
17   of everything that you claim Mr. Johnston
18   did to you because of your race.
19        So we have got the three-day
20   suspension.  Just give me a list of
21   anything else that you claim Mr. Johnston
22   did to you because of your race.
23   A.    He didn't allow me to -- he

Page 94

1    didn't allow me to, you know, just -- just
2    partake in like projects.  During the time
3    that we was in this meeting and we had a
4    magazine -- the girl was reading a
5    magazine -- she was white -- Dottie.
6         And as soon as I touched the
7    magazine, he told me, "You can't read a
8    magazine in my meeting."  But I wasn't
9    reading a magazine.
10   Q.    Anything else?
11   A.    I don't remember anything
12   else.  Not right now, anyway.
13   Q.    Well, did you keep a list
14   anywhere of actions by Mr. Johnston that
15   you believe occurred because of your race?
16   A.    No, I didn't.
17   Q.    Did you keep a diary while you
18   worked with Albany?
19   A.    No, I didn't.
20   Q.    Okay.  As you sit here today
21   you have been able to identify a three-day
22   suspension, Mr. Johnston did not allow you
23   to partake in some projects, and he told

Page 95

1    you that you can't read a magazine in his
2    meetings as the events where you allege
3    Mr. Johnston treated you differently
4    because of your race.
5    A.    Yes.
6    Q.    Are there any other actions by
7    Mr. Johnston during your employment with
8    Albany that you believe were motivated by
9    your race?
10   A.    I don't remember.
11   Q.    Is there anything that I can
12   do to refresh your memory so I can get a
13   complete list from you today?
14   A.    I don't know.
15   Q.    We have talked about the
16   three-day suspension.  What projects did
17   he not allow you to participate in?
18   A.    I used to be a lead, and they
19   just stopped -- I wasn't allowed to be a
20   lead anymore.  Assistant lead.  Maybe I
21   should say assistant lead.
22   Q.    When were you an assistant
23   lead?

Page 96

1    A.    I don't remember.
2    Q.    Were you an assistant lead in
3    the seaming department?
4    A.    In the seaming department.
5    Q.    Who was your supervisor at the
6    time you were an assistant lead?
7    A.    I believe it was Tim
8    Woodward.  It started out with Nat Jones
9    and finished up with Tim Woodward, I
10   believe.
11   Q.    How did you become an
12   assistant lead in the seaming department?
13   A.    I was asked.  I don't remember
14   who I was asked by.  I was asked to
15   assist.
16   Q.    Somebody asked you to become
17   assistant lead, but you don't recall who?
18   A.    I don't remember who.
19   Q.    Okay.  How long did you serve
20   as an assistant lead in the seaming
21   department?
22   A.    I don't remember that either.
23   Q.    Why did you stop being an

25 (Pages 97 to 100)

Page 97

1  assistant lead in the seaming department?
2      A.   I was just told I couldn't be
3  a lead anymore.
4      Q.   Who told you that you could
5  not be an assistant lead in the seaming
6  department anymore?
7      A.   Tim Woodward.
8      Q.   Did Mr. Woodward tell you why
9  you were no longer going to be assistant
10 lead in the seaming department?
11     A.   No.
12     Q.   Did you ask Mr. Woodward why
13 you were no longer going to be assistant
14 lead in the seaming department?
15     A.   I asked him what happened. He
16 said, "We cut it out."
17     Q.   He told you that the company
18 cut out the assistant lead position?
19     A.   Yes.
20     Q.   Were there any other assistant
21 leads at the --
22     A.   Yes.
23     Q.   Let me finish my question.

Page 98

1          Were there any other assistant
2  leads at the same time that you were
3  assistant lead?
4      A.   Yes.
5      Q.   In the seaming department?
6      A.   Yes.
7      Q.   How many?
8      A.   I know one. One. I believe
9  one.
10     Q.   Who was that?
11     A.   Hazel Johnson.
12     Q.   At the time you stopped being
13 an assistant lead, did Ms. Johnson also
14 stop being assistant lead?
15     A.   No.
16     Q.   Was she on your shift?
17     A.   No.
18     Q.   What shift were you on at the
19 time you were an assistant lead?
20     A.   We rotated, so -- it varies.
21     Q.   Well, you were -- you worked
22 with a particular group of employees in
23 seaming, and your group rotated -- was it

Page 99

1  every three weeks?
2      A.   Yes.
3      Q.   So you would be on first shift
4  for a period of time and then you would
5  rotate either to second or to third. I'm
6  not sure which way the rotation went.
7      A.   First to midnight, midnight to
8  second.
9      Q.   You would rotate between --
10 among all three shifts?
11     A.   Yes.
12     Q.   And nobody just had day shift,
13 at least, not normally?
14     A.   Not in that department.
15     Q.   All right. And Hazel Johnson,
16 who was the other assistant lead, do you
17 know -- she was on a different group from
18 you?
19     A.   Yes.
20     Q.   All right. Now, Mr. Woodward,
21 as I understand it, told you that the
22 company cut out the assistant lead
23 position.

Page 100

1      A.   Yes.
2      Q.   But you don't remember when
3  that occurred?
4      A.   No, I don't.
5      Q.   Do you know who made the
6  decision to eliminate your job as an
7  assistant lead?
8      A.   No.
9      Q.   Do you believe your position
10 as an assistant lead was eliminated
11 because of your race?
12     A.   Because of me.
13     Q.   It was eliminated because of
14 you?
15     A.   Me, the person.
16     Q.   You don't believe that the
17 assistant lead position was eliminated
18 because you were black?
19     A.   I believe that it played a
20 role.
21     Q.   All right. How so?
22     A.   Because I have been harassed
23 throughout the department since the time

**American Court Reporting**
**toll-free (877) 320-1050**

26 (Pages 101 to 104)

Page 101

1   Jeff Johnston became my supervisor.
2       Q.   You have been harassed in the
3   seaming department?
4       A.   I was harassed from Jeff
5   Johnston ever since he has been in that
6   department.
7       Q.   What about prior to
8   Mr. Johnston; any harassment prior to
9   Mr. Johnston getting in the department?
10      A.   I had problems with Jewel.
11  Jewel harassed me, too.
12      Q.   With Jewel?
13      A.   Jewel Johnson.
14      Q.   Jewel Johnson. Other than
15  Jewel Johnson and Jeff Johnston, anybody
16  else at Albany that you believe has
17  harassed you in any way?
18      A.   As far as jeopardizing my job,
19  they are the only two.
20      Q.   I'm asking in any way ,
21  whether it jeopardized your job or not.
22      A.   We had other people that made
23  racial slurs.

Page 102

1       Q.   You are not accusing -- are
2   you accusing Mr. Johnston of making any
3   racial slurs?
4       A.   No.
5       Q.   Are you accusing Jewel Johnson
6   of making any racial slurs?
7       A.   Well, I heard her.
8       Q.   What did you hear her say?
9       A.   She told me to go to the back
10  of the line. I should have been in the
11  back of the line.
12      Q.   When did Jewel Johnson tell
13  you that you should have been in the back
14  of the line?
15      A.   That's been -- it was a long
16  time. Like when I first went to work at
17  Albany.
18      Q.   1979, 1980?
19      A.   Between 1979 and '80,
20  something like that. It was during that
21  time. But I was in the seaming
22  department.
23      Q.   All right. Other than

Page 103

1   Ms. Johnson telling you to go to the back
2   of the line somewhere in 1979, 1980, did
3   Ms. Johnson ever make any other racial
4   slurs in your presence?
5       A.   I don't remember.
6       Q.   Other than Ms. Johnson and
7   this telling you to go to the back of the
8   line, list for me every other Albany
9   employee that you allege made a racial
10  slur.
11      A.   When I first went to the
12  weaver, it was like Jimmy Dix. I heard
13  them talking about hanging Tony Harris.
14  Taking him down the road and hanging him.
15  I heard about nooks, whatever you call
16  it -- noose.
17      Q.   Who else?
18      A.   Sometimes it would be a room
19  full of them, and I would just -- when
20  they make their jokes, being a woman, I
21  would walk out. I would just leave and go
22  some place else and leave my lunch. It
23  was usually like a lunch break.

Page 104

1       Q.   I want names of the people
2   that you heard make racial slurs.
3       A.   I can't remember all of the
4   peoples, but it would be a shift. I don't
5   remember the names. But I remember Jimmy
6   Dix in particular.
7       Q.   All right. So you claim to
8   have heard Jimmy Dix say he was going to
9   take Tony Harris down the road and hang
10  him?
11      A.   Yes.
12      Q.   That happened right after you
13  moved to the weave room?
14      A.   I was working in the weaving
15  department. I don't know whether it was
16  right after I was hired or later, but I
17  was working in the weaving department.
18      Q.   As I understand it, the only
19  time that you worked in the weaving
20  department would have been as a worker bee
21  when you were first hired.
22      A.   Yes.
23      Q.   When in 1979 were you hired?

**www.AmericanCourtReporting.com**
**May 12, 2006**

Page 105

1    A.   I was hired in March the 12th,
2  1979.
3    Q.   You moved to the seaming
4  department somewhere by September or
5  October of 1980.  You told me you were --
6    A.   About a year and a half in the
7  seaming department.
8    Q.   So you would have been a
9  worker bee when you heard Jimmy Dix make
10 this comment about Tony Harris?
11   A.   Yes.
12   Q.   Was Jeff Johnston working in
13 the plant at the time?
14   A.   No.
15   Q.   Did you go report that to
16 anybody at the company?
17   A.   No.
18   Q.   Other than Jewel Johnson
19 telling you to go back to the back of the
20 line, and Jimmy Dix making this comment
21 about Tony Harris, can you name any other
22 employee of Albany International that you
23 have ever heard make a racial slur in the

Page 106

1  plant?
2    A.   I don't remember anymore.
3    Q.   Okay.  Do you have a list of
4  names anywhere?
5    A.   No.
6    Q.   All right.  Even if you can't
7  tell me who said it, are there other
8  racial slurs that you believe you have
9  heard in the plant?
10   A.   I have heard other racial
11 slurs.  I have heard other racial slurs.
12 I have heard them.
13   Q.   Tell me what you heard.
14   A.   I won't quote what I heard.  I
15 don't -- I can't quote what I have heard,
16 but I have heard racial slurs.
17   Q.   When?
18   A.   It was -- been down -- really,
19 down through the years of my employment.
20   Q.   2003, your last -- the last
21 year which you worked with the company,
22 did you hear anybody in 2003 make a racial
23 slur at Albany International?

Page 107

1    A.   I don't remember.
2    Q.   Okay.  I tell you what.
3  Exhibit 5 earlier was the training record
4  that you identified your signature.  It
5  looks like from this document that you
6  went through your training with Dana
7  Champagne on January the 10th, 2001,
8  correct?
9    A.   Yes.
10   Q.   Okay.  After this training
11 session on January the 10th, 2001, can you
12 name any Albany International employee you
13 heard make a racial slur?
14   A.   I can't name one, because I
15 don't remember.  But when I hear things, I
16 walk away.
17   Q.   All right.
18   A.   I don't -- I don't sit in the
19 midst or stay in the midst.
20   Q.   After this training session on
21 January the 10th, 2001, can you identify
22 for me any slur -- racial slur you heard
23 made in the Montgomery plant?

Page 108

1    A.   No, I can't identify it.
2    Q.   Are you alleging in this
3  lawsuit that after this training on
4  January the 10th, 2001, any racial slurs
5  were made in your presence in the
6  Montgomery plant?
7    A.   Yes.
8    Q.   By whom?
9    A.   Different people, but I don't
10 remember.  I just told you, I don't sit up
11 -- I don't sit in the midst.
12   Q.   Okay.  Did any of these racial
13 slurs that you heard in the Montgomery
14 plant have any impact on your ability to
15 do your job at Albany?
16   A.   I didn't like it, you know,
17 no.
18   Q.   You didn't like it, but none
19 of these slurs had any effect on your
20 ability to do your job?
21   A.   No.
22   Q.   All right.  Did you go to Ted
23 Bryant in Human Resources and complain

**American Court Reporting**
**toll-free (877) 320-1050**

28 (Pages 109 to 112)

Page 109

1   about any of these slurs that you heard in
2   the plant?
3       A.   No.
4       Q.   Did you go to George Kazalay
5   and report any of these slurs?
6       A.   No.
7       Q.   All right. And as you sit
8   here today, you cannot describe for me a
9   single slur that you heard between January
10  the 10th, 2001, and the end of your
11  employment with Albany in October of 2003?
12      A.   I remember racial slurs, and I
13  cannot tell you.
14      Q.   You can't tell me what they
15  were or who said them?
16      A.   What they were -- I know of a
17  couple of people, but I can't tell you
18  what they were or remember them.
19      Q.   Who were the couple of
20  people? Are you referring to Jewel
21  Johnson and Jimmy Dix?
22      A.   I remember Dottie Brown. I
23  remember Shirley Howard.

Page 110

1       Q.   Anybody else?
2       A.   No.
3       Q.   All right. What do you
4   remember about Dottie Brown?
5       A.   I don't remember exact -- I
6   just don't remember. But I remember
7   slurs -- racial slurs. I don't remember
8   what was said or how it was said.
9       Q.   Are you claiming that Dottie
10  Brown made some racial slur?
11      A.   Dottie Brown, Shirley Howard.
12      Q.   When did you hear Dottie Brown
13  make a racial slur?
14      A.   I can't remember that. I
15  don't know that. I don't remember that
16  date or that hour.
17      Q.   What --
18      A.   I don't remember that.
19      Q.   What job did you have when you
20  heard Ms. Brown make a racial slur?
21      A.   Seaming.
22      Q.   Your first time in the seaming
23  department?

Page 111

1       A.   Second time.
2       Q.   Second time. All right. And
3   did you say what Ms. Brown's job was at
4   the time?
5       A.   Seaming.
6       Q.   Do you remember who your
7   supervisor was in seaming at the time?
8       A.   I don't remember whether it
9   was Nat Jones or -- I don't know. I don't
10  remember. Nat Jones possibly.
11      Q.   All right. Did you go to
12  Mr. Bryant or anyone in Human Resources at
13  Albany to report this slur that you claim
14  you heard Ms. Brown make?
15      A.   No.
16      Q.   Why not?
17      A.   I walk away from things like
18  that.
19      Q.   Did you go to George Kazalay
20  and report what you believe you heard
21  Ms. Brown say?
22      A.   No.
23      Q.   This comment that Ms. Brown

Page 112

1   said, did it in any way impact your
2   ability to do your job at Albany?
3       A.   No.
4       Q.   Did it affect your life in any
5   way?
6       A.   It was an insult,
7   humiliating. I was humiliated.
8       Q.   Did you go see a doctor about
9   it?
10      A.   No.
11      Q.   What did Shirley Howard say?
12      A.   I don't remember.
13      Q.   When did Shirley Howard say
14  it?
15      A.   During the time we were
16  together. I don't remember that time
17  either.
18      Q.   Do you remember who your
19  supervisor was?
20      A.   Probably Nat Jones.
21      Q.   All right. You don't remember
22  what Ms. Howard said, you don't remember
23  when she said it, but you think it was

**www.AmericanCourtReporting.com**
**May 12, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

29 (Pages 113 to 116)

Page 113

1    somehow racial?
2        A.   Yes.
3        Q.   All right.  Was Ms. Howard's
4    comment before or after this training
5    meeting with Ms. Champagne?
6        A.   I don't remember.
7        Q.   Okay.  Before or after your
8    August the 19th, 1998, training session on
9    the harassment policy?
10       A.   After.
11       Q.   You think it was after 1998?
12       A.   1998 -- I don't remember the
13   dates.
14       Q.   If you don't know, don't
15   guess.  Just say, "I don't know."
16       A.   I don't know.
17       Q.   All right.  Did you make any
18   effort to contact anyone in Human
19   Resources at Albany to report what you
20   allege Ms. Howard said?
21       A.   No.
22       Q.   Did you make any effort to
23   contact George Kazalay?

Page 114

1        A.   No.
2        Q.   At any point during your
3    employment with Albany, did you make any
4    effort to report to Human Resources any
5    racial slur that you ever heard in the
6    plant?
7        A.   No.
8        Q.   All right.  Did you make any
9    effort to report any such slurs to George
10   Kazalay?
11       A.   No.
12       Q.   Okay.  Other than Jewel
13   Johnson, Jimmy Dix, Dottie Brown, and
14   Shirley Howard, can you name any other
15   Albany International employee that you
16   have some recollection of ever having
17   heard make a racial slur in the Montgomery
18   plant?
19       A.   I don't remember.
20       Q.   Okay.  Have you ever worked
21   for Albany anywhere other than Montgomery?
22       A.   No.
23       Q.   Okay.  Did you go to your shop

Page 115

1    steward about what you heard any of these
2    four individuals say?
3        A.   No.
4        Q.   All right.  I think we kind of
5    got side tracked.  We were trying to get
6    from you a list of everything that you
7    allege Jeff Johnston did to you because of
8    your race.  And we talked about a
9    three-day suspension earlier, and you
10   mentioned that he did not allow you to
11   participate in projects, he told you that
12   you couldn't read a magazine in a
13   meeting.
14           All right.  Let's talk about
15   the projects.  What specific projects did
16   Mr. Johnston not allow you to participate
17   in?
18       A.   That was the only one.  I
19   think that was the only one.
20       Q.   Which one was the only one?
21       A.   When I --
22       Q.   Being the assistant lead?
23       A.   Assistant lead.  Once I was

Page 116

1    asked to -- once I was asked to go on day
2    shift to train other employees, to work on
3    the H-500, M-3000 -- the H-500, that was
4    the fabric.  He didn't tell me this, but I
5    was told that he said, "Over his dead
6    body."
7        Q.   Well, did somebody offer you
8    the job of moving to first shift to train
9    anybody?
10       A.   Ken Thunderbird came up to me
11   and asked me to go -- if he went to George
12   Kazalay and asked George Kazalay if I
13   could go to day shift to work and train
14   the other employees to run that fabric,
15   would I.  I said if he -- if he says this
16   is okay.
17           So after that I never heard
18   anything from Ken Thunderbird.  One of the
19   employees was telling me he -- he came to
20   me and he said, "They really need you on
21   day shift so we can move" -- he was a
22   tech.  And he asked me, you know.  And he
23   told me the reason that I wasn't doing it

**www.AmericanCourtReporting.com**
**May 12, 2006**

30 (Pages 117 to 120)

Page 117

1   was because Jeff didn't want me to.
2       Q.   Who was -- is it Ken
3   Funderburk?
4       A.   Thunderbird. Thunderbird. I
5   don't know.
6       Q.   Just for ease of reference,
7   you said Ken asked you if he got George
8   Kazalay's permission, would you move to
9   first shift to train?
10      A.   Yes.
11      Q.   When did that conversation
12  occur?
13      A.   It had to be two -- between
14  2001, 2003, something like that.
15      Q.   Well, was it before or after
16  your injury in 2001?
17      A.   I don't know. But it was
18  between that time. It was in -- during
19  that time.
20      Q.   Was anybody else present for
21  this conversation with Ken where he asked
22  you about moving to first shift to train?
23      A.   Yes.

Page 118

1       Q.   Who?
2       A.   Lomack Bean.
3       Q.   And who was Mr. Bean?
4       A.   He was our technician.
5       Q.   Do you believe that Ken ever
6   took any action against you because of
7   your race?
8       A.   No.
9       Q.   Did you ever hear Ken make any
10  racial comments at work?
11      A.   No.
12      Q.   Ever hear Ken make any racial
13  slurs?
14      A.   No.
15      Q.   Now, if I understood your
16  testimony correctly, after Ken asked you
17  if you would move, that's the last you
18  heard about it from him?
19      A.   Yes.
20      Q.   Did you ever approach Ken and
21  ask him what about that training job?
22      A.   No.
23      Q.   Why not?

Page 119

1       A.   Because afterwards, Lomack and
2   I was talking, I asked Lomack -- I said,
3   "I never did hear." He said, "Well, I put
4   it" -- he said, "Tee, they ain't going to
5   give you that job. Jeff said it was over
6   his dead body."
7       Q.   When did this conversation
8   with Mr. Bean occur?
9       A.   Maybe about two weeks after
10  Mr. Thunderbird had asked him to do this?
11      Q.   Did you ever go to George
12  Kazalay and ask him about the training
13  job?
14      A.   No.
15      Q.   In this conversation with
16  Mr. Bean, where he told you that Jeff
17  Johnston made some comment about you
18  getting the training job over his dead
19  body, was anybody else present?
20      A.   No.
21      Q.   Did Mr. Bean tell you that he
22  understood Jeff Johnston was blocking you
23  from that job because of your race?

Page 120

1       A.   No, he didn't.
2       Q.   Did he give any reason why
3   Mr. Johnston would be blocking you from
4   that job?
5       A.   No.
6       Q.   Did he tell you that he had
7   heard Mr. Johnston say that?
8       A.   He didn't tell me that he
9   heard him. He just said, "Jeff said that
10  he was not going to give you the job." It
11  would be over his dead body before you get
12  this job, something to that effect.
13      Q.   All right. Were you going to
14  get paid more money to move to first shift
15  and train?
16      A.   No.
17      Q.   Was it going to change your
18  seniority in the plant in any way?
19      A.   No.
20      Q.   Okay. Do you know if anybody
21  actually got the training job?
22      A.   No.
23      Q.   So nobody ever filled the job?

Page 121

1      A.   It wasn't posted.  He came to
2   me personally, because I had worked the
3   M-3000.  And he thought I had did a good
4   job, so he asked me.
5      Q.   So there was never a posting
6   for a trainer job?
7      A.   No.
8      Q.   Okay.  So you didn't apply
9   and, to your knowledge, nobody ever got
10  that position?
11     A.   No.
12     Q.   Did you go to Mr. Johnston and
13  ask him if he was stopping you from
14  getting that job?
15     A.   No.
16     Q.   The assistant lead and the
17  training positions, are those the only
18  projects that you think Mr. Johnston
19  denied you involvement in?
20     A.   Yes.
21     Q.   When did this meeting with the
22  magazine occur?
23     A.   I don't know exactly when.

Page 122

1      Q.   Who was reading the magazine
2   in the meeting?
3      A.   Dottie Brown.
4      Q.   Dottie Brown.  What was
5   Ms. Brown's job at the time?
6      A.   Nap seamer.
7      Q.   Was she a union steward?
8      A.   No.
9      Q.   Okay.  And what was this
10  meeting?
11     A.   I don't remember.
12     Q.   And what was Mr. Johnston's
13  job at the time?
14     A.   I believe he was department
15  manager.  I believe.  I don't know.
16     Q.   Besides Mr. Johnston, Dottie
17  Brown, and yourself, who else was present
18  for this meeting?
19     A.   I remember Katherine Davis,
20  Mamie Long -- who else -- I believe Susan
21  Snead.
22     Q.   Susan who?
23     A.   Snead.  I don't remember who

Page 123

1   else was on the shift.
2      Q.   What was this meeting about?
3      A.   I don't remember.
4      Q.   Was it work related?
5      A.   Yes.
6      Q.   And what was the magazine that
7   Dottie Brown was reading?
8      A.   I don't remember that.  It was
9   just a pamphlet.
10     Q.   It was a pamphlet?
11     A.   It was something like a
12  pamphlet.  We would -- we would bring
13  magazines, pamphlets, in like, and we
14  would, you know, look at them on our break
15  or somewhat.  And she just had a pamphlet
16  reading it -- looking through the
17  pamphlet.  I said, "Let me see that."  She
18  slid it over.
19          When she slid the pamphlet
20  over, he just abruptly said, "Dora, I will
21  not have you looking at a magazine in my
22  meeting."
23     Q.   Had the meeting already

Page 124

1   started?
2      A.   Yes.
3      Q.   So Dottie Brown was looking at
4   this pamphlet during the meeting?
5      A.   Yes.
6      Q.   But you don't remember what
7   Mr. Johnston had -- had called the meeting
8   for?
9      A.   I don't remember.
10     Q.   Any other supervisors in the
11  meeting besides Mr. Johnston?
12     A.   I don't think so.
13     Q.   So your shift supervisor
14  wasn't present?
15     A.   I don't remember.
16     Q.   All right.  Anybody else in
17  this meeting reading any magazines?
18     A.   I don't remember.
19     Q.   At the time Ms. Brown started
20  reading it, had the meeting started?
21     A.   Yes.
22     Q.   Did Mr. Johnston tell you that
23  you couldn't read the meeting -- read the

**American Court Reporting**
**toll-free (877) 320-1050**

Page 125

1    magazine because of your race?
2        A.    No.
3        Q.    Did he make any references
4    during this meeting to yours or anyone
5    else's race?
6        A.    No.
7        Q.    Did Jeff Johnston make any
8    racial slurs in this meeting?
9        A.    No.
10        Q.    Did he tell any racial jokes
11    in this meeting?
12        A.    No.
13        Q.    Did you report Mr. Johnston's
14    conduct during this meeting to anyone in
15    Human Resources?
16        A.    No, I don't think so.
17        Q.    Did you make any effort to
18    report this incident to George Kazalay?
19        A.    No.
20        Q.    Did you think Mr. Johnston in
21    this meeting told you not to read the
22    magazine because of your race?
23        A.    Yes.

Page 126

1        Q.    Why do you believe that he
2    didn't want you reading the magazine
3    because of your race?
4        A.    I don't know why.
5        Q.    Did you ask Mr. Johnston if
6    that was the reason he told you not to
7    read the magazine?
8        A.    No.
9        Q.    Has anybody at Albany ever
10    told you that the reason Mr. Johnston told
11    you not to read it is because of your
12    race?
13        A.    No.
14        Q.    So why do you think that your
15    race had anything to do with this magazine
16    incident?
17        A.    Because I was sitting next to
18    a white woman.  She was reading the
19    magazine.  It was no problem.  As soon as
20    I touched it --
21        Q.    And, as best you recall, this
22    occurred when Mr. Johnston was your
23    department manager?

Page 127

1        A.    I believe he was the
2    department manager at the time.
3        Q.    All right.  Other than the
4    three-day suspension, the assistant lead,
5    the training project, and this incident
6    with the meeting, any other instances that
7    you can point me to where you think
8    somehow Mr. Johnston treated you
9    differently than other employees because
10    of your race?
11        A.    Because of my race, no.
12        Q.    Okay.  Any other action by
13    Mr. Johnston at any point while you worked
14    for the company that you believe was in
15    any way influenced by your race?
16        A.    No.
17        Q.    At any point, while you worked
18    for Albany, did you ever submit an
19    application for disability insurance
20    benefits?
21        A.    Yes.
22        Q.    When?
23        A.    I don't remember the dates,

Page 128

1    but I remember the last time.
2        Q.    When was the last time?
3        A.    It was approximately --
4    probably 2002, 2003.  2002 -- 2001, 2002.
5        Q.    All right.  And to whom did
6    the application get sent?
7        A.    Well, what you do is -- I'm
8    going to explain to you what happens in
9    situations like that.
10        Q.    All right.  That would be
11    great.
12        A.    Because when you go to a
13    doctor and your doctor takes you off the
14    job, you get the paperwork from -- her
15    name was Linda Jones.  I don't remember
16    what her position was.  And then you take
17    these papers to your doctor and your
18    doctor fills this paperwork out and you
19    bring them back to the company.
20        Q.    Then what happens?
21        A.    And that's it.  And if you are
22    off past, I think, the third day, then
23    that's when your benefits will kick in.

**www.AmericanCourtReporting.com**
**May 12, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 129

1    Other than that, you have to be off at
2    least three days before you could be paid
3    for your time off.
4         Q.    All right.  Did Ms. Jones ever
5    refuse to give you any paperwork, if you
6    asked for it, for disability insurance?
7         A.    No.
8         Q.    In '01, '02, I think you said
9    that you got the paperwork from Linda to
10   take to your doctor.
11        A.    Yes.
12        Q.    Okay.  Your doctor fills out
13   some part of the form?
14        A.    Yes.
15        Q.    Were you responsible for
16   filling out part of it?
17        A.    Yes.
18        Q.    And did Linda Jones or
19   somebody else at the company fill out
20   another part of it?
21        A.    I believe so.
22        Q.    That application, to your
23   knowledge, did it get sent to an insurance

Page 130

1    company?
2         A.    Yes.
3         Q.    Do you know what insurance
4    company?
5         A.    I don't remember.
6         Q.    Does Prudential sound right?
7         A.    Yes.  Prudential.  Prudential.
8         Q.    Did anybody at Prudential ever
9    contact you concerning any application by
10   you for disability insurance benefits?
11        A.    No.
12        Q.    Do you know what your doctors
13   said on the application for disability
14   insurance benefits?
15        A.    No.
16        Q.    Do you know if your doctor
17   indicated on the form that your injury was
18   work related?
19        A.    The time that he did, yes, he
20   did indicate it was work related.
21        Q.    Were you receiving Workers'
22   Compensation benefits for that injury?
23        A.    No.  I had to go to my private

Page 131

1    doctor.
2         Q.    Is that the injury that was
3    later determined to be Workers'
4    Compensation and was treated as a Workers'
5    Comp injury?
6         A.    No.  There was once I was --
7    what was -- I was being treated -- I was
8    going to the Work Comp doctors.  They gave
9    me an injection in my shoulder, and I went
10   to work and I passed out, because I was
11   allergic to steroid.  They gave me
12   steroids in his office.
13        And, in turn -- I think this
14   is the same time, I'm not for sure -- the
15   paramedics came and I was taken to my
16   doctor's office.  But I believe that this
17   is the -- this is the time -- I can't --
18   it is so many occasions till I don't
19   remember.
20        Q.    Okay.  Take a look at that for
21   me.  I will put a sticker on it.
22        (WHEREUPON, a document was
23   marked as Defendant's Exhibit 6 and is

Page 132

1    attached to the original transcript.)
2         Q.    Just take a minute and read
3    over that for me.
4         (Pause)
5         Q.    Have you had a chance to look
6    over what we have marked as Exhibit 6?
7         A.    Yes.
8         Q.    Do you recognize it?
9         A.    Yes.
10        Q.    Who is Jeffrey Mathis?
11        A.    That was my doctor.
12        Q.    Mr. Mathis was your private
13   doctor?
14        A.    Primary care.
15        Q.    Okay.  And when you have
16   referred a couple of times to your private
17   doctor earlier in your deposition, is
18   Mr. Mathis who you are referring to?
19        A.    Yes.
20        Q.    All right.  Now, it looks like
21   this application was filled out by
22   probably three different people.  Just so
23   the -- I can be clear, I'm just going to

**American Court Reporting**
**toll-free (877) 320-1050**

Page 133

1    go through page by page.
2         Is that your handwriting on
3    the first page?
4         A.    No.
5         Q.    All right.  Do you recognize
6    the handwriting?
7         A.    It's not my writing.  No.  No.
8         Q.    The second page looks like it
9    has the signature on it of Linda Jones.
10        A.    Okay.
11        Q.    Based on your experience with
12    the application process you have
13    described, are these -- the first couple
14    of pages, would Ms. Jones have filled
15    these out?
16        A.    Yes.
17        Q.    Let's look at page three.  Is
18    this your handwriting?
19        A.    Yes.
20        Q.    Okay.  And on the fourth page,
21    where your signature is at the bottom, is
22    that also your handwriting?
23        A.    Yes.

Page 134

1         Q.    Okay.  On the fifth page there
2    are two signatures on here; both yours?
3         A.    Yes.
4         Q.    All right.  And turn over to
5    the last -- I guess the next page also
6    looks like it has your signature in the
7    middle of the page.
8         A.    Yes.
9         Q.    Is that your handwriting on
10    that page?
11        A.    Yes.
12        Q.    At least on the -- I'm looking
13    at -- there is a stamped number in the
14    bottom right corner of two-o-seven, is the
15    page number.  It looks like this
16    (Indicating).  That page right there.
17        A.    Okay.
18        Q.    Is that your handwriting on
19    the top in those blocks?
20        A.    Yes.
21        Q.    Is that your signature?
22        A.    Yes.
23        Q.    Now, the bottom half of this

Page 135

1    page that we are looking at right now
2    looks like it says, "To be completed by
3    attending physician."
4         A.    Yes.
5         Q.    That would have been
6    Dr. Mathis?
7         A.    Yes.
8         Q.    Is any of the handwriting on
9    the bottom of that page or the next page
10    yours?
11        A.    No.
12        Q.    Look at the last page of what
13    we have marked as Exhibit 6.  Do you
14    recognize Dr. Mathis' signature?
15        A.    Yes.
16        Q.    Now, in the middle of the --
17    up towards the top there is a reference
18    that says, "Work-related illness or
19    injury."  Do you see that space?
20        A.    Yes.
21        Q.    And, to your knowledge, did
22    Dr. Mathis complete this on your behalf?
23        A.    Yes.

Page 136

1         Q.    All right.  And he indicated
2    that this was a work-related injury?
3         A.    Yes.
4         Q.    All right.  For workplace
5    injuries, do you know what the disability
6    policy said?  Were you eligible for
7    disability insurance if it was a
8    work-related injury?
9         A.    I don't understand.
10        Q.    Okay.  Do you know who made
11    the decision about whether you were
12    eligible for benefits under the disability
13    policy?
14        A.    No.
15        Q.    So you don't know who actually
16    decided whether you would or would not be
17    paid benefits under this policy?
18        A.    No.
19        Q.    All right.  When you signed up
20    for disability insurance with the company,
21    did you get any kind of booklet describing
22    the short-term and long-term disability
23    program of the company?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 137

1    A.    I'm sure I did.
2    Q.    All right. Did you keep a
3 copy of it?
4    A.    I don't have it now.
5    Q.    Okay. And during the course
6 of your employment with the company, did
7 you get any updates to the disability
8 policy?
9    A.    Yes.
10    Q.    Okay. That is going to be 7
11 when I mark it.
12        (WHEREUPON, a document was
13 marked as Defendant's Exhibit 7 and is
14 attached to the original transcript.)
15        (Pause)
16    Q.    Does that look familiar to
17 you, what we have marked as Exhibit 7?
18    A.    No.
19    Q.    Okay. Now, at the time of
20 this document -- do you recall submitting
21 this application for disability benefits,
22 that is Exhibit 6, to Prudential?
23    A.    To Linda Jones.

Page 138

1    Q.    Your doctor didn't send this
2 to Prudential?
3    A.    I don't know.
4    Q.    Is it your understanding that
5 this document was actually sent to
6 Prudential on your behalf?
7    A.    Yes.
8    Q.    All right. And if I have
9 asked you this already, I'm sorry. Do you
10 recall receiving any communication from
11 anybody at Prudential concerning your
12 application for disability insurance?
13    A.    After I had been off and
14 received the -- they -- Jeff Johnston, Ted
15 Bryant, Donna Smith -- I think that's her
16 name -- Bob Hampsey, they called me up
17 into the conference room, and I listened
18 to a Tim Golden on a telephone. And he
19 told me that they paid me, but they would
20 consider this job related. That's the
21 only thing I heard of it.
22    Q.    Who is Tim Golden?
23    A.    I'm -- I assume he had

Page 139

1 something to do with Prudential, the
2 insurance company.
3    Q.    But you don't know who Tim
4 Golden was?
5    A.    No, I don't know him.
6    Q.    Mr. Golden told you that you
7 were paid what?
8    A.    The -- well, when I was off
9 during that time, I received benefits.
10    Q.    From?
11    A.    From Prudential.
12    Q.    For short-term disability?
13    A.    For that short-term
14 disability.
15    Q.    Did you ever submit an
16 application to Prudential for long-term
17 disability coverage through your Albany
18 plan?
19    A.    No.
20    Q.    So you never applied for LTD
21 benefits?
22    A.    No.
23    Q.    And were you -- you received

Page 140

1 short-term disability payments?
2    A.    For that, yes.
3    Q.    Okay. Any other applications
4 for short-term disability benefits while
5 you worked for the company?
6    A.    Yes.
7    Q.    Before or after this one?
8    A.    It was before.
9    Q.    Before this one?
10    A.    Yes.
11    Q.    Did you receive short-term
12 disability benefits then?
13    A.    Yes.
14    Q.    Okay. Have you ever been
15 denied short-term disability benefits when
16 you applied for them while you were at
17 Albany?
18    A.    The only time you didn't
19 receive benefits is when you didn't have
20 three or more days of short-term -- I mean
21 short-term disability.
22    Q.    All right. Is there any
23 occasion where you were out for more than

**www.AmericanCourtReporting.com**
**May 12, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 141

1  three days that you applied for but were
2  denied short-term disability payments?
3      A.  No.
4      Q.  Okay.  As a member of the
5  bargaining unit at Albany, were there
6  retirement benefits negotiated in the
7  contract?
8      A.  I believe so.
9      Q.  Okay.  Do you recall what they
10  were?
11      A.  No.
12      Q.  All right.  Has anybody at the
13  company denied you your retirement
14  benefits in any way?
15      A.  Retirement benefits?
16      Q.  Yes, ma'am.
17      A.  No.
18      Q.  Okay.  Do you know what the
19  eligibility criteria were for retirement
20  benefits at Albany?
21      A.  I don't know exactly.  I know
22  you have to be fifty-five plus amount of
23  service -- years of service -- I mean

Page 142

1  service years.
2      Q.  Right.
3      A.  I don't know exactly how it --
4  how it worked.
5      Q.  All right.  Do you believe
6  anybody at the company has done anything
7  to interfere with your ability to get your
8  retirement benefits from Albany?
9      A.  Yes.
10      Q.  What did they do?
11      A.  I was terminated.
12      Q.  Okay.  When were you
13  terminated?
14      A.  October the 29th.
15      Q.  Of 2003?
16      A.  Well, let me restate.  I
17  believe it was -- I was terminated August
18  the 21st, because that's when I stopped
19  being able to come in the plant -- being
20  able to work.  Was told not to come in or
21  when to come in and not to come in.
22      Q.  Okay.  So you believe that you
23  were discharged August the 21st, 2003?

Page 143

1      A.  Yes.
2      Q.  And why do you believe that
3  you were discharged.
4      A.  Because I was told that I
5  couldn't come in the plant to work.
6      Q.  I understand that is what you
7  say that you were told.  Why do you
8  believe that you were discharged?
9      A.  Because I couldn't come to
10  work.
11      Q.  Do you believe you were
12  discharged by Albany because you are
13  black?
14      A.  No.
15      Q.  Do you believe that you were
16  discharged by Albany because of some
17  retirement benefits issue?
18      A.  I don't know why I was
19  discharged.
20      Q.  Who do you believe discharged
21  you from the company on August the 21st,
22  2003?
23      A.  Jeff Johnston.

Page 144

1      Q.  Did Mr. Johnston call you and
2  tell you you were terminated?
3      A.  No, he didn't.
4      Q.  Did anybody at Albany tell you
5  that you were terminated on August the
6  21st, 2003?
7      A.  No.
8      Q.  Why do you believe
9  Mr. Johnston terminated you on August the
10  21st, 2003?
11      A.  Because he was in control of
12  the activities that went on at the
13  company.
14      Q.  Did you participate in any
15  meetings where Mr. Johnston announced that
16  he had decided that you would be
17  discharged on August the 21st, 2003?
18      A.  No.
19      Q.  Well, why do you -- why do you
20  believe Mr. Johnston terminated you on
21  August the 21st, 2003?
22      A.  Mr. Johnston asked me on
23  several occasions was I -- could I

**www.AmericanCourtReporting.com**
**May 12, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 145

1    guaranty him whether I could come to work
2    and wouldn't be in pain. And after that,
3    I was not allowed in the building, because
4    I can't -- I couldn't guaranty him that I
5    couldn't be in pain.
6        Q.    Well, when did Mr. Johnston
7    ask you -- the dates, please -- of when
8    Mr. Johnston asked you whether you could
9    guaranty him that you could work without
10   pain?
11       A.    I don't have the dates, but it
12   was on about three different occasions.
13       Q.    What year?
14       A.    2003.
15       Q.    All right. And were you under
16   the care of any treating physicians at the
17   time?
18       A.    Yes.
19       Q.    And who would those doctors
20   have been?
21       A.    Dr. Katz, Dr. Wade. They were
22   Workers' Comp doctors. I went to so many.
23       Q.    Do you know if Dr. Katz ever

Page 146

1    told the company his medical opinion about
2    your ability to do your job?
3        A.    I don't know what Dr. Katz
4    told the company.
5        Q.    Do you know if Dr. Wade ever
6    told the company he thought you were
7    physically able to do your job?
8        A.    I don't know.
9        Q.    Do you know why Mr. Johnston
10   asked you if you could do -- if you could
11   guaranty him that you could do the job
12   without pain?
13       A.    Because I had complained --
14   constantly complained of being in pain.
15       Q.    Because of your Workers'
16   Compensation injuries?
17       A.    Yes.
18       Q.    For which you were receiving
19   medical treatment?
20       A.    I was going to doctors.
21       Q.    Approved Workers' Compensation
22   doctors?
23       A.    Yes.

Page 147

1        Q.    All right. And they were
2    treating you?
3        A.    I was going to the doctor.
4        Q.    Did any doctor ever recommend
5    treatment to you that you declined?
6        A.    No. I have never declined
7    treatment.
8        Q.    So you never had a doctor
9    recommend a treatment procedure to you
10   that you turned down for any reason?
11       A.    I was allergic to pain pills.
12   I also have become allergic to
13   inflammation. So if they wrote me a
14   prescription, or whatever, for the
15   inflammation pill, I would receive them,
16   but they would upset my stomach and they
17   would cause me to start the acid
18   regurgitation. So I could not take the
19   pill. I couldn't take the medication.
20       Q.    On August the 21st, 2003, when
21   you say that you were discharged from
22   Albany, were you able to do all of your
23   job functions at Albany?

Page 148

1        A.    Not without pain.
2        Q.    I didn't ask if you were going
3    to be uncomfortable when you did it. Were
4    you physically able to do the job on
5    August the 21st, 2003?
6        A.    Not without pain.
7        Q.    Well, I mean, my knees hurt
8    every day, but I go to work. Could you
9    have performed your job duties as a seamer
10   on August the 21st, 2003?
11       A.    With medical help and -- I
12   could not do it in pain. I had worked
13   since 1991 in pain. I have been working
14   since 1991 in pain. I was reinjured four
15   or five times after that. And I could not
16   guaranty anyone that I could not work in
17   pain. And, as a matter of fact, the
18   doctors told me that I would be working in
19   pain for the rest of my life.
20       Q.    Okay. Who at Albany told you
21   that you were discharged?
22       A.    I don't even remember.
23       Q.    Did anybody at Albany ever

**American Court Reporting**
**toll-free (877) 320-1050**

Page 149

1  tell you that you were terminated?
2      A.   They told me that I couldn't
3  come to the building.  I couldn't come in,
4  I couldn't work.
5      Q.   And you were told that on
6  August the 21st, 2003?
7      A.   The 21st I was given -- phone
8  call, came in -- I was called in on
9  occasional meetings, and I was told, "I
10  can't allow you in this plant."  I was --
11  come in one day and my card was pulled.  I
12  came in one day -- I was supposed to come
13  in one night, Jeff Johnston and -- I can't
14  think of his name, but he was the
15  department head -- they were at the door
16  waiting to send me home.
17      Q.   When was that?
18      A.   This was during the time
19  when -- the three-day suspension.
20      Q.   You were -- when you were
21  suspended for three days, did you try to
22  come anyway?
23      A.   I came to work.  I didn't know

Page 150

1  I was suspended.
2      Q.   When you came to work, you
3  were notified that you were suspended?
4      A.   I was called to the office.
5      Q.   August the 21st, 2003 --
6  strike that.  I will start over again.
7           Is it your contention in this
8  lawsuit that you were terminated by Albany
9  International on August the 21st, 2003?
10      A.   Yes.
11      Q.   All right.  By Jeff Johnston?
12      A.   Jeff Johnston was the decision
13  maker, yes.
14      Q.   How do you know Mr. Johnston
15  was the decision maker?
16      A.   Because he was the plant
17  manager.
18      Q.   Okay.  And who communicated
19  the decision to you on August the 21st,
20  2003?
21      A.   Ted Bryant.
22      Q.   Ted Bryant.  Now, I thought
23  you told me earlier, though, after August

Page 151

1  the 21st, 2003, that you still came in and
2  did some work for the company.
3      A.   They would call me and -- like
4  I said, they would allow me -- this was
5  the day that I was taken off my job.
6  But from August the 21st till October the
7  29th, periodically, I would come in --
8  they would call me in -- told me I could
9  come in.  Then when I had a doctor's
10  appointment or I complained, I was sent
11  home or I was called at home and I was
12  told not to come in.
13      Q.   When you had a doctor's
14  appointment?
15      A.   I don't know.  But it was
16  still out -- throughout 2001, 2002, and
17  the rest of 2003.
18      Q.   Well, if you were terminated
19  on August the 21st, 2003, why do you think
20  anybody would let you come back to work?
21      A.   Because they were trying to
22  get me to get a doctor to say that I was
23  medically disabled.  They didn't want to

Page 152

1  admit that they were -- I was -- there
2  were injuries that was causing me the
3  pain.
4      Q.   Who didn't want to admit that?
5      A.   Jeff Johnston, Ted Bryant -- I
6  can't think of the other person's name
7  that was the department manager.
8      Q.   Would that have been Bob
9  Hampsey?
10      A.   Bob Hampsey.
11      Q.   Any of them -- did
12  Mr. Johnston ever tell you that he didn't
13  want to admit that you were in pain?
14      A.   He wanted me to admit that I
15  wasn't in pain.
16      Q.   That wasn't my question.  My
17  question is:  Did Mr. Johnston ever tell
18  you that, you know, he would not admit
19  that you were in pain?
20      A.   No, he didn't.
21      Q.   All right.  Did Ted Bryant
22  ever tell you that he didn't think that
23  you were in pain?

39 (Pages 153 to 156)

Page 153

1    A.    No.
2    Q.    Did Bob Hampsey ever tell you
3  that he didn't think you were in pain?
4    A.    No.
5    Q.    And throughout this time
6  period, August the 21st of 2003, through
7  the end of October, 2003, you were being
8  treated by both Dr. Katz and Dr. Wade as
9  Workers' Compensation doctors?
10    A.    It was probably some more, but
11  I just can't remember their name.
12    Q.    But you were going to Workers'
13  Compensation doctors related to injuries
14  that you had suffered --
15    A.    Injuries?
16    Q.    -- injuries you had suffered
17  at Albany International?
18    A.    Yes.
19    Q.    The company was paying those
20  -- for those doctors' visits?
21    A.    Yes.
22    Q.    I guess I'm still confused.
23  I'm trying to determine why you believe

Page 154

1  that you were fired.
2    A.    Because I was. Anytime you
3  are dismissed or taken off of a job, what
4  do you call that?
5    Q.    Well, I'm trying to determine
6  why you believe -- what you believe
7  motivated your release from the company.
8    A.    I have just said it. I was
9  injured. I had neck pain, wrist pain,
10  back pain, knee pain, shoulder pain. I
11  was constantly having problems to try to
12  sit at the machine, to stand, to walk. I
13  had my hand in two wrist braces. I would
14  have to take my hand out of the brace to
15  do some of the work. I was told not to
16  take it out. The company had no light
17  duty.
18    Q.    Did you go to talk to your
19  union representatives about this at any
20  point in this time frame?
21    A.    Yes.
22    Q.    Who did you talk to?
23    A.    I talked to Norma.

Page 155

1    Q.    Heath?
2    A.    Heath. I talked to -- he
3  worked in the -- Danny Roland.
4    Q.    Norma Heath was a shop
5  steward?
6    A.    Yes.
7    Q.    Was Danny Roland a shop
8  steward?
9    A.    Yes.
10    Q.    Was Norma Heath the shop
11  steward for the seaming department?
12    A.    Seaming department.
13    Q.    Danny Roland, was he in the
14  weaving department?
15    A.    No. He was -- he was on the
16  dock, but I can't remember what they
17  called that area. Finishing.
18    Q.    Finishing?
19    A.    No, it wasn't finish. It was
20  on the shipping. I believe shipping.
21    Q.    Tell me about your
22  conversations with Ms. Heath as your
23  department's union steward.

Page 156

1    A.    I asked her -- I would ask
2  her, you know, "What is it that the Union
3  can do about this," that I was being
4  railroaded out of my job. And she told me
5  that the Union couldn't do anything. It
6  was nothing -- the Union didn't take
7  anything to do with Workmen's
8  Compensation.
9    Q.    Is it your contention in this
10  case that the company was trying to force
11  you out of your job because of Workers'
12  Compensation injuries?
13    A.    Yes.
14    Q.    Is that the only reason that
15  you believe that the company was trying to
16  force you out of your job?
17    A.    I don't know.
18    Q.    Well, in this lawsuit do you
19  allege that there is any reason, other
20  than your Workers' Compensation injuries,
21  that is the basis for the company's
22  efforts to push you out?
23    A.    I know that injuries was the

40  (Pages 157 to 160)

Page 157

1    reason that I was in pain.
2         Q.    Did Mr. Johnston ever hit you
3    at work?
4         A.    No.
5         Q.    Did he ever touch you
6    inappropriately in any way?
7         A.    No.
8         Q.    Did he ever touch you?
9         A.    The job that we did, sometimes
10   you had to brush past or touch or lean if
11   you are checking on a fabric.  If he want
12   to check to see what the seam is doing,
13   how the machine is running.  The way we
14   worked, he might have.  I don't know.  But
15   I don't remember, because it is so many
16   touches.
17        Q.    But other than in the context
18   of working around the machine, is there
19   any other instance where Mr. Johnston ever
20   touched you at work?
21        A.    No.
22        Q.    Has Mr. Johnston ever
23   threatened you at work in any way?

Page 158

1         A.    He threatened to fire me.
2         Q.    I mean, did he ever threaten
3    you physically in any way?
4         A.    No.
5         Q.    Did he ever do anything to
6    make you afraid that he was going to hurt
7    you physically in some fashion?
8         A.    No.
9         Q.    Okay.  Between August the 21st
10   and October, 2003, any estimate of how
11   many days you might have worked?
12        A.    I don't know.
13        Q.    Okay.  Now, do you recall
14   having a meeting October the 29th, 2003,
15   at the Montgomery facility?
16        A.    Yes.
17        Q.    Who was present for this
18   meeting?
19        A.    Ted Bryant, Jeff Johnston, Bob
20   Hampsey, Norma Heath, and myself.
21        Q.    And how long did this meeting
22   last?
23        A.    I don't remember.

Page 159

1         Q.    Were you at work that day?
2         A.    No.
3         Q.    Who contacted you about the
4    meeting?
5         A.    I believe Ted Bryant.
6         Q.    And did he tell you what the
7    purpose of the meeting was?
8         A.    I don't know.  I don't know.
9         Q.    You don't recall him saying
10   one way or the other what the purpose of
11   the meeting was?
12        A.    I know that he called me and I
13   went to the meeting.
14        Q.    Okay.  Now, right before this
15   meeting do you recall if you had been to
16   see Jeff Wade in Birmingham?
17        A.    Yes, I had been to see Jeff
18   Wade.  I had been to see Dr. Wade.  I
19   didn't know his name.
20        Q.    He is an orthopedic doctor at
21   Brookwood Hospital.
22        A.    I think I went to a hospital
23   to his office.

Page 160

1         Q.    You went to his office?
2         A.    Yes.
3         Q.    Dr. Wade is an orthopedist
4    based in Birmingham?
5         A.    Yes.
6         Q.    All right.  And you had gone
7    to see Dr. Wade in connection with one of
8    your work place injuries?
9         A.    Yes.
10        Q.    Do you know if Dr. Wade had --
11   in advance of this meeting on October the
12   29th had communicated his conclusions
13   about you to the company?
14        A.    No.
15        Q.    During this meeting on the
16   29th did -- was there any discussion about
17   your doctor's conclusions about your
18   physical condition?
19        A.    I was told that I was sent
20   back to work.
21        Q.    Who told you that your doctors
22   had released you to work?
23        A.    I think it was Ted Bryant.