# Plaintiff's 5/12/06 deposition, with exhibits
## *Part 2*

**American Court Reporting**
**toll-free (877) 320-1050**

41 (Pages 161 to 164)

Page 161

1    Q.    Now, in advance of this
2    meeting on October the 29th, 2003, do you
3    know if -- were you on inactive status
4    with the company?
5        A.    I was taken off of the job.
6    What status they called it, I don't know.
7        Q.    During this time period
8    between August and October, were you
9    accruing attendance occurrences?
10       A.    I don't know.  No -- I don't
11   know.  I don't know.
12       Q.    You don't know.  Okay.
13           During this meeting on October
14   the 29th Ted Bryant tells you that your
15   doctors released you to return to your job
16   in the seaming department?
17       A.    Yes.
18       Q.    What else is said?
19       A.    I don't remember.  But it was
20   a lot said.
21       Q.    Okay.  At any point during
22   this meeting of October the 29th, 2003,
23   does anybody make any reference to your

Page 162

1    race?
2        A.    My race?
3        Q.    To your race.
4        A.    No.
5        Q.    Did anybody tell any racial
6    jokes?
7        A.    No.
8        Q.    Anybody make any racial slurs?
9        A.    No.
10       Q.    Anybody make any reference to
11   your retirement benefits with the company?
12       A.    I don't believe so.
13       Q.    As best you recall, other than
14   Mr. Bryant telling you that your doctors
15   had released you -- your Workers' Comp
16   doctors had released you to return to
17   work, tell me everything else that was
18   said in this meeting.
19       A.    Jeff Johnston told me that he
20   was giving me the opportunity to go to my
21   doctor so they could take me off the job.
22   And I told him that my -- what was going
23   on was injuries, not job related.  My

Page 163

1    medical doctors didn't see any reason to
2    take me off.
3            He insisted that I find a
4    doctor to take me off the job.  And I
5    asked him did he have one.  But before it
6    was over, he threatened to call the police
7    on me.
8        Q.    Did anybody call the police on
9    you in this meeting?
10       A.    No.
11       Q.    Did anybody in this meeting
12   tell you that, you know, the company was
13   kind of in a difficult spot because you
14   were telling them you were in pain and
15   your doctors were telling them that you
16   could do the job?
17       A.    I don't remember.
18       Q.    You understand that Dr. Wade
19   and Dr. Katz said that you could go back
20   to work and do your full job as a seamer.
21   You understand that, don't you?
22       A.    Yes.
23       Q.    And were you not -- even

Page 164

1    though your doctors said that you could do
2    the job during this meeting on the 29th,
3    you told Mr. Johnston and Mr. Bryant that
4    you were in pain, weren't you?
5        A.    I told them that I was in pain
6    and it was excruciating.  I told them that
7    I was going to the doctors, and their
8    doctors was not doing anything for me.  I
9    told them that I was getting passed
10   through the doctor's office and that no
11   matter what, they wasn't doing anything
12   for me.  They was just -- I was just
13   visiting the office, and that was it.
14   They wasn't doing anything about the pain.
15       Q.    Is it your contention that
16   Dr. Wade didn't really treat you when you
17   went to see him as an orthopedist?
18       A.    He -- I -- no, he didn't treat
19   me.  He just examined me.  He didn't treat
20   me, he just examined me.
21       Q.    What about Dr. Katz?
22       A.    Dr. Katz -- reluctantly, I
23   knew I was allergic to steroids, because

**www.AmericanCourtReporting.com**
**May 12, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 165

1  they had -- they had me -- I had had them
2  before. They caused me to have heart
3  problems. So the pain was so
4  excruciating -- he kept saying, "All I can
5  do for you is injections." Each time I
6  had an injection -- which on three
7  different occasions I had to stop my
8  medication; aspirins and my blood pressure
9  medicine. Each time he injected me I had
10  an anxiety attack or my heart would
11  flirt. I even passed out.
12      Q.  Are you talking about
13  Dr. Katz?
14      A.  Dr. Katz. I told him that I
15  was allergic to the steroids. He says,
16  "Well, I'm going to give you something to
17  cope with the steroids." In turn he gave
18  me Valium, and the Valium was causing me
19  to run red lights, to just sit up at a
20  light -- three or four lights and the
21  lights turning and changing, people
22  tooting their horns.
23          So during that point, I

Page 166

1  decided I wasn't going to drive, because I
2  didn't want to kill anybody, and I didn't
3  want to be killed. So that's what
4  happened with Dr. Katz.
5          And then after that he never
6  -- the only thing he would tell me, "I
7  could treat you with injections." He knew
8  I was allergic to injections.
9      Q.  Now, you selected Dr. Wade
10  from a Workers' Comp panel of four, didn't
11  you?
12      A.  Yes.
13      Q.  So the company gave you four
14  names?
15      A.  Yes.
16      Q.  And you picked Dr. Wade from
17  the list?
18      A.  Yes.
19      Q.  Okay. When you had this
20  meeting with the company on October the
21  29th, 2003, did you tell Mr. Johnston and
22  Mr. Bryant and Bob Hampsey and Norma Heath
23  that you had already applied for Social

Page 167

1  Security disability benefits?
2      A.  Yes.
3      Q.  You told them that during this
4  meeting?
5      A.  Yes.
6      Q.  During this meeting you had a
7  discussion with them about whether you
8  were going to apply for long-term
9  disability benefits with the company.
10  What did you tell them about that?
11      A.  I didn't know my rights.
12      Q.  You didn't tell them that you
13  had applied for Social Security?
14      A.  I had applied for Social
15  Security. Not with the company, but with
16  the State.
17      Q.  All right. And you have
18  since, in fact, been declared disabled by
19  Social Security, right?
20      A.  Yes.
21      Q.  And they declared you disabled
22  all the way back to August the 21st, 2003?
23      A.  Yes.

Page 168

1      Q.  Okay. So if I understand this
2  determination correctly -- we are going to
3  mark this as Exhibit 8.
4          (WHEREUPON, a document was
5  marked as Defendant's Exhibit 8 and is
6  attached to the original transcript.)
7      Q.  Just take a minute and read
8  over what is marked as Exhibit 8.
9      A.  Okay.
10      Q.  Have you had a chance to look
11  over this Notice of Decision-Fully
12  Favorable that we have marked as Exhibit
13  8?
14      A.  Yes.
15      Q.  Did somebody help you file
16  this?
17      A.  Yes.
18      Q.  Who?
19      A.  My daughter.
20      Q.  Okay. At any point in this
21  process -- during your disability
22  application process -- did you provide
23  them with a list of all of your Workers'

43 (Pages 169 to 172)

Page 169

1  Comp doctors?
2      A.   Yes.
3      Q.   Okay.  Now, the doctors who
4  are referenced in here, Dr. Darryl
5  Hamilton, your treating cardiologist,
6  Dr. Steven Allen, your treating
7  physician -- it looks like you saw these
8  doctors after you left Albany
9  International.
10     A.   Yes.
11     Q.   Did you receive any treatment
12  from Dr. Hamilton during your employment
13  with Albany International?
14     A.   Yes.
15     Q.   For what?
16     A.   Mitral value prolapse.
17     Q.   How long have you had that?
18     A.   Since about '97.
19     Q.   Okay.  What about Steven
20  Allen?
21     A.   I was seeing -- I only saw him
22  one time.
23     Q.   After you left Albany?

Page 170

1      A.   Yes.
2      Q.   All right.
3      A.   I think once.
4      Q.   Okay.  This is your daughter
5  who helped you with the application?
6      A.   Yes.
7      Q.   What is her name?
8      A.   DeMonica Jones.  I'm sorry, we
9  just are -- Ritchison.  DeMonica
10  Ritchison.
11     Q.   Did she get married?
12     A.   Yes.
13     Q.   Congratulations.  It's been
14  awhile.
15     A.   I forgot.
16     Q.   Based on this, it looks like
17  you have been completely unable to work
18  since August the 21st, 2003.
19     A.   I can explain that.
20     Q.   Please do.
21     A.   Because that's when I filed,
22  because that's when the company took me
23  off the job.  I was not receiving money.

Page 171

1  I wasn't earning money.  That was the time
2  that the company told me I couldn't come
3  to work.  When they asked me when was I
4  disabled, I wrote August the 21st.
5      Q.   I assume, Ms. Davis, that some
6  of these either treating doctors, or
7  medical experts that look like they
8  testified on your behalf, somehow
9  identified August the 21st as -- August
10  21st, 2003, as a date after which you were
11  incapable of performing any work.
12     A.   Uh-huh (Nodding head).  The
13  first time I was turned down.  After that
14  I was diagnosed with congestive heart
15  failure, and I was diagnosed with -- after
16  I was turned down, I was diagnosed with
17  congestive heart failure, and I was turned
18  down with the depression.  Severe
19  depression.
20     Q.   You were turned down for what?
21     A.   Disability on my first -- when
22  I first went -- applied.  First six
23  months.

Page 172

1      Q.   When you first applied for
2  disability, what reason did you list as
3  the disability?
4      A.   I listed the fibromyalgia,
5  bulging disks, chronic neck pain, back
6  pain.  I listed my wrists, but they are
7  not on here.
8      Q.   And you say Social Security
9  initially denied your request for
10  benefits?
11     A.   They denied my request.
12     Q.   Did you appeal it or file a
13  new application?
14     A.   I appealed.
15     Q.   Appealed.  And is that when
16  all of this -- it looks like you had a
17  hearing of some sort and the doctors
18  testified.
19     A.   That was July the 22nd of
20  2005.
21     Q.   Had you already been diagnosed
22  with congestive heart failure when you
23  were initially denied Social Security?  If

**American Court Reporting**
**toll-free (877) 320-1050**

Page 173

1  you don't know just -- that's fine.
2      A.  No.
3      Q.  So you were --
4      A.  It was after.
5      Q.  So during the time period that
6  you were appealing your Social Security is
7  when --
8      A.  I developed --
9      Q.  -- Dr. Hamilton diagnosed you
10  -- yeah.  Dr. Hamilton diagnosed you with
11  congestive heart failure?
12      A.  Yes.
13      Q.  Did the Social Security folks
14  conclude in any way that you suffered some
15  mental impairment?
16      A.  The only thing I see is severe
17  depression.  That's what I see on here.  I
18  did see their -- I guess their
19  psychiatrist.
20      Q.  Are you undergoing any type of
21  psychiatric treatment?
22      A.  Not right now.
23      Q.  Okay.  Have you undergone

Page 174

1  psychiatric treatment?
2      A.  Yes.
3      Q.  When?
4      A.  It was 2004.
5      Q.  Where?
6      A.  Montgomery Area Mental Health,
7  I believe.
8      Q.  How many times did you go?
9      A.  I don't remember that.  I
10  don't know exactly.
11      Q.  Why did you go?
12      A.  Depression.
13      Q.  Has anybody diagnosed the
14  cause of your depression?
15      A.  I don't know.  I don't know,
16  because I was never told.
17      Q.  All right.  Did you seek
18  mental health counseling in any way
19  because of your interactions with
20  Mr. Johnston?
21      A.  Yes.
22      Q.  In what way?
23      A.  Because I was -- I was

Page 175

1  constantly humiliated, I was harassed out
2  of my job, I felt robbed.
3      Q.  Okay.  Anything else?
4      A.  I worked for that company
5  twenty-four and a half years.  I gave it
6  my all.  I made millions for that company,
7  and to be just robbed of my job.
8      Q.  You realize there is something
9  that just appears inconsistent with being
10  declared completely disabled to work and
11  an assertion that somehow the company
12  robbed you of a job that apparently you
13  and your medical experts have -- you know,
14  it's been concluded that you couldn't do.
15      A.  I don't know how they -- I
16  don't know what -- I know that they --
17  right here she said they determined it
18  this way.  When I listed fibromyalgia,
19  when I listed chronic back pain, neck
20  pain, wrists, when I listed -- let's see
21  what else -- I was denied.  Not until I
22  was diagnosed with congestive heart
23  failure, severe depression, and

Page 176

1  "cardiomanopathy."  After then, that's
2  when I was determined disabled.
3      Q.  The depression diagnosis, was
4  that before or after you started having
5  marital problems with your most recent
6  husband?
7      A.  What are you talking about?
8      Q.  You are currently married.
9      A.  I'm not anymore.
10      Q.  Okay.  When did you get
11  divorced?
12      A.  April -- April the 4th, 2006.
13      Q.  When did you file for divorce?
14      A.  I didn't file.  He filed.
15      Q.  He filed.  Now, at the time
16  you were receiving treatment from the
17  Montgomery Area Mental Health Authority
18  you were having marital problems with your
19  former husband, weren't you?  He was then
20  your husband.  You were already having
21  problems, weren't you?
22      A.  No, I wasn't having problems,
23  because he was the one taking me to and

**www.AmericanCourtReporting.com**
**May 12, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

45 (Pages 177 to 180)

Page 177

1  from the doctors and taking care of me
2  during that time.
3      Q.    All right.  Now, your
4  congestive heart failure, did any of your
5  doctors tell you what the cause of that
6  was?
7      A.    I have never been told that
8  either.
9      Q.    Have you ever asked any of
10  your treating doctors what caused your
11  congestive heart failure?
12      A.    No, I didn't.
13      Q.    Have any of your doctors ever
14  told you that Mr. Johnston caused your
15  congestive heart failure?
16      A.    No.
17      Q.    Any of your doctors ever told
18  you anything about your employment with
19  Albany International caused your
20  congestive heart failure?
21      A.    No.
22      Q.    You originally applied for
23  disability benefits on October the 13th,

Page 178

1  2003, correct?
2      A.    Yes.
3      Q.    Now, at the time you applied,
4  did you tell Social Security that you were
5  completely unable to work?
6      A.    No.  I told them that my
7  company had -- I called them, I explained
8  what was going on on my job.  I told them
9  I was not earning anything.  They was
10  taking me off my job, they didn't allow me
11  to work.
12      Q.    Did you tell Social Security
13  that you had been fired on August the
14  21st, 2003?
15      A.    I told them that I wasn't
16  working.  The last time I was on my job it
17  was August, 2000 -- 21st, 2003.  They
18  asked me the last time I worked, that's
19  what I told them.
20      Q.    So at the time you originally
21  applied for Social Security disability
22  benefits, they asked you when you last
23  worked?

Page 179

1      A.    That's what they asked.
2      Q.    You reported to them that it
3  was August the 21st?
4      A.    21st.
5      Q.    2003?
6      A.    Yes.
7      Q.    All right.  You didn't tell
8  them that you had worked any shifts
9  between August the 21st and October the
10  13th?
11      A.    I told them that this was --
12  that -- the last consistently working, and
13  I told them that I was going to and from.
14  And I told them that this is what was --
15  in other words, I was going to and from
16  the job off and on.  Just called in -- I
17  explained to them what was going on and my
18  situation.
19      Q.    Okay.  Now, during this
20  meeting on October the 29th, 2003, did
21  anybody give you any documents during that
22  meeting?
23      A.    I remember signing a piece of

Page 180

1  paper, but I don't know whether it was a
2  document or not.  It was a note written
3  and a letter threatening me that I would
4  be fired.
5      Q.    A letter threatening you --
6      A.    A letter telling me that I
7  would be terminated -- it was the
8  attendance policy.  Something pertaining
9  to the attendance policy.
10      Q.    I tell you what.
11      MS. WILLIAMS:  Can we take a
12  short break?
13      MR. POWELL:  Off the record
14  for a second.
15          12:30 PM
16          (Short recess)
17          1:40 PM
18      Q.    (BY MR. POWELL) Are you ready?
19      A.    Yes.
20      Q.    All right.  Shortly before we
21  broke for lunch, you indicated that you
22  had been somehow constantly humiliated at
23  work.

**www.AmericanCourtReporting.com**
**May 12, 2006**

46 (Pages 181 to 184)

Page 181

1   A.   Yes.
2   Q.   By whom?
3   A.   Jeff Johnston.  I was
4   humiliated by Ted Bryant, Bob Hampsey,
5   supervisors, Barbara Smith and Nat Jones.
6   Q.   When you said you were
7   constantly humiliated by supervisors, are
8   you referring to Barbara Smith and Nat
9   Jones?
10  A.   Well, Nat Jones and Barbara
11  Smith, them two.
12  Q.   Okay.  So were you humiliated
13  by anybody other than Jeff Johnston, Ted
14  Bryant, Bob Hampsey, Barbara Smith, and
15  Nat Jones?
16  A.   As far as when I was coming
17  into the end of my leave, not being
18  there.  I was placed on wire assignments
19  which was difficult.  I was asked to do
20  things that they know was causing pain or
21  further injuries.  I was constantly
22  reminded of what -- how do you put it --
23  what I could or couldn't do.  Whenever

Page 182

1   they put -- like I would be working, they
2   would ask me to help other employees,
3   which I would be in pain, and this person
4   be standing up laughing, holding a
5   conversation.
6        Some occasions where -- when I
7   came back from injury, I was placed on a
8   machine where other people were given
9   light duty or a desk -- something to do at
10  a desk or paperwork.  A whole bunch of
11  things.
12  Q.   All right.  So when you said
13  earlier that you were constantly
14  humiliated, are these the types of things
15  that you were referring to?
16  A.   Yes.
17  Q.   Okay.  And if I understood you
18  correctly, the humiliation was caused by
19  Jeff Johnston, Ted Bryant, Bob Hampsey,
20  Barbara Smith, and Nat Jones?
21  A.   Yes.
22  Q.   Let's take them one at a
23  time.  What did Mr. Johnston do that you

Page 183

1   believe resulted in constant humiliation?
2   A.   They were in authority.
3   Q.   Just Mr. Johnston
4   specifically.
5   A.   He was in authority.  He
6   allowed work -- he knew that I had an
7   injury.  No one did anything to make my
8   job easier or to help me through or to
9   make me be able to just perform my job.  I
10  was sent to work as if though I never
11  received -- I didn't have an injury.
12       I was placed on difficult
13  fabrics.  I asked off the M-3000.  I was
14  never taken off.  I was told that I had to
15  work, I couldn't come off.  I know of
16  people that they took off of the M-3000
17  when they complained of the pain and
18  difficulties or when they were told that
19  this fabric is too difficult or I'm having
20  problems here.  If I asked off, I never
21  could -- I would always have to work that
22  fabric.
23  Q.   What exactly did Jeff Johnston

Page 184

1   do that you claim resulted in constant
2   humiliation?
3   A.   If -- he did nothing about
4   it.  He did nothing about it.  He allowed
5   these things to take place.
6   Q.   So, if I understand you
7   correctly, other people were humiliating
8   you, and Mr. Johnston didn't do anything
9   to stop it?
10  A.   No.  It wasn't other people.
11  Under these conditions -- under these
12  working conditions, I was being
13  humiliated, because nothing was done
14  about -- okay, you have a rotator tear --
15  you have a rotator tear, but you have got
16  to go work this machine.  I'm constantly
17  using this arm, pulling wires down, tieing
18  knots, pushing machines, crawling on the
19  floor, moving stands, lifting weights.
20  I'm doing everything that people that was
21  not injured do -- was doing.
22       I was helping people do things
23  that they know -- like starting up a

**American Court Reporting**
**toll-free (877) 320-1050**

Page 185

1   seam. I start up a seam I'm going,
2   "Ouch," "Oh," just hollering, because I'm
3   in pain. And nobody did anything about
4   it. They just allowed me to work under
5   those conditions.
6       Q.    They asked you to do something
7   that wasn't part of your normal job
8   assignment?
9       A.    It was part of the job
10  assignment, but they knew I was injured in
11  my assignment.
12      Q.    My question is: Did anybody
13  at the company ask you to perform a job
14  function that was not part of your normal
15  job assignment?
16      A.    To help others wasn't part of
17  my job assignment.
18      Q.    Over the course of your career
19  working in the seaming department, have
20  other employees helped you with projects?
21      A.    I needed very little help.
22      Q.    That wasn't my question. Over
23  the course --

Page 186

1       A.    I have been helped.
2       Q.    Other employees have helped
3   you?
4       A.    Yes.
5       Q.    Have you helped other
6   employees?
7       A.    Yes.
8       Q.    Okay. When other employees
9   have helped you, is there something
10  humiliating about that?
11      A.    It became humiliating when I'm
12  in constant pain, instead of being asked
13  to do it -- that's when it became
14  humiliating.
15      Q.    The time that you are being
16  asked to do this and you claim it was
17  humiliating, were you under any specific
18  restrictions from any doctor not to do
19  some aspect of your job?
20      A.    I have -- yes.
21      Q.    When?
22      A.    At different -- different
23  times.

Page 187

1       Q.    Okay. I'm going to reverse
2   the order of the list, because you have
3   alleged that somehow you were constantly
4   humiliated. You have named five people
5   that you claim did things to humiliate
6   you.
7           What I'm trying to determine
8   is what exactly each person did that
9   humiliated you. So let's start with Nat
10  Jones. What did Mr. Jones do that
11  humiliated you?
12      A.    He would send me to fabric.
13  He would have me to seam difficult
14  fabrics. He would allow me to do other
15  people's rework. He would -- it's been
16  time I seamed his girlfriend's wires.
17      Q.    Is there anything else
18  Mr. Jones did that you believe humiliated
19  you in some fashion?
20      A.    I have gone to work and been
21  on one assignment, and he would take that
22  assignment from me. The easy
23  assignment -- when I come in, that would

Page 188

1   be my assignment. He would have taken that
2   assignment from me and given me the other
3   person's assignment that was more
4   difficult.
5       Q.    Anything else from Mr. Jones
6   that you believe humiliated you?
7       A.    I guess -- I don't know. I
8   can't remember anything else.
9       Q.    Do you have a list anywhere?
10      A.    No, I don't have a list.
11      Q.    All right. Based on my notes,
12  what I have that you allege Mr. Jones did
13  to humiliate you was to have you seam
14  difficult fabrics, do other employee's
15  rework on fabrics, seam his girlfriend's
16  wires.
17      A.    Yes.
18      Q.    And then he would reassign you
19  from an easy job to a hard job.
20      A.    See, we were always assigned.
21  We were always assigned -- we had an
22  assignment when we came in. And sometimes
23  he would take that assignment, if it was

**American Court Reporting**
**toll-free (877) 320-1050**

Page 189

1    an easy assignment, and give it to another
2    person and put me on a more different
3    assignment.
4        Q.   Are those the four things that
5    you claim Mr. Jones did that humiliated
6    you?
7        A.   That's the four that I can
8    remember.
9        Q.   What was Mr. Jones' job at the
10   time?
11       A.   Seaming supervisor.
12       Q.   And can you tell me what year
13   any of these four events took place with
14   Mr. Jones?
15       A.   I don't remember.
16       Q.   All right.
17       A.   It was during his supervising
18   -- seaming supervisor period.
19       Q.   Now, he would have you seam
20   difficult fabrics?
21       A.   Yes.
22       Q.   What do you mean by that?
23       A.   Some fabrics we may have off

Page 190

1    beat, bad counts, or sometimes they would
2    be where it was cut too short to finish
3    it.  You had to start on the edge and you
4    had to make sure you go to the other
5    edge.  When you do that, it was
6    difficult.  It made -- it was more
7    difficult than it would be if you just
8    hook a fabric up and seam.
9        Q.   Asking you to work on a
10   difficult fabric, is that part of your
11   normal job duties?
12       A.   It was part of all of our job
13   duties.
14       Q.   Now, being asked by Mr. Jones
15   to work on a difficult fabric, how did
16   that humiliate you?
17       A.   Because he was taking the job
18   that another qualified operator was doing
19   and he would give it to me when that
20   person was supposed to do that job
21   themselves.
22       Q.   Who was he taking the job away
23   from?

Page 191

1        A.   He has done it -- different
2    ones; Dottie, Shirley, different people.
3        Q.   Well, do you know why he
4    switched that person and gave that job to
5    you?
6        A.   That person went to him and
7    complained, "I don't want to work this
8    fabric, I don't want to do this."  We had
9    people to do that, "I don't know what to
10   do this."  When they didn't want to do it,
11   the less favorite person got the job.
12       Q.   Did you ever see anybody else
13   seam a different fabric?
14       A.   Yes.
15       Q.   Who?
16       A.   Katherine Davis and Jerelene
17   Forest.
18       Q.   When did Mr. Jones assign --
19   take a difficult fabric away from somebody
20   else and give it to you?  When did that
21   happen?
22       A.   Throughout his -- throughout
23   his seaming supervisor.

Page 192

1        Q.   How many times did he do that?
2        A.   A lots.  I can't say how
3    many.  Several.  A lot.
4        Q.   In asking you to seam a
5    difficult fabric, you were still seaming a
6    fabric, correct?
7        A.   Yes.
8        Q.   That's your job in the plant
9    was to seam fabrics?
10       A.   Yes.
11       Q.   Did he make any derogatory
12   remarks to you when he switched you to
13   seaming difficult fabrics?
14       A.   What do you call derogatory?
15       Q.   Did he make any comments to
16   you that upset you in any way when he
17   switched you to a difficult fabric?
18       A.   You just go to this machine
19   and you seam this fabric.
20       Q.   You got paid your normal rate
21   of pay?
22       A.   Yes.
23       Q.   Whose rework did he have you

**American Court Reporting**
**toll-free (877) 320-1050**

49 (Pages 193 to 196)

Page 193

1   do?
2       A.   Let's see.  I have done -- I
3   can't -- Jim's, Arnold's, Evelyn's,
4   Mamie's, Dottie's -- just a whole bunch of
5   people.
6       Q.   Did he ever tell you why he
7   was giving you their rework?
8       A.   They always said that I could
9   handle it.
10      Q.   Who is they?
11      A.   Like Nat or the other
12  supervisors.  They would say, "You can
13  handle it."
14      Q.   So on the occasions that
15  Mr. Jones assigned you to rework somebody
16  else's fabric, he told you that you could
17  handle it?
18      A.   Handle it, yes.
19      Q.   Do you believe Mr. Jones gave
20  you these assignments because of your
21  race?
22      A.   No.
23      Q.   Do you know why Mr. Jones gave

Page 194

1   you the rework assignments?
2       A.   He wanted the job done, and he
3   felt like I could handle it.
4       Q.   All right.  Do you believe
5   Mr. Jones assigned you to do difficult
6   fabrics because of your race?
7       A.   No.
8       Q.   Why do you believe Mr. Jones
9   gave you that job assignment?
10      A.   The other person went to him
11  and told him they didn't want to do it.
12      Q.   Did you ever hear somebody
13  tell Mr. Jones that they didn't want to do
14  it?
15      A.   Yes.  Yes.
16      Q.   Who?
17      A.   I have heard Mamie, Dottie,
18  Dot, Doris.
19      Q.   You said Mr. Jones had you
20  seam his girlfriend's wires.
21      A.   Yes.
22      Q.   Who?
23      A.   Her reworks.  Evelyn.  I done

Page 195

1   forgot her last name.
2       Q.   Morgan?
3       A.   Yes.
4       Q.   Did you ever go out with
5   Mr. Jones?
6       A.   No.
7       Q.   How many times did Mr. Jones
8   ask you to, I guess, rework Ms. Morgan's
9   wire?
10      A.   I have -- I have come in and I
11  have worked rework five days out of a
12  week.  Jean Carr, that's another one.
13      Q.   Another who?
14      A.   Person who I reworked behind.
15      Q.   Okay.  Did anybody else in the
16  seaming department do rework?
17      A.   Yes.
18      Q.   Who?
19      A.   Everybody.
20      Q.   Reworking on fabrics was
21  something that everybody in the seaming
22  department did?
23      A.   Yes.

Page 196

1       Q.   Okay.  Do you believe
2   Mr. Jones had you rework Evelyn Morgan's
3   wire because of your race?
4       A.   No.
5       Q.   Do you know why he had you
6   rework Ms. Morgan's wire?
7       A.   She didn't want to do it.
8       Q.   Did you hear Ms. Morgan say
9   that?
10      A.   Well, I have seen people --
11  Evelyn.  I have seen others say, "I don't
12  want this assignment," and they give it to
13  the next person.
14      Q.   The next person being you?
15      A.   Yes.
16      Q.   You say somehow you were
17  humiliated by Mr. Jones taking easy
18  assignments away from you and switching
19  you to a hard assignment.
20      A.   When you are in constant,
21  excruciating pain, I'm talking about pain
22  where you are trembling, and somebody
23  takes an assignment from another person

**American Court Reporting**
**toll-free (877) 320-1050**

Page 197

1  and give it to you, it humiliates you. It
2  humiliated me.
3      Q.   Did Mr. Jones make any
4  announcement to the department as a whole
5  that he was switching you from an easy
6  assignment to a hard assignment?
7      A.   No.
8      Q.   So he didn't do anything to
9  hold you up to public ridicule?
10     A.   No.
11     Q.   Well, what specific easy
12  assignments did he take away from you and
13  switch you to hard assignments?
14     A.   Some fabrics you go in, you
15  start the fabric in, it runs. Other
16  fabrics was more difficult. They were
17  tedious. They required a lot of
18  attention. You had to just stay there.
19  You couldn't relax in it, because I had to
20  put a decent seam in the fabric. I did
21  that.
22          I purposefully made sure that
23  everything that I put my hand on, I did --

Page 198

1  I worked it to my best. I made sure that
2  it was quality work.
3      Q.   When you say Mr. Jones
4  switched you from an easy assignment to a
5  hard assignment, he was -- he still had
6  you doing a job that was within your
7  normal job description, correct?
8      A.   Yes.
9      Q.   Okay. And at the time he was
10  switching you from these easy assignments
11  to these hard assignments, were they
12  within any medical restrictions placed on
13  you by your doctors?
14     A.   No.
15     Q.   Well, exactly which jobs did
16  he give you that were outside of any
17  restrictions put on you by your doctors?
18     A.   We had a system where you were
19  assigned fabrics, and you were assigned
20  those fabrics according to -- of
21  difficulties and -- less difficult. You
22  didn't have one person seam all of the
23  difficult wire, you spreaded them out.

Page 199

1  Sometimes I got the most difficult wire.
2          And during the time of my
3  injuries, no one had sympathy for me.
4  They would put me on the difficult fabrics
5  as -- as if though I wasn't in pain or
6  anything that was going on in my body.
7      Q.   Well, during this time -- this
8  system that you say where -- I guess you
9  rotated on different fabrics?
10     A.   Yes.
11     Q.   All right. Did that system
12  apply to you and to everybody else in the
13  seaming department?
14     A.   Yes.
15     Q.   So you rotated periodically
16  among the fabrics?
17     A.   Yes.
18     Q.   Okay. Occasionally, under the
19  rotation, you would get easy fabrics?
20     A.   You would -- if I had -- if
21  this fabric is my assignment, the other
22  operators come in and their assignment --
23  because her assignment is difficult, you,

Page 200

1  in turn, take this person off their
2  assignment and you give them my assignment
3  and gave me her assignment.
4          And then you had where we was
5  supposed to start a wire and we would
6  finish that fabric. We stayed on that
7  fabric till we finished. We wasn't
8  supposed to switch up in the middle of the
9  fabric. So he would switch me up
10  sometimes.
11     Q.   Did you go complain to the
12  Union?
13     A.   A lot of times I didn't
14  complain, because it wasn't doing me any
15  good to complain.
16     Q.   That wasn't my question. Did
17  you go complain to the Union?
18     A.   Yes, I did.
19     Q.   Who did you complain to?
20     A.   I complained to the supervisor
21  first.
22     Q.   Who would have been Mr. Jones?
23     A.   Mr. Jones.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 201

1    Q.   Okay.  And did you go to
2  anybody in the Union and ask if you could
3  file a grievance about this change in job
4  assignments?
5    A.   I have gone to shop stewards
6  about wire assignment.
7    Q.   I'm talking about with respect
8  to Mr. Jones.  Did you go to the shop
9  steward about your job assignments?
10    A.   Yes.
11    Q.   When?
12    A.   During the time of the wire
13  assignment.
14    Q.   Okay.  At the time of these
15  wire assignments with Mr. Jones, did you
16  have -- were you being treated by a
17  Workers' Compensation doctor?
18    A.   This was the process in the
19  time I became a seamer until the time that
20  I was not there anymore.  So this happened
21  down through the years.
22    Q.   Right now we are talking about
23  Mr. Jones.

Page 202

1    A.   Okay.  My point is, when I was
2  on limitations, wrist bands, lifting a
3  certain amount of weight, can't twist, you
4  can't bend, you are not supposed to crawl
5  today, just different things that I was --
6  restrictions.  I -- I would have to go --
7  what I'm telling you is, I would have to
8  work that machine irregardless, whether I
9  was on restrictions or anything.  If I
10  have to take the band off to fix
11  something, because it was a tedious area,
12  you couldn't put your hand in with a wrist
13  band.  You couldn't fix different things
14  with a wrist band on.  You have to take it
15  off.
16    Q.   What did Barbara Smith do that
17  allegedly constantly humiliated you?
18    A.   The last time -- the time that
19  I was constantly humiliated -- the two
20  times -- during the times of when I was on
21  restrictions, I have seen an operator get
22  up and go to the bathroom, and she asked
23  me to help load a fabric.

Page 203

1    I have -- during the last time
2  I was there, I think it was N-5 I was
3  working, it was the -- I'm trying to think
4  -- I can't think of the fabric.  It's a
5  very small fabric, a triple layer.
6    So I had on two wrist bands --
7  this is what I'm talking about.  When you
8  find -- have an error, you have to take it
9  out and put it in.  I could not put my
10  hand down.  I asked Barbara to call up
11  front and ask them to move me off that
12  machine.  She told me that she couldn't do
13  it.  And if you are in excruciating pain
14  and this happens, yes, there is humility.
15    Q.   Did you finish out your shift
16  this day?
17    A.   I don't know whether I did or
18  not.
19    Q.   Did you get disciplined in any
20  way on that day?
21    A.   No.
22    Q.   Did you get paid for whatever
23  hours you worked that day?

Page 204

1    A.   Yes.
2    Q.   Okay.  Did Ms. Smith in any
3  way hold you up to ridicule among your
4  co-workers in the plant?
5    A.   No.
6    Q.   All right.  I think you said
7  somehow she humiliated you two times.  You
8  have described one.  What was the second
9  one?
10    A.   When you are -- when I was
11  working -- I told the second time -- the
12  first time was when I was on -- a person
13  -- a fabric was assigned to a person, I
14  had two wrist bands on.  This person
15  strolls off to the bathroom.  She calls me
16  over to help load the fabric.  She knows
17  that I've got two wrist bands on.
18    Q.   All right.  So there is only
19  one occasion where Ms. Smith did something
20  that humiliated you?
21    A.   That's two separate; loading
22  somebody else's fabric and seaming a wire
23  with a wrist band.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 205

1    Q.    Well, then, I'm confused.
2    Somebody is working on a machine, they get
3    up to go to the restroom and Ms. Smith
4    calls you over to help load --
5    A.    Load the fabric.
6    Q.    -- the fabric. That's one
7    occasion?
8    A.    Uh-huh (Nodding head).
9    Q.    Then when does this second
10   occasion with seaming occur?
11   A.    I'm working on a machine --
12   I'm seaming, and I have got on two wrist
13   bands. I'm trying to seam a wire, and I'm
14   having to take the wrist bands off to make
15   sure that I'm putting the seam in the
16   fabric. And I asked her to call up
17   front -- and when I say up front, call
18   management -- to let them know that I'm in
19   a lot of pain, and this is causing more
20   pain.
21   Q.    This seaming time when you
22   asked her -- asked Ms. Smith to call up
23   front, when was that?

Page 206

1    A.    It was in the -- it was in
2    2003, because this was near the end.
3    Q.    What about the time where the
4    other employee went to the restroom and
5    she asked you to load?
6    A.    It was around the same time.
7    Q.    Do you know when in 2003?
8    A.    No.
9    Q.    Early part of 2003?
10   A.    Middle.
11   Q.    May, June?
12   A.    May, June, something like
13   that.
14   Q.    So these two incidents with
15   Ms. Smith happened in May or June of 2003?
16   A.    Yes.
17   Q.    Do you believe either of these
18   events with Ms. Smith had anything to do
19   with your race?
20   A.    Pardon?
21   Q.    Do you believe either of these
22   two events that you have just described
23   with Barbara Smith had anything to do with

Page 207

1    your race?
2    A.    My rights?
3    Q.    Race?
4    A.    Race. No.
5    Q.    These humiliating events with
6    Mr. Jones, did you make any effort to
7    report them to Ted Bryant?
8    A.    I stopped complaining, because
9    nothing was being done about it. I
10   complained, and that was the end of it. I
11   hear it, and that was it.
12   Q.    Nothing was being done to deal
13   with your being in pain from your work
14   injuries?
15   A.    That, and about me being
16   humiliated. Me going -- if I went to Ted
17   or Jeff, I was always the problem.
18   Q.    Who, at the company, did you
19   go to and tell them that you felt that any
20   other Albany employee had humiliated you?
21   A.    I didn't go to anybody.
22   Q.    So you didn't report to
23   Mr. Bryant or Jeff Johnston or George

Page 208

1    Kazalay that Nat Jones had humiliated you
2    in any way?
3    A.    No.
4    Q.    Did you report to anybody in
5    management at the company that Barbara
6    Smith had humiliated you in any way?
7    A.    No.
8    Q.    How did Bob Hampsey humiliate
9    you?
10   A.    Once -- well, it was more than
11   once, because we were given -- like
12   sometimes -- we were told that we could
13   take a break or we could step away from a
14   fabric. And during this process -- during
15   this period of the injury, and -- I don't
16   know -- I guess getting ready to move me
17   out of the plant -- I was being
18   monitored. I had -- I would -- like if I
19   go -- stood up or walked around, I was his
20   -- he would call Tim and tell Tim, "You
21   have got an employee away from the
22   fabric," or, "Why is Dora doing this," or,
23   "Why is Dora doing that."

**American Court Reporting**
**toll-free (877) 320-1050**

Page 209

1    Q.   Who was monitoring you?
2    A.   Tim Woodward.
3    Q.   Was Bob Hampsey monitoring
4    you?
5    A.   Well, he would -- he has
6    walked up to me on occasion and told me,
7    "Bob was wondering why you are standing
8    up," or, "Bob was wondering this."
9    Q.   Do you know if Mr. Hampsey
10   ever checked on other employees who had
11   walked away from their wire?
12   A.   I don't know.
13   Q.   And did Mr. Woodward say on
14   either of these occasions why Mr. Hampsey
15   had said anything about you being away
16   from your wire?
17   A.   No.
18   Q.   Were you away from your wire
19   on those occasions?
20   A.   No.  I probably was sitting
21   like I'm sitting now or taking a break or
22   trying to move my head back or rest my
23   arms or stand up and relax my back or do

Page 210

1    something other than just sit there and be
2    in pain.
3    Q.   Is there anything Mr. Hampsey
4    has done towards you that humiliated you
5    other than send Mr. Woodward to check on
6    you?
7    A.   Well, once I went to the
8    doctor -- this has been awhile -- and they
9    wanted -- did the injection in my arm, the
10   steroids that I was allergic to.  It was a
11   grievance process going on, so I had to go
12   up front.  And we were on our way up --
13   this was Norma Heath, Shederick Abner, and
14   myself.
15        And on my way up, I think
16   Barbara had passed our checks out, so I
17   couldn't see.  I gave the check to Norma
18   and said, "Look at this check.  I can't
19   see it."  And when we got upstairs, I
20   passed out.  And I know I passed out from
21   the injection, because it was steroids.
22   It was a reaction to the steroids.
23        During that time -- before --

Page 211

1    like you could hear, and he was asked to
2    dial 911.  He said he didn't have to dial
3    911.
4    Q.   Somebody from the company
5    called an ambulance for you?
6    A.   Yes.  I don't know who called
7    it, but I know Shed called my daughter.
8    Q.   And who is Shed?
9    A.   Shederick Abner.  He used to
10   be an employee at the plant, too.
11   Q.   Did you work in the same
12   department with Mr. Abner?
13   A.   A little while.
14   Q.   Which department was that?
15   A.   He worked in seaming.
16   Q.   He worked in the seaming
17   department for a little while?
18   A.   Yes.
19   Q.   Did Mr. Abner ever do anything
20   to humiliate you?
21   A.   No.
22   Q.   Okay.  Do you keep up with
23   Mr. Abner?

Page 212

1    A.   I haven't talked to him in a
2    long time, no.
3    Q.   Okay.  How do you know
4    Mr. Hampsey said, "I don't have to call
5    911?"
6    A.   I heard him.
7    Q.   I thought you were passed
8    out.
9    A.   You also heard me say, too, I
10   could hear.  And when I heard him say --
11   maybe I was coming back around -- I don't
12   know what the situation was.  I could hear
13   him say, "I don't have to dial 911."
14   Q.   Well, at that point do you
15   know if somebody for the company had
16   already called the paramedics for you?
17   A.   I don't know, because -- I
18   don't know -- I don't know.  I just know
19   the paramedics came.
20   Q.   And you received medical
21   treatment for your allergic reaction to
22   the steroid shot?
23   A.   I received the treatments for

54 (Pages 213 to 216)

Page 213

1  the -- yes.
2      Q.   Now, were you in a grievance
3  meeting with Mr. Hampsey when this
4  allergic reaction kicked in?
5      A.   I would say the devastations
6  of it, but it was already kicking in when
7  I couldn't see.
8      Q.   Were you a participant in a
9  grievance meeting?
10     A.   Yes.
11     Q.   What was the grievance about?
12     A.   I don't remember.
13     Q.   Who filed the grievance?
14     A.   Shederick Abner.
15     Q.   Did you file the grievance?
16     A.   I believe my name was on it.
17  I don't know. I remember -- but I believe
18  it was, because that's why I was there.
19     Q.   Was this grievance arising out
20  of yours and Mr. Abner's work in the
21  seaming department?
22     A.   I don't remember. Yes, it
23  derived from it. I don't remember exactly

Page 214

1  what it was.
2      Q.   Do you remember what year this
3  happened?
4      A.   This had to be about 2000,
5  2001, something like that.
6      Q.   Okay. Do you remember what
7  the ultimate outcome of the grievance was?
8      A.   I don't remember , because I
9  have never did -- like it was -- whatever
10  took place was -- it took place while I
11  was still sick.
12     Q.   Okay. Anything else that you
13  think Mr. Hampsey did that in any way
14  humiliated you?
15     A.   I don't remember.
16     Q.   And you don't have a list
17  written down anywhere?
18     A.   No, I don't have a list.
19     Q.   Okay. What is it that
20  Mr. Bryant did that in any way humiliated
21  you?
22     A.   Because he was our plant
23  manager.

Page 215

1      Q.   Ted Bryant was the plant
2  manager?
3      A.   He was our personnel manager.
4  He knew the rules, he knew what it took
5  for me to be treated right. And he sit
6  back and he allowed it. He allowed my job
7  to be taken away, he allowed me to hurt
8  every day. He knew the extent of the
9  pain. He knew. He knew.
10         He -- when I come to work and
11  had expressed myself or talked to him on
12  the phone, he knew that I was in pain. He
13  knew that I was hurting.
14     Q.   Well, Ms. Davis, if your
15  doctors released you to return to work --
16     A.   My doctors didn't release me.
17     Q.   They didn't?
18     A.   No.
19     Q.   Your doctors didn't tell the
20  company that you could go back to work?
21     A.   No. Their doctors released
22  me. The company doctors released me.
23     Q.   Your assigned Workers'

Page 216

1  Compensation doctors released you.
2      A.   Yes. That's who released me.
3      Q.   Right. Your assigned work --
4  approved Workers' Compensation doctors
5  said that you could go back to doing your
6  job as a seamer, correct?
7      A.   That's what they told me.
8      Q.   Okay. So some other doctor
9  you think they should have listened to
10  instead of the ones by law that you were
11  seeing under your Workers' Comp?
12     A.   If you have four slipped
13  bulging disks in your neck, you have four
14  in your lower back, you have constant pain
15  in your wrists, you have a rotator surgery
16  where you have been told that the --
17  anyway, the surgical -- after surgery or
18  whatever -- the scars is aggravating you.
19  This is all parts of your body. This is
20  your -- this is your spine. You are in
21  constant pain every day, and some doctor
22  is going to release you knowing that you
23  are in constant pain and not doing

**American Court Reporting**
**toll-free (877) 320-1050**

Page 217

1  anything for you. They are -- they didn't
2  do anything for me. They passed me
3  through their office.
4      Q.   Well, are you suing the
5  doctors for malpractice in their treatment
6  of you?
7      A.   I was under their care because
8  of Appleton Wire.
9      Q.   Is it your contention
10 Mr. Bryant is a doctor?
11     A.   He was my personnel manager.
12     Q.   Well, he didn't give you any
13 medical advice, did he?
14     A.   He sent me to doctors for them
15 to give it to me.
16     Q.   You picked Dr. Wade off of a
17 list of four.
18     A.   I picked him because I had no
19 choice. I didn't know one from the other.
20     Q.   So is it your contention that
21 merely because you were telling the
22 company that you were in pain that they
23 should ignore your -- the advice of your

Page 218

1  medical doctors that you could do your
2  job?
3      A.   I thought -- I think that they
4  should have made sure that I was medically
5  taken care of. They should have made sure
6  that I got proper medical help. I did not
7  know how to treat myself. Doctors do.
8      Q.   Correct me if I'm wrong, but
9  didn't your treating doctors say that you
10 could go back to work?
11     A.   When I went to him to ask him
12 to take me off, he told me, "All they are
13 going to say -- I'm not taking you off,
14 because all they are going to say is it is
15 not job related." He said that it was
16 nothing medically wrong with me to be off
17 my job.
18     Q.   Who is he?
19     A.   This was Dr. Mathis.
20     Q.   Your personal physician said
21 there wasn't any medical reason -- your
22 personal physician, Dr. Mathis, said there
23 was no reason for you to be off work?

Page 219

1      A.   No medical reason. He didn't
2  say it wasn't job related.
3      Q.   Well, if there is no medical
4  reason for you to be off work, why do you
5  believe that the company had any
6  obligation to let you off work or change
7  your job in any way?
8      A.   They didn't have to change my
9  job. All they had to do was give me
10 medical attention to attend -- to take
11 care of the medical injuries that I
12 received on Appleton Wire premises.
13     Q.   How many different doctors did
14 the company pay for you to see for your
15 injuries at work?
16     A.   I really don't know.
17     Q.   Ten, twelve?
18     A.   I haven't a clue.
19     Q.   The company paid for your
20 rotator cuff surgery, didn't they?
21     A.   Yes.
22     Q.   They paid for rehabilitation
23 for your shoulder surgery?

Page 220

1      A.   Yes.
2      Q.   Paid to send you to an
3  orthopedist in Birmingham?
4      A.   But they didn't do anything
5  for me. The rotator --
6      Q    You mean the doctor didn't?
7      A.   They repaired the rotator
8  cuff. Nobody repaired my lower back. My
9  neck was not repaired. My wrist was not
10 repaired. I went to Dr. Palmer with Donna
11 Smith. He told me because he had did
12 surgery on so many of the other people --
13 other ladies, he didn't see it was no good
14 to do it on my wrists. He didn't say
15 nothing was wrong with my wrist, he just
16 said he didn't have a reason to do it,
17 because he had done it for the other
18 ladies.
19     Q.   Are you telling me that in
20 this case you think somehow the company is
21 responsible for the quality of treatment
22 that you received from licensed doctors in
23 the State of Alabama?

**www.AmericanCourtReporting.com**
**May 12, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 221

1    A.    Yes, sir.
2    Q.    Well, just kind of -- let's
3  start with -- let's start with Jeff Wade,
4  orthopedic surgeon.  The last time I
5  checked, he is chief of staff at Brookwood
6  Medical Center in Birmingham.
7    A.    It doesn't make him --
8    Q.    Let me ask my question.
9    A.    Go on.
10   Q.    Does he work to Albany
11 International?
12   A.    He worked for -- yes.  Yes.
13   Q.    He is employed by the company?
14   A.    No.
15   Q.    Okay.  He is a private
16 practice doctor, right?
17   A.    He was employed with them to
18 take -- to see me.
19   Q.    Are you suing Dr. Wade for the
20 quality of care that he gave you?
21   A.    Not yet.
22   Q.    Are you suing Dr. Katz for the
23 quality of care that he gave you?

Page 222

1    A.    Not yet.
2    Q.    Are you suing Dr. Mathis?
3    A.    Not yet.
4    Q.    You say not yet.  Do you plan
5  on filing suit against Jeff Wade?
6    A.    I don't know.
7    Q.    Other than Mr. Bryant's
8  apparently failing to properly supervise
9  Jeff Wade and Dr. Katz, and other
10 healthcare professionals, is there
11 anything else that Mr. Bryant did that in
12 any way humiliated you with your
13 employment with Appleton Wire?
14   A.    I don't know about properly
15 supervising them, but he is the personnel
16 manager at Appleton Wire.  And he was
17 responsible for seeing to me -- seeing to
18 the injured people receiving proper
19 medical help.
20   Q.    From whom did you get -- I'm
21 still trying to figure out what it is that
22 a personnel manager -- what is it that you
23 think he didn't do with respect to you

Page 223

1  getting treated by these doctors.
2    A.    I have to call -- I had to
3  report to him.  He called me and told me I
4  couldn't come in the building.  He was in
5  most of the meetings whenever anything
6  happened, and he was the personnel
7  manager.
8    Q.    Was Mr. Bryant ever rude to
9  you on any occasion?
10   A.    No, he is not.
11   Q.    Did he ever say anything
12 inappropriate to you?
13   A.    No.
14   Q.    Has he ever been anything
15 other than completely polite to you?
16   A.    No.
17   Q.    Okay.  Do you think he did
18 anything to you because you are black?
19   A.    I don't know.
20   Q.    Okay.  Did Mr. Bryant ever go
21 with you on any visit to a doctor?
22   A.    No.  They sent Donna Smith.
23   Q.    And who was Ms. Smith?

Page 224

1    A.    She was a nurse.
2    Q.    She is actually a medical
3  professional?
4    A.    No.  She was a nurse for
5  Appleton Wire.
6    Q.    Did she work for the company?
7    A.    I assume, yes.
8    Q.    All right.  Did Ms. Smith ever
9  do anything -- Donna Smith ever do
10 anything that humiliated you?
11   A.    Yes.
12   Q.    What did she do?
13   A.    She lied.
14   Q.    She lied?
15   A.    She told me I didn't need a
16 lawyer.  She listened to my complaints,
17 and then she went back and she goes to the
18 doctors before I could get there.  She had
19 already been in, she had already seen the
20 doctor, and when I go, I was just being
21 passed through.
22   Q.    So what is it that Ms. Smith
23 did when she went to see these doctors?

**www.AmericanCourtReporting.com**
**May 12, 2006**

Page 225

1    A.    I have no clue.  She get their
2    late, because sometimes you sit an hour or
3    sometimes two hours before she got there.
4    And then she would go in the back.  They
5    wouldn't call you.  She will go in the
6    back and she will commute with the
7    doctors.  Then when she came out the
8    doctors would call you.  She is already in
9    your room.
10    And when you leave, they
11    wouldn't -- we used to have to bring our
12    reports back to the office.  She would
13    take -- I never received paperwork.  I
14    would never really know my diagnosis.  I
15    wouldn't know anything until one of them
16    -- Ted would call me on the phone and say,
17    "Dora, the doctor said this," or, "Dora,
18    the doctor said that."
19    Q.    Well, while you were in a
20    doctor's offices you had an opportunity to
21    ask the doctor questions, didn't you?
22    A.    I have been told -- especially
23    in Dr. Katz's office -- "No.  We give this

Page 226

1    to Ms. Smith."
2    Q.    Are you telling me Dr. Katz
3    wouldn't talk to you when you were there
4    with a visit?
5    A.    He would talk to me.  But my
6    paperwork -- when we leave, they gave --
7    you know how the doctor give you a slip of
8    paper or give you your diagnosis or give
9    you something letting you know what you
10    was in there for -- he wouldn't give
11    them to me, he gave them to Donna Smith.
12    Q.    While you were in Dr. Katz's
13    office did you have an opportunity to ask
14    Dr. Katz questions about your healthcare?
15    A.    The reason I stopped asking
16    doctors questions --
17    Q.    That wasn't any question.  Did
18    you have an opportunity --
19    A.    I'm going to let you know why
20    anyway.
21    Q.    You can tell me that in a
22    minute.
23    A.    I had the opportunity to, but

Page 227

1    they -- but he -- I had the opportunity,
2    but he would never answer me.  The last
3    time I was in there I was accused of being
4    a problem in his office, because I asked a
5    question.  I stopped asking questions from
6    all of them, because it was a problem
7    asking questions.
8    Q.    What did Mr. Johnston do that
9    you believe humiliated you?
10    A.    You haven't gotten that yet?
11    You are still asking me about
12    Mr. Johnston.
13    Q.    I'm still trying to get a list
14    of what specifically it is Mr. Johnston
15    did that you allege constantly humiliated
16    you.
17    A.    Mr. Johnston have tried to get
18    -- have tried -- anyway, he took my job.
19    He wanted me to promise him that I
20    couldn't -- that I wasn't in pain when I
21    was in constant pain.  He constantly tried
22    to get me fired or fire me.  And you don't
23    see no humiliation there?

Page 228

1    Q.    Did Mr. Johnston ever tell you
2    that you were fired?
3    A.    I don't know whether he did or
4    not.
5    Q.    Did Mr. Bryant ever tell you
6    that you were fired?
7    A.    No.
8    Q.    Did Bob Hampsey ever tell you
9    that you were fired?
10    A.    No.
11    Q.    Did Norma Heath tell you you
12    were fired?
13    A.    No.
14    Q.    The meeting on October the
15    29th, 2003; did anybody in that meeting
16    tell you that you were terminated from
17    Albany International?
18    A.    When he told me he was calling
19    the police on me, I was terminated then.
20    Q.    All right.  He said he was
21    going to call the police.  Did anybody in
22    that meeting tell you that you were
23    discharged from Albany International?

**American Court Reporting**
**toll-free (877) 320-1050**

58 (Pages 229 to 232)

Page 229

1    A.    I don't remember.
2    Q.    Did anybody in that meeting
3  show you any papers?
4    A.    I didn't see any papers. I
5  saw a sheet of paper where I was
6  constantly being harassed by attendance
7  stuff. Everytime they got ready to write
8  me up or check -- they would go back
9  through the same attendance day. I don't
10  even remember the date, because I spent my
11  time trying to forget all of this mess.
12    Q.    Trying to forget all of what
13  mess?
14    A.    This -- what I'm going
15  through.
16    Q.    Trying to forget this lawsuit?
17    A.    No, not the lawsuit. Trying
18  to hang onto my job. Trying to work.
19  Trying to get them to treat me like they
20  was treating everybody else, giving them
21  proper medical care.
22    Q.    Name for me other people at
23  the company who got proper medical care.

Page 230

1    A.    Jean Carr, Doris Carter,
2  Shirley Howard, Dottie -- Doris Cooley,
3  Velma Sutton, Bessie Jones. And there are
4  probably some more, I just can't remember.
5    Q.    We will talk about that
6  document in a minute. You can hang on to
7  it for a second.
8        Did you ever go on any visits
9  with Doris Carter to any doctor for any
10  reason?
11    A.    No.
12    Q.    What medical treatment was
13  Ms. Carter provided by Albany
14  International?
15    A.    They didn't -- they didn't
16  take her off a job. They didn't send her
17  out wondering did she have a job. They
18  didn't make sure that -- I worked -- they
19  didn't give voided checks on payday.
20    Q.    When did you get a voided
21  check?
22    A.    Almost three months I got a
23  voided check, because that is what they

Page 231

1  would send me, a voided check where I
2  wasn't being paid.
3    Q.    Were you working?
4    A.    They took me off the job.
5    Q.    Were you working?
6    A.    No.
7    Q.    You didn't clock in or clock
8  out for any hours at the company?
9    A.    No.
10    Q.    So why would the company owe
11  you any money if you didn't do any hours
12  of work?
13    A.    They didn't allow me to clock
14  in and out. They pulled my time card.
15    Q.    Now, Doris Carter, did she get
16  hurt at work?
17    A.    Yes. She had gotten hurt at
18  work on several occasions.
19    Q.    On this occasion where you
20  think they got her proper medical
21  treatment but were denying you proper
22  medical treatment, what were they treating
23  Ms. Carter for?

Page 232

1    A.    I don't know.
2    Q.    How do you know what kind of
3  treatment they gave her?
4    A.    Because, like I said, no one
5  lost their job behind work injuries but
6  me.
7    Q.    Do you know what Ms. Carter
8  was being treated for?
9    A.    No.
10    Q.    Do you know when she received
11  this treatment?
12    A.    It was during the same time
13  that I was, but I don't know what doctor
14  she was going to.
15    Q.    Do you know what she was being
16  treated for?
17    A.    No.
18    Q.    You don't know which doctor?
19    A.    No.
20    Q.    Do you know if her doctor
21  released her to work with no restrictions?
22    A.    No.
23    Q.    Shirley Howard, when was she

**www.AmericanCourtReporting.com**
**May 12, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

59 (Pages 233 to 236)

Page 233

1  being treated by a doctor provided by the
2  company?
3      A.   I think both of her wrists she
4  had surgery, and I think her lower back.
5  She even laughed at me.  She said --
6  before she retired, she said, "Dora, you
7  mean to tell me all this time they are not
8  helping you, they are not giving you any
9  medical help."  And she told me she had
10  received her --
11     Q.   Received what help?
12     A.   I think she had back surgery.
13  I'm not for sure.
14     Q.   She received what help?
15     A.   From the company.  Medical
16  help.
17     Q.   What kind of medical help?
18     A.   For injuries.  Both wrists.
19  Whatever you call it.  Carpal tunnel
20  syndrome and lower back, I believe.
21     Q.   All right.  Did she file
22  Workers' Comp claims for her wrists?
23     A.   Yes.

Page 234

1      Q.   Was she treated by some doctor
2  provided by the company?
3      A.   Dr. Palmer was the one who
4  told me he had treated the other women.
5      Q.   Do you know if Dr. Palmer
6  treated Ms. Howard?
7      A.   Yes.
8      Q.   How do you know that?
9      A.   I believe that's who she told
10  me.  I think Dr. Palmer -- yeah, that was
11  the doctor, Dr. Palmer.
12     Q.   Do you know what treatment
13  Dr. Palmer gave Ms. Howard?
14     A.   Carpal tunnel syndrome.
15     Q.   Do you know what specific
16  treatment he gave her for her injury?
17     A.   Surgery.
18     Q.   Did she come back to work
19  after the surgery?
20     A.   Yes.
21     Q.   Do you know if he placed her
22  on any type of restrictions?
23     A.   I believe so.

Page 235

1      Q.   What were her restrictions?
2      A.   Probably -- well --
3      Q.   Do you know what?
4      A.   Filing -- I will tell you what
5  I saw.  I saw them filing -- something of
6  that sort.
7      Q.   And how long did she file?
8      A.   I don't know.
9      Q.   What was her normal job?
10     A.   Seaming operator.
11     Q.   Did Ms. Howard go back to
12  being a seaming operator?
13     A.   Yes.
14     Q.   And then she subsequently
15  retired?
16     A.   Yes.
17     Q.   Do you know if the company
18  provided the doctor who treated her for
19  carpal tunnel?
20     A.   Yes.
21     Q.   Do you have some idea of why
22  it is that the company would have provided
23  qualified medical care for these other

Page 236

1  individuals and would not have provided
2  you quality medical care?
3      A.   Discrimination.
4      Q.   For what reason?
5      A.   I have no clue.
6      Q.   Do you think that they -- the
7  company somehow intentionally picked poor
8  quality doctors because you are black?
9      A.   I don't know why they -- be
10  honest with you, a lot of times they
11  didn't -- the company didn't pick the
12  doctor.  Donna picked the doctors.
13     Q.   So you think Donna was
14  intentionally sending you --
15     A.   I told Donna --
16     Q.   Do you think Donna was picking
17  doctors -- intentionally picking lower
18  quality doctors for you for discriminatory
19  reasons?
20     A.   I won't say that the doctors
21  was lower quality doctors.  I just believe
22  she picked doctors that would do her
23  favors.

**www.AmericanCourtReporting.com**
**May 12, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 237

1    Q.    That would do what; say there
2    wasn't anything wrong with you so you
3    could go to work?
4    A.    Yes.  I believe that.
5    Q.    Did any doctor ever tell you
6    that they were doing her a favor and were
7    intentionally, in spite of knowing that it
8    was wrong, giving false medical testimony
9    on your part?
10    A.    No, they never told me.
11    Q.    Are you accusing Dr. Katz of
12    doing that?
13    A.    Yes.
14    Q.    Are you accusing Dr. Wade of
15    doing that?
16    A.    Yes, sir.
17    Q.    Any other doctors that you are
18    accusing of intentionally providing the
19    company false information about your
20    physical condition?
21    A.    I want to tell you about
22    Dr. Miller.  Dr. Miller -- he gave me a
23    nerve damage test.  And when he did the

Page 238

1    nerve damage test, he would stick me and
2    he wouldn't get a response.  Then he would
3    take the needle and just poke it in me.
4    And I would just lay there and tremble and
5    let them know the excruciating pain I was
6    in.  He didn't do anything but just finish
7    the test.
8    Q.    Who is Dr. Miller?
9    A.    Caudill Miller.  He was one of
10    Donna's picked doctor.
11    Q.    What did Dr. Miller treat you
12    for?
13    A.    Nerve damage.  He was a
14    neurologist or neuro something.
15    Q.    When --
16    A.    In the process I received two
17    nerve damage tests.
18    Q.    What process?
19    A.    Lower extremity the first
20    time, upper and lower extremities the
21    second time.
22    Q.    What year?
23    A.    2001, 2002.  Some of those

Page 239

1    times.
2    Q.    So Dr. Miller is on the list
3    of your treating doctors that you are
4    alleging intentionally gave the company
5    misleading information about your physical
6    condition?
7    A.    Let me -- he is on the list.
8    Let me tell you about Dr. Garrison.  I
9    went to him -- the first time I went to
10    Dr. Garrison, this -- I have a -- I have
11    proof.  I have a witness.  He -- when I
12    got there, the nurse, Karen, told them
13    that this is not job related.  So if you
14    are going to a doctor's office and before
15    you get -- if they see you coming, they
16    decide that it is not job related, what
17    kind of -- what kind of care do you expect
18    to get.
19    But the second visit, he told
20    me, Dora -- he told me -- he gave me some
21    generics.  I don't know the list.  He gave
22    me three different medicines, generic.  He
23    told me to go to the generic store and get

Page 240

1    these and take these.  He told me to run
2    four miles, and when I start dragging my
3    leg to come back and see him.
4    Q.    When did you go see
5    Dr. Garrison?
6    A.    This was 2003.  This was at
7    the end -- coming into the end.
8    Q.    Was he one of your Workers'
9    Comp doctors?
10    A.    He was a Workers' Comp doctor.
11    Q.    Had you ever been to
12    Dr. Garrison before?
13    A.    No.
14    Q.    First time you had ever been
15    there?
16    A.    Yes.  The first time I went,
17    it was the nurse.  The second time I went,
18    it was Dr. Garrison.  Donna Smith was at
19    his visits.
20    Q.    What kind of doctor is
21    Dr. Garrison?
22    A.    Industrial something --
23    medicine.

**American Court Reporting**
**toll-free (877) 320-1050**

61 (Pages 241 to 244)

Page 241

1    Q.    Did he give you a functional
2    capacity exam; is that what he did?
3        A.    I don't remember.
4        Q.    All right.  So we have got
5    Dr. Wade, Dr. Katz, Dr. Miller, and
6    Dr. Garrison, all of whom somehow you
7    claim gave either false or, at least,
8    misleading medical information about you
9    to the company?
10        A.    I don't know what kind of
11    information they gave to the company.  I
12    know how I was treated in their office.
13        Q.    All right.  Let's talk about
14    that.
15            (WHEREUPON, a document was
16    marked as Defendant's Exhibit 9 and is
17    attached to the original transcript.)
18        Q.    We have marked this as
19    Defendant's Exhibit 9.
20        A.    All right.
21        Q.    Whenever you are done looking
22    through it, you just let me know.
23        A.    I'm okay.  I was just looking.

Page 242

1    Q.    Have you had a chance to
2    review what has been marked as Exhibit 9
3    to your deposition?
4        A.    Yes.
5        Q.    Do you recognize this?
6        A.    I don't know whether I do or
7    not.
8        Q.    All right.  Who is Ed Kelly?
9        A.    He was a department
10    supervisor.
11        Q.    Seaming?
12        A.    Yes.
13        Q.    Would he have come after
14    Barbara Smith as the supervisor in
15    seaming?
16        A.    He was the supervisor for
17    finishing.  So we didn't have a
18    permanent -- we only had one supervisor
19    for the seaming, and they only worked day
20    shift.  The supervisor from finish would
21    come back and check on it or they were
22    responsible for seaming if we was on
23    second or third shift.

Page 243

1    Q.    All right.  Do you recall
2    reviewing this document with -- it looks
3    like Norma Heath and Mr. Kelly?
4        A.    I remember.
5        Q.    You do recall reviewing this
6    document with Ed Kelly?
7        A.    Ed Kelly -- I remember -- I
8    think I remember, yeah.
9        Q.    All right.  I see attached to
10    this what looks like a printout, two
11    pages, called an attendance report.  Do
12    you see that?
13        A.    Yes.
14        Q.    Did you ever see one of these
15    while you worked for the company?
16        A.    Yes.
17        Q.    Now, this has got your name,
18    Dora Davis.  Is that your employee number?
19        A.    Let's see.  Yes.
20        Q.    Zero zero eight nine one?
21        A.    I just remember eighty-nine.
22    I used eighty-nine.
23        Q.    And this looks like a list of

Page 244

1    all of your absences from work from August
2    the 22nd, 2003, back to August the 29th,
3    2002.  Does that look like what it is?
4        A.    I don't -- I see the dates.  I
5    see the review.  I don't remember exactly
6    when I was off and what.
7        Q.    Fair enough.  If you could
8    remember every one of your absences over a
9    twelve-month period, I would be impressed.
10    I see on here, though -- I
11    just want to ask you some -- just a few
12    questions about what is noted on here.  I
13    see some -- clearly some dates on here
14    where you are out that says Workmans'
15    Comp, correct?
16        A.    Yes.
17        Q.    And there is a column over
18    here and it says number of occurrences.
19    Do you see that column?
20        A.    Yes.  Yeah.
21        Q.    So if I am reading this
22    correctly, it looks like if you were out
23    for Workers' Comp you were not charged an

**www.AmericanCourtReporting.com**
**May 12, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 245

1    occurrence; is that correct?
2        A.    That's right.
3        Q.    You were not getting an
4    occurrence under the company attendance
5    policy that could ultimately result in
6    discharge?
7        A.    Yes.
8        Q.    All right. I also see some
9    dates on here -- it looks like three days
10   in September of 2002 where you were out on
11   family medical leave. Do you see those?
12       A.    Yes.
13       Q.    And then there are some that
14   look like in November of '02 and then some
15   others spread out over the dates. Is
16   there any specific instance where -- how
17   did you go about getting family and
18   medical leave at Albany?
19       A.    These occasions I had to -- I
20   had to have gone to a doctor and he took
21   me off work for some reason. I don't
22   remember the reason.
23       Q.    Okay. Fair enough. Did you

Page 246

1    have to go to Linda Jones or Ted Bryant to
2    get family medical leave at Albany?
3        A.    Yes.
4        Q.    Could you go to either
5    Mr. Bryant or Ms. Jones, or who did you go
6    to?
7        A.    We went to Ms. Jones. We only
8    went to Ted if Ms. Jones wasn't available.
9        Q.    Any occasion that you recall
10   where you asked for family medical leave
11   that the company said no?
12       A.    The only time is when I asked
13   for family leave and you -- the only
14   reason you received it was because a
15   doctor would take you off. When I was in
16   a lot of pain, I would say, look, would --
17   I have asked them to allow me to heal, and
18   I was never granted that.
19       Q.    Well, on the occasions where
20   you asked them to give you time off to let
21   you heal, did a doctor tell the company
22   there was a medical reason that you needed
23   to be out of work?

Page 247

1        A.    No.
2        Q.    Is there any instance where
3    you asked for family medical leave from
4    Albany, backed up by a doctor's
5    representation that you needed to be off,
6    that Albany denied the request?
7        A.    No.
8        Q.    All right. Now, we are done
9    with that one.
10            During this meeting on October
11   the 29th -- I have only got one other copy
12   of that. Just take a minute and read over
13   that.
14            (Pause)
15       Q.    Have you had a chance to look
16   over what we are going to mark as Exhibit
17   10 to your deposition.
18            (WHEREUPON? A document was
19   marked as Defendant's Exhibit 10 and is
20   attached to the original transcript.)
21       A.    Not yet.
22            Okay.
23       Q.    Have you ever seen that

Page 248

1    before?
2        A.    Yes. I believe so, yes.
3        Q.    When did you see it?
4        A.    September the 29th.
5        Q.    September or October?
6        A.    October. Sorry.
7        Q.    That's all right.
8            Who showed you this document?
9        A.    I believe Ted did.
10       Q.    Was this during the meeting on
11   October the 29th with Bob Hampsey, Norma
12   Heath, Jeff Johnston, Mr. Bryant, and
13   yourself?
14       A.    Yes.
15       Q.    Okay. As I read this, it
16   appears to me to simply be sort of a
17   summary for you of where you stand under
18   the company's attendance policy. I mean,
19   did this memo in any way result in any
20   disciplinary action against you?
21       A.    Yes.
22       Q.    What discipline was taken
23   against you because of this memo?

**American Court Reporting**
toll-free (877) 320-1050

63 (Pages 249 to 252)

Page 249

1    A.    It's a warning.
2    Q.    Well, does this document
3  constitute a warning under the attendance
4  policy?
5    A.    Any time you were -- you were
6  -- this was called to your attention, and
7  they, you know, reminded you of your
8  attendance, it was a warning, but it was a
9  verbal.
10   Q.    Okay. I see at the last typed
11  paragraph, "We value your years of service
12  with our company and it is our sincere
13  hope that your future attendance record
14  stay within the acceptable guidelines of
15  our plant attendance policy."
16   A.    Yes.
17   Q.    That doesn't sound like to me
18  that they want to do anything other than
19  make sure you don't accrue enough
20  occurrences to lose your job. I mean, am
21  I missing something in this document? It
22  appears to me that this is just to remind
23  you where you are on the attendance

Page 250

1  policy.
2    A.    There was a -- this is part of
3  a constant harassment. I mean, they put
4  this here to all sound pretty. When you
5  are going through all of this -- the
6  warnings and the verbal -- the verbal
7  warnings, the written warnings, it is
8  constant harassment.
9    Q.    You mean receiving an
10  attendance warning constitutes harassment?
11   A.    Yes, because, see -- see, in
12  these you got a warning not year-to-year,
13  you got it year-to-date. It was like you
14  didn't do twelve years -- twelve days a
15  year, you did it year-to-date. It is like
16  before a day could come off it was half
17  into another year. It was like from 2001
18  to 2002. It was like September, 2001,
19  till September, 2002. This was a constant
20  -- like, for instance, this one right
21  here, November 8, 2002 --
22   Q.    Right.
23   A.    -- I had received probably

Page 251

1  about three warnings because of that
2  date. And I constantly -- everytime they
3  would give me a warning, I would remind
4  them that that was a visit to the
5  emergency room.
6    Q.    It looks like here they
7  removed a warning from your file because
8  they determined that one absence shouldn't
9  have counted against you. It looks like
10  they took a warning out. Isn't that what
11  they did?
12   A.    They took it out. This was
13  after -- I had been constantly warned on
14  this day at least three times or more.
15   Q.    But this says -- and you
16  agree -- that they took that warning out
17  of your record?
18   A.    They say they took it out.
19   Q.    All right. You were subject
20  to the same attendance policy as every
21  other employee in the Montgomery plant?
22   A.    Yes, I guess.
23   Q.    Do you have any indication

Page 252

1  that the policy was applied to you any
2  differently than the way it was applied to
3  any other employees in Montgomery?
4    A.    I have no clue.
5    Q.    Okay. We have marked this as
6  Exhibit 10.
7        Now, during this meeting on
8  October 29 -- let me put a sticker on
9  that.
10       (WHEREUPON, a document was
11  marked as Defendant's Exhibit 11 and is
12  attached to the original transcript.)
13   Q.    We have marked that Exhibit
14  11. Just read it over and let me know
15  when you have had a chance to look at it.
16       (Pause)
17   Q.    Have you had a chance to look
18  over what we have marked as Exhibit 11?
19   A.    Yes.
20   Q.    Have you ever seen that
21  document before?
22   A.    Yes.
23   Q.    All right. When did you see

64 (Pages 253 to 256)

Page 253

1   it?
2      A.   October the 29th.
3      Q.   Who gave it to you?
4      A.   Ted Bryant, I assume.
5      Q.   Anywhere in the text of this
6   letter did anybody at the company tell you
7   you were discharged?
8      A.   No.
9      Q.   Were you allowed to keep a
10  copy of this letter after that meeting?
11     A.   I don't remember.
12     Q.   Okay. I see on the second
13  page, next to last paragraph, it looks
14  like the company is offering to allow you
15  to remain on inactive status for some
16  period of time while you try to resolve
17  your medical issues. Do you see that?
18     A.   I see that.
19     Q.   Is something unfair about -- I
20  mean, the way this letter reads to me,
21  Ms. Davis, Mr. Bryant and Mr. Johnston and
22  the folks at Albany were bending over
23  backwards to try to find a way to

Page 254

1  accommodate your doctor saying that you
2  could work and you saying you were in
3  pain.
4     A.   It's like I say, I knew
5  nothing about an inactive status. I was
6  taken off the job.
7      Secondly, it was not my
8  doctors. I was going to doctors that they
9  assigned me to, which they knew that I was
10  there unhappy with, because no one was
11  doing anything for me.
12      When I got to that building, I
13  was told by Jeff Johnston he was going to
14  have me arrested.
15     Q.   When you got there --
16     A.   In this meeting. In this
17  meeting, I was told by Jeff Johnston he
18  was going to call the police on me.
19     Q.   Why was he going to call the
20  police on you?
21     A.   Because I wasn't agreeing to
22  the -- him. I didn't say what he liked.
23  He was telling me that I would have to say

Page 255

1  that I was not in pain. He was telling me
2  that I needed to go get a doctor to take
3  me off. In terms I was telling him, "You
4  give me a doctor that will take me off. I
5  don't have a doctor that will take me
6  off."
7     Q.   During this meeting on October
8  the 29th, 2003, you resigned from Albany.
9     A.   No, I did not.
10     Q.   You didn't?
11     A.   No.
12     Q.   You didn't tell anybody at the
13  company you were resigning?
14     A.   No. I told them that I was
15  applying -- I had applied for my state
16  disability.
17     Q.   And what did you want them to
18  do, just leave you off work waiting on the
19  results of that?
20     A.   No. I wanted them to send me
21  to a reputable doctor and get me some
22  medical help. Attend to the lower disks,
23  the four disks in my lower back, the four

Page 256

1  disks in my neck, my wrists, and this
2  rotator tear scar tissue.
3     Q.   Who qualifies as a reputable
4  doctor?
5     A.   I have no clue.
6     Q.   Do you think board
7  certification is an indication of the
8  quality of a doctor?
9     A.   I don't know what they do.
10     Q.   Well, I mean, you wanted them
11  to send you to another doctor. As far as
12  I can tell from your testimony and your
13  record, they -- the company, over the
14  course of about fifteen years, had sent
15  you to a lot of doctors --
16     A.   True.
17     Q.   -- for a lot of treatment.
18     I'm trying to determine what
19  it is that you think Mr. Bryant and
20  Mr. Johnston on October the 29th, 2003,
21  still owed you in the way of medical
22  treatment.
23     A.   They did not correct the

**American Court Reporting**
**toll-free (877) 320-1050**

Page 257

1  injuries. They were not corrected. The
2  four disks in my neck is still hurting me,
3  the lower back is still hurting me, the
4  wrists are still hurting me. I can barely
5  use this hand. I can't stand for it to
6  touch anything. So nothing went away.
7  The shoulder -- I'm still dropping
8  things. I'm still burning my hands when I
9  attempt. I can't open a jar.
10      Q.   I will mark this as Exhibit
11  12. Take a look at that for me.
12          (WHEREUPON, a document was
13  marked as Defendant's Exhibit 12 and is
14  attached to the original transcript.)
15      A.   I don't remember this.
16      Q.   You have had a chance to look
17  over what we have marked as Exhibit 12?
18      A.   Yes.
19      Q.   Okay. Are you saying that you
20  don't remember that document?
21      A.   I don't remember that.
22      Q.   Look down there next to
23  employee's comments; is that your

Page 258

1  signature?
2      A.   That's my signature.
3      Q.   Even though you recognize your
4  signature, you just don't remember
5  receiving this document?
6      A.   No. I have never seen that
7  before.
8      Q.   Well, how do you figure your
9  signature got on it?
10      A.   I don't know. Ask them.
11      Q.   Are you accusing Mr. Bryant of
12  forging your signature?
13      A.   He didn't forge my signature.
14  But he didn't fill that paperwork out on
15  my behalf -- in my presence.
16      Q.   How do you think your
17  signature got on there?
18      A.   I guess he -- I signed papers
19  after the fact -- before the fact.
20      Q.   Before what fact?
21      A.   Before he filled those papers
22  out.
23      Q.   You don't recall seeing this

Page 259

1  document at all?
2      A.   I have never seen this.
3      Q.   Okay. Do you ever recall
4  seeing a document that looks like that?
5      A.   I don't remember this.
6      Q.   It is referenced on the first
7  line of Exhibit 12, Voluntary Resignation
8  Form.
9      A.   This --
10      Q.   No. Exhibit --
11      A.   I know what you said. I'm
12  fixing to tell you what I'm confused
13  with.
14          This is the only sheet of
15  paper I saw. I never saw those two piece
16  of paper. When I left there I was told by
17  Ted Bryant, "We are going to send you some
18  documents." I have not seen those
19  documents. When I saw a document -- I got
20  a letter in the mail -- a certified letter
21  in the mail telling me -- I don't even
22  exactly know what it was. I have never
23  seen these papers before.

Page 260

1      Q.   You got a certified letter in
2  the mail?
3      A.   Telling me something about
4  termination.
5      Q.   Something about --
6      A.   That I was terminated.
7      Q.   You said you got a letter that
8  said you were fired?
9      A.   I was terminated. It's on
10  that sheet. I called -- who did I call --
11  I called somebody and asked them, "Okay,
12  what does termination mean." I asked them
13  what did termination mean. I told them
14  give me all of their definitions of
15  terminated.
16      Q.   Who did you call? Did you
17  call somebody in New York, somebody in
18  Montgomery? Where were they?
19      A.   I called New York once, too,
20  but I didn't get any response from New
21  York. I called -- I called -- it had to
22  be either -- if it wasn't the employment
23  office, it was -- the worker's division.

**American Court Reporting**
**toll-free (877) 320-1050**

66 (Pages 261 to 264)

Page 261

1  Somebody I called. I don't remember
2  exactly who I called.
3      Q.   I'm just going to attach this
4  as Exhibit 13 to your deposition.
5          (WHEREUPON, a document was
6  marked as Defendant's Exhibit 13 and is
7  attached to the original transcript.)
8      Q.   You said that you got a
9  certified letter.
10         (WHEREUPON, a document was
11 marked as Defendant's Exhibit 14 and is
12 attached to the original transcript.)
13     Q.   Is that the letter that you
14 are referring to?
15     A.   Yes.
16     Q.   All right. Do you know -- do
17 you recognize the signature on that
18 document?
19     A.   No.
20     Q.   Do you know anybody named
21 Linda Forget?
22     A.   No.
23     Q.   Any reason to believe that

Page 262

1  Ms. Forget ever did anything to you
2  because of your race?
3      A.   I have no clue.
4      Q.   All right. If I read this
5  right, this looks like it is simply a
6  letter explaining to you what your
7  retirement benefits are from the company.
8      A.   The second paragraph.
9      Q.   Did Mr. Johnston ever yell at
10 you?
11     A.   Yes.
12     Q.   When?
13     A.   Separate occasions.
14     Q.   List them for me.
15     A.   The last one when he
16 threatened to call the police on me.
17     Q.   Okay. So we have got he
18 shouted at you on October the 29th of
19 2003. Are there any other occasions?
20     A.   When he told me to go in the
21 office -- see him in the office.
22     Q.   All right. That's two. Any
23 other occasions?

Page 263

1      A.   One time I was working the
2  machine and this woman left a banana peel
3  on the table. I asked her to move it
4  off. He told me to take it off.
5      Q.   Any other occasions where
6  Mr. Johnston shouted or yelled at you?
7      A.   Mostly these meetings -- those
8  meetings that I would go to.
9      Q.   Did he ever use any profanity
10 in my presence?
11     A.   I don't think so.
12     Q.   Ever use abusive language?
13     A.   Well, I felt it was abusive
14 when he accused -- wanted to call the
15 police on me.
16     Q.   Okay.
17     A.   When he told me to get the
18 banana peel.
19     Q.   He didn't actually call the
20 police on you, did he?
21     A.   No, he didn't.
22     Q.   Did anybody at Albany ever
23 have you arrested for any reason?

Page 264

1      A.   No.
2      Q.   The banana peel, when did that
3  happen?
4      A.   It was earlier. I don't know
5  exactly the year or the date. I came in
6  behind a woman and I had to clean up for
7  her. I constantly reminded him that this
8  person was leaving filth. One of our job
9  descriptions is that you clean up your
10 area. And I went -- everytime -- I had to
11 clean up behind her.
12         So this one morning he came --
13 I believe he was a department manager. He
14 came to the department. I asked him -- I
15 asked him to ask her to clean up behind
16 herself, and he told me to remove the
17 banana peel.
18     Q.   Who was the employee who left
19 the banana peel?
20     A.   It was Evelyn Morgan.
21     Q.   And at the time of this banana
22 peel incident, Mr. Johnston was the
23 seaming department manager?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 265

1    A.    I think so.
2    Q.    After Mr. Johnston asked you
3    to move the banana peel, did you go talk
4    to Mr. Bryant in Human Resources?
5    A.    No.
6    Q.    Did you try to contact George
7    Kazalay about it?
8    A.    No.
9    Q.    We have got one handy.  I will
10   mark this as Exhibit 15.
11         (WHEREUPON, a document was
12   marked as Defendant's Exhibit 15 and is
13   attached to the original transcript.)
14   Q.    Here is what I want to do.
15   I'm just -- your lawyers have provided me
16   the names of some folks who may have
17   information related to your case.  I kind
18   of want to go through these folks and see
19   who they are and see what it is you think
20   they know.
21         Who is Glenda Missildine?
22   A.    She used to work for the
23   company.

Page 266

1    Q.    What did she do?
2    A.    She was a seamer.
3    Q.    And did you work with
4    Ms. Missildine in the seaming department?
5    A.    Yes.
6    Q.    And you say she used to work
7    for the company.  Is she gone?
8    A.    Yes.
9    Q.    Was she gone before you were?
10   A.    Yes.
11   Q.    Do you know how far in advance
12   of your departure from Albany
13   Ms. Missildine left?
14   A.    I don't know exactly.
15   Q.    I mean, any idea?  A year, two
16   years, five years?
17   A.    Maybe about five years, I
18   guess.  I don't know.
19   Q.    She has been gone about five
20   years or she left about five years before
21   you did?
22   A.    Left about five years before.
23   Q.    All right.  And

Page 267

1    Ms. Missildine, what is her race?
2    A.    White.
3    Q.    And what is it that you
4    believe Ms. Missildine may know about your
5    claims in this case?
6    A.    She and I worked close
7    together, and we was always helping each
8    other out.  But in reference to Glenda,
9    her situation and my situation is similar.
10   Q.    In what way?
11   A.    They just did her the same
12   way.  She just got out of the plant.  They
13   dismissed her.
14   Q.    So it's your belief that the
15   company treated Ms. Missildine the same
16   way it treated you?
17   A.    If not, close.
18   Q.    Okay.  Did she also have
19   workplace injuries?
20   A.    Yes.
21   Q.    And she was then moved out of
22   the company; is that your belief?
23   A.    Yes.

Page 268

1    Q.    Okay.  Have you spoken to her
2    at all since she left the company?
3    A.    Yes.
4    Q.    Do you keep in touch with her?
5    A.    I haven't talked to her in a
6    long time.
7    Q.    Okay.  Have you talked to her
8    about this lawsuit at all?
9    A.    Yes.
10   Q.    All right.  When did you do
11   that?
12   A.    When I filed it.
13   Q.    When you filed the federal
14   court lawsuit, the state court lawsuit?
15   A.    Both lawsuits.
16   Q.    Okay.  Do you have a phone
17   number for her?  Do you know how to reach
18   her?
19   A.    Phone book.  I have to look in
20   the phone book.
21   Q.    What did you tell her about
22   your lawsuit?
23   A.    I just told her that -- the

**American Court Reporting**
**toll-free (877) 320-1050**

68  (Pages 269 to 272)

Page 269

1  things that I had gone through.  And I
2  told her -- I asked her would she be a
3  witness.
4       Q.    All right.  Did you tell her
5  that you were suing the company?
6       A.    Yes.
7       Q.    Did you tell her you were
8  suing Jeff Johnston?
9       A.    No.  No, I didn't.
10      Q.    Okay.  Jerelene Forest, who is
11  she?
12      A.    She was a co-worker.
13      Q.    And Ms. Forest's race is?
14      A.    Black.
15      Q.    She was also a seamer?
16      A.    Yes.
17      Q.    Was she still with the company
18  at the time you left?
19      A.    No.
20      Q.    And how far in advance of your
21  departure from Albany did Ms. Forest
22  leave?
23      A.    It was some months.  I don't

Page 270

1  know how many months, but it was months.
2       Q.    Do you know why she left the
3  company?
4       A.    First she went off with both
5  wrists.  She had surgery on both wrists.
6  And then personal illness.
7       Q.    Do you know what the nature of
8  that illness was?
9       A.    I don't know.
10      Q.    What is it that you believe
11  Ms. Forest knows that relates to your
12  case?
13      A.    She can attest to everything
14  that I have told you today.  Almost
15  everything.
16      Q.    Did --
17      A.    She has been a witness, and --
18      Q.    She has been a witness to
19  which events?
20      A.    All of them except for the
21  October 29th situation.
22      Q.    Did she go on the doctor
23  visits with you?

Page 271

1       A.    No, she didn't go on no
2  doctors' visits.
3       Q.    All right.  Did Ms. Forest
4  ever tell you that she believed that she
5  was in any way treated differently by
6  anybody at Albany?
7       A.    Yes.
8       Q.    Who?
9       A.    I don't remember names, but it
10  has been brought up.
11      Q.    When did she bring that up to
12  you?
13      A.    Throughout the years.
14      Q.    Anything in particular that
15  you recall her mentioning?
16      A.    Discrimination, prejudice.
17      Q.    Was Ms. Forest already
18  employed at Albany when you were hired in
19  1979?
20      A.    Yes.
21      Q.    And do you recall any specific
22  person at Albany that Ms. Forest said that
23  she thought was prejudiced?

Page 272

1       A.    She told me that all of them
2  was prejudiced.
3       Q.    Everybody in the plant?
4       A.    She told me that all of them
5  was prejudiced.  That's just -- that's
6  what she said.
7       Q.    Did she explain who them was?
8       A.    No.
9       Q.    So does that mean everybody
10  else that worked in the plant?
11      A.    I don't know.
12      Q.    All right.  Did she tell you
13  specifically what she meant when she was
14  talking about discrimination?
15      A.    Because she had problems with
16  wire assignments.  She was one of the
17  better operators.  She would be placed in
18  areas to work fabrics that others didn't
19  want to work.  She heard racial slurs.
20  She felt that it was a discriminatory, if
21  I am saying it right, practice in the
22  plant about -- against blacks and whites.
23      Q.    What practice?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 273

1    A.    Favorable wire assignments,
2  hiring positions.  A black person can only
3  go this far, and that was it.
4    Q.    You mentioned that Ms. Forest
5  had some knowledge of racial slurs.  Did
6  you ever -- while you were in Ms. Forest
7  presence, did you ever hear any racial
8  slurs in the plant?
9    A.    Yes, because during the time
10  -- I'm trying to think.  Well, in the
11  seaming department, she would be the familiar
12  like with most -- I can't speak for
13  Ms. Forest.  You know, I can't speak for
14  Ms. Forest.
15    Q.    Did she ever tell you what
16  racial slurs she came to have heard in the
17  plant?
18    A.    Yes.
19    Q.    What did she tell you?
20    A.    Niggers.  What is it --
21  something about the gators.  Just
22  different things.  Gator bait.  Different
23  stuff.

Page 274

1    Q.    Did she tell you who she had
2  heard use the term "Nigger"?
3    A.    She -- well, for one person --
4  I believe it was Dottie.  It was Dottie.
5    Q.    Do you remember Dottie's last
6  name?
7    A.    Brown or Hassell.  I guess
8  those are the only two she had.
9    Q.    Did you ever hear Dottie
10  use that term?
11    A.    Let's see.  I don't exactly
12  remember.  You know, I don't exactly
13  remember.  I know I have heard of it, but
14  I don't remember.
15    Q.    As you sit here today, you
16  have no specific recollection of hearing
17  somebody use the term "Nigger" during your
18  employment with Albany?
19    A.    I can't say that.  I can't put
20  a finger on when I heard these terms, but
21  I have heard that term.
22    Q.    All right.  When did Jerelene
23  tell you that she had heard somebody use

Page 275

1  the term "Nigger"?
2    A.    It's been awhile.  I can't
3  tell you when, what time, or how.  But
4  it's been awhile.
5    Q.    Awhile meaning ten years,
6  fifteen years?
7    A.    It hadn't been fifteen years.
8  It hasn't been ten years.  It's maybe five
9  or six years, something like that.
10    Q.    She said that she heard it in
11  the last five or six years, or she told
12  you that five or six years ago?
13    A.    It had to be a sooner time
14  that she told me.
15    Q.    Who is Katherine Davis?
16    A.    Another co-worker.
17    Q.    Is she black or white?
18    A.    She is black.
19    Q.    Also a seamer?
20    A.    Yes.
21    Q.    Was she already with Albany
22  when you got heard?
23    A.    Yes.

Page 276

1    Q.    Was Glenda Missildine already
2  with Albany when you were hired?
3    A.    Yes.  She had been, but then
4  she came back.  She had been and came
5  back.
6    Q.    All right.  Katherine Davis,
7  was she still employed when you left the
8  company?
9    A.    Yes.
10    Q.    Does she still work for the
11  company?
12    A.    No.
13    Q.    Okay.  What is it that you
14  believe Ms. Davis knows about your claims
15  in this case?
16    A.    I don't know.
17    Q.    Have you ever talked to her
18  about your lawsuit?
19    A.    Yes.
20    Q.    Did you call each -- well, did
21  you call Jerelene Forest about your
22  lawsuit?
23    A.    Yes.

**www.AmericanCourtReporting.com**
**May 12, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 277

1    Q.    So you talked to Ms. Forest
2  about your case?
3    A.    Yes.
4    Q.    Did you talk to Katherine
5  Davis about your case?
6    A.    Yes.
7    Q.    During the time that Ms. Davis
8  was employed with the company, did
9  Ms. Davis report to you that she thought
10 that she had been treated differently than
11 any other employees because of her race?
12   A.    Yes.
13   Q.    Who?
14   A.    She has told me that she feels
15 like she has been treated different
16 because of race.
17   Q.    When did she tell you that?
18   A.    I really can't say exactly
19 when, but she have.
20   Q.    Do you remember -- did she
21 describe for you how it is that she had
22 been treated differently?
23   A.    I remember one time it was --

Page 278

1  she was lead, and they placed a white
2  person over her.  She had been lead,
3  because she trained me.  And they placed
4  -- they took the lead -- the company --
5  whoever was supervisor or the department
6  manager took the lead job from her and
7  gave it to a white person, who was Letha
8  Arnold.
9    Q.    When did that occur?
10   A.    This has been a long time.
11 Letha has been gone a long time.
12   Q.    1980s?
13   A.    Probably, yeah.
14   Q.    Other than this occasion in
15 the 1980s where Ms. Davis was -- Letha was
16 substituted as the lead in place of
17 Ms. Davis, any other examples Ms. Davis
18 ever gave you where she thought she was
19 treated differently?
20   A.    I don't remember.
21   Q.    Did Ms. Davis ever tell you
22 that she had heard any racial slurs in the
23 plant?

Page 279

1    A.    I don't know.
2    Q.    Dorothy Collins, did she go by
3  Dot?
4    A.    Dot.
5    Q.    White or black?
6    A.    Black -- I mean, white.
7  Sorry.  I'm tired.
8    Q.    What is it that you believe
9  Ms. Collins knows about your allegations
10 in this case?
11   A.    Basically, everything, because
12 she was with me for the grievances.  She
13 had interfered when I was attempting to be
14 fired.
15   Q.    She was your union steward?
16   A.    Yes.
17   Q.    Okay.  Shederick Abner?
18   A.    Yes.
19   Q.    Black or white?
20   A.    White -- I mean, black.  I
21 think I'm tired.  I probably need a break.
22   Q.    Are you related to Mr. Abner?
23   A.    No.

Page 280

1    Q.    Okay.  What is it that you
2  think Mr. Abner knows about your claims?
3    A.    He was working with me in the
4  department.  He was with me when the -- we
5  had to call the paramedics.  He filed
6  grievances.  And he knows that -- how I
7  was treated.
8    Q.    Well, other than this one
9  grievance meeting, did Mr. Abner sit in on
10 any other meetings that you had with Jeff
11 Johnston?
12   A.    I don't know.
13   Q.    Was Mr. Abner present for any
14 other meetings that you had with
15 Mr. Bryant?
16   A.    I don't know.
17   Q.    Now, at one point Mr. Abner
18 worked in seaming for a period of time.
19   A.    Yes.
20   Q.    And then he left seaming and
21 went to weaving?
22   A.    No.  He was in weaving.  He
23 left weaving and came to seaming.

**www.AmericanCourtReporting.com**
**May 12, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 281

1    Q.    Did he stay in seaming?
2    A.    Until he was terminated.
3    Q.    Do you know why he was
4    terminated?
5    A.    I don't know exactly why.
6    Q.    Were you in any way involved
7    in his discharge?
8    A.    No.
9    Q.    Do you know if he grieved his
10   discharge?
11   A.    No.
12   Q.    Okay.  Other than the fact
13   that -- do you believe Mr. Abner knows
14   anything about your employment with the
15   company prior to him moving into the
16   seaming department?
17   A.    Pardon?
18   Q.    Mr. Abner worked in weaving
19   and then transferred to the seaming
20   department, correct?
21   A.    Uh-huh (Nodding head).
22   Q.    Yes?
23   A.    Yes.

Page 282

1    Q.    All right.  Prior to Mr. Abner
2    coming to work in the seaming department,
3    y'all were in different areas of the
4    plant?
5    A.    Yes.
6    Q.    In different work areas?
7    A.    Yes.
8    Q.    Okay.  So you would not really
9    have been in a position to have observed
10   Mr. Abner's work circumstances when he was
11   in weaving?
12   A.    No.
13   Q.    He could -- like wise, he
14   would not have been in a position to see
15   what was going on in the seaming
16   department?
17   A.    No.
18   Q.    All right.  But once he moved
19   to seaming, were y'all in the same work
20   group?
21   A.    Yes.
22   Q.    So y'all were on first shift
23   together, second shift; you were in the

Page 283

1    same group?
2    A.    Yes.
3    Q.    All right.  Did Mr. Abner ever
4    tell you that he thought he was treated
5    differently because of his race?
6    A.    Yes.
7    Q.    Did he explain how?
8    A.    Because of a situation that
9    happened in the seaming -- in the weave
10   room, because of wire assignments, because
11   of actions being taken, the discipline, or
12   something like that.  So to that extent.
13   But what, I don't exactly know.
14   Q.    Okay.  Did you ever encourage
15   Mr. Abner if he thought that he was having
16   problems that he should go to Human
17   Resources and talk to Mr. Bryant?
18   A.    He filed a grievance.
19   Q.    I am asking if you recommended
20   to him that he should go complain.
21   A.    I don't believe I recommended
22   him, no.
23   Q.    Have you talked to Mr. Abner

Page 284

1    about your case?
2    A.    Yes.
3    Q.    Tell me what y'all talked
4    about.
5    A.    I asked him to be a witness
6    for me.
7    Q.    And what did he say?
8    A.    Yes.
9    Q.    Okay.  And did you talk with
10   him in any detail about what you wanted
11   him to say?
12   A.    No.
13   Q.    Okay.  Did you talk to
14   Mr. Abner about any issues that he
15   previously had with the company?
16   A.    We talked about them all the
17   time.  That's before he left the job.
18   Q.    Okay.  Prior to you calling
19   him about this lawsuit, had you talked to
20   him since he left the company?
21   A.    I hadn't talked to him in a
22   long time.  I maybe talked to him once,
23   twice.  After that -- it was until --

**www.AmericanCourtReporting.com**
**May 12, 2006**

72 (Pages 285 to 286)

Page 285

1    until this came -- this suit came up.
2        Q.    Who is Barbara Smith?
3        A.    She is my supervisor -- was my
4    supervisor.
5        Q.    She is black?
6        A.    Yes.
7        Q.    She still works for the
8    company?
9        A.    Yes.
10       Q.    Have you talked to Ms. Smith
11   about your lawsuit?
12       A.    No.
13       Q.    I think we have talked about
14   Nat Jones.
15           The Donna Smith listed on
16   here. She is the nurse that went with you
17   on doctors' visits, correct?
18       A.    Yes.
19           MS. WILLIAMS: Can we take a
20   break?
21           MR. POWELL: Yes, we can. I
22   think that's a good idea.
23   (Off the record discussion, at which time

Page 286

1    the deposition was adjourned at 3:30 PM)
2        C E R T I F I C A T E
3
4    STATE OF ALABAMA)
5    JEFFERSON COUNTY)
6        I hereby certify that the above
7    and foregoing deposition was taken down by
8    me in stenotype, and the questions and
9    answers thereto were transcribed by means
10   of computer-aided transcription, and that
11   the foregoing represents a true and
12   correct transcript of the deposition given
13   by said witness upon said hearing.
14       I further certify that I am
15   neither of counsel nor of kin to the
16   parties to the action, nor am I in anywise
17   interested in the result of said cause.
18
19           DAVID L. MILLER, CSR, RMR
20           Certificate No: AL-CSR-141
21
22   My Commission expires
23   November 30, 2009

IN THE CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA

DORA DAVIS,

    Plaintiff,

v.

APPLETON WIRE COMPANY, and
those persons, corporations and other
legal entities designated herein as
fictitious parties A, B, and C, . . . X, Y
and Z, whose names are otherwise
unknown, but will be added hereto by
amendment when ascertained,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO.: CV-_____

2005 OCT 21  PM 3: 01

## COMPLAINT FOR WORKER'S COMPENSATION BENEFITS

COMES now the Plaintiff in the above-styled cause and makes the following complaint for worker's compensation benefits:

### COUNT ONE

1.    Plaintiff, Dora Davis, is of legal age and is a resident citizen of the State of Alabama.

2.    Defendant, Appleton Wire Company, is an Alabama company, and is now and was doing business in Montgomery County, Alabama on or about October 29, 2003, and therefore is subject to the jurisdiction of this Court.

3.    On or about October 29, 2003, Plaintiff was employed by Defendant Appleton Wire Company, and was engaged in employment as a nap operator.

4.    On or about October 29, 2003, while working within the line and scope of her employment, Plaintiff was caused to be injured, to wit: Plaintiff injured her back, neck, shoulder, and

1


DEFENDANT'S
EXHIBIT

Davis       1

wrists.

5.    Plaintiff further avers that her average wage at the time of his injury made the basis of this claim was approximately $19.38 per hour.

6.    Defendant had timely and actual notice of said accident within the time specified by the Workmen's Compensation Act of the State of Alabama.

7.    As a proximate consequence of said injury, arising out of and in the course of her employment by Defendant, Plaintiff has been and will be temporarily totally disabled and will be permanently totally disabled for the rest of her life and has suffered a loss of earning capacity.

8.    As a further proximate consequence of said injury and loss of earning capacity, Plaintiff will require vocational rehabilitation to restore Plaintiff to gainful employment.

9.    Subsequent to said injury, Plaintiff was caused to obtain medical treatment for her injury and now suffers a permanent partial disability.

10.    Defendant has failed to pay all disability benefits and/or necessary and reasonable medical expenses as incurred by the Plaintiff.

11.    Defendant has failed to timely pay installments of compensation within thirty (30) days of due date and is therefore liable to Plaintiff in an amount equal to fifteen percent (15%) of each and every such overdue payment.

## COUNT TWO

12.    Plaintiff realleges Paragraph 1 through 11 of this Complaint as if fully set out herein.

13.    On or about October 29, 2003, and at all times relevant hereto, Plaintiff was employed by Defendant.

14.    On or about October 29, 2003, Plaintiff sustained injuries arising out of, and in the

2

course of her employment with Defendant.

15.    Further, on or about October 29, 2003, Plaintiff was terminated from her employment with Defendant after Plaintiff instituted and/or maintained action against Defendant to recover workmen's compensation benefits and/or otherwise exercised his rights to recover such benefits under the Alabama Workmen's Compensation Act (hereinafter referred to as "the Act").

16.    Plaintiff alleges that her employment was wrongfully terminated by Defendant as a direct result of her making claim for workmen's compensation benefits, and exercising her right therefore, and that such termination was retaliatory and illegal, and in violation of Alabama Code Section 25-5-11.1 (1975).

17.    Further, Plaintiff alleges that Defendant terminated Plaintiff's employment solely because Plaintiff claimed rights under the Act, and that such termination was done in violation of said laws with intentional and/or reckless disregard of same and of Plaintiff's rights thereunder.

18.    Plaintiff avers that Alabama Code Section 25-5-11.1 (1975) in effect creates an independent cause of action against Defendant for said Defendant's intentional and/or wrongful conduct in terminating Plaintiff, and that said cause of action is not barred by the exclusivity provisions of the Act.

19.    As a proximate result of said retaliatory and illegal termination, Plaintiff was injured and damaged as follows:

    a.    Plaintiff was caused to suffer severe emotional distress;

    b.    Plaintiff was caused to lose wages and valuable employee benefits; and

    c.    Plaintiff's employment record was caused to be tarnished.

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment against Defendant

3

for compensatory and punitive damages, with costs of Court and any such further relief that this Court shall deem appropriate.

## COUNT THREE

20.    Plaintiff realleges Paragraphs 1 through 19 of this Complaint as if fully set out herein.

21.    Fictitious party defendants A, B and C are those persons, corporations or other legal entities who or which employed Plaintiff on the occasion of Plaintiff's injury made the basis of this Complaint.

22.    Said Defendants have failed to pay all disability benefits and/or necessary and reasonable medical expenses as incurred by the Plaintiff.

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests this Honorable Court to issue an Order requiring Defendant to pay any and all medical expenses incident to said injury, and benefits due under the Workmen's Compensation Act of the State of Alabama, including but not limited to temporary installment payments, permanent partial disability payments, vocation rehabilitation benefits, penalties and costs.

RESPECTFULLY submitted on this the _19th_ day of October, 2005.

_DORA DAVIS_
DORA DAVIS
Plaintiff

I, the undersigned, DORA DAVIS, being first duly sworn, depose and say: I am a resident citizen of Montgomery County, Alabama. I am the Plaintiff named in the foregoing Complaint. I have read over the Complaint and the facts stated in Counts I and III herein are true and correct according to my information, knowledge and belief.

_DORA DAVIS_
DORA DAVIS
Plaintiff

4

STATE OF ALABAMA          )
COUNTY OF MONTGOMERY      )

I, the undersigned authority, a Notary Public in and for said state and county, hereby certify that Dora Davis, whose name is signed to the foregoing instrument and who is known to me, acknowledged before me on this day, that she executed the same voluntarily on the day the same bears date.

GIVEN under my hand and seal on this _13th_ day of October, 2005.

NOTARY PUBLIC
My Commission Expires: _9-23-09_


WILLIAM K. ABELL (ABE001)
Attorney for Plaintiff

OF COUNSEL:

SHINBAUM, ABELL, McLEOD & VANN, P. C.
P. O. Box 201
Montgomery, AL 36101-0201
Telephone     (334) 269-4440
Facsimile     (334) 263-4096


PLAINTIFF HEREBY DEMANDS TRIAL BY STRUCK JURY ON COUNT TWO OF THIS COMPLAINT.

OF COUNSEL

5

ALBANY INTERNATIONAL'S
POLICY REGARDING UNLAWFUL
DISCRIMINATION AND HARRASSMENT

It is the policy of the Albany International to provide a work environment free of discrimination or harassment which results in unlawful discrimination. Albany International will not tolerate any form of unlawful harassment based upon an individual's race, color, religion, sex, national origin, age, physical or mental disability, veteran status, or other protected classifications. Any employee acting contrary to this policy will be subject to corrective action up to and including discharge.

According to the EEOC, *Unlawful Harassment* on the basis of race, color, religion, sex, or national origin or other protected classification includes conduct which has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment. Examples of behavior which could be construed as harassment include, but are not limited to:

- slurs, jokes, or other verbal, graphic or physical conduct relating to an individual's race, color, religion or other protected status;
- degrading any protected group or class of people;
- assignment of less desirable work or working conditions to members of such protected groups based solely on their group membership;
- treating protected individuals in a demeaning fashion.

The EEOC guidelines on sexual discrimination define *Sexual Harassment* as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (1) submission to the conduct is either an explicit or implicit term or condition of employment; (2) submission to or rejection of the conduct is used as a basis for employment decisions affecting the person doing the submitting or rejecting; or (3) the conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

Examples of behavior which have been construed to constitute unlawful sexual harassment include:

- explicit or implicit threats to withhold pay increases, benefits or working conditions unless sexual favors or sexual activity is granted;
- promises to improve pay, benefits or working conditions in exchange for sexual favors or sexual activity;
- demanding sexual favors or sexual activity of another employee
- subtle pressure for sexual favors or sexual activity of another employee;
- deliberate, repeated or unsolicited verbal comments, gestures, or physical actions of a sexual nature toward another employee (i.e., lewd or lascivious remarks and unnecessary touching, patting or pinching).

If you feel you have been the victim of harassment... You should immediately contact your Supervisor, your Department Head or the Human Resources Manager. A prompt investigation will be conducted of *each and every complaint* and appropriate action will be taken. The Human Resources Manager has the responsibility for investigating and resolving complaints of harassment. You should report any harassment you either experience or observe. *Under no circumstances will a person's employment be jeopardized because of a report of what he or she perceives in good faith to be an incident of unlawful harassment.*

March 1998

**DEFENDANT'S EXHIBIT**

Davis    2

ALBANY/DAVIS
D 0144

# ACKNOWLEDGMENT OF
# SEXUAL HARASSMENT TRAINING

I acknowledge that on _8 - 12 -_, 199_8_ I attended sexual harassment sensitivity training entitled. *Is It or Isn't It?*, and I understand that:

**1.** I have the right to work in an environment free from sexual harassment;

**2.** I have the responsibility not to engage in behaviors that constitute sexual harassment;

**3.** If I feel I am being harassed. I have the right and responsibility to communicate this directly to the appropriate party: and

**4.** I understand my organization's policy on sexual harassment.

_____
**Signature**

_____
**Please print your name above.**

_____
**Date**

**DEFENDANT'S EXHIBIT**

Davis 3