# Plaintiff's 6/7/06 deposition, with exhibits
## *Part 1*

**American Court Reporting**
**toll-free (877) 320-1050**

1 (Pages 287 to 290)

Page 287

IN THE UNITED STATE DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NUMBER
CV-2:05CV-1040-WKW

DORA DAVIS,
    Plaintiff(s),
vs.
ALBANY INTERNATIONAL, JEFF JOHNSTON,
    Defendant(s).

VOLUME II
DEPOSITION TESTIMONY OF:
DORA DAVIS

June 7, 2006
9:00 a.m.

COURT REPORTER:
DAVID L. MILLER, CSR, RMR

Page 288

1          S T I P U L A T I O N
2      IT IS STIPULATED AND AGREED by and
3 between the parties throught their
4 respective counsel that the deposition of
5 DORA DAVIS, may be taken before David L.
6 Miller, Registered Merit Reporter and
7 Notary Pulbic, State at Large, at the law
8 offices of Toles & Williams, Montgomery,
9 Alabama, on June 7, 2006, commencing at
10 approximately 9:00 a.m.
11      IT IS FUTHER STIPULATED AND AGREED
12 that the signature to and the reading of
13 the deposition by the witness is waived,
14 the deposition to have the same force and
15 effect as if full compliance had been had
16 with all laws and rules of Court relating
17 to the taking of depositions.
18      IT IS FURTHER STIPULATED AND
19 AGREED that it shall not be necessary for
20 any objections to be made by counsel to
21 any questions, except as to form or
22 leading questions, and that counsel for
23 the parties may make objections and assign

Page 289

1 grounds at the time of trial or at the
2 time said deposition is offered in
3 evidence, or prior thereto.
4
5
6
7          I N D E X
8 EXAMINATION BY:        PAGE NO.
9 Mr. Powell         292, 394
10 Ms. Swain          332
11 Ms. Williams        361
12 Certificate         424
13
14
15      INDEX OF EXHIBITS
16 EXHIBITS          PAGE NO.
17 DEFENDANT'S 16   Job site analysis 326
18 DEFENDANT'S 17   EEOC letter    320
19
20 PLAINTIFF'S 1    M-300 Study    381
21 PLAINTIFF'S 2    Notice to dismiss 387
22 PLAINTIFF'S 3    Order      388
23

Page 290

1      A P P E A R A N C E S
2
3 FOR THE PLAINTIFF(S):
4     Triana S. Williams
5     Vicky U. Toles
6     TOLES & WILLIAMS
7     1015 South McDonough Street
8     Montgomery, Alabama 36104
9
10 FOR THE DEFENDANT, ALBANY:
11     Charles A. Powell, IV
12     BAKER, DONELSON, BEARMAN, CALDWELL
13     & BERKOWITZ
14     1600 SouthTrust Tower
15     420 20th Street North
16     Birmingham, Alabama 35203
17
18 FOR THE DEFENDANT, JOHNSTON:
19     Jennifer F. Swain
20     JOHNSTON, BARTON, PROCTOR & POWELL
21     2900 AmSouth/Harbert Plaza
22     1901 Sixth Avenue North
23     Birmingham, Alabama 35203

**American Court Reporting**
**toll-free (877) 320-1050**

Page 291

1       A P P E A R A N C E S
2
3   ALSO PRESENT:
4       Jeff Johnston
5       Ted Bryant
6       DeMonica Richeson
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 293

1   to try to finish up your deposition in
2   your case against Albany International and
3   Jeff Johnston.
4           The format will be the same as
5   it was last time, questions and answers,
6   so we are going to operate by the same
7   ground rules we did before, okay?
8       A.   Okay.
9       Q.   All right.  Are you on any
10  medication or anything this morning that
11  would in any way impair your ability to
12  testify?
13      A.   No.
14      Q.   Other than your attorneys,
15  have you talked to anybody about your
16  deposition since we last met?
17      A.   Yes.
18      Q.   Who?
19      A.   My daughter.
20      Q.   Okay.  She is here with us
21  today?
22      A.   Yes.
23      Q.   Okay.  DeMonica --

Page 292

1           I, David L. Miller, a Registered
2   Merit Report of Birmingham, Alabama, and a
3   Notary Public for the State of Alabama at
4   Large, acting as Commissioner, certify
5   that on this date, pursuant to the Federal
6   Rules of Civil Procedure, and the
7   foregoing stipulation of counsel, there
8   came before me at the law offices of Toles
9   & Williams, Montgomery, Alabama,
10  commencing at approximately 9:00 a.m. on
11  June 7, 2006, DORA DAVIS, witness in the
12  above cause, for oral examination,
13  whereupon the following proceedings were
14  had:
15
16          COURT REPORTER:  Ms. Davis,
17  you are still under oath.
18
19  EXAMINATION BY MR. POWELL (continued):
20      Q.   Good morning, Ms. Davis.  How
21  are you?
22      A.   I'm okay.
23      Q.   All right.  We are here today

Page 294

1       A.   Richeson.
2       Q.   Okay.  What does your daughter
3   do?
4       A.   She works for Montgomery Water
5   Works.
6       Q.   Has she ever worked at Albany
7   International?
8       A.   No.
9       Q.   To your knowledge, did she
10  ever work with Jeff Johnston or Ted
11  Bryant?
12      A.   Excuse me.  She did do some
13  help a -- about a week at Albany
14  International.
15      Q.   Do you remember when that was?
16      A.   No.
17      Q.   Which department did she work
18  in?
19      A.   I think it was like throughout
20  the plant.
21      Q.   Any idea how long ago that
22  was?
23      A.   No.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 295

1    Q.    Okay.  In the August to
2  October of 2003 time frame, had your
3  daughter worked at the plant anywhere in
4  that time frame?
5    A.    No.
6    Q.    To your knowledge, do you
7  believe that your daughter has any
8  personal knowledge of any of the events
9  identified in your complaint in this
10  lawsuit?
11    A.    No.
12    Q.    So what about your deposition
13  did you discuss with your daughter?
14    A.    We just talked about the
15  length, how long.
16    Q.    Okay.  During your last
17  deposition you had mentioned that you had
18  gotten divorced.  What is your husband's
19  name -- former husband's name?
20    A.    Former husband's?
21    Q.    Yes.  The most recent
22  husband.
23    A.    William Davis.

Page 296

1    Q.    Okay.  Where does Mr. Davis
2  live?
3    A.    He lives in Millbrook,
4  Alabama.
5    Q.    Okay.  Do you know where he
6  works?
7    A.    Yes.
8    Q.    Where?
9    A.    Montgomery Ford.
10    Q.    What does he do at Montgomery
11  Ford?
12    A.    I don't know.
13    Q.    Okay.  We talked a little bit
14  when we were here last time about some
15  previous FMLA leave that you had taken
16  from the company.  And I believe your
17  testimony was that you either went to
18  Linda Jones or to Mr. Bryant if you needed
19  to request FMLA leave from Albany
20  International, correct?
21    A.    Yes.
22    Q.    Okay.  To your knowledge, did
23  Mr. Johnston have any involvement in the

Page 297

1  FMLA process?
2    A.    I don't know.
3    Q.    Okay.  Now, you told me last
4  time you were together that Albany had
5  never denied you FMLA leave if you
6  presented the paperwork with information
7  from your doctor that you needed to be
8  off, correct?
9    A.    Yes.
10    Q.    Okay.  Do you have any reason
11  to believe that your efforts to ask for
12  FMLA leave at any point at Albany had
13  anything to do with your departure from
14  the company?
15    A.    I don't understand your
16  question.
17    Q.    Well, you allege in the
18  lawsuit, among other reasons, that you
19  were fired because you asked for FMLA
20  leave.  I want to know if you, in fact,
21  believe that any request by you for family
22  leave was the reason for your discharge?
23    A.    I know that everytime I asked

Page 298

1  for medical help I was denied it.
2    Q.    You mean everytime you asked
3  for help for your work place injuries?
4    A.    Yes.
5    Q.    Okay.  Do you believe -- on
6  these occasions -- because I know we
7  looked at some attendance records last
8  time that indicated you had been approved
9  for FMLA leave by Albany on at least one
10  or two occasions.
11    All right.  Do you allege in
12  this lawsuit that you were discharged
13  because you sought family medical leave?
14  Not Workers' Compensation issues, but do
15  you believe that you were terminated
16  because you sought family leave under the
17  FMLA?
18    A.    I would say partly.
19    Q.    Okay.  How?
20    A.    Because I was denied family
21  leave.  I asked for help -- I asked for
22  medical help.  I told them that my
23  injuries were hurting me and I was hurting

**www.AmericanCourtReporting.com**
**June 7, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 299

1  every day, and it was proved, and I was
2  denied.
3      Q.    And these injuries that you
4  were seeking help for, these were your
5  Workers' Compensation injuries?
6      A.    They were Workers'
7  Compensation injuries.
8      Q.    Okay. Since you last worked
9  for Albany have you worked anywhere else?
10     A.    No.
11     Q.    Have you applied for work
12  anywhere else?
13     A.    No.
14     Q.    Have you been able to work
15  anywhere since you last worked at Albany?
16     A.    No.
17     Q.    Okay. And have you been able
18  to work anywhere since -- I believe August
19  the 21st of 2003 is the date that you were
20  declared disabled by Social Security.
21     A.    No.
22     Q.    Okay. As you sit here today,
23  you are not able to do your prior job as a

Page 300

1  seamer at Albany?
2      A.    With corrective surgery, I
3  might.
4      Q.    But as you sit here today, no?
5      A.    No.
6      Q.    Okay. At any point between
7  August of 2003 and today have you been
8  able to perform all of your job duties as
9  a seamer at Albany?
10     A.    No.
11     Q.    Okay. When you were declared
12  disabled by Social Security, did they --
13  did they start paying you benefits;
14  meaning are you getting paid some payment
15  from Social Security for your disability?
16     A.    Yes.
17     Q.    Okay. And I think they -- I
18  think that ruling came out in 2005, is
19  when Social Security concluded that you
20  were disabled, correct?
21     A.    Yes.
22     Q.    Okay. Did they pay you back
23  pay, a catch-up payment back to August the

Page 301

1  21st of 2003?
2      A.    Yes.
3      Q.    Okay. Was that just a lump
4  sum payment back to August of 2003?
5      A.    Yes.
6      Q.    All right. We had, I think,
7  last time marked this as Exhibit 15.
8  These were your initial disclosures in the
9  case. And I'm sort of in the middle on
10  the one that I have handed you. I really
11  want to start at number nine and just have
12  you to look down the rest of the list.
13  Just let me know when you have had a
14  chance to do that, and I will tell you
15  what I want to know.
16         (Pause)
17     A.    What was your question?
18     Q.    Okay. The question is:  Is
19  there anybody on this list of doctors or
20  healthcare facilities from whom you sought
21  treatment for any claimed injuries as a
22  result of anything Mr. Johnston did to
23  you?

Page 302

1      A.    I don't understand that
2  question.
3      Q.    Let's see if I can rephrase
4  it. You are seeking damages in this
5  lawsuit, okay. What I'm trying to
6  determine is whether or not any of these
7  doctors or healthcare providers that you
8  have listed -- if any of the folks on this
9  list treated you for injuries that you
10  claim were caused by some conduct by Jeff
11  Johnston.
12     A.    Yes.
13     Q.    Okay. Which ones?
14     A.    All of them, except for
15  Dr. Hamilton, Dr. Hackman, Dr. Jakes.
16     Q.    So it is your contention that
17  every doctor on this list in your initial
18  disclosures except Dr. Jakes, who is
19  number eleven, Dr. Hamilton, who is number
20  fifteen, and Dr. Hackman, who is number
21  sixteen, treated you for some injury that
22  you contend is caused by Jeff Johnston?
23     A.    No. I'm saying that number

**American Court Reporting**
**toll-free (877) 320-1050**

Page 303

1    nine, Dr. Sweet; number ten, Dr. Katz;
2    number twelve, Dr. Wade; thirteen,
3    Dr. Hartzog.
4            I went to Jackson Hospital for
5    tests -- well, I had surgery at Jackson
6    Hospital, too. So I would say yes. And
7    Dr. -- seventeen, Dr. Cargile Miller.
8        Q.   What is it that Dr. Sweet
9    treated you for that you claim was caused
10    by Mr. Johnston?
11        A.   I was injured on the job. I
12    was refused medical help.
13        Q.   All right. Which injury did
14    Dr. Sweet treat you for?
15        A.   He -- lower back, my neck.
16        Q.   When did Dr. Sweet treat you?
17        A.   It was 2003.
18        Q.   And was this treated as a
19    Workers' Compensation injury?
20        A.   Yes.
21        Q.   Is the treatment that you
22    received from -- for your lower back and
23    neck from Dr. Sweet, is that what is at

Page 304

1    issue in your State court Workers'
2    Compensation case?
3        A.   I really don't know.
4        Q.   Okay. What exactly is it that
5    you contend that Mr. Johnston did that
6    contributed to your back or neck injuries?
7        A.   I worked for Albany
8    International. They were in charge of the
9    way that I was medically treated, and I
10    was denied treatment.
11        Q.   I will ask the question a
12    little more specifically and see if maybe
13    we can speed this up. Is there -- did you
14    seek any medical treatment specifically
15    for some action by Jeff Johnston towards
16    you?
17        A.   Medical treatment -- repeat
18    me -- repeat yourself, I mean.
19        Q.   Let me ask it this way. Is
20    there some specific injury to you that you
21    believe was directly caused by Jeff
22    Johnston?
23        A.   I believe that I worked for a

Page 305

1    company where Jeff Johnston was in charge
2    of. And through my trying -- seeking help
3    for injuries, I was refused help. The
4    company was in charge. They denied me
5    medical help or corrective surgery or
6    anything that could make my life
7    comfortable to live.
8        Q.   All right. Outside of
9    Mr. Johnston's role with the Montgomery
10    plant for Albany, is there any specific
11    action by Mr. Johnston personally towards
12    you that you think caused you any injury?
13        A.   I was asked to be taken off of
14    the machines. Mr. Johnston was still in
15    charge. He denied me the right to come
16    off of the machine, where they allowed
17    other people to be moved off of the
18    machines, which they knowed these machine
19    was causing injuries to our bodies.
20        Q.   Which machines were causing
21    the injuries?
22        A.   The M-3000.
23        Q.   M-3000, okay. And how do --

Page 306

1    what is the basis for your contention that
2    they know that the machine was causing
3    injury?
4        A.   Because we were injured on --
5    in certain -- crawling, pulling, walking,
6    standing, lifting, shoving, sitting in a
7    position all day, lifting weights, having
8    to lean.
9        Q.   Anybody that you worked with
10    at Albany in the seaming department that
11    is still there?
12        A.   Yes.
13        Q.   Who?
14        A.   A lot of people. I don't know
15    everybody that is still there.
16        Q.   More than five?
17        A.   Yes.
18        Q.   More than ten?
19        A.   I don't know.
20        Q.   All right. And would these
21    other folks in seaming -- did they also
22    work on the M-3000 machine like you?
23        A.   Yes.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 307

1    Q.    And they are still able to
2    work?
3    A.    I assume so.
4    Q.    All right.  Now, I see right
5    below Dr. Sweet's name is Dr. Allen's
6    name.  Are they partners in a medical
7    group?
8    A.    Yes.
9    Q.    Did you see both Dr. Sweet and
10   Dr. Allen?
11   A.    No.
12   Q.    Just Dr. Sweet?
13   A.    I saw Dr. Allen later, but
14   there was a separate office when I saw
15   Dr. Allen.  Dr. Sweet was in a different
16   office.
17   Q.    All right.  We talked about
18   Dr. Katz and Dr. Wade last time.
19         Who is Dr. Hartzog?
20   A.    Dr. Hartzog -- he was a
21   Workers' Comp doctor who did surgery on my
22   rotator tear.
23   Q.    That surgery was in 2001?

Page 308

1    A.    Yes.
2    Q.    Okay.  Paid for by the company
3    as a Workers' Comp injury?
4    A.    Yes.
5    Q.    What did Dr. Miller treat you
6    for?
7    A.    My wrist.  Both wrists.
8    Q.    Your wrists?  Are those also
9    Workers' Comp injuries?
10   A.    Yes.
11   Q.    Were you treated for carpal
12   tunnel?
13   A.    Both wrists.
14   Q.    Okay.  Do you remember when
15   that was?
16   A.    Probably 2003, too.
17   Q.    Who is Dr. Hackman?
18   A.    Dr. Hackman was -- he treated
19   me once for Workers' Comp.  That's for my
20   lower back.  I went for an opinion.
21   Q.    So Dr. Hackman treated you one
22   time for your lower back?
23   A.    Yes.

Page 309

1    Q.    Was that a Workers' Comp
2    injury?
3    A.    Yes.
4    Q.    Did he treat you for anything
5    else?
6    A.    I went for a reading of
7    x-rays.
8    Q.    X-rays of what?
9    A.    My neck.
10   Q.    Your neck.  Did you get a
11   second opinion from Dr. Hackman for the
12   neck injury that Dr. Sweet had treated you
13   for?
14   A.    No.  I went for a -- personal.
15   Q.    Okay.  Was that while you were
16   employed by Albany?
17   A.    I believe it was after.
18   Q.    Who is Dr. Hamilton?
19   A.    He is my cardiologist.
20   Q.    Was he your doctor during the
21   time that you were employed by Albany?
22   A.    Yes.
23   Q.    Okay.  Was he treating you for

Page 310

1    health problems during your employment
2    with the company?
3    A.    Yes.
4    Q.    What is the nature of your
5    heart condition?
6    A.    You asked me what heart
7    diseases do I have?
8    Q.    Yes, ma'am.
9    A.    Okay.  I have cardiomyopathy,
10   mitral valve prolapse, congestive heart
11   failure, enlarged heart, hypertension.
12   Q.    Has Dr. Hamilton, to your
13   knowledge, diagnosed the cause of these
14   heart conditions?
15   A.    No, he didn't.
16   Q.    Do you believe in any way
17   Albany International is the cause of your
18   heart problems?
19   A.    Yes.
20   Q.    How so?
21   A.    When I was treated with
22   steroid treatments on my lower back, I
23   complained of not being able to take them,

**American Court Reporting**
**toll-free (877) 320-1050**

Page 311

1   because I was allergic to them.  And I
2   took them anyway, because of the pain that
3   was in my back.
4       Q.    Who gave you the steroid
5   shots?
6       A.    I believe it was a
7   Dr. Richardson under Dr. Dunavant.  I
8   believe that is -- that's been how long it
9   has been.  I don't remember.
10      Q.    Are these steroids shots part
11  of Workers' Comp treatment?
12      A.    Yes.
13      Q.    All right.  Has Dr. Hamilton
14  told you that these steroid shots caused
15  any of these heart conditions?
16      A.    Dr. Hamilton was my doctor at
17  that time.
18      Q.    Well, has any doctor told you
19  that steroid shots, as part of your
20  Workers' Compensation treatment for your
21  back pain, caused any of these heart
22  conditions that you have identified?
23      A.    No.

Page 312

1       Q.    Okay.  Then how do you draw
2   some connection between steroid shots and
3   your heart problems?
4       A.    I never had heart problems
5   until I started receiving the steroid
6   shots.
7       Q.    So that's simply your opinion
8   that there is a connection between the
9   steroid shots and your heart problems?
10      A.    I didn't -- I started having
11  heart problems afterwards -- after the
12  steroid shots.
13      Q.    All right.  And you, on your
14  own, have drawn some connection between
15  the steroid shots and your heart problems?
16      A.    I started having steroid shots
17  -- I mean, I started having heart problems
18  after the steroid shots.
19      Q.    Okay.  But no doctor has told
20  you that they have diagnosed any medical
21  link between your steroid shots and the
22  heart problems that you have identified?
23      A.    The only thing I know is each

Page 313

1   time I received steroid shots, I end up
2   with new heart -- heart diseases.
3       Q.    Have you seen anybody other
4   than Dr. Hamilton for your heart problems?
5       A.    I saw another doctor before
6   Dr. Hamilton, but I don't even remember
7   his name.
8       Q.    Okay.  What has Dr. Jakes
9   treated you for?
10      A.    Fibromyalgia.
11      Q.    And how long has Dr. Jakes
12  been treating you for fibromyalgia?
13      A.    I believe I saw him in -- it
14  was either 2004, late 2003, one or the
15  other.
16      Q.    Were you being treated by
17  Dr. Jakes during the time that you were
18  employed by Albany?
19      A.    No.
20      Q.    Who is Dr. Garrison?
21      A.    Dr. Garrison is another
22  Workers' Comp doctor.
23      Q.    What about Dr. Dalton?

Page 314

1       A.    Dr. Dalton is a personal
2   doctor.
3       Q.    What has Dr. Dalton treated
4   you for?
5       A.    He did a colonoscopy.
6       Q.    Just an exam or were you being
7   treated for some particular condition?
8       A.    Well, everytime -- when I
9   could not receive injections, when I could
10  not take the -- the muscle relaxers or the
11  inflammatory pills, I suffer from that
12  with acid reflux.
13          So she told me that it was
14  something had to be going on, the reason I
15  couldn't take this medicine.  So that's
16  when I consulted my physicians and asked
17  them to give me -- to try to find out was
18  anything going on in my body to cause me
19  not to be able to take the medicine.  She
20  suggested that I have some -- I have
21  something done about that.
22      Q.    All right.  And did Dr. Dalton
23  put you on any course of treatment

**www.AmericanCourtReporting.com**
**June 7, 2006**

Page 315

1  following this colonoscopy?
2  A.  Was nothing wrong in my colon
3  for them to treat me for.
4  Q.  Who is Dr. Turner?
5  A.  Dr. Turner is another Workers'
6  Comp doctor.
7  Q.  What did Dr. Turner treat you
8  for?
9  A.  He was the company doctor.
10  Wrists, neck, lower back.
11  Q.  What did Dr. Garrison treat
12  you for?  I know you said he was a Work
13  Comp doctor.
14  A.  Lower back, I believe.
15  Q.  Dr. Mathis?
16  A.  He was my medical -- my
17  personal medical doctor.
18  Q.  Okay.  There is a reference on
19  your disclosures to an ergonomic
20  evaluation of the M-3000 machine.  Is that
21  a -- what is that?  Is that --
22  A.  I don't know what it is.
23  Q.  Is that a job site analysis

Page 316

1  that was done of the seaming job?
2  A.  I assume.  I don't know.
3  Q.  Tell a look at that for me and
4  tell me if you recognize that.
5  (WHEREUPON, a document was
6  marked as Defendant's Exhibit 16 and is
7  attached to the original transcript.)
8  A.  Yes.
9  Q.  Did you see this job site
10  analysis at any point while you worked for
11  the company?
12  A.  Yes.
13  Q.  Okay.  And have you had a
14  chance to read over it?
15  A.  I have seen it.
16  Q.  Okay.  And is this a -- does
17  this job function wise and workwise
18  provide a fair assessment of the seaming
19  machine operator job at Albany's
20  Montgomery plant?
21  A.  It is a description of the job
22  that we did.
23  Q.  So this is a description of

Page 317

1  your seaming job?
2  A.  Yes, from what I can see.
3  Q.  Okay.  Now, you allege in your
4  complaint that the company knew the M-3000
5  was causing injuries.
6  A.  Yes.
7  Q.  All right.  Now, you told me a
8  little while ago that your basis for that
9  was you and others got hurt on the job.
10  A.  Yes.
11  Q.  All right.  Any basis for that
12  allegation other than your observation
13  that you were injured and others may have
14  been injured at work?
15  A.  When this -- when we -- when
16  the injuries start occurring, not only to
17  me, but other people, that is when the
18  company started -- I don't know what the
19  process was, but they brought somebody in
20  to evaluate this M-3000 and to check and
21  to see what we was doing and was not
22  doing.
23  Q.  Okay.  Did y'all start doing

Page 318

1  anything differently after that?
2  A.  My job was the same.
3  Q.  Did y'all start any kind of
4  exercise program in the plant?
5  A.  They started an exercise
6  program, yes.
7  Q.  For everybody in the seaming
8  department?
9  A.  Every -- yes.
10  Q.  What did that exercise program
11  consist of?
12  A.  You stand and make certain
13  movements with your body.
14  Q.  Just sort of a stretching
15  program?
16  A.  Stretching process, yes.
17  Q.  So you would be sort of warmed
18  up and ready to go to work?
19  A.  No.  It wasn't at the
20  beginning of the shift.  It was usually
21  like some part of the day -- in the
22  morning, and then another -- like about
23  two in the evening and probably nine,

**American Court Reporting**
**toll-free (877) 320-1050**

Page 319

1  something like that, in the morning.
2      Q.    Well, did you do the
3  stretching exercises every shift?
4      A.    No.  It was every shift, but
5  we did it two times a day.  We did it
6  morning and then we do it in the
7  afternoon.
8      Q.    So you did it two times per
9  shift?
10     A.    Yes.
11     Q.    Okay.  You say morning and
12  afternoon.  If you are on third shift,
13  that would be just after midnight and --
14  but two times a shift?
15     A.    Yes.
16     Q.    Okay.  So you would work a
17  little while, stop, stretch, go back to
18  work, then stretch again, and then finish
19  your shift?
20     A.    Yes.
21     Q.    All right.
22         MS. WILLIAMS:  Do you need a
23  break?

Page 320

1         THE WITNESS:  No, not yet.
2      Q.    (BY MR. POWELL) At any point
3  while you worked for the company did you
4  -- did you ever contact the EEOC to
5  complain about any of these allegedly
6  discriminatory events that you have
7  identified?
8      A.    Yes, I did.
9      Q.    What did you do?
10     A.    Wrote a letter.
11     Q.    Wrote a letter to them.
12  Okay.
13         Does it look like that?
14         (WHEREUPON, a document was
15  marked as Defendant's Exhibit 17 and is
16  attached to the original transcript.)
17         (Pause)
18     A.    Okay.
19     Q.    Have you had a chance to look
20  over what has been marked as Exhibit 17 to
21  your deposition?
22     A.    Yes.
23     Q.    Do you recognize it?

Page 321

1      A.    Yes.
2      Q.    What is it?
3      A.    It's a letter to the Equal
4  Opportunity Commission.
5      Q.    Who wrote this letter?
6      A.    I did.
7      Q.    Did you type it?
8      A.    No.
9      Q.    Okay.  Who typed it for you?
10     A.    A friend of mine.
11     Q.    Who was that?
12     A.    Her name is Valerie.
13     Q.    What is Valerie's last name?
14     A.    Abner.
15     Q.    Would that be Shederick
16  Abner's wife?
17     A.    Yes.
18     Q.    Okay.  Now, the only version
19  of this I have is not signed.  Did you
20  actually personally sign one of these to
21  the EEOC?
22     A.    I don't remember, but -- I
23  don't remember.

Page 322

1      Q.    All right.  But what is in
2  here were your thoughts at the time about
3  your employment with Appleton Wire?
4      A.    Yes.
5      Q.    All right.  And this letter is
6  dated October 14, 2000?
7      A.    Yes.
8      Q.    Did you ever formally file a
9  charge of discrimination with the EEOC?
10     A.    No.
11     Q.    Okay.  Were you contacted by
12  anyone at the Commission to discuss this
13  letter?
14     A.    No.
15     Q.    Okay.  What prompted you to
16  send this letter to Ms. Monroe?
17     A.    Because all of the --
18  everything -- it's true.
19     Q.    So what is in here then -- you
20  have also testified about a lot of this in
21  your deposition in this case --
22     A.    I believe so.
23     Q.    All right.  Well, if you

**American Court Reporting**
**toll-free (877) 320-1050**

Page 323

1  believed all of this in October of 2000,
2  why didn't you take any formal action on
3  it six years ago?
4      A.   Because -- so far everyone I
5  have turned to -- Mr. Johnston,
6  Mr. Bryant, the Union -- is like -- in
7  here, a deaf ear. It's like no one
8  hears. And when I do get an explanation,
9  it is explained away.
10      Q.   What exactly did you ask
11  Mr. Bryant for help with?
12      A.   I have always let Mr. Bryant
13  know that when I go to the doctor's
14  office, I let them know how I'm treated.
15      Q.   Other than your Workers'
16  Compensation treatment, any other issues
17  that you have brought to Mr. Bryant's
18  attention that he has not addressed?
19      A.   I don't remember.
20      Q.   Okay. None that you can
21  remember as you sit here today?
22      A.   The situation with Tim
23  Woodward, no matter who or how I

Page 324

1  complained, no one did anything about
2  anything. And all I was trying to do was
3  stay there until I turned fifty-five years
4  old so I could retire with dignity. I was
5  not allowed to -- I was not given that
6  opportunity.
7      Q.   Well, if you are incapable of
8  working -- I mean, you have testified that
9  you are unable to work.
10      A.   Because of injuries. Job --
11  on-the-job injuries.
12      Q.   Okay. So it's your contention
13  in this case that the reason that you were
14  unable to get to age fifty-five at Albany
15  and retire with dignity is because of
16  Workers' Compensation injuries?
17      A.   Because of -- I was not
18  treated for those injuries, I was just
19  passed through doctors' offices.
20      Q.   Okay. I see on page two of
21  this letter that you claim to have been
22  subjected to mental exams without your
23  consent while being treated for an

Page 325

1  on-the-job injury.
2      A.   One time I went to -- I was
3  under Workers' Comp, and I was sent to --
4  I don't remember the building -- but I was
5  given something like a three-hour test,
6  and it was testing my mental capabilities.
7      Q.   Who gave you the test?
8      A.   If I could remember that, I
9  would tell you. I don't know.
10      Q.   This test was not conducted at
11  Albany International?
12      A.   I was sent to this company by
13  Albany International.
14      Q.   By Albany or by the Workers'
15  Compensation doctor?
16      A.   Albany International or the
17  Workers' Comp or whoever was working for
18  Albany International.
19      Q.   Well, who, by name
20  specifically, asked you to go take this
21  three-hour test?
22      A.   I don't remember.
23      Q.   Okay. And since it is

Page 326

1  referenced in an October the 14th, 2000,
2  letter, I assume that you had this test
3  sometime prior to that?
4      A.   I don't remember the dates or
5  the time. I don't remember.
6      Q.   Do you know what year?
7      A.   I don't remember.
8      Q.   I see further down in that
9  paragraph it says that you have been
10  clinically diagnosed with depression and
11  you are currently taking drug treatments
12  and counseling.
13      A.   During this time I was -- I
14  went to a program we had called -- I was
15  in a lot of pain, just like I was up until
16  the point where I was dismissed. And I
17  would -- the doctors wasn't treating me.
18  So I went to EEO --
19      Q.   EAP?
20      A.   EAP. The EAP -- I think her
21  name was Linda -- I believe Linda -- Linda
22  Jackson. It was -- I don't remember her
23  name. But, anyway, she sent me to a

**www.AmericanCourtReporting.com**
**June 7, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

11 (Pages 327 to 330)

Page 327

1  doctor for this.
2      Q.    And how long did you get
3  treatment under Albany's EAP program?
4      A.    I had to pay for that service
5  myself. You only go to their counselors.
6  And I had to go -- when I went to this
7  doctor, I had to pay the doctor myself.
8      Q.    The company paid for the EAP
9  portion of the counseling?
10     A.    Yes.
11     Q.    Okay. And after you met with
12 the EAP counselor you then went to a
13 separate private --
14     A.    She sent me to a doctor --
15 which I don't even remember his name. But
16 I know I went -- I went for a little
17 while, but it wasn't long. But during the
18 medication I could not drive or anything.
19 My daughter drove me.
20     Q.    Okay. Did you personally talk
21 with anyone at the EEOC in response to
22 this letter?
23     A.    No.

Page 328

1      Q.    Did you meet with anybody at
2  the EEOC about your claims?
3      A.    No.
4      Q.    Did you mail this to the EEOC,
5  or what did you do with it?
6      A.    Most likely mailed it, because
7  I didn't go to it. I had to have mailed
8  it.
9      Q.    What was Shederick Abner's
10 involvement in this letter?
11     A.    He encouraged me.
12     Q.    To your knowledge, did he
13 write his own letter?
14     A.    I don't know.
15     Q.    Okay. Have you ever given any
16 testimony on any of these events anywhere?
17     A.    Yes. Most likely, I have.
18     Q.    Do you remember where?
19     A.    No.
20     Q.    I'm just going to run some
21 medication names by you and I just want a
22 general description of why you were
23 prescribed these medicines. All right.

Page 329

1          Ketorolac, K-E-T-O-R-O-L-A-C.
2      A.    I don't know.
3      Q.    Dr. Hartzog prescribed that
4  for you.
5      A.    It was probably inflammation
6  or pain.
7      Q.    All right. Bextra.
8      A.    It was probably inflammation
9  or pain, which I was allergic to, too.
10     Q.    Diazepom, D-I-A-Z-E-P-O-M.
11     A.    I don't know.
12     Q.    Meclizine, M-E-C-L-I-Z-I-N-E.
13     A.    I don't know.
14     Q.    Skelaxin, S-K-E-L-A-X-I-N.
15     A.    Pain or inflammation.
16     Q.    Spironolactone,
17 S-P-I-R-O-N-O-L-A-C-T-O-N-E.
18     A.    I don't know.
19     Q.    Lisinopril,
20 L-I-S-I-N-O-P-R-I-L.
21     A.    I don't know.
22     Q.    Furosemide,
23 F-U-R-O-S-E-M-I-D-E.

Page 330

1      A.    I don't know.
2      Q.    That's a Dr. Hamilton
3  medicine.
4      A.    It's probably for fluid.
5      Q.    Trazodone, that's Dr. Jakes.
6      A.    Oh, probably pain or -- pain,
7  I guess.
8      Q.    Dr. Mathis appears to have
9  prescribed Premarin.
10     A.    That's estrogen.
11     Q.    Also Dr. Mathis Protonix?
12     A.    I don't know.
13     Q.    And Meprozine, also
14 Dr. Mathis?
15     A.    I don't know, but I believe it
16 was for the acid reflux or the relief.
17     Q.    Dr. Katz appears to have
18 prescribed Alprazolam,
19 A-L-P-R-A-Z-O-L-A-M.
20     A.    Probably inflammation or pain.
21     Q.    All right. Tizakidine,
22 T-I-Z-A-K-I-D-I-N-E. That's Dr. Fallahi.
23     A.    Probably inflammation or --

**American Court Reporting**
**toll-free (877) 320-1050**

Page 331

1 it's because of the fibromyalgia.
2      Q.    Okay. Dr. Fallahi is not a
3 name that I think I have heard before.
4 Who is Dr. Fallahi?
5      A.    I also saw him. Fibromyalgia.
6      Q.    What about Dr. Fishnic
7 (Phonetic)?
8      A.    I don't know who that is.
9      Q.    Looks like he prescribed
10 amoxicillin, just a general antibiotic, I
11 think.
12      A.    This was probably pertaining
13 to having dental work.
14      Q.    Dr. McLamore, M-C-L-A-M-O-R-E,
15 appears to have prescribe
16 cyclobenzaprine.
17      A.    I don't know. I went to him
18 for sinuses.
19      Q.    Dr. Sweet appears to have
20 prescribed Srbudeprion,
21 S-R-B-U-D-E-P-R-I-O-N.
22      A.    I don't know. Possibly
23 inflammation or pain.

Page 332

1      Q.    Who is Dr. Wahid, W-A-H-I-D?
2      A.    I don't know.
3      Q.    Do you know why he prescribed
4 Naproxen for you?
5      A.    Inflammation, I guess, or
6 pain. Something, I don't know.
7      Q.    Okay. If you need at break at
8 any point, just let us know.
9           MS. WILLIAMS: If we could
10 just stop right now and take a break.
11           MR. POWELL: We can.
12                9:58 AM
13           (Short recess)
14                10:18 AM
15           MR. POWELL: I don't have any
16 more questions for you.
17
18 EXAMINATION BY MS. SWAIN:
19      Q.    Ms. Davis, are you ready?
20      A.    Yes.
21      Q.    My name is Jennifer Swain. I
22 represent Jeff Johnston in the lawsuit
23 that you have filed against him and

Page 333

1 Albany.
2           As Mr. Powell did, I'm going
3 to ask you a series of questions today.
4 If I ask you a question that you don't
5 understand, can you tell me that and ask
6 me to rephrase it?
7      A.    Yes.
8      Q.    If you answer a question, I
9 will assume that you understood what I was
10 asking and that's what you were answering;
11 is that fair?
12      A.    Yes.
13      Q.    You testified earlier today,
14 Ms. Davis, that it was your belief that
15 Mr. Johnston and Albany had terminated
16 your employment in some way related to the
17 Family Medical Leave Act; is that right?
18      A.    Yes.
19      Q.    And I think I understood you
20 to say that the reason why you believed
21 that is because even though you were in
22 pain and you had injuries, you didn't get
23 the medical help that you felt like you

Page 334

1 needed.
2      A.    Yes.
3      Q.    Am I correct in understanding
4 that your claim about the Family Medical
5 Leave Act is that the company was not able
6 to find a doctor who would recognize and
7 properly treat your injuries?
8      A.    I feel that under Workers'
9 Comp I was being sent to doctors and the
10 doctors wasn't properly medicating or
11 correcting the injuries that I had.
12      Q.    And you believe that that was
13 Jeff Johnston's fault?
14      A.    Yes.
15      Q.    And that's because why?
16      A.    Because he was the leader. He
17 was over the company.
18      Q.    So what you really wanted
19 Mr. Johnston to do was to find you a
20 Workers' Comp doctor that would treat you
21 the way you felt you should be treated?
22      A.    To treat me the way I needed
23 to be treated.

13 (Pages 335 to 338)

Page 335

1    Q.   Okay.  And it was your belief
2  that the Workers' Comp doctors should have
3  taken you off from work?
4    A.   Yes.
5    Q.   And it's your believe that the
6  Workers' Comp doctors should have told
7  Albany that you were unable to work
8  because of your injuries?
9    A.   Yes.
10    Q.   And it's your belief that
11  because the doctors didn't do that, that
12  Mr. Johnston violated the Family Medical
13  Leave Act?
14    A.   Yes.
15    Q.   Is there any other way in
16  which you think Mr. Johnston or Albany
17  violated the Family Medical Leave Act?
18    A.   When I would go to or when
19  they called me to these meetings, it was
20  never any concern about what was going on
21  in my body.  It was always are you able,
22  are you in pain, can you guarantee that
23  you cannot work in pain.  I couldn't

Page 336

1  guarantee that, because I had been working
2  in pain since 1991.
3    Q.   Okay.  My question is whether
4  there was any other way in which you think
5  Mr. Johnston or Albany violated the FMLA
6  other than not finding you a doctor that
7  would take you off of work?
8    A.   I don't know.
9    Q.   You were, as you have
10  testified previously, permitted to take
11  family and medical leave when you had a
12  doctor's certification, correct?
13    A.   Yes.
14    Q.   And in this situation around
15  the time that you claim that you were
16  discharged, the doctors that you were
17  seeing for your injuries did not certify
18  that you needed to be off from work,
19  correct?
20    A.   They did not.
21    Q.   Do you know of anyone at
22  Albany who was allowed to take Family and
23  Medical Leave Act protected leave who did

Page 337

1  not have a medical certification saying
2  that they needed to be off from work?
3    A.   I don't know.
4    Q.   Did you ever discuss the
5  Family and Medical Leave Act with
6  Mr. Johnston?
7    A.   What I -- I don't remember
8  whether it was family medical leave, but I
9  did let Mr. Johnston know that I was in
10  pain and I was in constant pain.  And each
11  visit we had, every meeting, I allowed
12  them -- I let them know the extent of the
13  pain that I was living in on a day-to-day
14  basis.
15    Q.   In response to many of those
16  conversations you were sent to Workers'
17  Comp doctors; is that right?
18    A.   Yes.
19    Q.   Those doctors would release
20  you to return to work.
21    A.   They would release me.
22    Q.   I believe you testified the
23  last time we were here -- not this

Page 338

1  morning, but before -- that it's your
2  belief that you were actually terminated
3  on August the 21st, 2003; is that correct?
4    A.   Yes.
5    Q.   So when you came to the
6  meeting on October the 29th, that you have
7  also testified about previously, was it
8  your understanding that your employment
9  had already been terminated?
10    A.   Yes.
11    Q.   Tell me about that meeting on
12  October the 29th.  You testified before
13  that Mr. Johnston had threatened to call
14  the police on you; is that right?
15    A.   Whenever I am involved with
16  Mr. Johnston in any meeting, he always
17  flares up, he always attacked me in ways
18  that it shouldn't be.  He accuses me of
19  things that I'm not guilty of.  And this
20  was one of the occasions.
21    He kept telling me, "Dora, you
22  need to find you a doctor."  I said,
23  "Well, my doctor says that -- didn't say

14 (Pages 339 to 342)

Page 339

1  that I was not disabled to work." They
2  did not take me off the job.
3      Q.    When you say your doctor, your
4  personal physician?
5      A.    My personal doctors.
6      Q.    Your personal physician said
7  that --
8      A.    That --
9      Q.    -- you could return to work?
10     A.    I could return to work.
11     Q.    The Workers' Comp doctors also
12  said you could return to work?
13     A.    They said I could return to
14  work.
15     Q.    What was the context of Jeff
16  Johnston threatening to call the police?
17  Did he just say that out of the blue, or
18  was something said before that that seemed
19  to upset him?
20     A.    I walked out of the room and
21  closed the door.
22     Q.    Then what happened?
23     A.    That's when he told me that he

Page 340

1  was calling the police on me.
2      Q.    You walked out of the room and
3  closed the door and he followed you out of
4  the room?
5      A.    No. The shop steward,
6  Norma -- I believe she followed me. She
7  brought me back into the room.
8      Q.    Why did you walk out of the
9  room?
10     A.    Because of his accusations.
11     Q.    What accusations?
12     A.    "I can't guarantee you, Jeff,
13  that I am not in pain. I am under your
14  physician's care."
15     Q.    Well, you have testified that
16  at the time of the October 29th meeting
17  you were not physically able to work,
18  correct?
19     A.    I said that I was in a lot of
20  pain. I was working -- I was in a lot of
21  pain. I was hurting from the top of my
22  head to the sole of my feet.
23     Q.    Because of that pain, you felt

Page 341

1  that you couldn't work and you wanted a
2  Workers' Comp doctor to take you off,
3  correct?
4      A.    In the process of my trying to
5  do my job, it was constant, unbearing
6  pain.
7      Q.    Because of that pain, you were
8  unable to work?
9      A.    I was -- I wanted to --
10  Workers' Comp to do what they was supposed
11  to do. They had Workers' Comp insurance
12  that takes you off and gives you the
13  opportunity to heal. The company denied
14  me that.
15     Q.    Did you understand during that
16  October 29th meeting that your doctors had
17  released you to return to work?
18     A.    Yes.
19     Q.    It's my understanding from you
20  that because of all of the pain that you
21  were experiencing that you could not work
22  and you needed a doctor to take you off
23  work; is that right?

Page 342

1      A.    I needed the Workers' Comp
2  doctors to do the job that Albany
3  International allowed them to do.
4      Q.    Which, in your view, was to
5  take you off from work.
6      A.    To take me off work and allow
7  my body to heal.
8      Q.    Other than finding a Workers'
9  Comp doctor who would take you off from
10  work, was there anything else that you
11  think that Jeff Johnston should have done
12  for you and did not do for you?
13     A.    The Work Comp doctors was
14  under Albany International, they did what
15  Albany International say. They were their
16  doctors. I only went because they sent
17  me. They were Workers' Comp doctors. I
18  did what their doctors say do.
19          The company knowed the extent
20  of the injuries that I had acquired. They
21  knew that this had been going on for quite
22  some time. The pain was constant, they
23  know it was severe, they know I got locked

**American Court Reporting**
**toll-free (877) 320-1050**

Page 343

1   on the fabrics. I complained to Ted, I
2   complained to Jeff, I complained to the
3   shop steward supervisor. I complained to
4   everybody that I could have complained
5   to. No one did anything.
6       Q.   Well, what they did was she
7   sent to you a Workers' Compensation doctor
8   who did not take you off.
9       A.   These doctors were under the
10  supervision of Albany International. I
11  was told by Dr. Garrison that I -- that it
12  was something that he could do, but the
13  Workers' Comp did not approve it to make
14  my condition better.
15      Q.   Are you aware of any
16  conversations between Mr. Johnston and any
17  of your Workers' Comp doctors?
18      A.   I know that each day when I go
19  to Workers' Comp, if Donna was not with
20  me, before I get back to the company, the
21  company already knows what decisions have
22  been made before --
23      Q.   Okay.

Page 344

1       A.   -- from the doctors.
2       Q.   Here is my question. If you
3   will listen to the question and answer the
4   question I'm asking, we will get through
5   this a lot more quickly.
6           Are you aware of any
7   conversations between Jeff Johnston and
8   any of your Workers' Comp doctors?
9       A.   No.
10      Q.   Going back to the October 29th
11  meeting. You left the room, Norma Heath
12  came and asked you to come back into the
13  room; is that correct?
14      A.   Yes.
15      Q.   When you walked back into the
16  room Jeff Johnston just said, "Dora, I'm
17  going to call the police on you?"
18      A.   He told me he would call the
19  police on me.
20      Q.   Did he give you any indication
21  why he would call the police?
22      A.   He wouldn't have me slamming
23  doors or whatever.

Page 345

1       Q.   Did you slam the door when you
2   walked out of the room?
3       A.   I don't know whether I did. I
4   walked out.
5       Q.   Did Jeff Johnston actually
6   call the police?
7       A.   No, he didn't.
8       Q.   Did Jeff Johnston tell you on
9   October the 29th -- strike that.
10          Did you tell Jeff Johnston on
11  October the 29th, or Ted Bryant or whoever
12  was in this meeting, that you had decided
13  to pursue and, in fact, had applied for
14  Social Security disability benefits?
15      A.   I told them I had applied for
16  Social Security benefits.
17      Q.   Did you tell them you were
18  through with the Workers' Comp people?
19      A.   No, I didn't.
20      Q.   Did Jeff Johnston tell you in
21  the October 29th meeting that if you
22  returned to work but then had to leave
23  again or did not come into work because of

Page 346

1   pain without a doctor's excuse, that that
2   would be counted against you as an
3   occurrence?
4       A.   Yes.
5       Q.   Did you understand that you
6   could return to work, but that if you did,
7   you would have to actually come to work
8   and do the job?
9       A.   I understood that I had to
10  return -- I had to return to work.
11      Q.   And it was your feeling that
12  you could not do that?
13      A.   It is my thing that I was in a
14  lot of pain. At the time, barely
15  walking. My arms and things -- I couldn't
16  hardly move them. I couldn't drive
17  myself. I couldn't take care of my
18  myself. I couldn't even -- personally
19  take care of myself.
20      Q.   Because of?
21      A.   This company knew it, Jeff
22  Johnston knew it, Ted Bryant knowed. They
23  knew that all parts of my whole spine,

**American Court Reporting**
**toll-free (877) 320-1050**

16 (Pages 347 to 350)

Page 347

1  they knew my -- both wrists, they knew my
2  fingers, they knew my shoulder had erupted
3  again, the scar tissue. They knew the
4  pain that I was in every day. They knew.
5         And I was going and I begged
6  for help, and they didn't give it to me.
7  Instead, I don't have a job.
8         Q.    And because of all of the pain
9  that you were in, you knew that you were
10 not going to be able to go back to work --
11        A.    I knew that --
12        Q.    Let me finish the question.
13        A.    -- I had a Workers' Comp
14 situation, and I know it was Workers' Comp
15 laws, and I know Workers' Comp is supposed
16 to support me and make sure that the
17 injuries that I occurred was supposed to
18 be fixed, and they didn't do it. And
19 instead, I don't have a job today.
20        Q.    My question is, you -- because
21 of all of the pain that you were in when
22 you were in that October 29th meeting, you
23 knew that that you were not going to be

Page 348

1  able to come back to work and do all of
2  your job functions?
3         A.    I knew if I came to work I
4  would be in pain. I couldn't guarantee
5  Mr. Johnston that I couldn't be in pain.
6  He insisted that the only way I could come
7  back to work is not be in pain. I could
8  not guarantee him that I wouldn't be in
9  pain.
10        Q.    Did you ever have any
11 conversation with Mr. Johnston about
12 retirement benefits?
13        A.    I don't think so.
14        Q.    Do you know whether
15 Mr. Johnston had any responsibility for
16 administering the retirement plan at
17 Albany International?
18        A.    I don't know.
19        Q.    You testified last time we
20 were here that you had received a letter
21 from someone at Albany about your
22 retirement benefits; is that right?
23        A.    I guess.

Page 349

1         Q.    You understood -- let me show
2  you what Mr. Powell marked as Defendant's
3  Exhibit 14 and ask you to take a look at
4  that.
5         A.    Yes, I remember this letter.
6         Q.    Did you understand from that
7  letter that you are eligible for
8  retirement benefits from Albany when you
9  reach age fifty-five?
10        A.    Yes.
11        Q.    Other than the fact that --
12 let me ask you this.
13        How old were you in October of
14 2003?
15        A.    Fifty-one.
16        Q.    Other than the fact that you
17 weren't able to get retirement benefits at
18 the time you actually left the company, is
19 there anything else that either Jeff
20 Johnston or Albany did that you think
21 interfered with your retirement benefits?
22        A.    Yes.
23        Q.    What is that?

Page 350

1         A.    The fact that I was taken off
2  of my job way before this time came. The
3  fact that I was only going to receive
4  whenever I was eligible six hundred and
5  something dollars. I was insulted about
6  the loss and having to take two hundred
7  and something instead.
8         And I know that Albany had a
9  plan where if Workers' Comp had did their
10 part, I could have easily been taken off
11 of the job, offered early retirement. I
12 could have easily been taken off the job
13 under the -- under long-term disability,
14 and I would have received the benefits
15 that was -- I deserved.
16        Q.    What is it that you -- explain
17 to me what it is that you claim that you
18 are not eligible for in terms of
19 retirement benefits. I'm not talking
20 about Workers' Comp benefits.
21        A.    If I received these benefits
22 when I turned fifty-five -- you didn't
23 give me all of the paperwork. You only

**American Court Reporting**
**toll-free (877) 320-1050**

17 (Pages 351 to 354)

Page 351

1   gave me part of it, because it is showing
2   where I could have been eligible for six
3   hundred and seventy-nine dollars. But in
4   the letter that I received it said I would
5   receive those benefits. I only received
6   like two hundred and something dollars of
7   that benefit. I don't see that in this
8   letter.
9       Q.   Do you have a copy of the
10  letter that you are referring to?
11      A.   No, I don't.
12      Q.   Did you not understand from
13  Exhibit 14 that you are, in fact, eligible
14  to receive the six hundred and ninety-two
15  dollars and seven cents beginning
16  September 1st, 2006 -- I'm sorry --
17  september 1st, 2016, if you wait till you
18  are sixty-five to retire?
19      A.   That's if I waited till I
20  turned sixty-five. If I retired at
21  fifty-five, I would not receive full
22  benefit.
23      Q.   You do know, don't you, that

Page 352

1   if you retired at fifty-five you would
2   have taken a smaller retirement benefit
3   irrespective of the fact that you left
4   prior to that?
5       A.   I had an option. With what
6   happened, I don't have an option -- I
7   didn't have an option. It was taken away.
8       Q.   How was the option taken away?
9       A.   Because I'm no longer at
10  Albany International.
11      Q.   Your benefits aren't going to
12  be any different.
13      A.   You are missing the point.
14      Q.   I guess I am. See if you can
15  explain it to me.
16      A.   You -- if I retire at
17  fifty-five, I lost benefits. If Workers'
18  Comp had treated me with the same
19  advantage that they did some of the other
20  people, I would have been allowed to
21  receive my long-term disability payments
22  and I wouldn't have to retire until age
23  sixty-two.

Page 353

1       Q.   So, again, what you are really
2   complaining about with respect to your
3   retirement benefits is that the Workers'
4   Comp doctors did not take you off from
5   work?
6       A.   The worker -- the Workers'
7   Comp doctor I wasn't -- I was treated
8   differently, I was treated unfair.
9       Q.   And, again, the way that you
10  were treated differently and unfairly is
11  because they didn't take you off from
12  work?
13      A.   Because they did not make sure
14  that I was properly healed or able to
15  return to my job or able to perform my
16  job.
17      Q.   Okay. Do you know whether
18  Jeff Johnston had any responsibility for
19  administering the short-term or long-term
20  disability benefit plan?
21      A.   He was -- he was over the
22  company.
23      Q.   Well, you understood that the

Page 354

1   company employed certain people to deal
2   with benefit plans, correct?
3       A.   Yes. But Jeff Johnston was
4   the one riding my back about how -- how I
5   was able to work and to work without
6   pain. That's who was harassing me.
7       Q.   That is not the question. The
8   question is whether Jeff Johnston had any
9   responsibility for administering the
10  company's short or long-term disability
11  plans?
12      A.   I believe so.
13      Q.   And that's just based on your
14  own conjecture?
15      A.   I believe so.
16      Q.   Just your personal belief?
17      A.   I believe so.
18      Q.   Did anybody at Albany ever
19  tell you that Jeff Johnston was
20  responsible for administering the short or
21  long-term disability plans?
22      A.   I didn't ask.
23      Q.   Your answer is no, no one ever

18 (Pages 355 to 358)

Page 355

1 told you that?
2      A.   I didn't ask you.
3      Q.   Did anyone ever tell you that,
4 whether you asked or not?
5      A.   I didn't ask.
6      Q.   I understand you didn't ask.
7 Did anyone ever tell you?
8      A.   No.
9      Q.   Okay.  When you went into the
10 meeting on October the 29th, 2003, was it
11 your desire to return as of that date to
12 your full job duties at Albany?
13      A.   It was my desire that I get
14 the proper help from the doctors so I
15 could perform my job fully.  I was being
16 denied that right.
17      Q.   I'm trying to make sure I
18 understand what it was that you wanted to
19 have happen at that meeting.
20      A.   Yes.
21      Q.   What you wanted -- you knew
22 you couldn't actually work then, you
23 wanted someone to send you to a Workers'

Page 356

1 Comp doctor who would either -- who would
2 take you off work and treat your injuries;
3 is that correct?
4      A.   Yes.
5      Q.   Did you ever discuss long-term
6 disability benefits with Jeff Johnston?
7      A.   No.
8      Q.   Did you ever discuss
9 short-term disability benefits with Jeff
10 Johnston?
11      A.   No.
12      Q.   When you went to EAP for
13 depression prior to the letter that you
14 wrote the EEOC in 2000, what medication
15 did they put you on?
16      A.   I don't remember.
17      Q.   Did it work?
18      A.   I was on three different
19 medications.  I don't remember the name of
20 the medication.  One was to wake me up,
21 one was to lay me down, and one was help
22 me function during the day.  In the
23 process, the medication was overwhelming,

Page 357

1 so he had to take me off the medicine,
2 because I couldn't function.
3      Q.   So the medication did not help
4 you with depression?
5      A.   I don't know whether it helped
6 me with it.  The only thing -- it shut my
7 body down.
8      Q.   Have you been on any
9 medications for depression since leaving
10 Albany?
11      A.   The fibromyalgia doctors, they
12 tried to treat me with anti-depressants,
13 but my body could not take any of them.
14 So as of now, I take no anti-depressants.
15      Q.   Did you actually take some
16 anti-depressants that your fibromyalgia
17 doctor prescribed for a period of time?
18      A.   I was placed on two different
19 medications.  I don't remember the name.
20 I couldn't take either one, not even a
21 week.
22      Q.   What happened to you if you
23 took the anti-depressants?

Page 358

1      A.   I was shut down all day.  I
2 couldn't function.
3      Q.   Have you been able to function
4 without the anti-depressants?
5      A.   I live in constant pain every
6 day, all day.
7      Q.   Do you consider yourself to be
8 an emotionally stable person?
9      A.   Yes.
10      Q.   And has that been true at all
11 times since you left your employment with
12 Albany International?
13      A.   No.
14      Q.   At what point were you not
15 emotionally stable?
16           Will you answer the question?
17           MS. WILLIAMS:  Are you okay?
18      A.   I have not been able to think
19 about what happened to me.  It destroyed
20 me, ma'am.  To constantly think about what
21 I went through, how I worked twenty-four
22 and a half years on that job, how I gave
23 it my all, how I was one employee that

**American Court Reporting**
**toll-free (877) 320-1050**

Page 359

1  they could count on.
2        And for me to be sitting here
3  to explain myself to you right now, I
4  don't know whether you call it stable or
5  not, but it is not comfortable to think
6  about it. So if you call me stable, then
7  I'm stable. If you call me unstable, then
8  I'm unstable.
9        Q.   I'm not calling you anything.
10  I'm asking you whether you are emotionally
11  unstable.
12        A.   I don't know.
13        Q.   What doctors have treated you
14  for depression since you left Albany?
15        A.   Montgomery Area Mental Health.
16        Q.   Anybody else?
17        A.   I couldn't take the medicine.
18  They didn't administer the medicine, just
19  counseling. I cannot take -- or my body
20  will not accept the depressive --
21  anti-depressants.
22        Q.   When did you begin going to
23  Montgomery Area Mental Health?

Page 360

1        A.   It was in 2004.
2        Q.   Are you still being treated
3  there?
4        A.   No.
5        Q.   When did you stop going to
6  Montgomery Area Mental Health?
7        A.   Probably late 2004, early
8  2005. I don't know.
9        Q.   Did anybody other than
10  Montgomery Area Mental Help ever treat you
11  for depression since you left Albany?
12        A.   No.
13        Q.   Did anyone other than the EAP
14  and the doctor that you went to just
15  following that treat you for depression
16  prior to your leaving Albany?
17        A.   No.
18        Q.   Did you ever ask anyone at
19  Albany whether your employment had been
20  terminated?
21        A.   No.
22        Q.   Did you file any grievance
23  over what you claim was a termination?

Page 361

1        A.   I was out of the building.
2        Q.   Is that a no?
3        A.   No.
4        Q.   Norma Heath was your union rep
5  during the October 29th, 2003, meeting; is
6  that correct?
7        A.   Yes. She was there.
8        Q.   Was she there during the
9  entire meeting?
10        A.   Yes.
11        Q.   Have you spoken with her since
12  leaving Albany?
13        A.   No.
14             MS. SWAIN: Lets take a
15  break.
16             10:47 AM
17        (Short recess)
18             11:02 AM
19             MS. SWAIN: I'm done.
20
21  EXAMINATION BY MS. WILLIAMS:
22        Q.   Ms. Davis, I have a couple of
23  questions for you.

Page 362

1        Can you tell us how many times
2  you have been injured at the company? Do
3  you remember each time that you have been
4  injured?
5        A.   I remember about five times.
6  About five.
7        Q.   And during those five times,
8  were you actually sent to see the Workers'
9  Compensation doctors for those injuries?
10        A.   Yes.
11        Q.   Okay. And tell us, again,
12  those doctors' names.
13        A.   The first time -- well, I will
14  state it like this. The first time I went
15  -- when I first got injured, I saw my
16  personal doctor.
17        Q.   What is your personal doctor's
18  name?
19        A.   It was Dr. Fallahi.
20        Q.   Okay.
21        A.   Then I was sent from
22  Dr. Fallahi to, I believe it was,
23  Dr. Goodman. I'm not sure. I believe it

**American Court Reporting**
**toll-free (877) 320-1050**

Page 363

1  was Dr. Goodman. Then I was sent to a
2  Dr. Dunavant. I saw a Dr. Ryan. I
3  believe it was Dr. Richardson who did the
4  injections in my lower back. Who else?
5  That was for the first injury and rehab.
6        The second injury I think it
7  was also Dr. -- I can't remember the
8  second one.
9      Q.   If you can't remember, that is
10  fine.
11     A.   I think Dr. Goodman was the
12  company doctor for quite some time, but I
13  can't remember for how long. Then we went
14  to a Dr. Ulma (Phonetic), who was the
15  company doctor. And from Dr. Ulma to
16  Dr. Turner, the company doctors. And
17  these doctors would send me to
18  specialists. I saw a Dr. Kemp, he was
19  pain management, Dr. Miller, Dr. Katz,
20  Dr. Holt, Dr. Hartzog, Dr. Ulma, it was --
21  Dr. Wade. I don't remember.
22     Q.   Okay.
23     A.   I don't remember.

Page 364

1      Q.   During the time that you were
2  seeing these doctors, did any of the
3  doctors actually make any statements
4  regarding your condition -- medical
5  condition or your medical treatment that
6  you were actually receiving?
7      A.   Explain that.
8      Q.   Did they tell you -- did the
9  doctors tell you anything about your
10  treatment, why they were treating you and
11  the reason for the injuries, or anything
12  of that nature?
13         MR. POWELL: Object to the
14  form.
15     A.   When I went to Dr. Dunavant,
16  this was for my lower back. I was
17  receiving the injections. I complained
18  about I couldn't -- I couldn't complete --
19  I did two injections, but I couldn't do
20  the third one. I explained to him what
21  the injection was doing. They were making
22  me have heart pain, they were making my
23  heart beat rapid.

Page 365

1         When I went to his office that
2  day, he told me that -- I told him. He
3  said he didn't understand why I couldn't
4  finish the treatment. I told him -- I
5  clearly explained to him why. He told me
6  that he didn't see anything wrong anyway.
7         So I asked him -- I said, "You
8  stuck me in my spine three times and you
9  didn't see anything wrong with me." So I
10  told him when I got home that I will call
11  the insurance company and I will report
12  what he told me. I did report it to the
13  insurance company and I did report it to
14  Linda Jones. And this was Liberty -- I
15  think it was Liberty Mutual, the insurance
16  company at that time.
17         Okay. With Dr. Hartzog, I had
18  surgery. I was scheduled for surgery at
19  eleven o'clock that day. I don't know
20  what went wrong. I was brought in the
21  back about three o'clock. I was prep'd,
22  or whatever you called it, for surgery --
23  but, anyway, when I woke up it was five

Page 366

1  thirty. I hadn't had surgery. So I had
2  to be reprep'd and -- in other words, I
3  had the surgery, but it was like about ten
4  o'clock when I left there that night.
5         When they got ready to take me
6  out of the surgery, get me -- dress me to
7  leave, I sneezed and I started urinating.
8  I urinated from then till about, off and
9  on, three o'clock in the morning. I asked
10  the nurse -- I said, "Would you go get
11  Dr. Hartzog and let him know that
12  something is wrong. This is not normal."
13         She told me that, "Well, he is
14  going to send you home anyway. Your
15  company -- Workers' Comp said this is
16  outpatient, you go home." And this is
17  what happened to me.
18         I reported this -- the company
19  had a nurse to call, I guess, to check to
20  see what was going on or how did the
21  surgery come. I explained to her what
22  happened, I explained to Linda Jones what
23  happened.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 367

1      On another occasion, I went to
2  see Dr. Garrison -- first, Michael
3  Turner. I would go and I would tell him a
4  complaint about the pain that I was in.
5  Sometimes he would give me restrictions,
6  sometimes he didn't. The last time I was
7  in his office he told me that either I was
8  crazy or he was.
9      So then I was told by Donna
10 Smith that I wouldn't be seeing Dr. Turner
11 anymore. After that I was sent to
12 Dr. Garrison. I saw Dr. Garrison the
13 first time, and he sent me back to work.
14     I went back to work on this
15 occasion. Barbara Smith saw me limping
16 and she called up front and, in turn, Gay
17 Drake called the doctor. They sent me to
18 the doctor. When I left home I went to
19 Dr. Garrison's office. He was not there.
20 I had to go back across town to
21 Dr. Sweet's office. Dr. Sweet took me off
22 the job.
23     Okay. When I went back for my

Page 368

1  next exam, they sent me back to
2  Dr. Garrison. When I went to
3  Dr. Garrison, he -- that's when he told me
4  about the -- giving me the herbs -- a list
5  of herbs, telling me to run around the
6  track four times, when I started dragging
7  my leg, to come back to him. But in this
8  visit he also told me, too, that it was
9  something that he could do for me but the
10 Workers' Comp would not approve it.
11     I don't know whether I'm
12 answering the questions or whether I'm
13 rambling.
14     Q.  You are doing fine.
15     A.  But I -- it has been a history
16 throughout -- since I received injuries of
17 the treatment that I received from the
18 doctors. I have complained to the company
19 on several -- well, whoever was in charge
20 on several occasions. Nothing has been
21 done about it. Nothing.
22     I was still sent to these
23 doctors and these doctors just passed me

Page 369

1  through their office. They didn't do
2  anything to correct whatever was going on
3  in my body. They just allowed me to go
4  on. The pain just constantly build. I
5  worked. I worked. I went in and I worked
6  in pain, no matter what. I worked. The
7  pain got so excruciating that I could not
8  promise Mr. Johnston that I could not work
9  in pain.
10     Q.  Ms. Davis, you testified
11 earlier that the Workers' Compensation
12 doctors would not take you off the job.
13 Why do you think that they would not take
14 you off?
15     MS. SWAIN: Objection.
16     A.  Well, I believe that the
17 Workers' Comp doctors -- they told me that
18 they were under the company. Dr. Hartzog
19 told me that when I had rotator tear
20 surgery -- the next day he sent me back to
21 work. I had morphine in my arm and a
22 pillow under my arm.
23     I told Dr. Hartzog -- I said,

Page 370

1  "Dr. Hartzog, I won't be able to drive."
2  He said, "Don't you have an automatic."
3  That's exactly what he said to me. He
4  also told me -- I said, "Well, my company
5  don't have anything for me to do with the
6  pillow under my arm," and my company don't
7  -- I can't even tend to my personal -- if
8  I go to the bathroom, I can't even take
9  care of myself.
10     He told me that he was -- my
11 company said that they had -- in other
12 words, it was left up to the company to
13 decide whether I be at work or not be at
14 work.
15     Q.  Okay. So, based on your
16 treatment by him, did you return to work?
17     A.  Yes.
18     Q.  Okay. Did you at any point or
19 at any time tell any employee of Albany
20 International that you were not willing to
21 work?
22     MS. SWAIN: Object to the
23 form.

22 (Pages 371 to 374)

Page 371

1     A.    No.  No.
2     Q.    Okay.  Did you, in fact,
3   return to work?
4     A.    Yes.
5     Q.    I'm going to show you what was
6   previously marked as Defendant's Exhibit
7   Number 6.  Give you a few minutes to look
8   at it.  (Hands document)
9     A.    All right.
10    Q.    Okay.  Do you remember
11  reviewing this form earlier?
12    A.    Yes.
13    Q.    And can you tell us exactly
14  what this form is.
15    A.    This is short-term disability
16  claim.
17    Q.    Did you at some point complete
18  this form?
19    A.    Yes.
20    Q.    And, as you have seen, there
21  are several pages -- eight pages of this
22  form.  Did you complete all eight pages?
23    A.    No.

Page 372

1     Q.    Can you tell us which pages
2   you completed?
3     A.    I think -- I think pages -- I
4   don't know -- I know I did this one.  I
5   see my name signed to two.  There is a
6   portion -- I believe these two
7   (Indicating).
8     Q.    You completed two pages of the
9   eight pages; is that correct?
10    A.    I believe so.
11    Q.    All right.  Let me direct your
12  attention to page two of this document,
13  about middle ways.  Can you tell us
14  exactly what that says?  Can you see
15  that?
16    A.    Oh, yeah.  It says, "Has the
17  employee indicated that the absence is
18  work related," and it says no.
19    Q.    Did you check that box?
20    A.    No.
21    Q.    Okay.  And can you read that
22  for us -- the second part of that.
23    A.    "Has a Workers' Compensation

Page 373

1   claim been filed?"  "Yes."
2     Q.    Is there anything else
3   indicated near that block?
4     A.    It says, "For prior injury."
5     Q.    Did you complete that block?
6     A.    Yes, I guess -- no.  I don't
7   know whether I did or not.  I don't know.
8     Q.    At the bottom of the page
9   there is a name that says Linda Jones.
10  Did she actually complete the document,
11  those two -- first two pages?
12         MS. SWAIN:  Objection.
13    A.    Yes.
14    Q.    Okay.  Who is Ms. Jones?
15    A.    She handled medical records,
16  claims, stuff of that sort.  I don't know
17  what her title was.
18    Q.    Okay.  And would you know
19  why -- or do you know why the box next to,
20  "Has the employee indicated that the
21  absence is work related" -- and it is
22  checked no -- do you know why that was
23  checked?

Page 374

1     A.    No.
2     Q.    Okay.  Would you know why the
3   Workers' Compensation box is actually
4   checked yes?
5     A.    Because it was a Workers' Comp
6   injury that I was going to the doctor for.
7     Q.    But is there any indication,
8   based on Ms. Jones' completion of the
9   first two pages, that this is a Workers'
10  Compensation injury?
11         MR. POWELL:  Object to the
12  form.
13         MS. SWAIN:  Objection.
14    A.    This (Indicating).  Yes.
15    Q.    There is?
16    A.    Yes.
17    Q.    Is it for a prior injury?
18    A.    Yes.
19    Q.    But this particular instance,
20  was this work related?
21    A.    No -- yes.  It was work
22  related, yes.
23    Q.    Okay.  It was work related?

Page 375

1    A.   Yes.
2    Q.   Okay.  So why is the block
3 that says that it is not work related
4 checked; do you know?
5    A.   I don't know.
6    Q.   Okay.  But once you completed
7 pages, I think, four and five of the
8 document, it was your intention to
9 complete the form because it was work
10 related?
11       MS. SWAIN:  Objection to the
12 form.
13   A.   Yes.
14   Q.   Now, just a little while ago
15 Ms. Swain actually asked you if you
16 thought that you were emotionally stable.
17 Do you know what emotionally stable means?
18   A.   No.
19   Q.   Okay.  I am going to show you
20 what has been previously marked as
21 Defendant's Exhibit Number 9.  Do you
22 remember reading that document?
23   A.   Yes.

Page 376

1    Q.   And attached to that document
2 is actually an attendance report.  Do you
3 remember reviewing that as well?
4    A.   Yes.
5    Q.   And on this particular sheet
6 or attendance report, does it include the
7 days that you have actually worked?
8    A.   I believe it is showing
9 partial days.
10   Q.   Okay.
11   A.   Some are partial days.
12   Q.   Were you working those days?
13       MS. SWAIN:  Objection.
14   A.   Partial days -- I don't know.
15 I don't know.  I don't know.  No.
16   Q.   You were not working?
17   A.   Some -- some days are partial
18 days --
19   Q.   Okay.
20   A.   -- that I was at work.
21   Q.   Let me direct your attention
22 to October the 17th of 2002, and October
23 the 18th, 2002; do you see that?

Page 377

1    A.   Okay.
2    Q.   Can you tell me what is the
3 description of the work on those days?
4       MS. SWAIN:  Objection.
5    A.   I don't know -- I don't know
6 if -- like the Workers' Comp situation --
7 more than likely I left to go to a doctor
8 or I was going to therapy.
9    Q.   Was that based on work-related
10 injuries?
11   A.   Yes.
12   Q.   Okay.  And if you would look
13 at October the 8th -- I think there are
14 two blocks for October the 18th 2002; is
15 that correct?
16   A.   Okay.
17   Q.   What is the description for
18 that day, the second October 18?
19   A.   I don't know.
20   Q.   October the 18th --
21   A.   October the 18th.
22   Q.   -- description.
23   A.   Yeah.  See, it says Workers'

Page 378

1 Comp and an absence.
2    Q.   Okay.  Can you remember an
3 absence on that day?
4    A.   No.
5    Q.   Okay.  But there was a
6 Workers' Compensation -- something going
7 on that day; is that correct?
8       MS. SWAIN:  Objection.
9    A.   Yes.
10   Q.   And you were granted Workers'
11 Compensation based on this document for
12 that day?
13       MS. SWAIN:  Objection.
14       MR. POWELL:  Same objection.
15   A.   Yes.
16   Q.   But not granted for the entire
17 day; is that correct?
18   A.   Not the entire day.
19   Q.   Okay.  Is that the pattern and
20 practice of Albany International?
21       MR. POWELL:  Objection to the
22 form.
23       MS. SWAIN:  Objection.

**American Court Reporting**
**toll-free (877) 320-1050**

24 (Pages 379 to 382)

Page 379

1    A.    Yes.
2    Q.    Okay. Can you describe -- or
3    what is the procedure for taking Leave of
4    Absence at Albany?
5    A.    To take Leave of Absence a
6    doctor would have to declare that I am
7    sick or he is taking me off for an illness
8    or giving me recovery time.
9    Q.    Okay.
10   A.    And, in turn, I would have to
11   go to Linda Jones to get a document to
12   take to the doctor to fill out. And the
13   doctor mailed that portion to her, the
14   portion that he fills -- that he fills
15   out. But it has to be declared by a
16   doctor that I'm not able to work that day
17   or ever how many days that I'm not
18   working.
19   Q.    Okay. What is the procedure
20   for short-term and long-term disability?
21        MR. POWELL: Object to the
22   form.
23        MS. SWAIN: Objection.

Page 380

1    A.    Short-term disability is when
2    I'm out -- like during any work period I
3    have to be off sick. Long-term
4    disability -- I don't even know how that
5    works. But I know it is when -- there is
6    an insurance that we pay into. When you
7    become disabled to work, you are to be
8    paid -- this was a benefit, because you
9    are having -- been determined disabled
10   long-term.
11   Q.    Was there a requirement that
12   you be off for so many days to get that?
13        MR. POWELL: Object to the
14   form.
15   A.    I don't know.
16   Q.    Okay.
17   A.    I don't know.
18   Q.    You testified earlier that
19   this machine -- that the M-3000 was
20   causing injuries. How do you know that
21   that machine was causing injuries?
22   A.    Because I was -- I was -- I
23   was injured on the machine on several

Page 381

1    occasions. We had something placed in my
2    locker -- a document letting me know the
3    things that the M-3000 was doing and
4    causing injuries to our bodies.
5    Q.    Do you know who placed that
6    document there?
7    A.    No.
8    Q.    I'm going to show you what we
9    will mark as Plaintiff's Exhibit Number 1.
10        (WHEREUPON, a document was
11   marked as Plaintiff's Exhibit 1 and is
12   attached to the original transcript.)
13   Q.    Do you recognize that
14   document?
15   A.    Yes.
16   Q.    Is that the document that you
17   were referring to?
18   A.    Yes.
19   Q.    Is that the complete
20   document? Get you to review it.
21   A.    I believe so.
22   Q.    Okay. And what did you learn
23   in that document?

Page 382

1        MR. POWELL: Object to the
2    form.
3    A.    That --
4        MS. SWAIN: Same objection.
5    A.    -- repetitive motion had
6    caused a lot of the injuries that we had
7    acquired on the job while performing and
8    doing this job.
9    Q.    And did you bring that to the
10   attention of any of the employees of
11   Albany International?
12        MR. POWELL: Object to the
13   form.
14        MS. SWAIN: Objection.
15   A.    Yes. Other employees knows
16   about it.
17   Q.    Okay. And what was done based
18   on that?
19        MS. SWAIN: Objection.
20        MR. POWELL: Same.
21   A.    So far, nothing, I don't
22   think.
23   Q.    Did the company do anything in

**American Court Reporting**
**toll-free (877) 320-1050**

25 (Pages 383 to 386)

Page 383

1 response to the study that was done in
2 2003?
3          MS. SWAIN: Objection.
4     A.    I believe that's when we
5 started doing the exercising. They
6 started the exercising, you know. Like
7 you get up a portion of the day to
8 stretch, and then you do it both -- two
9 times a day, morning and evening.
10     Q.    And all employees were
11 required to do the exercises?
12     A.    Yes.
13     Q.    Okay. Did you complete the
14 exercises?
15     A.    I was not able to do -- I
16 could do some of the exercises, but I was
17 not able to do all of the exercises.
18     Q.    Was anyone present when the
19 exercises were performed?
20     A.    Yes.
21     Q.    Can you tell us who was
22 present.
23     A.    Day shift, Tim Woodward or

Page 384

1 either Barbara Smith. Evening shift would
2 be -- third shift, we were basically --
3 you know, the lead person would turn the
4 machine off, turn the tape on, then we
5 would do the exercise.
6     Q.    Okay. So did they monitor the
7 employees doing the exercise? Did they
8 take notes?
9     A.    I don't know.
10     Q.    Okay. You testified earlier
11 that you have suffered from some
12 depression; is that correct?
13     A.    Yes.
14     Q.    And is that depression caused
15 by the work environment at Albany?
16          MR. POWELL: Object to the
17 form.
18          MS. SWAIN: Objection.
19     A.    Yes.
20     Q.    Can you tell us what has
21 actually caused the depression.
22          MR. POWELL: Object to the
23 form.

Page 385

1          MS. SWAIN: Objection.
2     A.    Constantly being injured,
3 constantly being harassed, constantly
4 asking for help and being denied. I have
5 worked -- and I stated that I worked
6 twenty-four and a half years there. I
7 worked hard. I did my job to the best of
8 my ability.
9          I did things that some
10 operators weren't able to do. And out of
11 all of the work -- how hard I did, I
12 worked. My job was just taken from me.
13 All of my benefits, dignity, just a whole
14 bunch of humiliation. I was robed.
15     Q.    Ms. Davis, I think initially
16 when the deposition actually began defense
17 counsel actually showed you a complaint
18 that has been -- actually been filed in
19 State court. It's previously marked as
20 Defendant's Exhibit Number 1. Do you
21 remember reviewing that document?
22     A.    Yes.
23     Q.    And can you tell us what it

Page 386

1 is?
2     A.    It's a complaint that I filed
3 with Mr. Abel on the Workers' Comp.
4     Q.    Okay. And let me direct your
5 attention to page three of that document.
6 Do you remember reviewing that page as
7 well?
8     A.    Yes.
9     Q.    And I think defense counsel
10 previously asked if the sole reason for
11 actually filing that complaint was for
12 Workers' Compensation benefits; is that
13 correct?
14          MS. SWAIN: Objection.
15          MR. POWELL: Object to the
16 form.
17     A.    Yes.
18     Q.    Okay. And was that the sole
19 reason -- or is Workers' Compensation
20 benefits the sole reason for filing that
21 complaint?
22     A.    No.
23     Q.    Okay. And who is the attorney