# Plaintiff's 6/7/06 deposition, with exhibits
## *Part 2*

**American Court Reporting**
**toll-free (877) 320-1050**

Page 387

1    that represents you on that?
2        A.    Mr. Abel.
3        Q.    I will show you what we will
4    mark as Plaintiff's Exhibit Number 2.
5            (WHEREUPON, a document was
6    marked as Plaintiff's Exhibit 2 and is
7    attached to the original transcript.)
8        Q.    Can you tell us what that
9    document is.
10       A.    It's the complaint that I
11   filed against Albany International on --
12           MR. POWELL:  What Plaintiff's
13   2?
14           MS. SWAIN:  Have you got a
15   copy of that?
16           MS. WILLIAMS:  (Hands
17   document)
18           MS. SWAIN:  Thank you.
19       A.    -- for dismissal.  I'm not
20   sure if I am saying it right.
21       Q.    Can you tell us what that
22   document is?
23       A.    It's a Notice of Dismissal.

Page 388

1        Q.    Okay.  And was that previously
2    filed by the attorney that is representing
3    you on that case?
4        A.    Yes.
5        Q.    Okay.  Does that actually
6    dismiss count two of his State complaint?
7        A.    I don't understand.
8        Q.    The Notice of Dismissal that
9    you are holding, is that to dismiss one of
10   the counts of your complaint in State
11   court?
12       A.    Yes.
13       Q.    Okay.  I will show you what we
14   are going to mark as Exhibit Number 3.
15           (WHEREUPON, a document was
16   marked as Plaintiff's Exhibit 3 and is
17   attached to the original transcript.)
18           MS. WILLIAMS:  I don't have
19   enough copies.  Is it attached to the back
20   of your document already?
21           MS. SWAIN:  What is it?
22           MS. WILLIAMS:  It's the order.
23           MS. SWAIN:  Yes.

Page 389

1        Q.    (BY MS. WILLIAMS) I will show
2    you what is marked as Plaintiff's Exhibit
3    Number 3.  Can you tell us what that
4    document is.
5        A.    It's an order that count two
6    of plaintiff's complaint is dismissed.
7        Q.    Okay.  So that is signed by
8    which judge?
9        A.    William P. Shashy.
10       Q.    Judge Shashy.  Okay.
11           Have you gone over these
12   documents with your attorney that is
13   representing you in State court?
14       A.    No.
15       Q.    You have not?
16       A.    No.
17       Q.    You have not received a copy
18   of these?
19       A.    No.
20       Q.    Ms. Davis, you were also
21   previously asked about any specific acts
22   that either Ted Bryant or Jeff Johnston
23   was involved in that you thought

Page 390

1    constituted some form of discrimination or
2    harassment.  Do you remember doing that?
3        A.    Yes.
4        Q.    Okay.  And is that a complete
5    list of everything that has actually
6    occurred?
7            MS. SWAIN:  Objection.
8            MR. POWELL:  Same objection.
9        A.    I don't remember.  I don't
10   remember.
11       Q.    Okay.  Well, can you tell us
12   today what are the specific acts that Jeff
13   Johnston actually committed against you or
14   in your presence that constituted
15   discrimination and/or harassment?
16           MR. POWELL:  Object to the
17   form.
18           MS. SWAIN:  Objection.
19       A.    He has, on a constant basis,
20   belittled me in front of groups -- our
21   group session, our group meetings.  He has
22   mostly -- everytime I open my mouth to
23   talk to him, he always exercises power.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 391

1   He was always letting me know that he
2   could take my job. He was always finding
3   fault.
4         Basically, most of the things
5   that I did I said. Ever since day one,
6   with the incident with the two other
7   operators, it is a constant form of
8   harassment with him or from him since I
9   have been in the company.
10        I actually spent my time
11  trying to stay away from Mr. Johnston,
12  because any time it was -- I had to be in
13  the midst or around him, it was always him
14  finding fault or something wrong with what
15  I did or didn't do.
16    Q.   What are the specific acts
17  that Ted Bryant did? Can you tell us
18  those?
19    A.   Ted Bryant is personnel
20  manager. Ted Bryant allowed all of the
21  stuff that I'm going through to happen.
22  Ted Bryant, as an employer -- I felt like
23  I was supposed to be protected just like

Page 392

1   he protected the rest of the employees. I
2   was denied protection.
3         The things that we were going
4   through -- I was going through, Ted Bryant
5   knew the rules, he knew the conditions of
6   Workmen's Comp, he knew things they didn't
7   and did do. He didn't exercise that
8   power.
9     Q.   What do you mean by protect
10  the employees?
11    A.   With what I was going through,
12  they knew that -- they knew of the
13  multiple injuries that I received. And it
14  was not like to one part of my body, it
15  was to all of the major parts of my body.
16  The body -- the parts that caused my body
17  to function on a day-to-day basis.
18        He knew that I was constantly
19  in pain. I complained. I let them know.
20  And he didn't do anything about it.
21    Q.   Okay. Let me rephrase this.
22  How did he protect the other employees?
23    A.   You have people that were

Page 393

1   injured. They were taken off of the job,
2   they were given light duty, they were sent
3   to doctors. The doctors performed
4   surgeries. They don't have to spent the
5   rest of their life in constant pain like I
6   do every day.
7         I explained to them that I was
8   sleeping on seven pillows. I had to prop
9   my body in every direction that I could to
10  even get a halfway decent sleep at night.
11  I told them this. And all of this is
12  going on because they knew that they
13  controlled those doctors. Those doctors
14  did not take care of me. They did not.
15        Right now, I sleep on seven
16  pillows. I'm propped up every direction
17  you can be propped up. And this was
18  before I was diagnosed with fibromyalgia.
19  It was way before. I let them know. I'm
20  sorry.
21        MS. WILLIAMS: No more
22  questions. Let's take a break.
23        THE WITNESS: I'm sorry.

Page 394

1         MS. WILLIAMS: I'm done. No
2   more questions.
3         MR. TOLES: Let's take a break
4   for a minute and get her together.
5         11:40 AM
6         (Lunch recess)
7         1:15 PM
8         MS. WILLIAMS: Back on the
9   record. We are done with questioning.
10        MR. POWELL: Okay.
11
12  REEXAMINATION BY MR. POWELL:
13    Q.   Ms. Davis, I want to follow up
14  on some questions that your lawyer asked
15  you before we took a break earlier. Your
16  lawyer showed you what she had marked as
17  Exhibit 1, a document entitled Portland
18  M-3000 Ergonomic Project, March, 2003. I
19  believe your testimony earlier was that
20  somebody put this in your locker.
21    A.   Yes.
22    Q.   All right. But you do not
23  know who put it in your locker?

**www.AmericanCourtReporting.com**
**June 7, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

28 (Pages 395 to 398)

Page 395

1    A.   No.
2    Q.   When did they put it in your
3    locker?
4    A.   I don't know.
5    Q.   Do you know when in relation
6    to -- you know, before or after August of
7    2003?
8    A.   I don't know exactly. I don't
9    know.
10   Q.   All right. Do you know of
11   anybody else in the Montgomery plant who
12   received a copy of this document?
13   A.   No.
14   Q.   After finding this in your
15   locker, did you give this to anybody at
16   Albany in Montgomery?
17   A.   No.
18   Q.   All right. You didn't go ask
19   your supervisor in the seaming department
20   about this document?
21   A.   No.
22   Q.   Did you give it to any of the
23   Union stewards?

Page 396

1    A.   No.
2    Q.   Did you give it to Mr. Bryant?
3    A.   No.
4    Q.   Give to it Mr. Johnston?
5    A.   No.
6    Q.   All right. You were asked a
7    number of questions about some doctors,
8    and in connection with Dr. Donovan you
9    testified that you reported to Liberty
10   Mutual and to Linda Jones what I
11   understood was a comment by Dr. Donovan
12   that he didn't see anything wrong with
13   your back.
14   A.   Yes.
15   Q.   Okay. When did Dr. Donovan
16   make that comment to you?
17   A.   It was the first injury.
18   Around '91, '92, something within that
19   time frame.
20   Q.   And in the 1991, 1992 time
21   frame was Liberty Mutual the Workers'
22   Compensation insurer?
23   A.   I believe so.

Page 397

1    Q.   And at any point since 1991 or
2    1992, have you been sent to see
3    Dr. Donovan for any treatment?
4    A.   Yes.
5    Q.   When?
6    A.   It was in the time frame of --
7    between 2000, 2001 -- I mean, 2003.
8    Q.   What did you go see
9    Dr. Donovan for in the 2002, 2003 time
10   frame?
11   A.   Dunavant -- Donna took me back
12   for a lower back pain and neck pain.
13   Q.   Did you get any more steroid
14   injections at that point?
15   A.   He refused to see me.
16   Q.   So you didn't actually see the
17   doctor?
18   A.   He came in and told me that he
19   wouldn't see me.
20   Q.   All right. And did you then
21   go to some other doctor for treatment?
22   A.   No. We left and -- I don't
23   know exactly what happened after then. I

Page 398

1    left his office.
2    Q.   Okay. When did you report
3    this comment by -- well, strike that. Let
4    me ask you this.
5        What is the doctor's last
6    name?
7    A.   I think it is Dunavant. The
8    doctor -- which doctor?
9    Q.   I had written it down as
10   Donovan.
11   A.   I believe it was Dunavant. I
12   believe it was Dunavant.
13   Q.   When did you report to
14   Ms. Jones this comment by Dr. Dunavant?
15   A.   It was after the day that I
16   visited his office.
17   Q.   1991, 1992?
18   A.   1991, 1992, one of those
19   dates. During that time.
20   Q.   During that time. Okay.
21       You also testified earlier
22   about you had some surgery with
23   Dr. Hartzog.

**American Court Reporting**
**toll-free (877) 320-1050**

29 (Pages 399 to 402)

Page 399

1    A.    Yes.
2    Q.    Is that for -- what was that
3  one for?
4    A.    For right shoulder rotator
5  tear.
6    Q.    Rotator cuff.  Okay.
7         When was that surgery?
8    A.    2001.
9    Q.    And I believe what you
10  testified earlier was that a nurse of
11  Dr. Hartzog indicated that in spite of you
12  reporting some problems with urinating
13  after the surgery, that Comp had said you
14  were going to have to leave the hospital
15  anyway?
16    A.    No.  When I was in the
17  hospital -- before I left the hospital --
18    Q.    Yes, ma'am.
19    A.    -- the nurse that was
20  dismissing me -- I started just
21  urinating.  And after -- in the process I
22  told her to call the doctor.  And she said
23  it wouldn't do any good to call the

Page 400

1  doctor, because I was going to have to
2  leave the hospital.
3    Q.    Do you remember the nurse's
4  name?
5    A.    No, I don't.
6    Q.    What hospital?
7    A.    Jackson Hospital.
8    Q.    Did you personally make any
9  effort to contact the doctor about this
10  incident?
11    A.    When I went back to
12  Dr. Hartzog, I reported to him what
13  happened.
14    Q.    And what did he say?
15    A.    I don't remember what he said.
16    Q.    And when did you report this
17  comment by the nurse to Ms. Jones?
18    A.    It probably was during the
19  time after the surgery.
20    Q.    How long were you in the
21  hospital for rotator cuff surgery?
22    A.    Eleven to ten -- how many
23  hours is that?

Page 401

1    Q.    One day, though?
2    A.    It wasn't a day.
3    Q.    All right.
4    A.    It was from eleven in the
5  morning till ten that night.
6    Q.    They didn't keep you
7  overnight?
8    A.    No.
9    Q.    Then were you treated -- did
10  you go through rehabilitation for the
11  shoulder?
12    A.    Yes.
13    Q.    All Workers' Comp?
14    A.    Yes.
15    Q.    Other than Linda Jones, who
16  else at the company have you complained to
17  about your Workers' Comp doctors?
18    A.    I complained to Ted Bryant, I
19  complained to Linda Jones, I complained to
20  shop stewards.
21    Q.    Anybody else?
22    A.    Probably co-workers.
23    Q.    All right.  I thought we had

Page 402

1  gotten a list from you last time of
2  everything that you claimed that
3  Mr. Johnston had done to you.  But you
4  answered a question from your lawyer in a
5  fairly generic fashion, so I wanted to --
6  what you identified in response to a
7  question by Ms. Williams was that
8  Mr. Johnston belittled you in group
9  meetings, that he exercised his power,
10  that he let you know how he could take your
11  job, and he was always finding fault with
12  you.
13    A.    Yes.
14    Q.    At any point in any group
15  meeting between you and Mr. Johnston, did
16  he ever make any reference to race?
17    A.    No.
18    Q.    Did he ever make any racially
19  inappropriate remarks in your presence?
20    A.    I don't remember.
21    Q.    Did he ever tell any racially
22  inappropriate jokes in your presence?
23    A.    No.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 403

1    Q.    When was the first group
2  meeting where you claim Mr. Johnston
3  belittled you?
4    A.    I don't remember.
5    Q.    When was the last one?
6    A.    October 29th, 2003.
7    Q.    Okay.  Prior to October the
8  29th, 2003, when was the next most recent
9  group meeting where Mr. Johnston belittled
10  you?
11    A.    I don't know a date.  I don't
12  have -- I don't know the date.
13    Q.    Do you know where it occurred?
14    A.    Once on the floor, once in the
15  meeting.
16    Q.    All right.  So the settings
17  where Mr. Johnston belittled you in group
18  meetings were the October 29th, 2003,
19  meeting, one time on the floor, and one
20  time in some other meeting?
21    A.    This didn't happen one, two,
22  three times.  This happened more than one,
23  two, three times.

Page 404

1    Q.    How many?
2    A.    This was something -- I can't
3  tell you how many, but I know that it was
4  something that occurred often enough for
5  me to be upset or to feel discriminated or
6  not being treated like the next person.
7    Q.    All right.  Other than the one
8  time on the floor, the one time in a
9  meeting on October the 29th, 2003, can you
10  identify any other particular event or
11  meeting where you claim Mr. Johnston
12  belittled you?
13    A.    I can't -- I don't know
14  exactly when.  I don't remember exactly
15  when.  But it was periods of time where I
16  did my best to stay away from
17  Mr. Johnston, because any time I was in
18  Mr. Johnston's presence, Dora was the one
19  singled out.
20    Q.    You were singled out from
21  every other employee in the Montgomery
22  plant?
23    A.    I was treated different.

Page 405

1    Q.    From every other employee in
2  the Montgomery --
3    A.    It was -- Mr. Johnston picked
4  on me as much as possible.  Mr. Johnston
5  let me know that he could have my job.  So
6  I stayed away as much as possible from
7  Mr. Johnston so that I could hold my job
8  or keep my job.
9    Q.    Well, did you see Mr. Johnston
10  behave in a similar fashion towards any
11  other employee of Albany International?
12    A.    I saw what Mr. Johnston did to
13  me.
14    Q.    Did you see Mr. Johnston
15  behave in the same manner toward any other
16  employee of Albany International?
17    A.    No.
18    Q.    All right.  So are you the
19  only employee of the company that you
20  observed Mr. Johnston belittle?
21    A.    I don't know.
22    Q.    I'm asking what you personally
23  saw at Albany.  Are you aware of any other

Page 406

1  employee of the company that Mr. Johnston
2  belittled in the fashion that you claim
3  that he belittled you?
4    A.    No.
5    Q.    Okay.  You worked with both
6  male and female employees, correct?
7    A.    Yes.
8    Q.    You worked with both black and
9  white employees?
10    A.    Yes.
11    Q.    You are the only employee that
12  you observed Mr. Johnston treat this way?
13    A.    Yes.
14    Q.    The one time on the floor
15  where he belittled you, which event was
16  that?
17    A.    This was when the person left
18  banana peels on the machine.
19    Q.    We talked about that in detail
20  last time.  And the one time in the
21  meeting; is that the magazine meeting?
22    A.    The magazine, and then it
23  was -- the other occasion was when he

**American Court Reporting**
**toll-free (877) 320-1050**

31 (Pages 407 to 410)

Page 407

1  called me in the office.
2      Q.   And who was the -- I know you
3  called Dot Collins on the phone. Who was
4  the other employee with you on that
5  occasion?
6      A.   Jerelene Forest.
7      Q.   Okay. Now, when you testified
8  in response to Ms. Williams' question that
9  Mr. Johnston exercised power, what did you
10 mean by that?
11     A.   He exercised his -- his job
12 title where he was supervisor, whether it
13 was department manager, production
14 manager, or plant manager.
15     Q.   Was there something
16 inappropriate about Mr. Johnston carrying
17 out his job duties?
18     A.   The way he treated me.
19     Q.   When you say he exercised his
20 power in the way that he treated you, are
21 you referring to anything other than these
22 events where you claim he belittled you?
23     A.   I'm claiming the belittlement

Page 408

1  treatments, I'm claiming on one occasion I
2  was not even in the plant and I got wrote
3  up for somebody knocking a hole in a
4  fabric. I'm claiming that.
5      Q.   When did that happen?
6      A.   This happened during his time
7  of department manager, seaming department
8  manager.
9      Q.   That would be the mid 1990s?
10     A.   It was late 1990s. It wasn't
11 mid '90s. He became the -- I think it was
12 '95 when he became the seaming
13 supervisor.
14         Then one occasion he -- I was
15 working on this machine with two other
16 operators, and they were pulled off of the
17 machine and someone had put the wrong
18 chemicals on when they serviced the
19 machine. I was forced to work on that
20 machine until it damaged my health where I
21 ended up in the emergency room with fifty
22 percent of oxygen in my bloodstream. I
23 actually passed out, and the ambulance had

Page 409

1  to come and take me to the hospital.
2      Q.   Is that the fume incident that
3  we talked about last time?
4      A.   I don't know.
5      Q.   Okay. When did that occur?
6  What was Mr. Johnston's job at the time?
7      A.   He was department supervisor
8  -- I mean, department manager. I begged
9  off the machine. I told him the machine
10 was making me sick.
11         Another operator came -- the
12 lead person came to the machine. As soon
13 as she sat down on the machine she had
14 short wind and tightening of the breath.
15 She didn't have to go back to the
16 machine.
17         The tech came and he was
18 trying to fix the problem. He couldn't
19 fix the problem, because he couldn't
20 breathe.
21     Q.   Why do you believe
22 Mr. Johnston belittled you?
23     A.   Mr. Johnston didn't like me.

Page 410

1      Q.   Did he tell you that he didn't
2  like you?
3      A.   No. He just treated me like
4  he didn't like me.
5      Q.   Do you know why he didn't like
6  you?
7      A.   Because I -- he had to
8  apologize to me.
9      Q.   Other than having to apologize
10 to you, is there any other reason that you
11 believe Mr. Johnston didn't like you?
12     A.   I just believe he didn't like
13 me because of the way he treated me.
14     Q.   Okay. And do you believe that
15 he belittled you because he was made to
16 apologize to you?
17     A.   I just believe he didn't like
18 me.
19     Q.   Do you think he belittled you
20 because of your race?
21     A.   That's part of the reason.
22     Q.   What are the other reasons?
23     A.   He didn't like me.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 411

1    Q.    Okay.  You didn't see him
2  belittle other black employees in the
3  plant, did you?
4    A.    No, I didn't.
5    Q.    Why do you believe your race
6  made a difference to Mr. Johnston?
7    A.    You would have to ask
8  Mr. Johnston that, because I have no clue.
9    Q.    You filed the lawsuit, so I'm
10  asking you why --
11    A.    What he did happened to me.
12  I'm telling you what happened to me.
13    Q.    I understand.  I'm asking
14  you --
15    A.    I don't know why.
16    Q.    Do you allege in this case
17  that he belittled you because of your
18  race?
19    A.    Yes.
20    Q.    Okay.  What is your basis for
21  believing that your race made a difference
22  to him?
23    A.    What he did to me happened to

Page 412

1  me.
2    Q.    I understand that.
3    A.    Okay.
4    Q.    Why do you believe your race
5  made -- was a factor in his behavior
6  towards you?
7    A.    The situation was between me
8  and other white women.  I was the black
9  person and I was the one who was belittled
10  in two situations with Mr. Johnston; the
11  magazine situation and the firing
12  situation.
13    Q.    The firing situation meaning
14  the October 29th meeting?
15    A.    Meaning when he was trying to
16  take me upstairs to get my job.
17    Q.    With Jerelene Forest, that
18  event?
19    A.    Yes.
20    Q.    All right.  And he was
21  department manager for both -- for the
22  magazine and the Jerelene Forest incident?
23    A.    Yes.

Page 413

1    Q.    Okay.  You said Mr. Johnston
2  let you know he could take your job.  How
3  many times did he do that?
4    A.    With the magazine situation,
5  with the time I had to take Jerry in the
6  office with me, and October the 29th.
7    Q.    Other than those three
8  occasions, is there any other time during
9  your employment with Mr. Johnston where he
10  let you know he could take your job?
11    A.    I don't remember.
12    Q.    Okay.  Did Mr. Johnston ever
13  actually take your job?
14    A.    Yes.
15    Q.    When?
16    A.    October the 29th, 2003.
17    Q.    All right.  I thought you
18  testified earlier that you were terminated
19  on August the 21st, 2003.
20    A.    I said I felt like I was
21  terminated August the 21st, because that's
22  when I was asked to not punch in.  And
23  then this was an ongoing situation.

Page 414

1    Q.    Okay.  You have testified in
2  response to one of Ms. Williams' questions
3  that Mr. Johnston was always finding fault
4  with you in some way.
5    A.    If I was asked to work on the
6  project, I was denied because of
7  Mr. Johnston.  If it come to wire
8  assignments, another employee wanted this,
9  they got the wire assignment.  When I
10  worked on that machine that I almost died
11  with, Mr. Johnston was in charge of taking
12  the other two operators off.  One was Nat
13  Jones' supervisor, the other one was a
14  white woman.
15    Q.    Who was Nat Jones' supervisor?
16    A.    A girlfriend, and the other
17  one was a white woman.
18    Q.    Well, Mr. Jones' girlfriend,
19  was she white or black?
20    A.    She was black.
21    Q.    Okay.  So the two other
22  operators who were taken off of the
23  machine, both were women, and one was

**American Court Reporting**
**toll-free (877) 320-1050**

33 (Pages 415 to 418)

Page 415

1   black and one was white?
2       A.   Yes.
3       Q.   I'm trying to understand how
4   it is Mr. Johnston was finding fault with
5   you.
6       A.   I have explained to you, and I
7   don't understand why you can't find fault,
8   because I have been talking to you for
9   almost two days and I have complained for
10  two days, and you don't see any fault that
11  he found with me.
12      Q.   I'm asking you to -- for you
13  to tell me which specific events where it
14  is Mr. Johnston found fault with your work
15  performance.
16      A.   He didn't allow me to go -- to
17  do projects.  He said that I wouldn't do
18  anymore projects.  I didn't do anymore
19  projects.  If I asked to be moved off of
20  the machine, I couldn't be moved off of
21  that machine.  The same machine that was
22  hurting everybody else, somebody -- they
23  would be moved off.  I was not moved off.

Page 416

1   I was actually made to work on that
2   machine.
3            If I was accused of something,
4   he never tried to find out what was the
5   problem, he just chastised me.
6       Q.   Any other instances where you
7   believe that Mr. Johnston found fault with
8   you?
9       A.   I don't remember.
10      Q.   Okay.  Now, you mentioned when
11  you were asked a question by Ms. Williams
12  and you added Mr. Bryant to the list who
13  somehow did something inappropriate to
14  you.
15      A.   Mr. Bryant was personnel
16  manager.  Mr. Bryant was over all of us.
17  He is the one that held the meetings,
18  taught us this, said that, said that.  He
19  was in charge of personnel.  He could have
20  reported Mr. Johnston, but he did not
21  report Mr. Johnston for his action.
22      Q.   For what actions?
23      A.   For the actions that he took

Page 417

1   towards me.
2       Q.   When --
3       A.   Taking my job.
4       Q.   When did you go to Mr. Bryant
5   to complaint about Jeff Johnston?
6       A.   Listen, I talked to Mr. Bryant
7   all the time.  I talked to Mr. Bryant all
8   the time.  I have talked to him on the
9   phone, I have been in his office to talk
10  to him.  I have explained to him what was
11  going on in the doctor's office and with
12  -- in other situations, and he didn't do
13  anything about it.
14      Q.   When did you go to Mr. Bryant
15  to complain about Jeff Johnston?
16      A.   All the time.
17      Q.   When?
18      A.   All the time.  I don't
19  remember.  I don't have dates.  I don't
20  remember the dates.  I don't remember
21  hours.  I don't remember days.
22      Q.   Identify a specific event that
23  you went to Ted Bryant about involving

Page 418

1   Jeff Johnston.
2       A.   I don't remember.
3       Q.   Can you name a single one in
4   all of the years that you worked in the
5   Montgomery plant with Ted Bryant and Jeff
6   Johnston?
7       A.   I don't remember.
8       Q.   You can't name any?
9       A.   I don't remember.
10      Q.   Okay.  But you went to
11  Mr. Bryant?
12      A.   I have gone to Mr. Bryant.
13      Q.   I see.  Okay.  You testified
14  that Mr. Bryant had denied you
15  protection.  Is that in connection with
16  the level of treatment that you received
17  for the Workers' Compensation injuries?
18      A.   Mr. Bryant was sitting in on
19  the meetings.  He knows exactly what
20  happened in the meetings, okay.
21      Q.   Well, you filed the lawsuit.
22      A.   Yes.
23      Q.   You are now -- you have now

**American Court Reporting**
**toll-free (877) 320-1050**

Page 419

1    testified in response to a question by
2    your lawyer that somehow Mr. Bryant denied
3    you projection.
4        A.    He did.
5        Q.    I am trying to get from you a
6    list of the specific instances where you
7    claim Mr. Bryant denied you some
8    projection in the plant.
9        A.    From August the 21st to
10   October the 29th, Mr. Bryant was in every
11   meeting that was held. He took notes, he
12   knew what Jeff Johnston was doing. He
13   heard Jeff Johnston when he wanted me to
14   promise that I can work with no pain. He
15   heard -- he was there when Jeff Johnston
16   jumps from the table, pushed his chair
17   back and talked to me in anger. He was
18   there.
19       Q.    How many meetings was -- were
20   you in with Mr. Bryant between August the
21   21st of 2003 and October of the 29th,
22   2003?
23       A.    I don't know exactly.

Page 420

1        Q.    All right. Prior to August
2    the 21st, 2003, is there any instance that
3    you can identify where you claim Ted
4    Bryant denied you some protection in the
5    plant?
6        A.    I don't remember.
7        Q.    On these occasions where you
8    claim Mr. Bryant denied you projection,
9    why do you believe he did that?
10       A.    I have no clue.
11       Q.    Do you believe Mr. Bryant
12   denied you some projection in the plant
13   because of your race?
14       A.    I don't know.
15       Q.    Do you believe Mr. Bryant
16   denied you some projection in the plant
17   because of Workers' Compensation claims?
18       A.    I don't know.
19       Q.    Now, at the time Mr. Bryant
20   allegedly denied you some projection in
21   the plant, you weren't making any effort
22   to go to George Kazalay to complain, were
23   you?

Page 421

1        A.    It didn't do me no good to go
2    to Mr. Kazalay. Mr. Kazalay didn't do
3    anything about anything. When I called
4    Mr. Kazalay's office he said there was a
5    chain of command. Part of that chain of
6    command was Jeff Johnston.
7        Q.    Well, you told me about the
8    chain of command story in connection with
9    an event involving Mr. Woodward several
10   years earlier. My question to you was:
11   Did you ever go to George Kazalay to
12   report to Mr. Kazalay that you thought
13   somehow Ted Bryant had failed to project
14   you in the plant?
15       A.    No.
16       Q.    Did you ever make any effort
17   to call anybody at Albany's corporate
18   headquarters to report some concern with
19   Ted Bryant?
20       A.    I called corporate, yes, when
21   I was taken off of my job. And I was -- I
22   called them. No one returned my call.
23       Q.    You called corporate when?

Page 422

1        A.    It was 2003.
2        Q.    Before or after October the
3    29th, 2003?
4        A.    I don't remember.
5        Q.    Who did you call at corporate?
6        A.    The CEO. I don't know his
7    name. I just know the CEO.
8        Q.    And did you leave a message
9    for him to return your call?
10       A.    I believe I did the first
11   time.
12       Q.    Well, what was the nature of
13   the message?
14       A.    I don't remember.
15       Q.    Did you leave it on voicemail,
16   leave it with the secretary?
17       A.    A voicemail.
18       Q.    Well, as best you recall, what
19   did you say on the voicemail?
20       A.    I don't remember. I just
21   asked for them to return my call.
22       MR. POWELL: I don't think I
23   have any further questions. Jennifer

**American Court Reporting**
**toll-free (877) 320-1050**

35 (Pages 423 to 424)

Page 423

1   might.
2           MS. SWAIN: I don't have any
3   questions.
4           I do want, Ms. Davis, to put
5   you on notice, and your lawyers as well,
6   that I think it is clear that the facts
7   that you have alleged in this lawsuit do
8   not support the claims made in the
9   complaint.
10          And because of that, on behalf
11  of Jeff Johnston, I want to ask you
12  voluntarily to dismiss your claims and put
13  you on notice that he will seek fees if he
14  has to continue fighting this lawsuit
15  under Rule 11, the Alabama Accountability
16  and Litigation Act, and the fee shifting
17  provisions, but the statutes you sued
18  under.
19          MS. WILLIAMS: Anything else?
20          MS. SWAIN: No.
21          MS. WILLIAMS: Okay. Thank
22  you.
23          1:44 PM

Page 424

1       FURTHER DEPONENT SAITH NOT
2         C E R T I F I C A T E
3   STATE OF ALABAMA)
4   JEFFERSON COUNTY)
5
6       I hereby certify that the above
7   and foregoing deposition was taken down by
8   me in stenotype, and the questions and
9   answers thereto were transcribed by means
10  of computer-aided transcription, and that
11  the foregoing represents a true and
12  correct transcript of the deposition given
13  by said witness upon said hearing.
14      I further certify that I am
15  neither of counsel nor of kin to the
16  parties to the action, nor am I in anywise
17  interested in the result of said cause.
18
19          DAVID L. MILLER, CSR, RMR
20          Certificate No: AL-CSR-141
21
22  My Commission expires
23  November 30, 2009

**www.AmericanCourtReporting.com**
**June 7, 2006**



Davis 16



## JOB SITE ANALYSIS

**Appleton Wire**
**Albany International**

**Job Title:  Seaming Machine Operator**

### Job Functions:

1. Takes out warps in fabric using pick.
2. Will sand poles.
3. Will use paper towels behind sanding to wipe down poles for smooth finish.
4. Will set up material in machine, which includes loading boards onto the machine for the fabric and opening top of machine to perform procedures.
5. Will check under the material for defects in the seams.
6. Will visually inspect seam as machine is running.
7. May have to trace and re-steam machine if one breaks.
8. May have to start process of loading machine over if defective material has to be restarted.
9. Will perform cleanup activities at end of day.

### Tools Used:

Seam pick
Sandpaper
Paper towel
Allen wrench
Needle nose pliers
Pliers
Tape Measure
Scissors
Clippers
C-clamp
Vice grip
Broom

### Overview of Job:

Oversees seaming machine for production of designated good.

1801 Pine St., Suite 102
Montgomery, AL 36106
334-262-6161
Fax: 334-034-1705

Rehab Associates
Physical Ther
CHA Land Care
Athletic Trainers
Industrial Rehab

ALBANY/DAVIS
D 0210

<u>Physical Characteristics of Work</u>

1. Standing/Walking:
   Is performed occasional to frequent. This could entail up to 40% of the workday and sometimes a greater period of time than this depending on how the machine is running. This is going to have variability; most standing/walking would be performed when setting the machine up.

2. Sitting:
   Would be performed frequently, but it is going to have variability depending on how the machine is running. When sitting, the worker may be taking warps out of fabric and sitting may be performed when unthreading fabric.

3. Hand Controls:
   Are used on each machine for pushing buttons and levers.

4. Crouching:
   Is performed occasionally. This may be done when getting in a position to get under the machine to check under the material for defects. It may also be performed when getting boards at floor level for setting the machine up.

5. Crawling or Creeping:
   May be performed occasionally when checking the seam area under the fabric. At this point, when the worker gets under the fabric, some may choose to get in a supine position to view.

6. Climbing:
   Is performed occasionally when putting the material on the roller inside the machine. This entails four steps up to a height of 36.25 inches.

7. Bending:
   Is performed continuously. Bending may be performed from both a sitting position or a standing position. In sitting position, the degree of trunk flexion is going to range from 35-40 degrees or less depending on the worker. In standing position, bending may entail up to 70-80 degrees of trunk flexion when sanding poles. Bending to a lesser degree is performed when inspecting the seam as material is running.

8. Kneeling:
   Is performed occasionally and this may be performed when getting in position to get under the machine to check under the fabric.

2

ALBANY/DAVIS
D 0211

9. Balancing:

Is required continuously for ordinary locomotion, as well as occasionally from heights such as 36.25 inches off of ladder.

10. Reaching:

Is performed continuously when performing all aspects of the job. Overhead reaching is not performed typically, however, there may be an occasional overhead reach depending on the height of the worker when opening the top of the machine up and the workers observed did not require full overhead reach, just slightly over 90 degrees of shoulder flexion. There is a significant amount of horizontal reaching up to 29-30 inches when having to work on defects that may be in the material. This significant horizontal reach also requires significant lumbar flexion at the same time. The continuous use of reaching is predominantly waist level.

11. Hands, fingers, and wrist:

Are used continuously. With these movements, the worker may be sitting at the machine reaching in to do rework and pick work, which entails flexion and abduction, as well as wrist flexion, extension, ulnar and radial deviation, as well as hand interface. The fingers are used when starting and stopping the machine, as well as using the tools. The forearm, which includes pronation and supination is used when sanding the rails. Movements for the hands, fingers, and wrist include simple grasping, pinching, picking, seizing, holding, grasping, turning, and feeling.

ASC Z365 Hazard Analysis

In analyzing movements of the upper extremity that at least fall into the moderate category for susceptibility to cumulative trauma disorder, the following exists: Forearm, wrist, hand interface, and grasping.

Material Handling

Lifting:

Is rated occasionally. Lifting is done when placing the boards on the machine during the setup procedure. These boards predominantly weigh between 5-8 pounds with some boards or weights that are placed on material weighing up to 11 pounds. This could be performed on a consistent basis between 8-12 repetitions per day. The ranges of lift may include lifting from floor level up to 33 inches in height, lifting from 33 inches in height to floor level, or the board may be taken off of rack, which could range from 26-46 inches off of rack to 33 inches.

3

ALBANY/DAVIS
D 0212

**NIOSH Lifting Equation:**
In analyzing lifts using horizontal origins, vertical origins, total distance traveled, asymmetric angles, frequency of lift, and duration of lift; when analyzing all the different positions the worker lifts from, all fall below the 1:00 standard set by NIOSH.

Carrying:
Is rated occasionally and basically corresponds with the lifting repetitions and weights of 5-8 pounds for the most part up to 11 pounds for the boards. Distances may be anywhere from 5 feet to 100 feet in which they are carrying these materials.

Push/Pulling:
Pushing and pulling is performed occasionally in terms of gross pushing and pulling. The worker will have to push and pull levers at the top of the machine. The levers can be somewhat difficult to lock-in or lockout of place. It could require on average 3 pounds of mean force, but 40 pounds of peak force on some of the machinery. When pushing fabric that is on different types of dollies, it could require 31 pounds of mean force and 62 pounds of peak force. Pushing/Pulling with negligible forces such as threading may be performed frequently.

**Physical Demand Classification:** It is felt the most accurate description of this job would rate light. Please note that when pushing the big, bulky fabric on the dolly, it is going to require 31 pounds of peak force, which would classify medium, but this is an occasional task and there may be more than one worker involved, which would divide the force and it would be more in the 15 pound force range, which corresponds with a light physical demand category.

Environmental Conditions

The worker is not exposed to weather as they work inside in comfortable conditions. The noise intensity level could be rated quiet on some days, but could range to loud depending on what may be running on the machines. They are exposed to vibration with the seaming machine itself, as well as odors, which may include odors from sandpaper, silicone spray, degreaser, and contact cleaner. They are exposed to moving mechanical parts and they are exposed to elevated places when getting on top of the machine.

Other Factors

Talking and hearing are requirements, as well as near acuity, far acuity, depth perception, accommodation, and field of vision.

4

ALBANY/DAVIS
D 0213

Conclusion:

This job analysis performed by Rehab Associates was compiled by direct observation of the job, interview with employees performing the job, and employer description.

Based on the various modes in which analysis was performed, efforts to ensure accuracy is hoped to be obtained. However, due to variability with most jobs, some functions may not have been observed. This may include variation in task performance between workers and reports from employees regarding frequency or demand of task.

It is recommended that this analysis be reviewed by appropriate personnel for accuracy of data collected.

Tony Bridges, MS, CSCS, CDB, CEES
Regional Director of Industrial Rehab

ysh

5

ALBANY/DAVIS
D 0214

Equal Employment Opportunity Commission
Attention: Intake Investigator, Devorlayn Monroe
1900 3rd Avenue North
Birmingham, AL 35303

October 14, 2000

Dear Ms. Monroe:

Appleton Wire has employed me, Dora Iverson, more than 20 years and I am presently working in the Seaming department as a seamer. During my entire tenure as an employee I have witnessed and have been subjected to a racially hostile and offensive work environment. I also believe that I have been recently subjected to discriminatory practices and retaliated against because I opposed discriminatory actions of the company and have given testimony to the same.

I believe historically Appleton Wire has allowed management personnel to conduct intimidating and threatening conduct toward those who oppose the unlawful conduct, and had a death ear to any inquiring of these type allegations.

On approximately 7 October 2000, Tim Woodward, Seaming Supervisor informed me that I needed to write on a fabric ticket that I had inspected a fabric and observed no holes and no damages. This practice is not apart of ISO certification or a practice that the entire department engages. I believe that Mr. Woodward used this procedure to provoke a confrontation in hopes that I would respond in a manner that would place my job in jeopardy. Reason being that a day or two before this incident, I questioned Mr. Woodward as to the fairness of wire assignments and expectation of employees. It's a known fact that Mr. Woodward bounces some black operators from machine to machine, wire to wire, while allowing whites and non-union workers to choose their partners (by shift). Ironically, when the shifts were divided from two shifts to three, all the non-union workers were placed on the same shift. He has allowed some operators to choose whether to train own new and more critical wires while at the same time violating the union company contract by informing employees that if no one volunteers that person will be forced to work with the new fabric and machines by least seniority. The contract states that all operators will be trained on all fabrics and machines to ensure that work assignments and overtime be offered on fair and equitable basics.

Approximately 3 months ago I was summoned to the conference room via Norma Heath *(union steward)* after she received a phone call from Ted Bryant. During this conference I was informed that my job was in jeopardy because of attendance. The contract states that I have the option of having a union steward present when conducting proceedings with the company. In this case, I was not afforded this opportunity.

DEFENDANT'S EXHIBIT

Davis    17

On August 31, in an attempt to discuss a grievance prompted by the attendance warning, I was told by the union representative that he could do nothing about the company's practices unless I was disciplined, lost of job, pay or position. He stated that I needed to take the issue up with another agency such as the EEOC. Prior to that meeting, I had approximately five (5) attendance occurrences. I called in and requested to use a week of vacation in which others and I had been allowed to use before in similar situations. I spoke to Ed Kelley (finishing Foreman) and he granted me the days. When I returned to work, I was told by Mr. Woodward that the vacation days were disallowed and I would be charged occurrences for each day, making my total allotted time approximately 10 occurrences. Mr. Woodward could have called me at home after his learning of this information and inform of the changes that were made in regards to my vacation instead of allowing my job security to be placed in jeopardy being that we can only obtain 12 occurrences before being terminated.

While seeing the company doctor, as a result of an on the job injury, I have been subjected to mental exams without my consent. Throughout my employment with this company, I have been made to suffer by working in a majority white male work place, having them create work for me while standing afar staring, and smiling as I had to expose my body, bending, climbing and stooping. They would disengage their work and line up to see me just as if I was a freak show, degrading me as a woman. Jeff Johnston has twice been forced to apologize to the entire shift for his wrongful conduct and statements made towards me. I have witnessed and felt the sting of sexual harassment to include discrimination and also believe my quality of life has been made to suffer as a result of the treatment and experiences I have endured while being a employee of Albany International (Appleton Wire Division). Furthermore, I have been clinically diagnosis with depression and currently taking drug treatments and counseling for this condition that stemmed from constant mistreatment on the job.

I believe that this company has and will continue to conduct themselves in unlawful practices. I request that you inquire and formally charge this company if they are founded that they have willingly or negligently allowed and/or condoned any of these actions I have mentioned.

Thank you for your attention in this matter. If you have any questions, please contact me at 334-409-7968, 5702 Red Barn Road, Montgomery, AL 36116

Sincerely,


Dora Iverson



PLAINTIFF'S EXHIBIT

# Portland M3000 Ergonomic Project
## March 2003

Presented by:
David Daughtry, Seaming Project Engineer
Anita Gerace, Physical Therapist and Ergonomics Consultant
Tim Golden, Corporate Workers' Compensation Manager
Jeff Lusk, Process Development Project Engineer
Steve Maye, Plant Manager: Portland
Portland NAP Seaming Department

# Index

Introduction:                              Page 1-2

M3000 Engineering Modifications            Page 3-5

Organization of the Department             Page 6-7

Future Engineering Modifications           Page 8-9

Summary                                    Page 9

# Introduction

Industrial workers are exposed to ergonomic risk factors in the workplace such as repetition, force, vibration, contact stress, static positioning and awkward postures. These risk factors can result in injuries or illnesses in the employees by

- Decreasing the blood supply which supplies nutrients to the muscles involved in the task,
- Impacting the nerves which direct function of the body part or
- Compromising the strength and range of motion of the body.

As a result, NAP seaming operators in particular have developed cumulative trauma disorders such as carpal tunnel syndrome, tendonitis, and epicondylitis (tennis elbow) amongst other diagnoses. This not only costs the company tens of thousands of dollars in direct medical costs and other indirect expenses, but also affects the employees through physical symptoms, pain and suffering and diminished physical capabilities.

Development on the Ergonomic M-3000 project began in March of 2002 in response to increasing numbers of repetitive trauma injuries in the Portland NAP department. The initial effort of the project was to simply evaluate the ergonomic effects of an angled head configuration for an M-3000 machine. As work progressed, it became evident that although machine configuration is an important factor to workstation ergonomics, it is only a part of an overall solution. The stresses on the human body in any workplace are a result of workstation geometry and work environment. As a result, the scope of this project was enlarged to include improvements to existing M-3000 workstations, assessment of department and task organization on the worker and lastly engineering considerations for future NAP machines.

In analyzing the five-year Workers' Compensation history of the Portland facility, it is apparent that Single Machine Assignments (SMA) are the main concern when considering cost and number of injuries sustained. A work-related injury has many costs other than the direct cost reflected on the graph below: the human suffering, payments to other workers in the form of overtime to make up for the individual not at work, the fear the worker has when returning to the same task that produced the injury, and the resulting

Page 2

government costs that are assessed due to high injury rates. If injuries are avoided, the capital can be used for profitable business endeavors that will help ensure Albany's success for the future.

## Workers' Compensation
## Total Claim Cost – Portland



Claim cost = payment for medical, wage replacement and expenses. Fixed costs not included. Figures in US dollars

# M-3000 Engineering Modifications

On going progress on the Ergo M3000 Project has led the engineering development towards modifying and retrofitting the framework of the automated seaming machine while allowing the machine head and main framework to remain in its original geometric configuration. Three primary engineering modifications were made to the M-3000 prototype: chair retrofit, table edge reprofiling and tilt on demand.

## ENGINEERING MODIFICATION 1: CHAIR RETROFIT

 

**Mechanical Implementation:**
- Platform was removed
- Spring bracket is replaced with spacer
- Elbow of bracket is drilled and tapped for nylon tipped set screw
- Pivot at bracket base and set screw are tightened to desired friction of movement

**Ergonomic Benefits of Chair Retrofit:**
- Operator can sit closer to the table which minimizes bending
- Operator can take advantage of the back rest to support the lower back since they can sit closer
- Chair stays in place which minimizes repeated tugging and pulling the chair forward

**Cost:** materials and hardware: $60.00 (US)
**Project time:** 30 minutes

Page 4

# ENGINEERING MODIFICATION 2: TABLE EDGE RE-PROFILING

 

## Mechanical Implementation:

- Rolled seaming table edge on front side of machine is replaced with a one-piece bolt on assembly that has a more narrow profile in both the horizontal and vertical plane.
- Also aiding in the reduction of the table edge profile, strap systems have been implemented. Straps and specially designed end stands that incorporate tensioning devices have replaced the aluminum poles that once supported the fabric. This retrofit not only benefits the operator by increasing legroom, it also aids the utility worker that loads and unloads the fabrics to be seamed. Removing the aluminum poles eliminates the need for unnecessary lifting. Fabric damage and machine downtime have also been decreased.

### Ergonomic Benefits of Table Edge Reprofiling:

- Narrower profile in the vertical plane provides more leg room and allows shorter operators to raise the chair to position themselves closer to the work which minimizes reaching and bending
- Narrower profile in the horizontal plane allows all operators to move closer to the table which also minimizes reaching (keeps the shoulders below a 45 degree angle) and bending
- As a result the two benefits above, the operator's back is at less risk: the back is supported on the back rest and the thighs are fully supported on the entire seat pan rather than the operator perching on the edge of the seat

**Cost:** Materials and hardware: $700.00 (US)
**Project Time:** 30 minutes

Page 5

## ENGINEERING MODIFICATION 3: TILT ON DEMAND




**Mechanical Implementation:**

- Two braces, one of which also serves as a bracket for mounting the fringe guards, join two front table panels.
- Pneumatic cylinders that activate the tilt are mounted underneath the seaming table and are attached to the joined table panels.
- Quick detach hinge type brackets are mounted on the front table panel and latch into the seaming table frame.
- Pneumatic hoses and mechanical valve are plumbed accordingly.

### Ergonomic Benefits of Tilt on Demand:

- Tilted work surface during rework allows for a better visual alignment on the fabric in an upright body position which minimizes the previous static positioning in an awkward bent forward position
- Tilted work surface positions the seam closer to the operator and therefore minimizes reaching
- Precision work required for rework is now done slightly above elbow height since the tilted work surface raises the seam.
- Neck alignment is improved since the operator does not need to bend the neck as far forward to view the seam area.
- The tilting panel can be easily removed so technicians can work on the machine from the top rather than having to get under the machine in an awkward position.

**Cost:** Materials and hardware: $600.00 (US)

**Project Time:** 5 hours
**Total Project Cost Estimate**: $1,400.00 (US) per machine plus 6 hours project time.

# ORGANIZATION OF DEPARTMENT: SINGLE MACHINE VERSUS MULTIPLE MACHINE ASSIGNMENT.

As the Portland M3000 Ergonomic Project evolved, it became apparent that modifying the machine was not the only solution to address the ergonomic risk factors the employees are exposed to. Issues such as job rotation, microbreaks for job specific exercises and adjustment of existing equipment also needed to be examined. One issue that stood out as an effective way to minimize the workers risk of injury was the workers assignment at a single machine versus a multiple machine assignment.

**Ergonomic concernson a single machine assignment**
- Prolonged static positioning in an awkward position to view the seam face while monitoring the work
  - Twisted torso
  - Bent lower back
  - Flexed neck
  - Legs confined due to lack of leg room
  - Operator is unsupported in the chair: can not take advantage of the beck rest and perches on the edge of the seat to view seam face, both of which stress the upper and lower back.
- Operators are required to reach to perform rework which stresses the shoulders,
  - Neck and upper back
- Operators perform repetitive fine motor tasks with the hands

**Ergonomic Tactics to minimize these risks**
- Take frequent microbreaks with stretching and strengthening exercises
- Adjust the chair to fit the individual operator
- Rotate between single and multiple machine assignment
- Rotate between "easy" and "hard" fabrics

6

# Portland Workers' Compensation Claim Cost. Single Machine Assignment vs. Multiple Machine Assignment: 1997 - 2002



Figures in US dollars.

## Ergo Benefits of Multiple Machine Assignment

- Multiple Machine Assignment allows the operator to change their body position frequently:   minimizes the static positioning (particularly awkward static positioning)
  - ○ Can change from sitting to standing
  - ○ Can change from a stationary task to a dynamic task
- NAP eye technology allows the operator to use multiple machines rather than having to constantly monitor the fabric visually. Current Napeye technology allows the use of a computer and camera system to assist in stopping a NAP machine if a defect worthy of attention is identified.  This system allows a single operator to run multiple machines, which allows greater freedom of mobility while moving between machines.

**Additional Ergo Tactics to Minimize Ergonomic Risks**
- Rotation between MMA and SMA
- Rotate between NAP assignments and other tasks in the department.

In addition to the ergonomic benefits identified with MMA, there are *production benefits* that have been documented:

Portland Production Standards (1 end per hour = 1 front side and 1 backside insertion)
- MMA: 1000 ends per hour
- SMA:  600 ends per hour                                    7

# Future Automated Seaming Machine Ergonomic Design Recommendations

The Portland team has worked to retrofit the existing NAP machines to minimize the workers exposure to workplace hazards. These modifications should be incorporated into the development plans for the NAP machines future. Machine geometry and NAPeye technology must be considered in the future plans for NAP machines.

**Future Machine Geometry Design Changes**:
- *Decrease horizontal reach distance*: Decreasing operator reach can be achieved to its maximum by redesigning the configuration of the underside components that transfer and insert warps into the seam. The current M3000 design for rapier arms works on a horizontal linear driven system, which requires significant space under the table for insertion of the warp. Incorporating a combination of linear and rotational movements where the rapier arms are curved instead of straight would decrease the profile of this linear travel therefore reducing the space needed to perform the insertions/transfers which will allow the operator to get closer to the seam face.
- *Center the seam face:* Ergonomic benefits can be gained by relocating the seam face to a position that is in the center of the operators' body. Centering the seam face will eliminate the awkward twisted trunk position required to operate the existing machines.
- *Incorporate ideal table height:* The human body works most efficiently in a neutral position of the trunk, shoulders and arms. The work area of the table should be positioned at a height that will allow the average height operator to work with their arms and shoulders in a relaxed comfortable, ergonomically correct position.
- Although *modifications 1, 2, and 3* are recommendations for existing machines for a retrofit, the concepts for these modifications should be considered in the future engineering of the new machines.

**Future Plans for NAPeye Technology**:
- We have recently upgraded our technology to Windows based computers with touch screen interaction with the operators. These touch screens and Windows upgrades also improve the ability for us to display a clearer image on the screen, thus allowing the operators to feel more comfortable watching a monitor rather

than leaning in a poor ergonomic position. Our current focus for development is in the more difficult triple layer and black fabric styles that have historically been required to have only one operator dedicated to one machine. As we improve the NAPeye technology, we hope to allow the operator the freedom to move between multiple machines even on difficult triple layer styles. We are also working toward the ability for live images to be displayed on remote machines. This additional capability will add more flexibility and confidence in out remote monitoring and multimachine assignments. Current technology only

8

Page 9

allows periodic still images due to the speed issues of networking equipment, however future technology may allow moving live images.

## Summary

This project and the ensuing report is a culmination of extensive trial and error of machine modifications, continuous operator feedback, ergonomic principles, cost considerations and management input. It is our belief that the retrofit recommendations devised as a result of the project work are feasible for existing machines and should be implemented to address the ergonomic risk factors the operators are exposed to.

The automated seaming machine manufacturer should take these recommendations into consideration to avoid the ergonomic risk factors that have contributed to Portland's injury history. Not only will the workers be healthier as a result of the new design, productivity will be maximized as verified by an increased number of ends with a multiple machine assignment. The manufacturer's engineering development team should reference this report or those involved during concept development for additional feedback and recommendations for automated seaming machines of the future.

This M3000 project has been very enlightening but the presenters believe that hazard evaluation and implementation of ergonomic improvements should not be limited to seaming machines only. Albany International should continue to be cognizant of the ergonomic risks that can be posed by machinery and processes our employees are asked to utilize and perform. The proactive Ergonomic Teams that are working within Albany International must continue to look at new and existing processes and must play an active role in assessing new equipment as well.

## IN THE CIRCUIT COURT OF
## MONTGOMERY COUNTY, ALABAMA

PLAINTIFF'S EXHIBIT

Davis    2

DORA DAVIS,                              )
                                         )
    Plaintiff,                          )
                                         )
v.                                       )    **CIVIL ACTION NO.: CV-05-2729**
                                         )
APPLETON WIRE COMPANY, et al.,           )
                                         )
    Defendants.                         )


## NOTICE OF DISMISSAL

    COMES now the Plaintiff, by and through counsel, and dismisses, with prejudice, Count II only of Plaintiff's Complaint for Worker's Compensation Benefits.


                    WILLIAM K. ABELL (ABE001)
                    Attorney for Plaintiff


OF COUNSEL:

SHINBAUM, ABELL, McLEOD & VANN, P. C.
P. O. Box 201
Montgomery, AL  36101-0201
Telephone    (334) 269-4440
Facsimile     (334) 263-4096

2006 JAN -9 PM 3:35

FILED
CIRCUIT COURT OF
MONTGOMERY COUNTY

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document upon all counsel of records, as listed below, by placing same in the United States Mail, First Class delivery, properly addressed and postage prepaid, on this the _____ day of January, 2006.

OF COUNSEL

Hon. Joseph T. Carpenter
CARPENTER, INGRAM & MOSHOLDER, LLP
303 Sterling Centre
4121 Carmichael Road
Montgomery, AL 36106

Hon. Charles A. Powell, IV
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
420 20th Street, North, Suite 1600
Birmingham, AL 35203-5202

Hon. Trina D. Sanders-Williams
TOLES & WILLIAMS, LLP
P. O. Box 501
Montgomery, AL 36101-0501



# IN THE CIRCUIT COURT OF
## MONTGOMERY COUNTY ALABAMA

Dora Davis,           )
Plaintiff,            )
                      )
vs.                   )          CV-2005-2729
                      )
Appleton Wire Company, et al.,  )
Defendant.            )

## ORDER

It is hereby **ORDERED** that Count II of Plaintiff's complaint is

**DISMISSED** *with prejudice.*

**DONE** and **ORDERED** this the ___17___ day of January, 2006.


_____
**WILLIAM A. SHASHY**
Circuit Judge


William K. Abell
Shinbaum, Abell, McLeod & Vann, P.C.

Hon. Joseph T. Carpenter
Carpenter, Ingram & Mosholder, LLP

Hon. Charles A. Powell, IV
420 20th Street, North, Suite 1600
Birmingham, AL 35203-5202

Hon. Trina Sanders-Williams
Toles & Williams, LLP

2006 JAN 17 PM 4:13

FILED
CIRCUIT COURT OF
MONTGOMERY COUNTY




Davis   3

# IN THE CIRCUIT COURT OF
## MONTGOMERY COUNTY ALABAMA

Dora Davis,                     )
Plaintiff,                      )
                                )
vs.                             )          CV-2005-2729
                                )
Appleton Wire Company, et al.,  )
Defendant.                      )

### ORDER

It is hereby **ORDERED** that Count II of Plaintiff's complaint is

**DISMISSED** *with prejudice.*

**DONE** and **ORDERED** this the ___17___ day of January, 2006.

**WILLIAM A. SHASHY**
Circuit Judge

William K. Abell
Shinbaum, Abell, McLeod & Vann, P.C.

Hon. Joseph T. Carpenter
Carpenter, Ingram & Mosholder, LLP

Hon. Charles A. Powell, IV
420 20th Street, North, Suite 1600
Birmingham, AL 35203-5202

Hon. Trina Sanders-Williams
Toles & Williams, LLP

2006 JAN 17 PM 4:18
FILED
CIRCUIT COURT OF
MONTGOMERY COUNTY