# Excerpts from Plaintiff's 10/19/99 deposition

Harris v. Albany International Corp., Appleton Wire Division
CV-97-M-657-N
U.S. District Court for
the Middle District of AL

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

THOMAS HARRIS, )
Plaintiff, )
vs. ) CASE NUMBER:
ALBANY INTERNATIONAL ) CV-97-M-657-N
CORPORATION, APPLETON )
WIRE DIVISION, )
Defendants. )

DEPOSITION OF DORA DEAN IVERSON

In accordance with Rule 5(d) of The Alabama Rules of Civil Procedure, as Amended, effective May 15, 1988, I, Cindy Weldon, am hereby delivering to Charles A. Powell IV, the original transcript of the oral testimony taken on the 19th day of October, 1999, along with exhibits.

Please be advised that this is the same and not retained by the Court Reporter, nor filed with the Court.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

THOMAS HARRIS, )
Plaintiff, )
vs. ) CASE NUMBER:
) CV-97-M-657-N
ALBANY INTERNATIONAL )
CORPORATION, APPLETON )
WIRE DIVISION, )
Defendants. )

S T I P U L A T I O N

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the deposition of DORA DEAN IVERSON, may be taken before Cindy Weldon, Certified Shorthand Reporter, Commissioner and Notary Public, at 516 South Perry Street, Montgomery, Alabama, on October the 19th, 1999, at 9:30 a.m.

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of trial, or at the time said deposition is offered in evidence, or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that notice of filing of the deposition by the Commissioner is waived.

A P P E A R A N C E S

FOR THE PLAINTIFF:

MS. KAY DICKEY
516 SOUTH PERRY STREET
MONTGOMERY, ALABAMA 36101

MR. MARK GRAHAM
1900 3RD AVENUE NORTH
BIRMINGHAM, ALABAMA 35203

FOR THE DEFENDANT:

CHARLES A. POWELL IV
SUITE 1410, AMSOUTH/HARBERT PLAZA
1901 SIXTH AVENUE NORTH
BIRMINGHAM, ALABAMA 35203

ALSO PRESENT:

MR. THOMAS HARRIS
MR. TED BRYANT

The company had no more -- didn't have anywhere else to put him. That -- somewhat like this company don't like blacks. They don't like women. And you are as far as you're going. That's -- I've heard that statement.

Q. Well, who have you heard make these statements?

A. Dot Collins, I've heard her make those.

Q. Have you heard anybody else at Appleton Wire make those statements?

A. I don't remember. But I know I've heard Dot Collins.

Q. Okay. Have you ever heard anybody in management at Appleton Wire say that blacks are never going to be promoted?

A. No.

Q. Ever heard anybody in management at Appleton Wire say women are never going to be promoted?

A. No.

Q. You said -- I think this is pretty

close to accurate, and if it's not, correct me -- as black employees, there are places for you with the company?

A. Yes.

Q. Is there some list somewhere that says these are the jobs for blacks?

A. No.

Q. Ever seen a list like that?

A. No.

Q. Had anybody in management at Appleton Wire tell you there's a list like that?

A. No.

Q. What are you talking about?

A. I'm talking from -- I'm talking from experiences, being there. I'm talking from -- okay. As far as -- we have had -- I've been a lead. I gave up the lead job because of Jewell Johnson because -- well, in the lead -- during that time when you were lead, you just helped the other employees out. But then they had the guys from finishing to come back and take down

the wires or put boards on.

So then they stopped the guys from doing it and they had women do it. They had the lead people help changing out all the wires. So when they asked -- when they said -- I said, well, Jewell does this mean that I have to change wires out? If four wires come down that day, I have to help change those wires out?

When you working with those wires -- we was working with like steel poles and everything. I'm talking about huge steel poles. The wires were like -- when you turn them, it was like you can practically flip with the wire if you wasn't strong enough.

So I told him -- I said, well, I can't be your lead anymore. So she went to Ted and told Ted I was refusing to do my job. He came back, he asked no questions. He just told me, Dora, you're not -- you're refusing to do your job? I says, no, Ted, I'm giving up the lead job. I don't want to be lead anymore.

Things like -- As far as like this HOA project I'm on. When we went to the project -- when Jeff decided two people to work on it -- we had like a little committee. Jeff decided that a white and a Korean person would work it. And there was two other blacks. He picked the whites over the blacks.

He -- Sook Chung had been a lead. Then they turn around and what they did was, she gave up the lead. They in turn asked her again to do the lead work. Meanwhile, she's not doing any more than I was doing; but she was getting fifty cent more than I'm getting.

It's just -- there's so much -- this is how come -- it's from their practices -- the practices. And just recently, they made Nat -- put Nat in a seaming job. But as far as the company, we never see -- you just see -- in the high places, you just see whites in high places. I'll put it like that.

A. Nat Jones.
Q. He and Maurice Rollins have the same job on different shifts?
A. Yes.
Q. Nat Jones also has supervisory responsibility in the seaming department?
A. Seaming, yes.
Q. All right.
A. Maurice and John Johnson, too. They come and handle things in seaming, too, on their shifts.
Q. What's Barbara's last name?
A. Smith.
Q. Is Barbara Smith white or black?
A. Black.
Q. What's her job in the plant?
A. I really don't know her title because she was a supervisor. Then they made some changes. Management made changes. And then she was like a trainer. So now, she's back in the office. So I really don't know her title.
Q. But she's in some kind of -- she's

not on the floor as a production employee?

A. No.

Q. And she had been a supervisor and then a trainer and you're not sure what she is now?

A. No.

Q. How long had Barbara been a supervisor?

A. I don't know exactly, but I know she was seaming supervisor. Then she was a trainer. And I really don't know how long.

Q. You talked earlier about you giving up the lead position.

Now, you voluntarily gave up the job?

A. Yes.

Q. If I understood you correctly, you gave it up because there was a change in the way the work was distributed in the plant and you physically couldn't handle the equipment, changing wires in the seaming department?

A. Yes.

Q. Something discriminatory about how that happened?

A. No.

Q. What is the HOA project?

A. This is -- it's an exclusive project where we work for P&G and we do -- they call -- the fabrics we seam, they're called HOA. I don't know why, but they are called HOA.

This is where we was having some new machines brought in. And people were to train to operate these machines and to run these fabrics on these machines.

Q. When did this HOA project start?

A. About two years ago.

Q. You brought some documents and you may want to pull them out and take a look at them. I'm looking at a grievance report dated March 28th of '97. I see in this written component some reference to the HOA project.

A. Okay. What are you asking me?

Q. From the standpoint of when the

HOA project began, I assume it was sometime before March of '97?

A. We started like having meetings and making plans for operators to run the machine. So what happened was, when they did so -- I'm trying to think exactly what happened.

In reference to this, this grievance, I came in one day and -- so I had heard from other employees that they had assigned the two people they wanted on the machines, which was at first, Doris and Sook Chung.

So I asked Nat -- I was asking Nat -- in other words, I was working on the project and then I come to work. So I asked Nat -- I said, Nat -- I asked him about what did they -- what was I to do that day. Anyway, I was asking about the project.

Well, what happened, while I was talking to Nat, Jeff -- he just jumped in and said that it was his -- it was his decision what took place on the HOA

Q. Any other shop stewards in the plant?
A. No.
Q. What's Geri's last name?
A. Forest.
Q. Is Geri Forest a shop steward?
A. No.
Q. She was not a shop steward at the time?
A. No.
MS. DICKEY: Could we take a break?
MR. POWELL: Sure. Not a problem.
(Whereupon, a brief recess was taken.)
Q. Was there a resolution to this grievance?
A. He wrote that note.
Q. Is that this note that's --
A. Which he didn't sign.
MS. DICKEY: He didn't sign or --
THE WITNESS: He didn't sign it. He wrote it.

(Whereupon, Defendant's Exhibit No. 2 was marked for identification.)

Q. But this back page of what's been marked as Exhibit 2, this handwritten note, Jeff Johnson wrote this?

A. Yes.

Q. Did you accept this as the resolution of the grievance?

A. At that point in time, Dot said, well, since he had did this, that -- had wrote this note, that we'll just -- and he had agreed to apologize, that we could just -- we would just go on.

Q. When you say Dot, you're talking about Dot Collins?

A. Dot Collins, uh-huh (indicating yes).

Q. She was the shop steward?

A. Shop steward.

Q. All right. So that was the end of this grievance?

A. Yes.

Q. Other than this particular

occasion, had Mr. Johnson ever done anything else to you that you thought was inappropriate?

A. Once, he -- We was in a meeting and Dottie was looking at something like a -- we keep pamphlets. Anyway, she was looking at the book, so she passed the book for me to look at. As soon as I opened it up, he told me to shut the book; I could not look at it in his meeting. But he allowed Dottie to look at it.

Q. When did this happen?

A. This may have been about two years. Year-and-a-half, two years. One other time was when he first became supervisor. That's probably about four years ago. He -- I was working with Doris Carter.

It was like almost time for shift change. I finished up a fabric, and I was -- in other words, usually if we finish up, we don't have time to take down the wire. We don't have to take it down. The next

person to come in -- but anyway, he insisted that I take the wire down.

So my take down went -- it ran into shift change. So when I was on my way out the door, Shirley and Dottie said something to me pertaining to the take down. Somewhat like, he saw to you taking that wire down. So I responded to them.

So after I went home from work, they went in the office and told Jeff that I had jumped on them. He called me in the office the next day and he got onto me. He told me that he wouldn't have me jumping his employees.

So a couple of days went on. So I went to the telephone and I called -- because George had told us his door was open. I went to talk to -- I called George's office. But instead, I didn't get George. This is -- I got John, John Watson.

But John said he was going to come back and talk to me. Probably about three