**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **DORA DAVIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:05-CV-1040-WKW** |
| | ) | |
| **ALBANY INTERNATIONAL** | ) | |
| **CORP.; JEFF JOHNSTON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANT JEFF JOHNSTON'S BRIEF IN SUPPORT OF HIS
MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Plaintiff Dora Davis' ("Davis") factual allegations consist of nothing more than a tangled conspiracy theory that do not support any of the legal claims asserted in her complaint. Although she admits that her race had nothing to do with her termination, she is pursing a race discrimination claim.  Although she admits that she was never denied FMLA leave when her request was supported by medical certification, she is pursing an FMLA claim.  Although she admits that she was declared disabled by the Social Security Administration, she is pursing an ERISA claim that requires her to show qualification for the job.  Although she admits that Johnston never touched her in an offensive manner or threatened her physically, she is pursuing an assault and battery claim.  Although her allegations constitute nothing more than minor annoyances, virtually all of which occurred well outside the statute of limitations period, she is pursuing an outrage claim.  In short, Davis' claims are unsupported in law or in fact and are due to be dismissed.

## II.     SUMMARY OF FACTS

### A.     The Parties

Dora Davis was hired by Defendant Albany International Corporation ("Albany") on March 12, 1979 to work at its Appleton Wire facility in Montgomery, Alabama.  (Complaint ¶ 8).  Davis continued her employment with Albany until August or October, 2003.  (Davis 142, lines 12-14, 16-19; 150, lines 7-10; 228, lines 14-19; 178, lines 12-17; 179, lines 19-23; 180, lines 1-4).[1]

During her employment with Albany, Davis held a variety of hourly positions.  Davis initially worked as a Warper B in the weaving department. (Davis 15, lines 1-2; 16, lines 1-10). She then moved to the seaming department, where she worked as a seamer for approximately ten years.  (Davis 15, line 4; 16, lines 11-14; 17, lines 12-14).  She then worked as a "Helper B" in the finishing department for approximately two months before going back to the seaming department, first as a seamer again, and ultimately as a NAP operator.  (Davis 15, lines 1-2; 16, lines 13-14; 20, lines 4-7, 20-21; 23, lines 12-16).  Davis was a member of the Teamsters union during her employment with Albany.  (Davis 15, lines 15-19).

Defendant Jeff Johnston ("Johnston") was hired by Albany to work at its Appleton Wire facility in Montgomery, Alabama in 1988.  (Johnston Decl. ¶ 1).  Johnston began at Albany as a Kraft Applications Engineer.  (Johnston Decl. ¶ 2).  Johnston worked as a Kraft Applications Engineer from 1988 through 1991.  (Johnston Decl. ¶ 2).  From 1991 to September 1992, Johnston worked as a supervisor in the Finishing Department and then became a supervisor in the Seaming Department until October 1993.  (Johnston Decl. ¶¶ 3-4).  From October 2003 to

---

[1]  References to Davis' deposition are cited as "Davis Page #, Line #."  Davis' deposition was taken in two sequentially numbered parts.  Part Two begins with page number 287.  References to Davis' deposition exhibits are cited as "Davis Ex. #."  References to the declaration of Jeff Johnston are cites as "Johnston ¶ #."

March 1997, Johnston was the Department Manager of the Seaming and Finishing Department, and from March 1997 to June 2000, he was Department Manager of the Weaving Department. (Johnston Decl. ¶¶ 5-6).  In June 2000, Johnston became Production Manager, a position he held until he assumed the role of Plant Manager in June 2003.  (Johnston Decl. ¶¶ 7-8).  Johnston remained Plant Manager until he left Albany in April 2004.  (Johnston Decl. ¶ 8).

### B.    Davis' Alleged Work-Related Injuries

Davis contends that she suffered on-the-job injuries on multiple occasions throughout her employment with Albany, including alleged injuries to her rotator cuff in July 2001 and alleged injuries to her neck in February 2002.  (Complaint ¶¶ 15, 17).  Davis visited numerous doctors through the worker's compensation program as a result of these alleged injuries, including doctors she selected from panels of four offered to her under the worker's compensation program.  (Davis 35, lines 17-23; 36, line 1; 131, lines 7-8; 145, lines 19-22; 146, lines 20-23; 153, lines 5-21; 166, lines 9-18; 240, lines 6-10).  Following each of her worker's compensation injuries, Davis was released to return to work at Albany.  (Davis 160, lines 15-19).  However, between August 21, 2003 and October 29, 2003, Davis contends that she was unable to perform any of her job duties without experiencing excruciating pain.  (Davis 147, lines 20-23; 148, lines 1-19; 164, lines 5-6; 165, lines 3-4).

On August 21, 2003, Albany Human Resources Manager Ted Bryant called Davis at home and allegedly suggested that she not return to work until after a scheduled doctor's appointment with one of her approved worker's compensation physicians.  (Davis 30, lines 22-23; 31, lines 1-5, 13-14; 34, lines 2-5; 35, lines 8-11).  Davis had received warnings for violations of Albany's attendance policies, and Albany had decided to place Davis on "inactive status" in an effort to prevent her from accruing additional attendance occurrences while Davis

resolved the conflict between her own belief that she was unable to work and the opinion of the approved worker's compensation physicians who had repeatedly released her to return to work. (Johnston Decl. ¶ 11).

Some time after her August 21, 2003 conversation with Ted Bryant, Davis was seen by Dr. Wade at Brookwood Hospital in Birmingham.  (Davis 159, lines 14-21).  Davis had selected Dr. Wade from a panel of four physicians offered to her under the worker's compensation program.  (Davis 166, lines 9-18).

### C.    The October 29, 2003 Meeting

On October 29, 2003, Davis met with Albany Human Resources Manager Ted Bryant ("Bryant"), Department Manager of Seaming, Finishing and Shipping Bob Hampsey ("Hampsey"), Union Steward Norma Heath ("Heath"), and Johnston.  (Davis 158, lines 13-20; Johnston Decl. ¶12).  Davis was informed that Dr. Wade had released her to return to work. (Davis 160, lines 15-23).  Johnston told her that if she returned to work but had to leave, or if she did not come to work because of pain and did not have a doctor's excuse, she would be subject to Albany's attendance policy.  (Davis 345, lines 20-23; 346, lines 1-4).  Bryant also gave Davis a memorandum regarding her attendance, in which he notified her of her standing under the company's attendance policy.  (Davis 248, lines 8-9, Ex. 10).  Davis was subject to the same attendance policy as every other employee in Albany's Montgomery plant, and she has "no clue" whether the policy was applied to her any differently than it was to any other employee.  (Davis 251, lines 19-23; 252, lines 1-4).

Also during the October 29, 2003 meeting, Davis told Johnston and Bryant that she "was in pain and it was excruciating."  (Davis 164, lines 2-6).  She allegedly said that the doctors were not helping her with her pain.  (Davis 164, lines 7-8, 14).  It was Davis' understanding that she

had to return to work, but she knew that if she returned to work she would be in pain.  (Davis 346, lines 2-10; 348, lines 3-4).  Davis claims that Johnston informed her that she could not return to work unless she would not be in pain.  (Davis 348, lines 4-7).

During the October 29, 2003 meeting, Bryant provided Davis with a letter noting the "conflicting conclusions" from Davis and her treating physicians regarding her medical condition.  (Davis Ex. 11).  In the letter, Bryant suggested that Davis stay on inactive status consisting of unpaid leave in order to prevent her from accruing additional attendance points that could result in the termination of her employment.  (Davis Ex. 11).  Bryant also noted in the letter that Davis had the option of returning to work if she felt that she were physically capable of doing so.  (Davis Ex. 11).

During the October 29, 2003 meeting, Davis notified Bryant, Hampsey, Heath and Johnston for the first time that she had applied for Social Security disability benefits.  (Davis 345, lines 10-16; Ex. 11).  Davis ultimately received disability benefits on the basis of a variety of health issues, some of which she contends were not diagnosed until after her alleged termination from Albany.  (Davis 169, lines 3-10; 173, lines 5-11; 175, lines 15-23; 176, lines 1-4).  Davis was declared disabled retroactively to August 21, 2003, which she asserted was her last day of work at Albany, although she worked periodically after that date.  (Davis 34, lines 10-19; 167, lines 21-23; 178, lines 12-19).  Davis testified that she has not been physically able to work since August 21, 2003.  (Davis 299, lines 14-21).

Although claiming at times during her deposition that her employment with Albany was terminated on August 21, 2003, Davis contended at other times in her deposition that she was terminated during the October 29, 2003 meeting.  (Davis 142, lines 12-14, 16-19; 150, lines 7-10; 228, lines 14-19; 178, lines 12-17; 179, lines 19-23; 180, lines 1-4).  Neither Johnston,

5

Bryant, Hampsey nor Heath told Davis that she had been terminated.  (Davis 228, lines 1-4; Johnston Decl. ¶ 12).  The documents Davis received during the October 29, 2003 meeting in no way suggested that her employment was being terminated and, in fact, they referenced her continued employment with Albany.  (Davis 248, lines 22-23; 249, lines 1-9; 253, lines 5-8; Ex. 10-11).  Davis did not file a grievance protesting her "termination."  (Davis 360, lines 22-23; 361, lines 1-3).

### D.    Davis' State Court Complaint

Almost two years after her employment with Albany ended, Davis filed a complaint in the Circuit Court of Montgomery County, Alabama on October 21, 2005.  (Davis Ex. 1).  In Count Two of that complaint, Davis stated a claim under Ala. Code § 25-5-11.1 (1975), asserting that her employment with Albany had been terminated solely because she had made claims for worker's compensation benefits.  (Davis Ex. 1).  Davis confirmed during her deposition in this case that everything in Count Two of her complaint filed in the Circuit Court of Montgomery County, Alabama is true.  (Davis 14, lines 4-13).

### E.    Davis' Federal Court Complaint

A week after filing her state court complaint alleging that she had been terminated solely because she had filed claims for worker's compensation benefits, Davis filed the instant complaint in the United States District Court for the Middle District of Alabama on October 28, 2005.  In her federal court complaint, Davis claims that her employment was terminated because of her race in violation of 42 U.S.C. § 1981, in violation of the Family and Medical Leave Act ("FMLA") and to prevent her from receiving full retirement benefits in violation of the Employee Retirement Income Security Act ("ERISA").  (Complaint, Claim One, ¶ 29, Claim Two, Claim Three).  Davis also states claims against Johnston under 42 U.S.C. § 1981 for

discrimination in various terms and conditions of her employment and under Alabama law for intentional infliction of emotional distress and assault and battery (Complaint, Claim Ten, Claim Twelve).

### 1.    Davis' § 1981 Claims

Although asserting in her complaint that her termination was racially motivated, Davis conceded during her deposition that she does not believe that she was terminated because of her race. (Davis 143, lines 11-14). Rather, Davis testified that she believes that Albany was trying to force her out of her job because of her worker's compensation injuries. (Davis 156, lines 9-13).

Davis also claims that Johnston and Albany violated 42 U.S.C. § 1981 in that she was "treated differently than individuals similarly situated." (Complaint ¶ 30). Although her Complaint is silent as to the alleged disparate treatment, Davis described in her deposition five occasions over the many years she worked with Jeff Johnston that she believes she was were motivated by her race. (Davis 67, lines 21-23; 68, lines 1-7, 21-23; 69, lines 1-9; 71, lines 16-22; 72, lines 10-13; 86, lines 1-23; 88, lines 11-14; 89, lines 1-23; 90, lines 1-4; 91, lines 1-4; 92, lines 20-23; 94, lines 2-9; 95, lines 6-21; 97, lines 4-19; 98, lines 12-15; 100, lines 2-4, 9-20; 116, lines 1-2, 10-18; 117, lines 11-19; 119, lines 1-6; 120, lines 6-12; 120, lines 13-15, 20-23; 121, lines 1-11, 21-23; 122, lines 12-15; 123, lines 15-18; 125, lines 20-23; 155, lines 5-23; Johnston Decl. ¶¶ 4-5; Prior Davis 36, lines 18-23; 37, lines 1-9, 16-23; 49, lines 12-23; 50, lines 1-3). First, Davis claims that she was leaving work one day when she "had words" with two white employees. (Davis 67, lines 21-23; 68, line 1) Afterwards, Davis asserts that she went home but that the two white employees "obviously" stayed and talked to Johnston. (Davis 68, lines 2-4). The next day, Johnston allegedly called Davis into his office and told her "not to

jump his employees." (Davis 68, lines 5-7). Johnston did not write up Davis or formally discipline her in relation to this incident. (Davis 71, lines 16-22).

Davis initially testified that she did not know whether Johnston told her "not to jump his employees" because of her race. (Davis 72, lines 10-13). However, she later testified that, at the time, she believed Johnston had taken this action because of her race. (Davis 86, lines 13-16). Davis does not recall specifically when this incident took place, but testified that Johnston was a supervisor in the seaming department at the time. (Davis 68, lines 21-23; 69, lines 1-9). Johnston was a supervisor in the seaming department from October 1992 and October 1993. (Johnston Decl. ¶ 4).

Davis also claims that she received a three-day suspension for insubordination because of her race. According to Davis, she was leaving the plant following the conclusion of her shift when supervisor Tim Woodward asked her to indicate on a ticket she had signed off on that there were "no holes, no damage." (Davis 89, lines 9-23). Davis refused to do so, and was informed by Johnston that she was suspended for three days. (Davis 88, lines 1-23; 89 lines 1-23; 90, lines 1-4). Johnston did not make any reference to Davis' race during this conversation. (Davis 91, lines 1-4). Although Davis claims that this suspension occurred in approximately 2000, she also testified that Johnston was department manager in seaming when she was suspended. (Davis 88, lines 11-14; 92, lines 20-23). Johnston was department manager in seaming from October 1993 to March 1997. (Johnston Decl. ¶ 5).

Additionally, Davis claims that Johnston told her not to read a magazine or pamphlet during a meeting because of her race. (Davis 125, lines 20-23). According to Davis, another hourly employee, who was white, had a magazine or pamphlet and, as Davis' request, passed it over to her. (Davis 94, lines 2-7; 123, lines 15-18). Johnston then told Davis not to read a

magazine during the meeting.  (Davis 94, lines 7-9).  Davis testified in this case that she did not know when this incident occurred, but believes that Jeff Johnston was department manager at the time.  (Davis 121, lines 21-23; 122, lines 12-15).   Johnston was department manager over seaming from October 1993 to March 1997.  (Johnston Decl. ¶ 5).[2]

Davis also claims that Johnston prevented her from being able to train employees on another shift because of her race.  (Davis 155, lines 5-23). According to Davis, she was asked by Ken Funderburk whether she would be interested in going to first shift to train other employees on a particular fabric if he could get approval for her to do so.  (Davis 116, lines 1-2, 10-16).  Davis never heard back from Funderburk, but claims that another hourly employee, Lomack Bean, later told her that Johnston had said that Davis would do the training "over [my] dead body."  (Davis 116, lines 17-18; 119, lines 1-6; 120, lines 6-12).  The training would not have involved any increase in pay, and the position was never awarded to another employee.  (Davis 120, lines 13-15, 20-23; 121, lines 1-11).  Davis does not know when this incident occurred, or even whether it was before or after 2001.  (Davis  117, lines 11-19).

Additionally, Davis claims that she was removed from an "assistant lead" position because of her race.  (Davis 95, lines 6-21).  Davis concedes that supervisor Tim Woodward told her that her assistant lead position "was cut," but claims that another employee continued to act as an assistant lead on a different shift. (Davis 97, lines 4-19; 98, lines 12-15).  Davis does not know who made the decision to eliminate her position as assistant lead, but believes that race played a role:

---

[2]   Davis also testified about this incident when she was deposed as a witness in the case styled *Thomas Harris v. Albany International Corporation, Appleton Wire Division*, CV-97-M-657-N, United States District Court for the Middle District of Alabama.  (Prior Davis 58, lines 4-14).  She testified at that time that the incident occurred one and a half to two years prior to that deposition, which was taken on October 19, 1999.  (Prior Davis 58, lines 4-14).

Q.    Do you believe that your position as an assistant lead was eliminated because of your race?

A.    Because of me.

Q.    It was eliminated because of you?

A.    Me, the person.

Q.    You don't believe that the assistant lead position was eliminated because you were black?

A.    I believe that it played a role.

(Davis 100, lines 9-20).

Davis could not recall during her deposition when her assistant lead position was eliminated.  (Davis 100, lines 2-4).  However, Davis' removal from the assistant lead position necessarily occurred prior to her deposition in the *Thomas* case, which was taken on October 19, 1999, as she testified about the incident at that time.  (Prior Davis 36, lines 18-23; 37, lines 1-9, 16-23; 49, lines 12-23).  In that deposition, Davis testified that she gave up the assistant lead position voluntarily, and that there was nothing discriminatory about how it occurred.  (Prior Davis 49, lines 12-23; 50, lines 1-3).

### 2.    Davis' ERISA Claim

Davis also claims in her federal lawsuit that she was terminated "for the purpose of preventing [her] from receiving full retirement benefits under the Defendant's pension plan" which, she alleges, was in violation of § 510 of the Employee Retirement Income Security Act, 29 U.S.C. § 1140 ("ERISA").  (Complaint, Claim Three, ¶ 57).  Davis acknowledges that she will still be eligible for retirement benefits from Albany when she reaches, at a minimum, age fifty-five.  (Davis 349, lines 6-10).  However, she claims that her benefits would have been

greater if she had been taken off work for a work-related injury under worker's compensation. (Davis 349, lines 20-23; 352, lines 16-23; 353, lines 1-23).

When asked during her deposition whether she believed that her employment was terminated "because of some retirements benefits issue," Davis responded, "I don't know why I was discharged." (Davis 143, lines 15-19). Davis does not think that she ever had a conversation with Jeff Johnston about her retirement benefits. (Davis 348, lines 10-13). Johnston had no responsibility for administering the retirement plan at Albany. (Johnston Decl. ¶ 9; Davis 348, lines 14-18).

### 3.    Davis' FMLA Claim

Davis also states a claim against Johnston for violation of the Family and Medical Leave Act ("FMLA"). (Complaint, Claim Two). Davis acknowledges that she was never denied FMLA leave when her request was supported by medical certification, as required by Albany policy. (Davis 336, lines 10-13). While Davis claims in her complaint that she was terminated in retaliation for seeking FMLA leave, she testified in her deposition that Johnston's sole violation of the FMLA was that he did not find a doctor who would take Davis off of work due to her worker's compensation injuries:

Q.    Am I correct in understanding that your claim about the Family Medical Leave Act is that the company was not able to find a doctor who would recognize and properly treat your injuries?

A.    I feel that under Workers' Comp I was being sent to doctors and the doctors wasn't properly medicating or correcting the injuries that I had.

Q.    And you believe that was Jeff Johnston's fault?

A.    Yes.

Q.    And that's because why?

A.    Because he was the leader. He was over the company.

Q.    So what you really wanted Mr. Johnston to do was to find you a Workers' Comp doctor that would treat you the way you felt you should be treated?

A.    To treat me the way that I needed to be treated.

Q.    Okay.  And it was your belief that the Workers' Comp doctors should have taken you off from work?

A.    Yes.

Q.    And it's your belief that the Workers' Comp doctors should have told Albany that you were unable to work because of your injuries?

A.    Yes.

Q.    And it's your belief that because the doctors didn't do that, that Mr. Johnston violated the Family Medical Leave Act?

A.    Yes.

                                    *        *        *

Q.    .... My question is whether there was any other way in which you think Mr. Johnston or Albany violated the FMLA other than not finding you a doctor that would take you off of work?

A.    I don't know.

(Davis 334, lines 3-23; 335, lines 1-14; 336, lines 3-8).

### 4.    Davis' Intentional Infliction of Emotional Distress Claim

Davis also states a claim against Johnston for intentional infliction of emotional distress. (Complaint, Claim Ten).  Davis apparently bases this claim on various acts of "harassment" by Johnston over the course of her employment with Albany.  (Davis 57, lines 8-13; 62, lines 2-7, 22-23; 63, lines 8-16; 66, lines 3-6; 263, lines 1-4; 264, lines 2-17; 408; lines 2-23; 344, lines 10-23; 345, lines 5-7; 409, lines 4-8; Johnston Decl. ¶ 5).  Specifically, Davis claims that Johnston raised his voice to her when he asked her to remove a banana peel from a table, made her work on a machine that made her sick although he took two other employees off the machine, and

called her into the seaming supervisor's office without allowing her to bring a co-worker.  (Davis 62, lines 2-7; 63, lines 8-16; 263, lines 1-4; 264, lines 2-17; 408; lines 14-23).  Davis filed a grievance over Johnston's calling her to the supervisor's office, which was resolved by Johnston apologizing to Davis.  (Davis 62, lines 22-23; 63, lines 8-16; 66, lines 3-6).  According to Davis, each of these incidences occurred while Johnston was the department manager in seaming.  (Davis 57, lines 8-13; 264, line 13; 409, lines 4-8).  Johnston was department manager in seaming from October 1993 to March 1997.  (Johnston Decl. ¶ 5).  Davis also claims that Johnston "wrote her up" in the mid- to late 1990s for "knocking a hole in a fabric."  (Davis 408, lines 2-13).  Finally, Davis claims that, during the October 29, 2003 meeting, she had left the room and, when she returned, Johnston said that he "wouldn't have [her] slamming doors," and threatened to call the police.  (Davis 344, lines 10-23).  Johnston did not call the police.  (Davis 345, lines 5-7).

### 5.    Davis' Assault and Battery Claim

Finally, Davis brings a claim against Johnston for assault and battery.  (Complaint, Claim Twelve).  However, Davis admitted during her deposition that Johnston had never touched her in an offensive manner, nor had he threatened to her in any physical way.  (Davis 157, lines 5-7; 158, lines 2-8).

## III.    ARGUMENT

### A.    Summary Judgment Standard

Summary judgment is proper under Fed. R. Civ. P. 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."  Celotex Corp v. Catrett, 477 U.S. 317 (1986).  While all

reasonable doubts must be resolved in the non-movant's favor, the trial court is not required to "resolve all doubts in such a manner." Barnes v. Southwest Forest Indus., Inc., 814 F.2d 607, 609 (11th Cir. 1987). Summary judgment is proper unless there is sufficient evidence favoring the non-movant for the finder of fact to find for that party. See Earley v. Champion Int'l Corp., 907 F.2d 1077, 1080 (11th Cir. 1990).

Although the movant has the initial responsibility of informing the court of the basis for its motion and identifying the evidence that demonstrates the absence of any genuine issue of material fact, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322-23.

### B.      Davis' § 1981 Race Discrimination Claim is Meritless

#### 1.      Davis Admits That She Was Not Terminated Because Of Her Race

Davis' claim of race discrimination with respect to her termination fails by Davis' own admission. The Eleventh Circuit Pattern Jury Instructions state that, in order to prevail, a § 1981 Davis must demonstrate (1) that she was discharged from employment, **_and_** (2) that her race was a substantial or motivating factor for her discharge. See Eleventh Circuit Pattern Jury Instructions 1.3.1, § 1981. For purposes of summary judgment only, Johnston concedes that Davis was discharged from her employment. [3] It is undisputed, however, that Davis' race was not a substantial, motivating or other factor in Davis' alleged termination. According to Davis' own testimony, she was not discharged from Albany because of her race. (Davis 143, lines 11-14). In fact, Davis believes that she was terminated because she filed worker's compensation claims, and filed a complaint in state court alleging that her worker's compensation claims were

---

[3] Johnston disputes the plaintiff's allegation that her employment was terminated and has evidence that the plaintiff resigned her employment but, for purposes of summary judgment, will assume that this assertion is true.

the sole reason for her discharge. (Davis 156, lines 9-13; Ex. 1). Accordingly, Davis' claim for discriminatory discharge on the basis of race is due to be dismissed and, indeed, should never have been filed.

### 2.    Davis' Remaining Assertions of Race Discrimination Fail

### a.    Most of Davis' Allegations Are Time-Barred

Davis' various allegations of discrimination in the terms and conditions of her employment are equally meritless. As an initial matter, almost all of these allegations are time-barred because Davis failed to file her complaint within the applicable statute of limitations. 42 U.S.C. § 1981 contains, at most, a four-year statute of limitations for racial discrimination with respect to disparate terms and conditions of employment. See Jones v. R.R. Donnelly & Sons Co., 541 U.S. 369, 382 (2004). Davis filed this suit on October 28, 2005. (Complaint). Thus, her disparate treatment claims are time-barred to the extent that they occurred prior to October 28, 2001. Id.

Davis alleges only five incidents in which her race allegedly played a factor: (1) she allegedly received a three-day suspension for insubordination after she refused an instruction by supervisor Tim Woodward (Davis 88, lines 2-23; 89, lines 1-23; 90, lines 1-23; 127, lines 3-11); (2) she allegedly was removed from the position of assistant lead at some point prior to 1999 when the position was "cut out" (Davis 96, lines 22-23; 97, lines 1-19; 115, lines 14-23; 127, lines 3-11; Prior Davis 58, lines 4-14); (3) she allegedly heard from another employee that Johnston had said Davis would train other employees during the day shift (a position that would not result in any additional pay or seniority, and which, to Davis' knowledge, was never filled) "[o]ver his dead body" (Davis 116, lines 1-23; 117, lines 1-19; 119, lines 3-6; 120, lines 2-22; 121, lines 8-11; 127, lines 3-11); (4) Johnston allegedly told her that she could not read a

magazine during a meeting.  (Davis 94, lines 6-9; 126, lines 1-23; 127, lines 1-11; 413, lines 1-4); and (5) after she "had words" with two white employees, Johnston allegedly told her "not to jump his employees."  (Davis 67, lines 21-23; 68, lines 1-16; 86, lines 3-16).

Davis asserts that the magazine incident and the three-day suspension took place when Johnston was the seaming department manager, which was between October 1993 and March 1997.  (Davis 88, lines 15-21; 126, lines 21-23; 127, lines 1-2; Johnston Decl. ¶ 5).   Her allegations regarding the assistant lead position took place sometime prior to 1999.  (Prior Davis 58, lines 4-14).  She says that the incident with the two white employees took place when Johnston was seaming supervisor between 1992 and 1993.  (Davis 69, lines 1-4; Johnston Decl. ¶ 4).  All of these allegations are plainly time-barred.  To the extent that Davis seeks to premise a § 1981 claim on any of these events, her claim is due to be dismissed.

> **b.    Davis Suffered No Adverse Employment Action Based On Her Race**

The only one of Davis' disparate treatment allegations that could conceivably be within the statute of limitations period is her allegation that Johnston prevented her from providing training to employees on another shift.[4]  Even if this claim were timely, however, it fails as a matter of law.  A race discrimination claim under § 1981 is governed by the burden-shifting framework established by the United States Supreme Court in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973), Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), and St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).  See Lincoln v. Board of Regents, 697 F.2d 928, 935 n.6 (11th Cir. 1982)(holding that the elements of a discrimination claim under section 1981 and Title VII are identical).

---

[4] Davis does not know when this incident took place.  She initially claimed that it was between 2001 and 2003, but could not say for sure whether it occurred before or after her injury in 2001.  (Davis 117, lines 11-19).

Where, as here, there is no direct evidence of discrimination, a plaintiff must create an inference of discrimination by proving a *prima facie* case. See Williams v. Motorola, Inc., 303 F.3d 1284, 1293 (11th Cir. 2002). To establish a *prima* facie case, Davis must demonstrate that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer (or individual supervisor) treated similarly situated, non-protected individuals more favorably; and (4) that she was qualified to do the job. Id.

Davis cannot establish a *prima facie* case based on Johnston's allegedly preventing her from training other employees because she did not suffer a materially adverse employment action. To demonstrate an adverse employment action, a plaintiff must show that the action constituted a "*serious and material* change in the terms, conditions or privileges of employment." Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001)(emphasis in original). This must be more than a mere change in job duties:

> [A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993) (cited by Davis, 245 F.3d at 1239); see also Doe v. Dekalb County School Dist., 145 F.3d 1441, 1447 (11th Cir. 1998).

Davis has asserted nothing more than the possibility that she might have been asked to perform some training on another shift. It is undisputed that this training position did not involve an increase in pay or a change in Davis' seniority. (Davis 120, lines 13-19). Indeed, Davis concedes that no one actually received this training position. (Davis 120, lines 20-22).

Accordingly, these allegations do not constitute adverse employment actions, and Davis cannot present a *prima facie* case. See Apodaca v. Sec'y of Dept. of Homeland Sec., 161 Fed. Appx. 897, 900 (11th Cir. 2006)("An action which, it turns out, had no effect on an employee is not an 'adverse' action")(internal citations omitted); Gaddis v. Russell Corp., 242 F.Supp. 2d 11236, 1145-46 (M.D. Ala. 2003)(denial of employee's transfer was not adverse employment action where there was no evidence that the position was a promotion, or otherwise entailed a significant difference in pay, benefits or responsibility); see also Davis, 245 F.3d at 1246 ("Because adverse employment action is an indispensable element of a Title VII plaintiff's case, Davis's failure to present sufficient evidence for a reasonable jury to find that this element was met is fatal to [her] case.").

Moreover, Davis' allegation that Johnston did not want her to perform the training is based on nothing more than inadmissible hearsay and, thus, is properly excluded from the Court's consideration. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991)(non-moving party cannot rely on inadmissible evidence to oppose a motion for summary judgment), cert. denied , 506 U.S. 952 (1992).

Davis' § 1981 allegations of race discrimination are either time barred or lack the requisite elements of a *prima facie* case and, thus, are due to be dismissed.

### C.    Davis' FMLA Claims Fail as a Matter of Law

Davis' FMLA claim against Johnston is not only without merit, but is nonsensical. According to Davis, Johnston violated the FMLA because he failed to find a doctor who would take her off work for her alleged worker's compensation injuries.  Of course, the FMLA does not require an employer to identify a health care provider who will certify that an employee needs to be off from work.

Moreover, while Davis claims that she was terminated because she was denied "family leave" for her worker's compensation injuries, (Davis 246, lines 9-18), she admits that she was never denied FMLA leave when her request was supported by medical certification, as required by Albany policy and permitted by the FMLA. (Davis 247, lines 2-7). See 29 U.S.C. § 2613(a). She also admits that neither her personal physician nor the myriad worker's compensation approved physicians who examined her could find any reason to take her off work. (Davis 215, line 23; 216, 1-7; 218, lines 20-23; 219, lines 1-2). Nor can Davis identify any other employee of Albany who was permitted to take FMLA leave without a medical certification stating that they needed to be off from work. (Davis 336, lines 21-23; 337, lines 1-3).

In light of Davis' failure to comply with Albany's uniformly applied policy requiring medical certification to support the need for FMLA leave, her FMLA claim fails as a matter of law. Cash v. Smith, 231 F.3d 1301 (11th Cir. 2000)(affirming summary judgment for employer and noting that employers have a statutory right to require an employee to obtain medical certification attesting to the employee's eligibility for leave and, where plaintiff's physician indicated that she was not eligible for leave, employer properly denied leave); Baldwin-Love v. Electronic Data Sys. Corp., 307 F.Supp. 2d 1222, 1235 (M.D. Ala. 2004)(granting summary judgment to employer on plaintiff's FMLA allegations where she failed to provide medical certification).

Davis' allegation in her Complaint that she "was forced to use vacation time as a result of her serious health conditions," Complaint ¶ 40, likewise fails. The FMLA permits employers to require employees to use vacation time concurrently with FMLA leave. See 29 U.S.C. § 2612(d)((2)(A-B). The allegation that she was penalized for FMLA time, therefore, is meritless.

Even if Davis could somehow demonstrate a violation of the FMLA, she has failed entirely to show liability on the part of Johnston.  She has adduced no evidence that Johnston participated in any decisions with regard to the FMLA, much less decisions that related to her.  In fact, Davis testified that FMLA leave requests were properly directed to Bryant and Lynda Jones.  (Davis 245, line 23; 246, lines 1-8; 296, lines 16-21).  When asked whether Johnston participated in the FMLA process, Davis responded, "I don't know."  (Davis 296, lines 22-23; 297, lines 1-2).  Without an indication that Johnston participated in any decision related to the FMLA, Davis' FMLA claim against him fails.  See Waters v. Baldwin County, 936 F.Supp. 860, 863 (S.D. Ala. 1996)(adopting rationale in Freemon v. Foley, 911 F.Supp 326 (N.D. Ill. 1995) and explaining that case's finding that "three supervisory defendants could be considered employers under the FMLA *if they had exercised some control over the plaintiff's ability to take protected leave*")(emphasis added).

### D.    Davis' ERISA Claim Fails as a Matter of Law

Davis' ERISA claim against Johnston likewise fails.  Davis contends that her termination "was for the purpose of preventing [her] from receiving full retirement benefits under the Defendant's pension plan,"[5] and, therefore, violated 29 U.S.C. § 1140, also known as ERISA § 510.  (Complaint ¶ 57).  To state a *prima facie* case of discrimination under ERISA § 510, Davis must show: (1) that she is entitled to ERISA's protection; (2) that she was qualified for the position; and (3) that she was discharged under circumstances that give rise to an inference of discrimination.  See Gitlitz v. Compagnie Nationale Air Fr., 129 F.3d 554, 559 (11th Cir. 1997)(quoting Clark v. Coats & Clark, 990 F.2d 1217, 1223-24 (11th Cir. 1993)).

---

[5] On June 14, 2006, the Court granted the plaintiff's motion to amend her complaint to combine her tort claims for fraudulent inducement, breach of contract and bad faith into her ERISA claim.  As of the date of this filing, however, the plaintiff has not filed her amended complaint.  Nevertheless, counsel for the plaintiff previously clarified that the claims for fraudulent inducement, breach of contract and bad faith, which in her amended complaint are included in the ERISA count, are not asserted against defendant Johnston.

Assuming, *arguendo*, that Davis was entitled to ERISA's protection, she cannot establish a *prima facie* case under ERISA § 510 because she fails to establish either of the other two requirements. Davis has adduced no evidence of any causal link between her alleged termination and any potential entitlement to benefits. Indeed, she does not think she ever had any conversation with Johnston about retirement benefits and is not even sure whether Johnston ever told her that her employment was terminated. (Davis 228, lines 1-4; 348, lines 14-18). When asked what anyone at Albany had done to interfere with her ability to get her retirement benefits, Davis simply responded, "I was terminated." (Davis 142, lines 5-11). When asked whether she believed she had been discharged "because of some retirement benefits issue," Davis responded, "I don't know why I was discharged." (Davis 143, lines 18-19). These facts do not give rise to an inference of discrimination, and Johnston is entitled to summary judgment as a matter of law.

Nor does any alleged reduction in retirement benefits as a result of Davis' alleged termination help her to establish a *prima facie* case. It is well established that a "plaintiff ... cannot establish a prima facie case merely by showing that, as a result of the termination, [s]he was deprived of the opportunity to accrue more benefits." Clark, 990 F.2d at 1224.

Davis' *prima facie* case also fails because she cannot demonstrate that she was qualified for the position. Davis admits that, during the October 29, 2003 meeting, she informed Johnston and others that she had applied for disability benefits through the Social Security Administration. (Davis 167, lines 3-5). Thereafter, the SSA declared her disabled retroactively to August 21, 2003, more than two months prior to her alleged termination. (Davis 167, lines 17-23; Ex. 8). Because Davis was unable to work, she was not qualified for her job at Albany and cannot state a *prima facie* case under ERISA § 510. See, e.g., Holtzclaw v. DSC Communications Corp., 255 F.3d 254, 261 (5th Cir. 2001)(finding that employee who represented to SSA that he was unable

to work was not qualified for job and, thus, could not state a *prima facie* case under ERISA §
510); <u>McNemar v. Disney Store, Inc.</u>, 91 F.3d 610, 621 (3d Cir. 1996)(discharged HIV-positive
plaintiff judicially estopped from establishing second element of § 510 prima facie case because
plaintiff and his doctors certified under penalty of perjury that he was totally and permanently
disabled, thereby obtaining state and federal disability benefits), <u>cert</u>. <u>denied</u>, 519 U.S. 1115
(1997); <u>see generally</u> <u>Cleveland v. Policy Mgmt. Sys. Corp.</u>, 526 U.S. 795, 806-07 (1999)
(rejecting judicial estoppel as a matter of law where plaintiff previously claimed complete
disability, but allowing summary judgment unless plaintiff provides "sufficient explanation of
this apparent inconsistency"; plaintiff's mere contradiction of own prior sworn statement is not
sufficient).

     In light of Davis' inability to establish even a *prima facie* case, her ERISA § 510 claim
fails as a matter of law.

     **E.**    **Davis' Intentional Infliction of
Emotional Distress Claim Is Due To Be Dismissed**

     As with her other claims, Davis' intentional infliction of emotional distress claim should
never have been filed and should now be dismissed. As an initial matter, only the final two days
of Davis' employment with Albany falls within the statute of limitations period. The statute of
limitations for an outrage claim is two years. <u>See</u> <u>Jenkins v. United States Fid. & Guar. Co.</u>, 698
So.2d 765, 768 n.5 (Ala. 1997); <u>see also</u> <u>Ala.</u> <u>Code</u> § 6-2-38(l). Because Davis filed this suit on
October 28, 2005, her actionable time frame begins on October 28, 2003, *one day* prior to her
alleged termination on October 29, 2003. Accordingly, her outrage claim is properly limited to
her termination and cannot include her various allegations of "harassment" by Jeff Johnston, all
of which took place in the 1990s. (Complaint ¶ 95).

Davis' timely allegations regarding the October 29, 2003 meeting are: (1) Johnston allegedly yelled at her, but did not use profanity (Davis 262, lines 9-11; 263, lines 9-11); and (2) Johnston allegedly threatened to call the police and told Davis that he would not tolerate her slamming a door.  (Davis 344, lines 15-23).  These allegations are hardly sufficient to support a claim for intentional infliction of emotional distress.

Even if her time-barred allegations of "harassment" could somehow be considered, Davis' allegations fall far short of the type of conduct required to state a claim for intentional infliction of emotional distress.   In Alabama, a plaintiff seeking to establish intentional infliction of emotional distress is required to prove: (1) that the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) that the conduct was extreme and outrageous; and (3) that the actor's conduct caused distress so severe that no reasonable person should be expected to endure it.  See Jackson v. Alabama Power Co., 630 So.2d 439, 440 (Ala. 1990).   The standard for establishing intentional infliction of emotional distress is high, and recovery is allowed "only in the most egregious of circumstances." Thomas v. BSE Indus. Contractors, Inc., 624 So.2d 1041, 1044 (Ala. 1993).

In addition to the elements of the claim, the Alabama Supreme Court has repeatedly held that a plaintiff claiming intentional infliction of emotional distress must "produce sufficient evidence to show that the defendant's conduct is 'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'"  Nipper v. Variety Wholesalers, Inc., 638 So.2d 778, 779 (Ala. 1994)(quoting American Rd. Serv. Co. v. Inmon, 394 So.2d 361, 365 (Ala. 1980)). The narrow scope of recognized outrage claims is well-noted by the Alabama Supreme Court:

> The tort of outrage is a very limited cause of action that is
> available only in the mot egregious of circumstances . . . In fact, in

> the 12 years since <u>Inmon</u> was decided, all cases in which this court
> has found a jury question on an outrage claim have fallen within
> only three categories: 1) cases having to do with wrongful conduct
> in the context of family burials . . . 2) a case where insurance
> agents employed heavy handed, barbaric means in attempting to
> coerce the insured into settling an insurance claim . . . 3) a case
> involving egregious sexual harassment.

<u>Thomas</u>, 624 So.2d at 1044.  Davis' allegations regarding Johnston's treatment of her are far from the egregious activities alleged in any of the recognized jury questions for intentional infliction of emotional distress and, thus, are due to be dismissed.

To the extent that Davis contends that her termination itself was outrageous, <u>see</u> Complaint ¶ 99, such claim fails as a matter of law.  As an employee at will, Davis cannot succeed on an outrage claim solely because of her termination.  As the Alabama Supreme Court has noted, "it would be intolerable in a civilized society to hold that an employer is guilty of outrageous conduct for merely discharging an employee at will."  <u>Harrell v. Reynolds Metals Co.</u>, 495 So.2d  1381, 1387 (Ala. 1986).

### F.    Davis' Assault and Battery Claim Is Unsupported by the Facts

In light of her deposition testimony, it is difficult to understand why Davis filed a claim for assault and battery.  To succeed on an assault and battery claim, a plaintiff must establish: (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner.  <u>Ex parte</u> <u>Atmore Community Hosp.</u>, 719 So. 2d 1190, 1193 (Ala. 1998).

Davis' testimony regarding her interaction with Johnston is at odds with any allegation of assault and battery:

> Q.    Did Mr. Johnston ever hit you at work?
> A.    No.
> Q.    Did he ever touch you inappropriately in any way.

      A.      No.

      Q.      Did he ever touch you?

      A.      The job that we did, sometimes you had to brush past or touch or lean if you are checking on a fabric.  If he want [*sic*] to check to see what the seam is doing, how the machine is running.  The way we worked, he might have.  I don't know.  But I don't remember, because it is so many touches.

      Q.      But other than in the context of working around the machine, is there any other instance where Mr. Johnston ever touched you at work?

      A.      No.

      Q.      Has Mr. Johnston ever threatened you at work in any way?

      A.      He threatened to fire me.

      Q.      I mean, did he ever threaten you physically in any way?

      A.      No.

      Q.      Did he ever do anything to make you afraid that he was going to hurt you physically in some fashion?

      A.      No.

(Davis 157, lines 2-23; 158, lines 1-8).  In <u>Whitlow v. Bruno's, Inc.</u>, 567 So.2d 1235 (Ala. 1990), the plaintiff's deposition testimony was similarly "devoid of any allegations that she was ever threatened with physical harm."  <u>Id.</u> at 1240.  The Alabama Supreme Court determined that summary judgment is proper on a claim of assault and battery where, as here, the plaintiff "did not possess a well founded fear of an imminent battery."  <u>Whitlow</u>, 567 So.2d at 1240.  Accordingly, Davis' assault and battery claim is due to be dismissed.

**IV.**    <u>**CONCLUSION**</u>

      Davis' factual allegations are so far removed from her legal claims that it is difficult to determine how one prompted the other.  Davis' deposition testimony reveals that her true concerns lie more with her treating physicians, over whom Albany and Johnston had no control, than with the defendants in this action.  Her allegations against those physicians, however, lie far outside the scope of the federal and state laws she has invoked in this lawsuit.  Because Davis

cannot demonstrate any genuine issue of material fact with respect to her allegations against Jeff

Johnston, Johnston is entitled to summary judgment as a matter of law as to all claims.[6]


                                                    /s Jennifer F. Swain
                                                    Jennifer F. Swain


                                                    /s Lynlee Wells Palmer
                                                    Lynlee Wells Palmer

                                                    Attorneys for Defendant Jeff Johnston

**OF COUNSEL:**

**JOHNSTON BARTON
PROCTOR & POWELL LLP**
2900 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203
(205) 458-9400
(205) 458-9500 (facsimile)

---

[6] Because of the utter frivolity of Davis' claims, and her refusal to voluntarily dismiss even those claims that she specifically disavowed during her deposition, Johnston intends to seek attorney's fees and costs at the appropriate time. Johnston respectfully requests that the Court permit him the opportunity to make the necessary motion prior to entry of final judgment.

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2006, I electronically filed the above and foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Trina S. Williams, Esq.
Vicky U. Toles, Esq.
TOLES & WILLIAMS, LLP
1015 South McDonough Street
Montgomery, AL 36104

Charles A. Powell IV, Esq.
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Wachovia Tower
420 20th Street North, Suite 1600
Birmingham, AL 35203


/s Lynlee Wells Palmer
OF COUNSEL