**American Court Reporting**
**toll-free (877) 320-1050**

1 (Pages 1 to 4)

## Page 1

IN THE UNITED STATE DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NUMBER
CV-2:05CV-1040-WKW

DORA DAVIS,
    Plaintiff(s),
vs.
ALBANY INTERNATIONAL, JEFF JOHNSTON,
    Defendant(s).

DEPOSITION TESTIMONY OF:
DORA DAVIS

May 12, 2006
9:00 a.m.

COURT REPORTER:
DAVID L. MILLER, CSR, RMR

## Page 2

1           S T I P U L A T I O N
2      IT IS STIPULATED AND AGREED by and
3 between the parties throught their
4 respective counsel that the deposition of
5 DORA DAVIS, may be taken before David L.
6 Miller, Registered Merit Reporter and
7 Notary Pulbic, State at Large, at the law
8 offices of Toles & Williams, Montgomery,
9 Alabama, on May 12, 2006, commencing at
10 approximately 9:00 a.m.
11      IT IS FUTHER STIPULATED AND AGREED
12 that the signature to and the reading of
13 the deposition by the witness is waived,
14 the deposition to have the same force and
15 effect as if full compliance had been had
16 with all laws and rules of Court relating
17 to the taking of depositions.
18      IT IS FURTHER STIPULATED AND
19 AGREED that it shall not be necessary for
20 any objections to be made by counsel to
21 any questions, except as to form or
22 leading questions, and that counsel for
23 the parties may make objections and assign

## Page 3

1 grounds at the time of trial or at the
2 time said deposition is offered in
3 evidence, or prior thereto.
4
5
6
7           I N D E X
8 EXAMINATION BY:        PAGE NO.
9 Mr. Powell         8
10 Certificate       286

## Page 4

1        INDEX OF EXHIBITS
2 EXHIBITS        PAGE NO.
3 DEFENDANT'S 1 State court complaint 13
4 DEFENDANT'S 2 Albany's policies  40
5 DEFENDANT'S 3 Acknowledgment    41
6 DEFENDANT'S 4 I understand document 42
7 DEFENDANT'S 5 Training record    45
8 DEFENDANT'S 6 Disability statement 130
9 DEFENDANT'S 7 Handbook     136
10 DEFENDANT'S 8 Notice of decision  167
11 DEFENDANT'S 9 Employee documentation 241
12 DEFENDANT'S 10 Inter-office memo  247
13 DEFENDANT'S 11 Return to work letter 252
14 DEFENDANT'S 12 Exit interview    257
15 DEFENDANT'S 13 Voluntary resignation 261
16 DEFENDANT'S 14 Forget letter    261
17 DEFENDANT'S 15 Initial disclosures  265

Exhibit B

**American Court Reporting**
**toll-free (877) 320-1050**

2 (Pages 5 to 8)

| Page 5 |
|---|
| 1  A P P E A R A N C E S |
| 2 |
| 3  FOR THE PLAINTIFF(S): |
| 4  Triana S. Williams |
| 5  Vicky U. Toles |
| 6  TOLES & WILLIAMS |
| 7  1015 South McDonough Street |
| 8  Montgomery, Alabama 36104 |
| 9 |
| 10  FOR THE DEFENDANT, ALBANY: |
| 11  Charles A. Powell, IV |
| 12  BAKER, DONELSON, BEARMAN, CALDWELL |
| 13  & BERKOWITZ |
| 14  1600 SouthTrust Tower |
| 15  420 20th Street North |
| 16  Birmingham, Alabama 35203 |
| 17 |
| 18  FOR THE DEFENDANT, JOHNSTON: |
| 19  Jennifer F. Swain |
| 20  JOHNSTON, BARTON, PROCTOR & POWELL |
| 21  2900 AmSouth/Harbert Plaza |
| 22  1901 Sixth Avenue North |
| 23  Birmingham, Alabama 35203 |

| Page 6 |
|---|
| 1  A P P E A R A N C E S |
| 2 |
| 3  ALSO PRESENT: |
| 4  Jeff Johnston |
| 5  Ted Bryant |
| 6  Demonica Ritchison |
| 7 |
| 8 |
| 9 |
| 10 |
| 11 |
| 12 |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |

| Page 7 |
|---|
| 1  I, David L. Miller, a Registered |
| 2  Merit Report of Birmingham, Alabama, and a |
| 3  Notary Public for the State of Alabama at |
| 4  Large, acting as Commissioner, certify |
| 5  that on this date, pursuant to the Federal |
| 6  Rules of Civil Procedure, and the |
| 7  foregoing stipulation of counsel, there |
| 8  came before me at the law offices of |
| 9  Toles & Williams, Montgomery, Alabama, |
| 10  commencing at approximately 9:00 a.m. on |
| 11  May 12, 2006, DORA DAVIS, witness in the |
| 12  above cause, for oral examination, |
| 13  whereupon the following proceedings were |
| 14  had: |
| 15 |
| 16  DORA DAVIS, |
| 17  Having been first duly sworn, was examined |
| 18  and testified as follows: |
| 19 |
| 20  COURT REPORTER:  Usual |
| 21  stipulations? |
| 22  MS. TOLES:  Yes. |
| 23  MR. POWELL:  Yes. |

| Page 8 |
|---|
| 1  MS. SWAIN:  Yes. |
| 2 |
| 3  EXAMINATION BY MR. POWELL: |
| 4  Q.  How are you this morning, |
| 5  Ms. Davis? |
| 6  A.  A little bit tired.  I'm not |
| 7  feeling well today. |
| 8  Q.  I'm sorry to hear that.  My |
| 9  name is Charles Powell.  I'm the attorney |
| 10  representing Albany International in the |
| 11  lawsuit that you have brought against the |
| 12  company and Jeff Johnston.  Jennifer Swain |
| 13  is representing Mr. Johnston in the case. |
| 14  I think he will be joining us in a little |
| 15  while. |
| 16  We are here to take your |
| 17  deposition in your lawsuit today.  This is |
| 18  my and Ms. Swain's opportunity to find out |
| 19  what facts that you have that you believe |
| 20  support your claims against Albany and |
| 21  Mr. Johnston in this lawsuit.  For that |
| 22  reason, I and Albany are going to rely on |
| 23  your testimony, as well as Mr. Johnston |

**American Court Reporting**
**toll-free (877) 320-1050**

3 (Pages 9 to 12)

Page 9

1  and Ms. Swain.
2       For that reason, it is
3  important for you to listen to my
4  questions carefully. If you don't
5  understand the question, please tell me
6  and I will happy to repeat or rephrase the
7  question.
8       If you answer a question, I'm
9  going to assume that you understood it and
10 that the answer that you have given me is
11 to the best of your ability. All right?
12      A.   (Nods head)
13           MS. TOLES:  He --
14      Q.   That instruction is coming
15 next. For Mr. Miller's benefit, I need
16 you to answer orally, either yes or no or
17 in a narrative fashion. He can take down
18 nods or shakes of the head, but it is not
19 always clear exactly what you meant.
20      So, mainly for Mr. Miller's
21 benefit, if you would either say yes or no
22 or give a narrative answer, it will make
23 it easier on Mr. Miller to take down the

Page 10

1  testimony.
2       A.   Yes.
3       Q.   All right. You said that you
4  are not feeling well this morning. Are
5  you on any kind of medication that you
6  think will affect your memory and your
7  ability to testify here today?
8       A.   No.
9       Q.   If you need a break at any
10 time, let me know and we can take a few
11 minutes.
12      A.   Okay.
13      Q.   All right. You were with
14 Albany for roughly twenty-four years; is
15 that about right?
16      A.   Twenty four and a half years.
17      Q.   All right. You are currently
18 Dora Davis. Are there any other names
19 that you went by during your employment
20 with the company?
21      A.   Yes.
22      Q.   What were they?
23      A.   Jones and Iverson.

Page 11

1       Q.   I-V-E-R-S-O-N?
2       A.   S-O-N, uh-huh.
3       Q.   Did you do anything to get
4  ready for your deposition today?
5       A.   Yes.
6       Q.   What did you do?
7       A.   I talked to my lawyer.
8       Q.   Don't tell me what y'all
9  talked about. Did you do anything else
10 besides talk to counsel?
11      A.   That was it.
12      Q.   Did you review any documents?
13      A.   I looked over the documents.
14      Q.   Do you remember which
15 documents you looked at?
16      A.   The response and my
17 complaints.
18      Q.   Okay. When you say your
19 complaint, your complaint in this lawsuit?
20      A.   In this lawsuit.
21      Q.   Did you also look at your
22 complaint from your State court lawsuit?
23      A.   State court -- I don't

Page 12

1  understand.
2       Q.   In addition to this case, I
3  think you also filed a State court lawsuit
4  against the company with different
5  lawyers.
6       A.   Okay. No, I didn't look over
7  that one.
8       Q.   Okay. Well, if you would just
9  take a look at that for me real quick.
10           MR. POWELL:  Do you have a
11 copy of it?
12           MS. TOLES:  I don't think I
13 have got that.
14           MR. POWELL:  (Hands document)
15           MS. TOLES:  Thank you.
16           (Pause)
17           THE WITNESS:  Okay.
18      Q.   (BY MR. POWELL) All right.
19 Have you had a chance to review that
20 document?
21      A.   Yes.
22      Q.   Do you recognize it?
23      A.   Yes.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 13

1    Q.    Okay.  What is it?
2    A.    It's a complaint I filed
3  against the company for Workers' Comp with
4  -- I can't think of his name.
5    Q.    Would that be William Abell
6  who is listed on the last page?
7    A.    Yes.  William Abell.
8    Q.    All right.  And if you could,
9  look on page four of the document.  Are
10  those your signatures?
11    A.    Yes.
12    Q.    All right.  Did you authorize
13  Mr. Abell to file this complaint on your
14  behalf?
15    A.    Yes.
16    Q.    And did you have an
17  opportunity to review it before Mr. Abell
18  filed it in court?  Did you read over it
19  beforehand?
20    A.    I don't remember.  I don't
21  remember.
22    Q.    Take a look at the bottom of
23  page four for me.  That little paragraph

Page 14

1  above the second signature on the bottom
2  of the page.
3    A.    Yes.
4    Q.    Okay.  Now, are the facts
5  alleged in this complaint true and
6  accurate?
7    A.    They are.
8    Q.    Okay.  And that includes all
9  of the facts that you have -- the
10  allegations that you have made in count
11  two of that complaint?
12       (Pause)
13    A.    Yes.
14    Q.    Okay.  If you could, just give
15  that to Mr. Miller.  We will mark that as
16  Exhibit 1 to your deposition.
17       (WHEREUPON, a document was
18  marked as Defendant's Exhibit 1 and is
19  attached to the original transcript.)
20    Q.    What did you do for Albany?
21    A.    From the beginning?
22    Q.    That may be the easiest way to
23  do it.  You got hired in 1979?

Page 15

1    A.    1979.  I started as a worker
2  bee.
3    Q.    Okay.
4    A.    A seamer, I went to the
5  finishing as a helper bee, and then I went
6  back to the seaming as a seamer, then a
7  nap operator.
8    Q.    And how were you paid at
9  Albany?
10    A.    Hourly.
11    Q.    Were you an hourly worker
12  throughout your tenure with the company?
13    A.    Twenty-four and a half years,
14  yes.
15    Q.    Okay.  Are you a member of the
16  Union?
17    A.    Yes.
18    Q.    Which one?
19    A.    Teamsters, I believe.
20    Q.    Okay.  Was there a collective
21  bargaining agreement that -- in place when
22  you were employed by Albany?
23    A.    I believe so.

Page 16

1    Q.    How long did you work as a
2  worker bee?
3    A.    About a year and a half.
4  About a year and a half.
5    Q.    Is that your first job at
6  Albany?
7    A.    Yes.
8    Q.    Okay.  Is that in the weaving
9  department?
10    A.    The weaving.
11    Q.    How did you get from being a
12  worker bee to a seamer?
13    A.    We had a bidding system , so I
14  bidded to be a seamer.
15    Q.    Was there a job bid procedure
16  in place your whole time at Albany?
17    A.    Yes.
18    Q.    So if any hourly employee at
19  Albany wanted to move from one job to
20  another, did you have to bid on the job to
21  move?
22    A.    Once the job was placed on the
23  board, was opened up, then you bid for

**American Court Reporting**
**toll-free (877) 320-1050**

Page 17

1  that job if you wanted to be placed.
2      Q.   Okay.  And do you know,
3  generally, what the criteria were that
4  were considered once people applied for a
5  job that was posted on the board?
6      A.   Not really.
7      Q.   All right.  And did you bid on
8  the job to get from seaming to finish?
9      A.   Yes.
10     Q.   How long did you say -- let me
11 ask you this.
12          How long did you stay a seamer
13 that first time?
14     A.   About ten years.
15     Q.   Do you remember who your
16 supervisor was when you were a worker bee?
17     A.   Eric Thorington, I believe.
18 Eric.
19     Q.   Was Mr. Bryant in the plant
20 when you got hired?
21     A.   Yes.
22     Q.   Okay.  So you worked with Ted
23 Bryant the whole time that you were with

Page 18

1  the company?
2      A.   Yes.
3      Q.   Okay.  Do you believe
4  Mr. Bryant ever took any action against
5  you because of your race?
6      A.   I don't know.
7      Q.   Do you allege in this lawsuit
8  that Mr. Bryant did anything to you at
9  Albany because of your race?
10     A.   I don't know that either.
11     Q.   You filed the lawsuit, so I'm
12 confused how you don't know if you are
13 accusing Mr. Bryant of doing anything
14 because of your race.
15     A.   I know that a lot of racial
16 things was done and based racially, but I
17 don't know whether he personally did it.
18     Q.   Okay.  So, as you sit here
19 today, you cannot identify any particular
20 act by Mr. Bryant that you believe
21 occurred because of your race?
22     A.   No, I can't.
23     Q.   Okay.  During your twenty-four

Page 19

1  and a half years at Albany, did you ever
2  hear Mr. Bryant make any racially
3  inappropriate remarks?
4      A.   No.
5      Q.   Ever hear Mr. Bryant telling
6  any racially inappropriate jokes?
7      A.   No.
8      Q.   Okay.  During the time -- your
9  first time as a seamer, that roughly
10 ten-year stretch, who was your supervisor?
11     A.   Jewel Johnson, Bill Smith,
12 and, I believe, Barbara Smith at one
13 point.
14     Q.   Jewel Johnson?
15     A.   Yes.
16     Q.   Jewel like a diamond, Ruby?
17     A.   I know her name is Jewel.  How
18 is it, I don't know.
19     Q.   And Jewel Johnson, Bill Smith,
20 and Barbara Smith were your supervisors
21 during your first run in the seaming
22 department?
23     A.   Yes.

Page 20

1      Q.   Okay.  Are Bill Smith and
2  Barbara Smith related?
3      A.   No.
4      Q.   All right.  So how did you get
5  from being a seamer to the finishing
6  department?
7      A.   I bidded.
8      Q.   Bid on it.  How long did you
9  stay in finishing?
10     A.   Maybe two months.
11     Q.   All right.  Did you have to
12 bid back to seaming, or is there some
13 procedure in the collective bargaining
14 agreement that let you go get your old job
15 back within a certain period of time?
16     A.   I was injured.  I fell off of
17 a table.
18     Q.   Okay.
19     A.   And when I got back from off
20 -- recovering, I was allowed to go back to
21 the seaming department.
22     Q.   Okay.  Was that a Workers'
23 Compensation injury?

**www.AmericanCourtReporting.com**
**May 12, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 21

1     A.   Yes.
2     Q.   What year?
3     A.   1991.
4     Q.   1991.  Who was your supervisor
5   during the time period that you were in
6   finishing?
7     A.   Joe Dean.
8     Q.   All right.  What was the
9   nature of your injury in 1991?
10    A.   I fell off a -- I don't know
11  what they call the table, but it was about
12  this high (Indicating).
13    Q.   About three and a half, four
14  feet?
15    A.   Four feet.  And I had to -- we
16  had something we called heat set -- a heat
17  set table.  So I was the helper.  And the
18  head told me to go up and take the bar and
19  put it so they could run the pan for the
20  heat set over it.
21         When I stood up -- got up on
22  the table to bend down to get the weight.  And
23  didn't know the extent of the injury.  And

Page 22

1   I picked it up.  And when I picked it up,
2   I fell off the table.  And I hurt my lower
3   back and my right knee.
4     Q.   Did you get some medical
5   treatment for that?
6     A.   Not at first.  I went to my
7   own doctor.  I went to the company.  I was
8   denied Workers' Comp.  I went to my own
9   doctor.  I was treated.
10         So, eventually, after I had
11  gone back to work, it was recognized as a
12  Workers' Comp situation.
13    Q.   All right.  And I take it at
14  some point you were released to return to
15  work at full duty?
16    A.   Yes.
17    Q.   And when you came back, is
18  that when you went back to your prior job
19  in the seaming department?
20    A.   Yes.
21    Q.   Okay.  When you fell off the
22  table, who was your table head?
23    A.   Eddie Lane.

Page 23

1     Q.   Did you just pick up the bar
2   and lose your balance because of the
3   weight of the bar?
4     A.   When I picked up the bar, I
5   just felt pain in my lower back.  I -- I
6   guess I acknowledged the pain, and that's
7   when I fell.
8     Q.   Okay.  When you came back and
9   went back to the seaming department, who
10  was your supervisor?
11    A.   Jewel Johnson.
12    Q.   You said that you were a
13  seamer and then became a nap operator.
14  Are those both in the seaming department?
15    A.   Both in the seaming
16  department.
17    Q.   How did you get from being a
18  seamer to a nap operator?
19    A.   During that time we had where
20  we would be transferred from the -- they
21  were phasing the groscey (phonetic)
22  machine out and they were bringing the
23  M-3000s in.  It was another -- it was

Page 24

1   another machine, but I don't know the name
2   of that machine.  But it was similar to
3   the M-3000.  And we kind of like went
4   from -- according to seniority, we were
5   taken from one to the other one.  From the
6   groscey to the nap side.
7     Q.   Okay.  Just for my benefit,
8   because I have never run any of these
9   machines.  What is a -- a groscey?
10    A.   It was a manual.  You seam
11  manually.  You actually put the steam in
12  with your hand.
13    Q.   Okay.  And when you say put
14  the seam in, are you weaving the ends of
15  the fabric together?
16    A.   Yes.
17    Q.   Okay.  So you are taking woven
18  pieces of fabric and putting the ends
19  together to making a belt out of it?
20    A.   Yes.
21    Q.   All right.  Do you know how
22  you spell a groscey?
23    A.   No.  I don't remember that

**American Court Reporting**
**toll-free (877) 320-1050**

7 (Pages 25 to 28)

Page 25

1  much.
2      Q.    All right.  Do you remember,
3  roughly, when the company was
4  transitioning from the manual groscey
5  seaming machine to what, I guess, were
6  electronic seaming machines?
7      A.    It was around like '91, '92.
8  In that area -- that time frame.
9      Q.    You mentioned -- is it an
10  M-3000?
11      A.    Yes.  That's what we called
12  it.  We called it an M-3000.
13      Q.    What is the M-3000?
14      A.    It was an automatic seaming.
15      Q.    Tell me how the job was
16  different when you changed from manual
17  seaming to an automatic seaming machine.
18      A.    It was different because I was
19  doing it with my hand.  When you went to
20  the groscey -- to the M-3000, it was done
21  automatically.  But you had to sit the
22  fabric up and connect it to the machine
23  and you had to sit and watch it and look

Page 26

1  for mistakes and anything else that might
2  occur.
3      Q.    All right.  And how many
4  M-3000 machines were there in your
5  department?
6      A.    I forgot that.
7      Q.    I assume it was more than
8  one.
9      A.    It was -- I don't know.  Maybe
10  thirteen between the M-3000s and -- it
11  might have been thirteen.  I can remember
12  up to N-9.  But it was more.  I believe it
13  was more.
14      Q.    Okay.  You said N-9; is that a
15  machine number?
16      A.    That was a -- all of the
17  machines were numbered.
18      Q.    Okay.
19      A.    And I can remember N-9.  I
20  don't remember.
21      Q.    Okay.  Did Jewel -- you said
22  that Jewel Johnson was your supervisor in
23  seaming when you came back from

Page 27

1  finishing.  Did Ms. Johnson remain your
2  supervisor for the rest of your time with
3  the company?
4      A.    No.
5      Q.    Who else served as your
6  supervisor after Ms. Johnson?
7      A.    I don't know whether anyone
8  was between Jewel, but I think Jeff
9  Johnston was the next supervisor.  I
10  believe.
11      Q.    So Jeff Johnston is the next
12  seaming supervisor that you remember?
13      A.    I believe he was.
14      Q.    Okay.  And how long did
15  Mr. Johnston remain your supervisor?
16      A.    I don't know whether it was
17  maybe two years -- if it was two years or
18  three.  Something like that.  I don't know
19  exactly.
20      Q.    Do you recall when
21  Mr. Johnston became your supervisor in the
22  seaming department?
23      A.    I believe it was -- I don't

Page 28

1  know whether it was '94 or '95.
2      Q.    Okay.  And he would have been
3  your supervisor in that department till
4  '96, '97, somewhere in that time frame?
5      A.    I know it was up until '96.  I
6  don't know when he left the department.  I
7  don't know when he left the department.
8      Q.    Okay.  Who replaced
9  Mr. Johnston?
10      A.    Nat Jones, I believe.
11      Q.    And how long was Nat Jones
12  your supervisor in seaming?
13      A.    I believe it was -- I don't
14  know.
15      Q.    Okay.  Did Mr. Jones -- Nat
16  Jones remain your supervisor for the rest
17  of your time at Albany?
18      A.    No.
19      Q.    Who replaced Mr. Jones?
20      A.    Tim Woodward.
21      Q.    Do you know when Mr. Woodward
22  became your supervisor?
23      A.    No, because I don't know when

**American Court Reporting**
**toll-free (877) 320-1050**

Page 29

1    Nat Jones left.
2        Q.    How long was Mr. Woodward your
3    supervisor?
4        A.    Maybe two or three years, I
5    guess.  I don't know.
6        Q.    Okay.  And any supervisors in
7    seaming after Mr. Woodward?
8        A.    Barbara Smith.
9        Q.    Do you know when Ms. Smith
10    became your supervisor?
11        A.    It was after Tim Woodward
12    left.  I don't know exactly.
13        Q.    Okay.  Was Ms. Smith your
14    supervisor at the time that you stopped
15    working at Albany?
16        A.    It -- she was there at the
17    time I was terminated.  She was there at
18    the time I was terminated.
19        Q.    Barbara Smith was?
20        A.    Barbara Smith.
21        Q.    So after Mr. Woodward, was
22    Barbara Smith your supervisor for the rest
23    of your time at the company?

Page 30

1        A.    Yes.
2        Q.    Okay.  Do you recall the
3    actual last day that you operated a
4    seaming machine at Albany?
5        A.    I don't know the last day.
6        Q.    Okay.  Do you know what month
7    it was?
8        A.    It probably was October,
9    because -- it probably was October.
10        Q.    Early October?
11        A.    I don't remember.
12        Q.    All right.  I know you had a
13    meeting with Mr. Bryant and Jeff Johnston
14    around October the 29th of 2003.
15        A.    That's true.
16        Q.    Okay.  We are going to talk
17    about that meeting in a little while.  But
18    do you know how far in advance of that
19    meeting -- do you have a sense of how far
20    in advance of that meeting was the actual
21    last day that you did any work at Albany?
22        A.    On August the 21st I was
23    called at home, and I was told not to

Page 31

1    return to work.
2        Q.    August 21st of 2003?
3        A.    August 21st, yes, of 2003.  I
4    was on and off at work up until October
5    the 29th.
6        Q.    You say that you got called at
7    home on August the 21st, 2003?
8        A.    Uh-huh (Nodding head).
9        Q.    Yes?
10        A.    Yes.
11        Q.    All right.
12        A.    I'm sorry.
13        Q.    Who called you?
14        A.    Ted Bryant.
15        Q.    Okay.  What did Mr. Bryant say
16    during this call?
17        A.    He -- he suggested that I
18    didn't come to work until -- I don't even
19    remember why.  He just suggested that I
20    didn't return to work.
21        Q.    Well, do you know what time of
22    day he called you on August the 21st of
23    2003?

Page 32

1        A.    No.
2        Q.    Do you remember what day of
3    the week it was?
4        A.    No.
5        Q.    Were you scheduled to work
6    that day?
7        A.    Yes.
8        Q.    Had you worked the day
9    before?
10        A.    If it wasn't a weekend, yes.
11    I don't remember what day it was.
12        Q.    Okay.  Had you had any type of
13    work-related injury somewhere near that
14    date?
15        A.    Yes.
16        Q.    What was the injury?
17        A.    Okay.  If you want me to back
18    up, because we skipped a lot of injuries.
19    In 1992 I was injured; in 1994 I was
20    injured.
21        Q.    Okay.
22        A.    In 1999 I was injured; in
23    2001, I was injured; in 2002 I was

**American Court Reporting**
**toll-free (877) 320-1050**

Page 33

1  injured.
2       Q.   Well, at the time Mr. Bryant
3  called you on August the 21st of 2003,
4  were you still receiving medical treatment
5  for any of these prior injuries that you
6  have listed?
7       A.   Yes.
8       Q.   All right.  We are going to
9  back up and kind of go through all of
10 that.
11           All right.  You say Mr. Bryant
12 called you on August the 21st of 2003 and
13 suggested that you not return to work.
14      A.   Yes.
15      Q.   Did he tell you that you were
16 being placed on any type of inactive
17 status?
18      A.   I don't remember that.
19      Q.   Do you recall what Mr. Bryant
20 said during this call?
21      A.   I don't know.  I just know
22 that he called and he told me not to
23 return to work.

Page 34

1       Q.   That day or ever?
2       A.   Until they -- until I see the
3  doctor or -- I don't know -- it was after
4  a certain appointment, but I don't
5  remember exactly.
6       Q.   And how long was it before you
7  returned to work after this call with
8  Mr. Bryant on August 21st?
9       A.   I don't know.
10      Q.   Okay.  You mentioned that you
11 worked on and off until October the 29th,
12 2003.
13      A.   Yes.
14      Q.   That would be between this
15 call with Mr. Bryant on August the 21st
16 and October the 29th, 2003?
17      A.   Yes.
18      Q.   You worked periodically?
19      A.   Yes.
20      Q.   All right.  Any time that you
21 worked, would you have clocked in?
22      A.   Yes, I would have.
23      Q.   And so then at the end of the

Page 35

1  shift, or whenever you left on any day,
2  you would also clock out?
3       A.   Yes.
4       Q.   All right.  During this call
5  with Mr. Bryant on August the 21st, 2003,
6  did he make any reference to your race?
7       A.   No.
8       Q.   Did you ask him why you were
9  being told not to return to work?
10      A.   He told me until I see the
11 doctor.
12      Q.   Well, at that time did you
13 have a doctor's appointment scheduled in
14 connection with one of your work
15 injuries?
16      A.   Yes.
17      Q.   And who would that doctor have
18 been?
19      A.   It would be Dr. Katz.  It
20 would be Dr. Katz.
21      Q.   Was he one of -- was Dr. Katz
22 one of your approved Workers' Compensation
23 treating doctors?

Page 36

1       A.   Yes.
2       Q.   And at that time were you
3  having difficulty working because of your
4  injuries?
5       A.   Yes.
6       Q.   Causing you to miss time at
7  work?
8       A.   It caused me at that time to
9  -- the only time I missed work during that
10 time was when Ted called me and told me
11 not to return, or whenever he said that
12 the doctor said, "You go to therapy."  So
13 I go to therapy a certain time of day.  I
14 would leave therapy and go to work.  That
15 was the only time that was missed.
16      Q.   Okay.
17      A.   Besides that, we had no work
18 days.  So we could take no work days.  I
19 did take no work days because of the
20 injuries.  I took vacation time because of
21 the injuries.
22      Q.   When you say no work days,
23 what does that mean?

**American Court Reporting**
**toll-free (877) 320-1050**

10 (Pages 37 to 40)

Page 37

1    A.   We would have slack day's,
2  work production -- no work to put out, so
3  they would declare it a no work day , and
4  they would allow you to take them.  Ted
5  Bryant or the company would allow you to
6  take it.
7    Q.   And that would apply to you
8  and everybody else in the plant?
9    A.   Yes.
10    Q.   Okay.  So you could just go
11  home for the day?
12    A.   Well, usually, you don't work
13  that day.  You let them know you don't
14  want to work that day, and you didn't work
15  that day.
16    Q.   Those days did not count as
17  attendance occurrences?
18    A.   No.
19    Q.   If you took a vacation day,
20  that didn't count as an attendance
21  occurrence?
22    A.   No.
23    Q.   All right.  I guess we will

Page 38

1  have a number of injuries to go through.
2  We will do that in a minute.  Let me ask
3  you a couple of quick questions.
4    During the time that you --
5  well, do you believe that Jewel Johnson
6  ever took any action against you because
7  of your race?
8    A.   I don't know.
9    Q.   Do you allege in this lawsuit
10  that Ms. Johnson took any action against
11  you because of your race?
12    A.   I don't remember.
13    Q.   You don't remember whether she
14  did or you don't remember whether you
15  allege --
16    A.   I don't remember whether I
17  allege it.  I don't remember.
18    Q.   Well, I am asking in the
19  lawsuit that you have brought against the
20  company, are you claiming in this lawsuit
21  that Ms. Johnson -- that Jewel Johnson
22  took any action against you because of
23  your race?

Page 39

1    A.   I would have to go over the
2  complaint.  I don't remember.
3    Q.   All right.  I can represent to
4  you that there is no reference to
5  Ms. Johnson in your complaint.
6    A.   I don't know.
7    Q.   Does that mean if there is not
8  a specific reference to someone in the
9  complaint, that you -- that you are not
10  claiming that that person took any action
11  against you because of your race?
12    A.   Yes.
13    Q.   Okay.  So you are not accusing
14  Nat Jones of taking any action against you
15  because of your race?
16    A.   No.
17    Q.   You are not accusing Tim
18  Woodward of taking any action against you
19  because of your race?
20    A.   No.
21    Q.   You are not accusing Barbara
22  Smith of taking any action against you
23  because of your race?

Page 40

1    A.   No.
2    Q.   Okay.  Well, what exactly is
3  it that you believe Mr. John --
4    THE WITNESS:  Can I take a
5  break?
6    MR. POWELL:  Do you want to
7  take a break?
8    THE WITNESS:  Yes.
9    MR. POWELL:  We can do that.
10    9:42 AM
11    (Short recess)
12    9:53 AM
13    Q.   (BY MR. POWELL) Are you ready?
14    A.   Yes.
15    Q.   All right.  When we took a
16  break, I was getting ready to ask you some
17  questions about Mr. Johnston.  We will put
18  that on hold for just a second.  We will
19  come back to Jeff in just a minute.
20    During your time at the
21  company, did Albany have a policy in place
22  regarding discrimination and harassment in
23  the workplace?

**American Court Reporting**
**toll-free (877) 320-1050**

11 (Pages 41 to 44)

Page 41

1      A.    We had equal opportunity
2   posted on the bulletin board, like a board
3   where it was equal opportunity.
4      Q.    Do you recall going through
5   any training at the company about the
6   company's harassment and discrimination
7   policies?
8      A.    No.
9      Q.    Okay.  Take a look at that for
10  me.
11         Have you had an opportunity to
12  look over that document?
13     A.    Yes.
14     Q.    Do you recognize it?
15     A.    No, I don't recognize it.
16     Q.    So you don't recall receiving
17  any training on this while you worked for
18  the company?
19     A.    I don't remember.
20     Q.    All right.  We are going to
21  mark that as Exhibit 2 to your deposition.
22         (WHEREUPON, a document was
23  marked as Defendant's Exhibit 2 and is

Page 42

1   attached to the original transcript.)
2      Q.    Go ahead and mark this one,
3   also.
4         (WHEREUPON, a document was
5   marked as Defendant's Exhibit 3 and is
6   attached to the original transcript.)
7      Q.    I will ask, does that refresh
8   your recollection, what has been marked as
9   Defendant's Exhibit 3?
10     A.    Huh-uh (Shaking head).
11     Q.    Have you had a chance to look
12  over what has been marked as Exhibit 3?
13     A.    Yes.
14     Q.    Is that your signature on it?
15     A.    Yes.
16     Q.    Is that your handwriting where
17  your name is printed under your signature?
18     A.    Yes.
19     Q.    Does that look like your
20  handwriting on the rest of the document?
21     A.    Yes.
22     Q.    So does this refresh your
23  memory as to whether or not you received

Page 43

1   any training on a harassment policy at the
2   company?
3      A.    I -- this is my handwriting.
4      Q.    Okay.
5      A.    But I still don't remember
6   it.
7      Q.    You just don't remember it?
8      A.    I don't remember it.
9      Q.    Okay.  Well, in that case, you
10  may not remember this one either, but I'm
11  going to show it to you, and we will see.
12         (WHEREUPON, a document was
13  marked as Defendant's Exhibit 4 and is
14  attached to the original transcript.)
15     Q.    Now, this is several different
16  items -- it may not be several.  It is a
17  one-page document entitled I Understand.
18  Then there are three pages clipped
19  together behind it, and then there is a
20  booklet in this together clipped on the
21  back of it.
22         If you will, just take a
23  minute to look through all of that for me.

Page 44

1         (Pause)
2      A.    Okay.
3      Q.    Have you had a chance to look
4   over what we have marked as Exhibit 4 to
5   your deposition?
6      A.    Yes.
7      Q.    Do you recognize those
8   documents?
9      A.    Yes.
10     Q.    All right.  Do you recall
11  where you first say these documents?
12     A.    I remember the meeting now.  I
13  remember the meeting now.
14     Q.    Do you remember a group
15  training session?
16     A.    Yes.
17     Q.    Do you remember who else was
18  in the room with you?
19     A.    They were hourly employees.
20  And I believe the lady was brought from
21  Albany, New York.  I believe she was.  I
22  believe it was a lady.
23     Q.    Dana Champagne, does that

**American Court Reporting**
**toll-free (877) 320-1050**

Page 45

1    sound right?
2        A.    I just remember a lady.
3        Q.    So somebody that you
4    understood was from Albany's corporate
5    office came down and gave you a training
6    class?
7        A.    Yes.
8        Q.    Okay.  The first page of
9    that -- the document that is entitled, "I
10   Understand" -- is that your signature on
11   that page?
12       A.    Yes.
13       Q.    And do you recall, during this
14   training session, receiving all of those
15   materials that are clipped to the "I
16   Understand" page with your signature?
17       A.    I remember the meeting.
18       Q.    Okay.
19       A.    I don't remember receiving
20   these, but I have seen these documents.
21       Q.    And they are listed on that
22   page with your signature on it, correct?
23       A.    Yes.

Page 46

1        Q.    I have marked that one as
2    Exhibit 5.
3            (WHEREUPON, a document was
4    marked as Defendant's Exhibit 5 and is
5    attached to the original transcript.)
6        Q.    And just to make it easy for
7    you, I will represent to you that these
8    are sign-in logs for everybody who went
9    through the same type of training that you
10   did.  You can look through all of them if
11   you would like.  I think what looks like
12   your signature is on the fourth page.
13       A.    Okay.
14       Q.    Is that your signature at
15   number two on that page?
16       A.    Yes.
17       Q.    Okay.  Prior to this meeting,
18   had you ever met Dana Champagne?
19       A.    No.
20       Q.    Have you ever spoken with her
21   since then?
22       A.    No.
23       Q.    During the remainder of your

Page 47

1    employment with Albany, which would have
2    been during -- two years and nine or ten
3    months after this training -- did you ever
4    make any effort to contact Ms. Champagne
5    to complain about any issues in the
6    Montgomery plant?
7        A.    No.
8        Q.    After this training session,
9    did you ever contact Mr. Bryant to
10   complain about any act that you thought
11   was somehow discriminatory because of
12   race?
13       A.    I filed grievances, but I just
14   don't remember what I put on the
15   grievance.  I have no records of it.
16       Q.    So you filed grievances.  Do
17   you remember what you filed the grievances
18   concerning?
19       A.    I filed grievance on one
20   disciplinary action, one where a statement
21   was made by a department -- a department
22   manager about women as opposed to men.
23   And I don't know.  I can't remember.

Page 48

1        Q.    Other than -- now, these
2    grievances -- is there a grievance
3    procedure under the collective bargaining
4    agreement?
5        A.    Yes.
6        Q.    So how do you file a
7    grievance?
8        A.    You have a shop steward.  You
9    have a -- people who represent you in the
10   department.  So you go to that person, and
11   you get the paperwork and you write out
12   your grievance.
13       Q.    Okay.  And then does the Union
14   submit the grievance to the company?
15       A.    Yes.
16       Q.    What happens then?
17       A.    Then you wait for something
18   like a hearing.
19       Q.    A formal hearing, or do you
20   have a --
21       A.    A formal hearing like -- would
22   be me, the shop steward, Ted Bryant,
23   possibly Jeff Johnston.  Plant manager,

Page 49

1  department manager, to that effect.
2      Q.    Who was your shop steward in
3  the steaming department?
4      A.    I had several.
5      Q.    Okay.  Let me see if I can do
6  it this way.  At the time of the grievance
7  over the disciplinary action, do you
8  recall who your shop steward was?
9      A.    I believe it was -- one was --
10 I remember Dot Collins.  The second -- I
11 don't remember who the second one was.
12     Q.    Okay.  Who was the department
13 manager that made some comments about
14 women versus -- male versus female
15 employees?
16     A.    It was Bob Hampsey.
17     Q.    What did Mr. Hampsey say?
18     A.    I don't remember, but I know
19 it was a grievance.  I know we wrote the
20 grievance out.  We went through the
21 grievance procedures.
22     Q.    How far in the grievance
23 procedure did you go?

Page 50

1      A.    We went to, I guess, the
2  arbitrary -- arbitrator -- where the --
3  the Union rep had to come down.  We went
4  to that.
5      Q.    You had a formal arbitration?
6      A.    Well, he was the person who
7  was like -- what -- we always say the man
8  from Birmingham.  When he had to come down
9  from Birmingham.
10     Q.    He works in the Union office
11 in Birmingham?
12     A.    In Birmingham, yes.
13     Q.    Okay.  Was that third step?
14     A.    It might have been.
15     Q.    Let me ask it this way.  Were
16 there any lawyers involved?
17     A.    No, I don't think so.
18     Q.    Then it wasn't an arbitration.
19     A.    Okay.
20     Q.    All right.  And what was the
21 resolution of this grievance involving
22 Mr. Hampsey?
23     A.    I don't remember.

Page 51

1      Q.    Okay.  Who was Bob Hampsey?
2      A.    He was a department manager
3  for the seaming department.
4      Q.    Would he have been above your
5  supervisor?
6      A.    Yes.
7      Q.    Okay.  And during what time
8  period was Mr. Hampsey department manager
9  for seaming?
10     A.    This was an occasion where it
11 was a male -- a male operator and we had
12 female operators.  So they brought this
13 male back -- well, he bidded for the
14 department, and they just made him -- I
15 don't even know what the position was.
16 But they just -- a position that women had
17 bidded for.  They didn't allow us, they
18 just placed him.
19     Q.    Well --
20     A.    He was working straight days,
21 and we had to rotate, stuff like that.  It
22 was somewhat to that effect.
23     Q.    Do you remember who the male

Page 52

1  operator was?
2      A.    It was Willie Reynolds.
3      Q.    Willie Reynolds?
4      A.    Yes.
5      Q.    Do you know what year this
6  occurred?
7      A.    I don't remember.
8      Q.    Is Mr. Reynolds white or
9  black?
10     A.    Black.
11     Q.    At the time, who was your
12 supervisor above you but below
13 Mr. Hampsey?
14     A.    I believe it was Nat Jones.
15     Q.    Did you ever hear Mr. Hampsey
16 make any racially inappropriate remark at
17 Albany?
18     A.    No.
19     Q.    Ever hear Mr. Hampsey tell any
20 racial jokes?
21     A.    No.
22     Q.    Do you believe Mr. Hampsey
23 ever took any action against you because

**American Court Reporting**
**toll-free (877) 320-1050**

14 (Pages 53 to 56)

Page 53

1    of your race?
2        A.   No.
3        Q.   Did you know how Willie
4    Reynolds got this particular job in the
5    seaming department?
6        A.   It was a bidding job, and the
7    reason I can remember it so -- because he
8    told me personally that George Kazalay --
9    that he was going to get the job.
10       Q.   Mr. Reynolds told you that
11   Mr. George Kazalay told him he was going
12   to get the job?
13       A.   Get the job.  Out of the other
14   bidders, he got the job.
15       Q.   Do you know who else bid for
16   the job?
17       A.   I believe Norma Heath was one
18   of the persons.
19       Q.   How do you know that Ms. Heath
20   bid on it?
21       A.   Because she made -- mentioned
22   it.
23       Q.   Ms. Heath told you that she

Page 54

1    bid on the job?
2        A.   Yes.
3        Q.   Did you bid on the job?
4        A.   No.
5        Q.   Did anyone besides
6    Mr. Reynolds or Ms. Heath tell you that
7    they bid the job?
8        A.   I don't remember the people.
9        Q.   Okay.  Do you know the level
10   of seniority of Mr. Reynolds and Ms. Heath?
11       A.   Yes.
12       Q.   Okay.
13       A.   Mr. Reynolds had seniority.
14       Q.   Mr. Reynolds had more
15   seniority than Ms. Heath?
16       A.   Yes.
17       Q.   In your experience at the
18   plant, when two -- when more than one
19   employee bids on the job, did the job
20   generally go to the employee with the most
21   seniority?
22       A.   On occasions.  Some occasions.
23       Q.   Okay.  Well, what occasions

Page 55

1    were you aware of where the job did not go
2    to the most senior employee?
3        A.   When they asked for
4    experience, they would ask -- they would
5    list experiences.
6        Q.   Okay.  On this occasion do you
7    know who -- well, do you know what the
8    criteria was for this job that
9    Mr. Reynolds was awarded?
10       A.   It was working the routing
11   table, bringing in and out fabrics out of
12   the department.  And Ms. Heath had been
13   doing it for two or three years.
14       Q.   Okay.  Had Mr. Reynolds ever
15   worked in the seaming department?
16       A.   He had worked earlier.  He had
17   worked years prior to that.
18       Q.   Okay.  Do you know if
19   Mr. Reynolds met the criteria on the
20   posting for the job?
21       A.   I don't know.
22       Q.   Okay.  Did you ever file --
23   while you were at Albany, did you ever

Page 56

1    file any grievances directly related to
2    the conduct of Mr. Johnston?
3        A.   Wow.  I don't remember.  Yes,
4    I did.  Yes.
5        Q.   Do you remember when that was?
6        A.   This was once when we were in
7    a meeting.  I don't remember what the
8    meeting was about, but -- I do.  It was
9    pertaining to the nap, the M-3000, the
10   fabric -- H-500 -- I think it was HE-500.
11       It was a new project, and we
12   were getting ready to train on it.  And in
13   the meeting he discussed whatever, and he
14   asked for questions.  During this time
15   another employee asked a question,
16   Katherine Davis.  He -- he accused her of
17   trying to run the company.
18       The second time was -- I asked
19   the question -- I don't know what the
20   question was -- but during that time -- he
21   told me after the meeting to meet him in
22   the office.
23       Q.   Now, you keep referring to

**American Court Reporting**
**toll-free (877) 320-1050**

15  (Pages 57 to 60)

Page 57

1   "he." Is the "he" you are referring to --
2       A.   Jeff Johnston.
3       Q.   Mr. Johnston?
4       A.   Yes.
5       Q.   Do you remember when this
6   meeting was?
7       A.   I don't remember.
8       Q.   What job did Mr. Johnston hold
9   at the time of this meeting?
10      A.   I believe it was department
11  manager.
12      Q.   Department manager?
13      A.   I believe it was.
14      Q.   Did Mr. Johnston move from
15  supervisor to department manager in
16  seaming?
17      A.   Yes.
18      Q.   And who replaced Mr. Johnston
19  as department manager?
20      A.   I believe it was Bob Hampsey.
21      Q.   Okay. Do you know what year
22  Mr. -- what years Mr. Johnston was
23  department manager in seaming?

Page 58

1       A.   No, I don't.
2       Q.   Okay. Was it prior to your
3   injury in 2001?
4       A.   Yes. Yes.
5       Q.   Okay. Do you remember who the
6   department manager was when you got
7   injured in 2001?
8       A.   The department manager -- I
9   believe it was Bob Hampsey.
10      Q.   Okay. So this meeting with
11  Mr. Johnston you have been describing
12  where Katherine Davis was there, you were
13  there, there may have been others, was
14  sometime prior to 2001?
15      A.   Yes.
16      Q.   All right. And at any point
17  during this meeting with Mr. Johnston, did
18  Mr. Johnston make any reference to
19  anyone's race?
20      A.   No.
21      Q.   Did he make any racially
22  inappropriate remarks?
23      A.   No.

Page 59

1       Q.   Did he tell any racial jokes?
2       A.   No.
3       Q.   Do you remember what the
4   question was that Ms. Davis asked?
5       A.   No, I don't.
6       Q.   And you said the meeting was
7   related to the M-3000, which is a seaming
8   machine.
9       A.   Yes.
10      Q.   All right. And you mentioned
11  a fabric.
12      A.   Yes.
13      Q.   What was the fabric?
14      A.   It was -- I believe it was the
15  HE-500. I believe that's what we called
16  it.
17      Q.   A as in apple, T as in Tom?
18      A.   HE.
19      Q.   HE, okay.
20          Do you know what that fabric
21  was for?
22      A.   I really don't know what they
23  used it for. I know it was a Proctor and

Page 60

1   Gamble project. We seamed it for Proctor
2   and Gamble.
3       Q.   At the time was this a new
4   fabric that you were working on?
5       A.   No, because I had worked it in
6   manual. Groscey.
7       Q.   You mentioned something about
8   training was involved.
9       A.   They were transferring it from
10  the groscey onto the M-3000.
11      Q.   Okay. So you were simply
12  moving the HE-500 fabric from a manual
13  seaming machine to the automatic?
14      A.   Yes.
15      Q.   Okay. Now, after the meeting
16  I think you said that Mr. Johnston told
17  you to meet him in his office.
18      A.   Yes.
19      Q.   Okay. Did you go?
20      A.   Yes.
21      Q.   Was anybody else present for
22  this meeting?
23      A.   Yes.

**www.AmericanCourtReporting.com**
**May 12, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 61

1    Q.    Who?
2    A.    Jerelene Forest.
3    Q.    And who is Ms. Forest?
4    A.    She was a co-worker.
5    Q.    Also an operator?
6    A.    Yes.
7    Q.    Was she a nap seamer?
8    A.    Yes.
9    Q.    Other than Jeff Johnston,
10   Jerelene Forest, and yourself, anybody
11   else present for this meeting?
12   A.    No.
13   Q.    How long did this meeting last
14   with Mr. Johnston?
15   A.    I really -- I don't know.  I
16   don't know what time.
17   Q.    What did y'all discuss in this
18   meeting?
19   A.    I really don't know how it
20   came about, but I know that he was -- he
21   told me that he was going to take me
22   upstairs and it was for disciplinary
23   actions.  So in the process -- first, he

Page 62

1    told Jerelene that she couldn't come in
2    the meeting.  He told her she couldn't be
3    there.  She wasn't a shop steward.  So --
4    when a union steward is not present, we
5    also take another member with us.  That's
6    why I asked her to go in the meeting with
7    me.
8         So after we got in the
9    meeting, he threatened to take me
10   upstairs.  So I asked him could I use the
11   telephone, and he said yes.  And I called
12   Dot Collins, which was my union steward.
13   So I told -- explained to her what was
14   going on.
15        She asked me could she speak
16   with Mr. Johnston.  And, in turn, I gave
17   him the telephone.  And I don't know what
18   was said, but he just -- he left me
19   alone.  He said it was okay for me to go
20   back on the floor to work.
21   Q.    Okay.
22   A.    So after that, Dot Collins --
23   we filed a grievance, and she asked him to

Page 63

1    write me a letter of apology, and he did
2    write it.  And during that time he had
3    promised me that I would never work on a
4    project again.  So he -- he had to just
5    write me a letter of apology.  I don't
6    remember exactly what was on the note, but
7    he did.
8    Q.    During this meeting with
9    Mr. Johnston, did that take place in his
10   office?
11   A.    It was in the seaming
12   supervisor's office.
13   Q.    In the seaming supervisor's
14   office?
15   A.    Seaming department.  Seaming
16   supervisor's office.
17   Q.    At any point during this
18   meeting did Mr. Johnston make any
19   reference to your race?
20   A.    No.
21   Q.    Did he make any racially
22   inappropriate remarks?
23   A.    No.

Page 64

1    Q.    Did he tell any racial jokes?
2    A.    No.
3    Q.    Okay.  Could you overhear what
4    Ms. Collins was saying on the telephone
5    with Mr. Johnston?
6    A.    I only heard -- when -- when
7    she hung up from Jeff, she, in turn, asked
8    for me.  He gave me the phone back.  She
9    told me -- before I -- before I gave him
10   the phone, she said, "Dora, no matter
11   what, if you have to stay here until I get
12   there, do not go upstairs with him." She
13   said, "He is getting ready to fire you."
14   I said okay, and I gave him the
15   telephone.
16        She told me she told him that
17   you -- told him to calm down.  You go
18   around the building -- you run around ten
19   times if you have to, but leave Dora
20   alone.
21   Q.    All right.  At any point in
22   this meeting did Mr. Johnston explain to
23   you why he was saying he was going to take

**American Court Reporting**
**toll-free (877) 320-1050**

Page 65

1  you upstairs?
2      A.   No.
3      Q.   At any point in this meeting
4  did Mr. Johnston tell you that he was
5  going to terminate your employment?
6      A.   No.
7      Q.   Okay.  Now, you say the
8  conclusion of all of this was that you
9  went back to work and finished your shift?
10     A.   Yes.
11     Q.   Then a grievance was filed
12 with Dot Collins' assistance?
13     A.   Yes.
14     Q.   While you were in this meeting
15 with Mr. Johnston, were you on the clock?
16     A.   Yes.
17     Q.   So you were paid for all of
18 your work that day?
19     A.   Yes.
20     Q.   And were paid for your time in
21 this meeting?
22     A.   Yes.
23     Q.   Okay.  And the conclusion of

Page 66

1  the grievance -- did the grievance go to
2  first step?
3      A.   It went to first step, because
4  -- in other words, first step is I filed
5  it.  But that's as far as it went, because
6  he did do the apology.
7      Q.   It was a satisfactory
8  resolution to you of the grievance to
9  receive the letter of apology for
10 Mr. Johnston?
11     A.   I didn't like what went on.  I
12 didn't like it, but I accepted the
13 apology.
14     Q.   Okay.  That was the end of the
15 grievance?
16     A.   Yes.
17     Q.   Okay.  So that matter was
18 resolved under the collective bargaining
19 agreement?
20     A.   I guess you could say that.
21     Q.   All right.  At the time this
22 meeting occurred, did you -- why did you
23 believe Mr. Johnston was taking this

Page 67

1  action against you?
2      A.   I don't know.
3      Q.   At the time this meeting with
4  Mr. Johnston occurred we have just been
5  discussing, did you believe Mr. Johnston
6  was taking this action against you because
7  of your race?
8      A.   No.
9      Q.   Okay.  Is this the only
10 grievance that you filed against
11 Mr. Johnston during the time that y'all
12 worked together at Albany?
13     A.   No.  Before this time --
14 before then -- it was beginning -- it was
15 shift change, and I was getting ready to
16 leave.  So at the end of the shift, I was
17 finishing a fabric.  But he asked me to
18 stay and take that fabric down.  That was
19 one of the processes -- procedures.  And I
20 did take the fabric down.
21         When I was on my way out the
22 door, two other operators -- two other
23 white operators started saying words --

Page 68

1  having words with me.  When I responded --
2  I responded, but I left -- I clocked out
3  and I went home.  Obviously, they stayed
4  and talked to Mr. Johnston.
5         The next day, when I got to
6  work, Mr. Johnston called me in the office
7  and he told me not to jump his employees.
8      Q.   Did he say anything else to
9  you?
10     A.   He said other things, but I
11 remember that distinctly.  He didn't give
12 me the opportunity to express myself.  He
13 asked me no questions.  He didn't ask me
14 anything.  He just assumed that I was
15 guilty.  He told me not to jump his
16 employees.
17     Q.   All right.  You say this
18 occurred prior to the other grievance,
19 which was sometime before 2001.
20     A.   Yes.
21     Q.   Do you remember what year this
22 issue with the shift change occurred?
23     A.   I don't know what year.  I

**American Court Reporting**
**toll-free (877) 320-1050**

18 (Pages 69 to 72)

Page 69

1  don't know exactly what year. He was a
2  supervisor at this time.
3      Q.    He was the seaming supervisor?
4      A.    Yes.
5      Q.    So at the time of this
6  incident with the shift change and
7  discussion, Mr. Johnston was the seaming
8  supervisor?
9      A.    Yes.
10     Q.    Who were the two white
11 operators that were involved?
12     A.    Shirley Thornton and Dottie --
13 I don't know what it was -- Brown, I
14 believe.
15     Q.    I believe you said as you were
16 leaving -- I guess they were coming to
17 work?
18     A.    They were leaving, too, but
19 they approached me. Some -- I don't know
20 -- I don't remember. All I know is that
21 they approached me when I was getting
22 ready to clock out.
23     Q.    What did they say to you?

Page 70

1      A.    It was that -- let me see how
2  they put it. It was pertaining to the
3  take down, and -- I don't remember what it
4  was, but it was pertaining to the -- to my
5  taking the wire down.
6      Q.    What did you say to them?
7      A.    I don't even remember. I know
8  that words were exchanged, and the next
9  day I got reprimanded.
10     Q.    When you say words were
11 exchanged, pleasant conversation,
12 argument?
13     A.    No. It was unpleasant.
14     Q.    Did anybody use any profanity
15 in this exchange?
16     A.    I don't remember that.
17     Q.    Did anybody in this exchange
18 make any references to your race?
19     A.    I don't remember that.
20     Q.    Did anybody in this exchange
21 make any racially inappropriate remarks?
22     A.    I don't remember.
23     Q.    Do you know whether or not

Page 71

1  Ms. Thornton or Ms. Brown went to make a
2  report to Mr. Johnston?
3      A.    I did know that.
4      Q.    You were not present for
5  any --
6      A.    No.
7      Q.    So you do not know what
8  Ms. Thornton or Ms. Brown may have said to
9  Mr. Johnston?
10     A.    No.
11     Q.    At any point during this
12 meeting with Mr. Johnston the following
13 day, did he discipline you in any way?
14     A.    He called me in the office and
15 he told me not to jump his employees.
16     Q.    Did Mr. Johnston write you up
17 on this occasion?
18     A.    No.
19     Q.    Did you receive any type of
20 formal disciplinary action under any of
21 Albany's plant rules?
22     A.    No.
23     Q.    Did Mr. Johnston at any point

Page 72

1  during this meeting make any reference to
2  your race?
3      A.    No.
4      Q.    Did he make any racially
5  inappropriate remarks?
6      A.    No.
7      Q.    Did Mr. Johnston tell any
8  racial jokes in this meeting?
9      A.    No.
10     Q.    Do you believe that
11 Mr. Johnston made these comments to you in
12 the office because of your race?
13     A.    I can't say why he did it.
14     Q.    Did Mr. Johnston tell you why
15 he did it?
16     A.    No, he didn't.
17     Q.    Okay. Did you file a
18 grievance arising out of this situation
19 with Shirley Thornton and Dottie Brown?
20     A.    In the meeting I had
21 remembered that George Kazalay said his
22 door was always opened. It bothered me
23 that -- why wasn't I asked a question.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 73

1    Why wasn't I asked what happened, you
2    know.  I was -- somebody was accusing me.
3         So I asked -- I asked Nat
4    Jones.  He came to the department, I asked
5    him what is -- I asked him for the number
6    -- how do I get in touch with George
7    Kazalay.  He gave me the number.
8         When I dialed Mr. Kazalay, I
9    got -- I don't know his -- he know it was
10   John.  He don't live there -- he had left
11   the company, and he was the production
12   manager at the time.  So he didn't come
13   down right then.  It took about two
14   weeks.
15        So finally he came and he
16   tried talking to me on the floor, but the
17   machines are noisy, I asked him -- "Let's
18   step in the cafeteria."  We stepped in the
19   cafeteria and I explained to him what
20   happened.  And he told me that he was
21   going to make Jeff apologize to me.
22        So one day Jeff came on the
23   floor, and he apologized to me.

Page 74

1         Q.    Okay.
2         A.    That was it.
3         Q.    All right.  Now, you say --
4    who is George Kazalay?
5         A.    He was the plant manager at
6    the time.
7         Q.    Okay.  And how long was
8    Mr. Kazalay the plant manager?
9         A.    I don't know.
10        Q.    Was Mr. Kazalay still the
11   plant manager at the time you left the
12   company?
13        A.    No.
14        Q.    Do you know how long -- how
15   far in advance of that -- the end of your
16   employment that Mr. Kazalay left?
17        A.    Approximately less than six
18   months.
19        Q.    Now, you say you went and
20   asked Nat Jones for Mr. Kazalay's
21   telephone number.
22        A.    Yes.
23        Q.    The phone number you were

Page 75

1    given rang to somebody else's office?
2         A.    Yes.
3         Q.    Did you leave a message on
4    that answering machine?
5         A.    Yes, I left a message.
6         Q.    For Mr. Kazalay?
7         A.    Yes.
8         Q.    Did you go back and tell
9    Mr. Jones he had given you the wrong phone
10   number?
11        A.    No, because -- I believe I
12   received -- anyway, I left a message.  But
13   later on John called back for me in the
14   department.  I explained to him what went
15   on.  And then he came to the department
16   and we sat -- well, I told him that I was
17   the one who called.  I was calling
18   Mr. Kazalay.  He took the place of
19   Mr. Kazalay.  He was the one that came to
20   the seaming department to talk to me.
21        Q.    Did you speak with Mr. Kazalay
22   directly?
23        A.    No.  I never spoke to

Page 76

1    Mr. Kazalay.
2         Q.    I thought you told me a minute
3    ago that Mr. Kazalay said that he was
4    going to make Mr. Johnston apologize.
5         A.    John -- John did.  I can't
6    remember his name -- his last name.
7         Q.    John told you that Mr. Kazalay
8    said --
9         A.    No.  John told me that he was
10   going to have -- make Jeff apologize to
11   me.
12        Q.    At any point during your
13   employment, did you ever go directly to
14   George Kazalay to report any concerns at
15   work?
16        A.    I called Mr. Kazalay on the
17   phone, because I was under -- I had -- I
18   was taking medicine, and I was on the
19   machine running it.  I was very light
20   headed and sleepy.
21        And I told Tim Woodward that I
22   believe the medicine -- I didn't need to
23   be on the machine, because the medicine

**American Court Reporting**
**toll-free (877) 320-1050**

20 (Pages 77 to 80)

Page 77

1  was really causing me not to be able to
2  operate it. And Tim told me to go get my
3  pill bottle, he wanted to see it.
4        He looked at the pill bottle.
5  He said, "Oh, you can run to the machine."
6  I went to the phone and I called
7  Mr. Kazalay. Mr. Kazalay told me that
8  there was a chain of command, and that was
9  the end of that.
10       Q.   So what happened after you
11  called Mr. Kazalay?
12       A.   He told me there was a chain
13  of command.
14       Q.   Did you go back to work?
15       A.   Yes. I went back to -- I went
16  back to the machine. And I went to
17  another operator, which was Mamie Long,
18  and I told her to watch out for me because
19  I had had medicine and I didn't know what
20  might happen in the process.
21       Q.   Did you finish your shift?
22       A.   Yes.
23       Q.   Did anything bad happen?

Page 78

1        A.   I was -- just druggish.
2        Q.   Well, you finished your shift?
3        A.   I finished my shift.
4        Q.   Any problems with the fabric
5  that day?
6        A.   No.
7        Q.   Were you able to finish out
8  your job duties for the day?
9        A.   Yes.
10       Q.   At any point while you worked
11  with Mr. Kazalay, did you ever go to
12  Mr. Kazalay and tell him that you thought
13  you were having issues with Jeff Johnston?
14       A.   No.
15       Q.   Did you ever go to Mr. Kazalay
16  and tell him you thought anybody at the
17  plant was treating you differently because
18  of your race?
19       A.   No.
20       Q.   Okay. Do you know who your
21  immediate supervisor was when Mr. Kazalay
22  became plant manager?
23       A.   Wow. I believe it was Jewel

Page 79

1  Johnson. Jewel Johnson, I believe.
2        Q.   Was Mr. Kazalay plant manager
3  when Mr. Johnston was your seeming
4  supervisor?
5        A.   Yes.
6        Q.   Was Mr. Kazalay, for lack of a
7  better way to describe it, the big boss in
8  Montgomery for most of the -- up until
9  close to the time that you left the
10  company?
11       A.   Yes.
12       Q.   Okay.
13       MS. WILLIAMS: Do you need a
14  break?
15       THE WITNESS: I'm getting
16  tired. I'm really getting tired.
17       MS. WILLIAMS: Can we take a
18  break for a few minutes? Let's take a
19  break.
20       THE WITNESS: Just tired. I
21  feel sleepy.
22       MS. WILLIAMS: Let's take a
23  break.

Page 80

1        THE WITNESS: I just feel real
2  sleepy.
3        MS. WILLIAMS: Do you want to
4  get up?
5        THE WITNESS: Just like I'm
6  going to fall asleep.
7        MS. WILLIAMS: Let's walk
8  around and get some water. Are you okay?
9        THE WITNESS: Uh-huh.
10       MS. WILLIAMS: Are you sure?
11       THE WITNESS: Uh-huh (Nodding
12  head).
13       10:35 AM
14       (Short recess)
15       10:53 AM
16       Q.   (BY MR. POWELL) Are you ready?
17       A.   Yes.
18       Q.   Okay. When we took a break,
19  we were talking a little bit about George
20  Kazalay. At any point during your
21  employment at Albany with Mr. Kazalay, do
22  you believe Mr. Kazalay took any action
23  against you because of your race?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 81

1     A.    No.
2     Q.    Did you ever make any
3   complaints directly to Mr. Kazalay about
4   Jeff Johnston?
5     A.    No.
6     Q.    You said at some point
7   Mr. Kazalay -- you had heard Mr. Kazalay
8   say that his door was always open.
9     A.    (Nods head)
10    Q.    Correct?
11    A.    Yes.
12    Q.    Do you recall when you heard
13  him say that?
14    A.    This was when he first came to
15  work for Albany in Montgomery.
16    Q.    Did he get there in 1989?
17  Does that sound about right?
18    A.    Did he get there in 1999?
19    Q.    '89.
20    A.    '89. Possibly.
21    Q.    Okay. But he was there for a
22  long time?
23    A.    Yes.

Page 82

1     Q.    And at the time Mr. Kazalay
2   first came to Montgomery, you heard him
3   say that his door was always open?
4     A.    Yes.
5     Q.    All right. At any point
6   during the time that you worked with
7   Mr. Kazalay, did you ever go to
8   Mr. Kazalay to complain that you thought
9   you had been treated differently because
10  of your race?
11    A.    No.
12    Q.    Did you ever go tell
13  Mr. Kazalay you thought you were being
14  harassed in any fashion by anybody at the
15  company?
16    A.    Well, when I called his office
17  and he told me there was a chain of
18  command, that's what I wanted to do was
19  complain then.
20    Q.    That was related to you being
21  on some medication and --
22    A.    Yes.
23    Q.    Okay. Where was Mr. Kazalay's

Page 83

1   office in the plant?
2     A.    I really don't know. It was
3   up front upstairs, but I don't know.
4     Q.    Okay. Now, when you say up
5   front --
6     A.    It --
7     Q.    -- is there an office area in
8   the front of the plant?
9     A.    Yes.
10    Q.    And from the seaming
11  department, can you see the area of the
12  plant where the business offices are?
13    A.    No.
14    Q.    Okay. How far, just walk
15  wise, to get from where your work area was
16  up to the office area?
17    A.    I don't know.
18    Q.    Okay. Did you ever try to
19  just go to Mr. Kazalay's office to report
20  any concerns about work?
21    A.    No.
22    Q.    Okay. You mentioned an
23  individual named John, and you couldn't

Page 84

1   remember his last name.
2     A.    Last name, right.
3     Q.    And do you recall what John's
4   position was in the Montgomery plant?
5     A.    I believe he was the
6   production manager.
7     Q.    Do you believe that John ever
8   took any action against you because of
9   your race?
10    A.    No.
11    Q.    Do you believe that John ever
12  engaged in any harassing behavior towards
13  you?
14    A.    No.
15    Q.    Ever hear John make any
16  racially inappropriate remarks?
17    A.    No.
18    Q.    Ever hear John tell any racial
19  jokes?
20    A.    No.
21    Q.    Ever make any effort to
22  complain to John about any employee in the
23  Albany plant?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 85

1      A.   Once.  Jeff Johnston.
2      Q.   That was the time when you
3   thought you were getting Mr. Kazalay's
4   number from Nat Jones, but you got into
5   John's voicemail?
6      A.   Yes.
7      Q.   Then John came and met with
8   you?
9      A.   Yes.
10      Q.   And said that he would have
11   Jeff Johnston apologize to you?
12      A.   Yes.
13      Q.   All right.  Now, when you met
14   with John, did you indicate to him that
15   you thought your race in any way had
16   played a part in the events that led you
17   to make that phone call?
18      A.   I indicated that -- you know,
19   why would Jeff not question me and allow
20   the two white women to do that.
21      Q.   Did you tell John in this
22   meeting that you thought the reason
23   Mr. Johnston didn't allow you to ask

Page 86

1   questions was because of your race?
2      A.   I didn't say he didn't allow
3   me to ask questions.  I wondered why Jeff
4   didn't ask me what happened or questioned
5   me as to what happened in that incident.
6   Just to assume that I was guilty, and just
7   ask me not to jump the employees -- his
8   employees.
9      Q.   Did you tell John in this
10   meeting that you thought Mr. Johnston had
11   taken that action because of your race?
12      A.   No, I didn't.
13      Q.   Did you believe Mr. Johnston
14   had taken that action because of your
15   race?
16      A.   At the time, I did.
17      Q.   All right.  Other than talking
18   to John, you didn't file a grievance under
19   the collective bargaining agreement over
20   that issue?
21      A.   No.
22      Q.   All right.  Did you make any
23   effort to complain to Mr. Bryant about

Page 87

1   that incident with Mr. Johnston?
2      A.   No.
3      Q.   Okay.  Make any effort to go
4   to George Kazalay?
5      A.   I did, but I got John in the
6   place.
7      Q.   All right.  Other than the
8   grievance related to the HE-500 fabric and
9   then this incident involving Shirley
10   Thornton and Dottie Brown, any other
11   complaints of any sort that you tried to
12   make concerning Mr. Johnston during your
13   employment with Albany?
14      A.   I don't remember.
15      Q.   Okay.  Now, given that you
16   filed a lawsuit, do you believe
17   Mr. Johnston ever took any action against
18   you because of your race?
19      A.   Yes.
20      Q.   What did he do?
21      A.   In these incidents he would
22   always chastise me.
23      Q.   What incidents?

Page 88

1      A.   Incidents in the meeting
2   room.  One morning I went to -- one
3   morning I was out of town and Tim Woodward
4   decided that I had -- insubordination.  I
5   got a -- I think I got a certified
6   letter.  I got a phone call saying that I
7   was to meet in his office.
8      Q.   Whose office?
9      A.   Jeff Johnston -- it wasn't his
10   office.  It was the supervisor's office.
11   And -- the next morning.  And the next
12   morning, when I tried to explain myself,
13   he just told me that I was given three
14   days off.
15      Q.   When did this three-day
16   suspension occur?
17      A.   I don't remember.
18      Q.   Do you remember what
19   Mr. Johnston's job was at the time?
20      A.   Department manager.  I believe
21   it was department manager.
22      Q.   Who sent you a certified
23   letter?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 89

1     A.    Albany International,
2   Montgomery plant.
3     Q.    What did it say?
4     A.    It -- wait.  I don't remember
5   exactly what it said.  But it was telling
6   me that because of disciplinary action, I
7   would have to be -- take three days off.
8   I would have to be off three days.
9     Q.    What were you disciplined for?
10    A.    I was getting off -- I was
11  fixing to get off.  I was on my way out
12  the door.  Tim Woodward, who was the
13  supervisor, he just ran up to me and he
14  said, "Dora, sign this ticket."  I said,
15  "Okay, Tim, I have already signed the
16  ticket."  He said, "Put on the ticket no
17  holes, no damage."  I said, "Tim, I can't
18  do that.  I can't say there is no holes
19  and no damage in that fabric."  He said,
20  "But I need you to sign the ticket."  I
21  said, "Tim, I can't sign the ticket,
22  because I can't say there is no holes and
23  no damage on that fabric."

Page 90

1         And I didn't sign the ticket,
2   and that was insubordination.  So that's
3   what I was told, it was insubordination,
4   and I was reprimanded for that.
5     Q.    So you were reprimanded for
6   not signing a ticket that Tim Woodward
7   asked you to sign?
8     A.    Yes.
9     Q.    During your conversation with
10  Mr. Woodward about this ticket, did he
11  make any reference to your race?
12    A.    No.
13    Q.    Did he tell you that he was
14  asking you to sign it because you are
15  black?
16    A.    No.
17    Q.    Do you know who made the
18  decision to discipline you for
19  insubordination?
20    A.    Jeff Johnston.
21    Q.    How do you know that?
22    A.    Because he was the one who I
23  had to go to and see.

Page 91

1     Q.    All right.  During your
2   meeting with Mr. Johnston, did he make any
3   reference to your race?
4     A.    No, he didn't.
5     Q.    Did he tell you that you were
6   being disciplined for insubordination
7   because of your race?
8     A.    No, he didn't.
9     Q.    Did you ask him if you were
10  being disciplined for insubordination
11  because of your race?
12    A.    No.
13    Q.    Did you believe that you were
14  being disciplined because of your race?
15    A.    Yes.
16    Q.    Did you make any effort to go
17  see Mr. Bryant after you were disciplined
18  and complain to him that you thought you
19  were being treated differently because of
20  your race?
21    A.    No.
22    Q.    Did you make any effort to go
23  complain to Mr. Kazalay about this

Page 92

1   discipline?
2     A.    No.
3     Q.    Did you file a grievance?
4     A.    No -- oh, yes.  A grievance
5   was filed about that insubordination.
6     Q.    And what was the outcome of
7   the grievance?
8     A.    You know, I don't remember
9   that either.
10    Q.    Do you remember who your union
11  representative was for the grievance?
12    A.    I think it was Dot Collins.
13    Q.    Do you remember how many steps
14  in the grievance process you went through?
15    A.    I don't remember.
16    Q.    Do you remember what year this
17  occurred?
18    A.    No.
19    Q.    Was it in the 1990s?
20    A.    It was in the 2000s.  Probably
21  2000.
22    Q.    You think it was around 2000?
23    A.    Yes.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 93

1    Q.    And following the three-day
2    suspension, did you return to your job in
3    the seaming department?
4    A.    Yes.
5    Q.    Do you know of anyone else in
6    the Montgomery plant who has ever been
7    disciplined for insubordination?
8    A.    No.
9    Q.    Now, we got on that topic
10   because I asked you what it is you believe
11   Mr. Johnston had done towards you because
12   of your race.  You told me about this
13   three-day suspension involving
14   Mr. Woodward, and then you mentioned that
15   he would chastise you.  But I want to make
16   sure that I get from you a complete list
17   of everything that you claim Mr. Johnston
18   did to you because of your race.
19         So we have got the three-day
20   suspension.  Just give me a list of
21   anything else that you claim Mr. Johnston
22   did to you because of your race.
23   A.    He didn't allow me to -- he

Page 94

1    didn't allow me to, you know, just -- just
2    partake in like projects.  During the time
3    that we was in this meeting and we had a
4    magazine -- the girl was reading a
5    magazine -- she was white -- Dottie.
6          And as soon as I touched the
7    magazine, he told me, "You can't read a
8    magazine in my meeting."  But I wasn't
9    reading a magazine.
10   Q.    Anything else?
11   A.    I don't remember anything
12   else.  Not right now, anyway.
13   Q.    Well, did you keep a list
14   anywhere of actions by Mr. Johnston that
15   you believe occurred because of your race?
16   A.    No, I didn't.
17   Q.    Did you keep a diary while you
18   worked with Albany?
19   A.    No, I didn't.
20   Q.    Okay.  As you sit here today
21   you have been able to identify a three-day
22   suspension, Mr. Johnston did not allow you
23   to partake in some projects, and he told

Page 95

1    you that you can't read a magazine in his
2    meetings as the events where you allege
3    Mr. Johnston treated you differently
4    because of your race.
5    A.    Yes.
6    Q.    Are there any other actions by
7    Mr. Johnston during your employment with
8    Albany that you believe were motivated by
9    your race?
10   A.    I don't remember.
11   Q.    Is there anything that I can
12   do to refresh your memory so I can get a
13   complete list from you today?
14   A.    I don't know.
15   Q.    We have talked about the
16   three-day suspension.  What projects did
17   he not allow you to participate in?
18   A.    I used to be a lead, and they
19   just stopped -- I wasn't allowed to be a
20   lead anymore.  Assistant lead.  Maybe I
21   should say assistant lead.
22   Q.    When were you an assistant
23   lead?

Page 96

1    A.    I don't remember.
2    Q.    Were you an assistant lead in
3    the seaming department?
4    A.    In the seaming department.
5    Q.    Who was your supervisor at the
6    time you were an assistant lead?
7    A.    I believe it was Tim
8    Woodward.  It started out with Nat Jones
9    and finished up with Tim Woodward, I
10   believe.
11   Q.    How did you become an
12   assistant lead in the seaming department?
13   A.    I was asked.  I don't remember
14   who I was asked by.  I was asked to
15   assist.
16   Q.    Somebody asked you to become
17   assistant lead, but you don't recall who?
18   A.    I don't remember who.
19   Q.    Okay.  How long did you serve
20   as an assistant lead in the seaming
21   department?
22   A.    I don't remember that either.
23   Q.    Why did you stop being an

**American Court Reporting**
**toll-free (877) 320-1050**

Page 97

1  assistant lead in the seaming department?
2      A.    I was just told I couldn't be
3  a lead anymore.
4      Q.    Who told you that you could
5  not be an assistant lead in the seaming
6  department anymore?
7      A.    Tim Woodward.
8      Q.    Did Mr. Woodward tell you why
9  you were no longer going to be assistant
10  lead in the seaming department?
11      A.    No.
12      Q.    Did you ask Mr. Woodward why
13  you were no longer going to be assistant
14  lead in the seaming department?
15      A.    I asked him what happened.  He
16  said, "We cut it out."
17      Q.    He told you that the company
18  cut out the assistant lead position?
19      A.    Yes.
20      Q.    Were there any other assistant
21  leads at the --
22      A.    Yes.
23      Q.    Let me finish my question.

Page 98

1          Were there any other assistant
2  leads at the same time that you were
3  assistant lead?
4      A.    Yes.
5      Q.    In the seaming department?
6      A.    Yes.
7      Q.    How many?
8      A.    I know one.  One.  I believe
9  one.
10      Q.    Who was that?
11      A.    Hazel Johnson.
12      Q.    At the time you stopped being
13  an assistant lead, did Ms. Johnson also
14  stop being assistant lead?
15      A.    No.
16      Q.    Was she on your shift?
17      A.    No.
18      Q.    What shift were you on at the
19  time you were an assistant lead?
20      A.    We rotated, so -- it varies.
21      Q.    Well, you were -- you worked
22  with a particular group of employees in
23  seaming, and your group rotated -- was it

Page 99

1  every three weeks?
2      A.    Yes.
3      Q.    So you would be on first shift
4  for a period of time and then you would
5  rotate either to second or to third.  I'm
6  not sure which way the rotation went.
7      A.    First to midnight, midnight to
8  second.
9      Q.    You would rotate between --
10  among all three shifts?
11      A.    Yes.
12      Q.    And nobody just had day shift,
13  at least, not normally?
14      A.    Not in that department.
15      Q.    All right.  And Hazel Johnson,
16  who was the other assistant lead, do you
17  know -- she was on a different group from
18  you?
19      A.    Yes.
20      Q.    All right.  Now, Mr. Woodward,
21  as I understand it, told you that the
22  company cut out the assistant lead
23  position.

Page 100

1      A.    Yes.
2      Q.    But you don't remember when
3  that occurred?
4      A.    No, I don't.
5      Q.    Do you know who made the
6  decision to eliminate your job as an
7  assistant lead?
8      A.    No.
9      Q.    Do you believe your position
10  as an assistant lead was eliminated
11  because of your race?
12      A.    Because of me.
13      Q.    It was eliminated because of
14  you?
15      A.    Me, the person.
16      Q.    You don't believe that the
17  assistant lead position was eliminated
18  because you were black?
19      A.    I believe that it played a
20  role.
21      Q.    All right.  How so?
22      A.    Because I have been harassed
23  throughout the department since the time

**American Court Reporting**
**toll-free (877) 320-1050**

26 (Pages 101 to 104)

Page 101

1  Jeff Johnston became my supervisor.
2      Q.    You have been harassed in the
3  seaming department?
4      A.    I was harassed from Jeff
5  Johnston ever since he has been in that
6  department.
7      Q.    What about prior to
8  Mr. Johnston; any harassment prior to
9  Mr. Johnston getting in the department?
10     A.    I had problems with Jewel.
11 Jewel harassed me, too.
12     Q.    With Jewel?
13     A.    Jewel Johnson.
14     Q.    Jewel Johnson. Other than
15 Jewel Johnson and Jeff Johnston, anybody
16 else at Albany that you believe has
17 harassed you in any way?
18     A.    As far as jeopardizing my job,
19 they are the only two.
20     Q.    I'm asking in any way ,
21 whether it jeopardized your job or not.
22     A.    We had other people that made
23 racial slurs.

Page 102

1      Q.    You are not accusing -- are
2  you accusing Mr. Johnston of making any
3  racial slurs?
4      A.    No.
5      Q.    Are you accusing Jewel Johnson
6  of making any racial slurs?
7      A.    Well, I heard her.
8      Q.    What did you hear her say?
9      A.    She told me to go to the back
10 of the line. I should have been in the
11 back of the line.
12     Q.    When did Jewel Johnson tell
13 you that you should have been in the back
14 of the line?
15     A.    That's been -- it was a long
16 time. Like when I first went to work at
17 Albany.
18     Q.    1979, 1980?
19     A.    Between 1979 and '80,
20 something like that. It was during that
21 time. But I was in the seaming
22 department.
23     Q.    All right. Other than

Page 103

1  Ms. Johnson telling you to go to the back
2  of the line somewhere in 1979, 1980, did
3  Ms. Johnson ever make any other racial
4  slurs in your presence?
5      A.    I don't remember.
6      Q.    Other than Ms. Johnson and
7  this telling you to go to the back of the
8  line, list for me every other Albany
9  employee that you allege made a racial
10 slur.
11     A.    When I first went to the
12 weaver, it was like Jimmy Dix. I heard
13 them talking about hanging Tony Harris.
14 Taking him down the road and hanging him.
15 I heard about nooks, whatever you call
16 it -- noose.
17     Q.    Who else?
18     A.    Sometimes it would be a room
19 full of them, and I would just -- when
20 they make their jokes, being a woman, I
21 would walk out. I would just leave and go
22 some place else and leave my lunch. It
23 was usually like a lunch break.

Page 104

1      Q.    I want names of the people
2  that you heard make racial slurs.
3      A.    I can't remember all of the
4  peoples, but it would be a shift. I don't
5  remember the names. But I remember Jimmy
6  Dix in particular.
7      Q.    All right. So you claim to
8  have heard Jimmy Dix say he was going to
9  take Tony Harris down the road and hang
10 him?
11     A.    Yes.
12     Q.    That happened right after you
13 moved to the weave room?
14     A.    I was working in the weaving
15 department. I don't know whether it was
16 right after I was hired or later, but I
17 was working in the weaving department.
18     Q.    As I understand it, the only
19 time that you worked in the weaving
20 department would have been as a worker bee
21 when you were first hired.
22     A.    Yes.
23     Q.    When in 1979 were you hired?

**www.AmericanCourtReporting.com**
**May 12, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 105

1    A.    I was hired in March the 12th,
2    1979.
3        Q.    You moved to the seaming
4    department somewhere by September or
5    October of 1980. You told me you were --
6        A.    About a year and a half in the
7    seaming department.
8        Q.    So you would have been a
9    worker bee when you heard Jimmy Dix make
10   this comment about Tony Harris?
11       A.    Yes.
12       Q.    Was Jeff Johnston working in
13   the plant at the time?
14       A.    No.
15       Q.    Did you go report that to
16   anybody at the company?
17       A.    No.
18       Q.    Other than Jewel Johnson
19   telling you to go back to the back of the
20   line, and Jimmy Dix making this comment
21   about Tony Harris, can you name any other
22   employee of Albany International that you
23   have ever heard make a racial slur in the

Page 106

1    plant?
2        A.    I don't remember anymore.
3        Q.    Okay. Do you have a list of
4    names anywhere?
5        A.    No.
6        Q.    All right. Even if you can't
7    tell me who said it, are there other
8    racial slurs that you believe you have
9    heard in the plant?
10       A.    I have heard other racial
11   slurs. I have heard other racial slurs.
12   I have heard them.
13       Q.    Tell me what you heard.
14       A.    I won't quote what I heard. I
15   don't -- I can't quote what I have heard,
16   but I have heard racial slurs.
17       Q.    When?
18       A.    It was -- been down -- really,
19   down through the years of my employment.
20       Q.    2003, your last -- the last
21   year which you worked with the company,
22   did you hear anybody in 2003 make a racial
23   slur at Albany International?

Page 107

1        A.    I don't remember.
2        Q.    Okay. I tell you what.
3    Exhibit 5 earlier was the training record
4    that you identified your signature. It
5    looks like from this document that you
6    went through your training with Dana
7    Champagne on January the 10th, 2001,
8    correct?
9        A.    Yes.
10       Q.    Okay. After this training
11   session on January the 10th, 2001, can you
12   name any Albany International employee you
13   heard make a racial slur?
14       A.    I can't name one, because I
15   don't remember. But when I hear things, I
16   walk away.
17       Q.    All right.
18       A.    I don't -- I don't sit in the
19   midst or stay in the midst.
20       Q.    After this training session on
21   January the 10th, 2001, can you identify
22   for me any slur -- racial slur you heard
23   made in the Montgomery plant?

Page 108

1        A.    No, I can't identify it.
2        Q.    Are you alleging in this
3    lawsuit that after this training on
4    January the 10th, 2001, any racial slurs
5    were made in your presence in the
6    Montgomery plant?
7        A.    Yes.
8        Q.    By whom?
9        A.    Different people, but I don't
10   remember. I just told you, I don't sit up
11   -- I don't sit in the midst.
12       Q.    Okay. Did any of these racial
13   slurs that you heard in the Montgomery
14   plant have any impact on your ability to
15   do your job at Albany?
16       A.    I didn't like it, you know,
17   no.
18       Q.    You didn't like it, but none
19   of these slurs had any effect on your
20   ability to do your job?
21       A.    No.
22       Q.    All right. Did you go to Ted
23   Bryant in Human Resources and complain

**American Court Reporting**
**toll-free (877) 320-1050**

Page 109

1  about any of these slurs that you heard in
2  the plant?
3      A.   No.
4      Q.   Did you go to George Kazalay
5  and report any of these slurs?
6      A.   No.
7      Q.   All right.  And as you sit
8  here today, you cannot describe for me a
9  single slur that you heard between January
10  the 10th, 2001, and the end of your
11  employment with Albany in October of 2003?
12      A.   I remember racial slurs, and I
13  cannot tell you.
14      Q.   You can't tell me what they
15  were or who said them?
16      A.   What they were -- I know of a
17  couple of people, but I can't tell you
18  what they were or remember them.
19      Q.   Who were the couple of
20  people?  Are you referring to Jewel
21  Johnson and Jimmy Dix?
22      A.   I remember Dottie Brown.  I
23  remember Shirley Howard.

Page 110

1      Q.   Anybody else?
2      A.   No.
3      Q.   All right.  What do you
4  remember about Dottie Brown?
5      A.   I don't remember exact -- I
6  just don't remember.  But I remember
7  slurs -- racial slurs.  I don't remember
8  what was said or how it was said.
9      Q.   Are you claiming that Dottie
10  Brown made some racial slur?
11      A.   Dottie Brown, Shirley Howard.
12      Q.   When did you hear Dottie Brown
13  make a racial slur?
14      A.   I can't remember that.  I
15  don't know that.  I don't remember that
16  date or that hour.
17      Q.   What --
18      A.   I don't remember that.
19      Q.   What job did you have when you
20  heard Ms. Brown make a racial slur?
21      A.   Seaming.
22      Q.   Your first time in the seaming
23  department?

Page 111

1      A.   Second time.
2      Q.   Second time.  All right.  And
3  did you say what Ms. Brown's job was at
4  the time?
5      A.   Seaming.
6      Q.   Do you remember who your
7  supervisor was in seaming at the time?
8      A.   I don't remember whether it
9  was Nat Jones or -- I don't know.  I don't
10  remember.  Nat Jones possibly.
11      Q.   All right.  Did you go to
12  Mr. Bryant or anyone in Human Resources at
13  Albany to report this slur that you claim
14  you heard Ms. Brown make?
15      A.   No.
16      Q.   Why not?
17      A.   I walk away from things like
18  that.
19      Q.   Did you go to George Kazalay
20  and report what you believe you heard
21  Ms. Brown say?
22      A.   No.
23      Q.   This comment that Ms. Brown

Page 112

1  said, did it in any way impact your
2  ability to do your job at Albany?
3      A.   No.
4      Q.   Did it affect your life in any
5  way?
6      A.   It was an insult,
7  humiliating.  I was humiliated.
8      Q.   Did you go see a doctor about
9  it?
10      A.   No.
11      Q.   What did Shirley Howard say?
12      A.   I don't remember.
13      Q.   When did Shirley Howard say
14  it?
15      A.   During the time we were
16  together.  I don't remember that time
17  either.
18      Q.   Do you remember who your
19  supervisor was?
20      A.   Probably Nat Jones.
21      Q.   All right.  You don't remember
22  what Ms. Howard said, you don't remember
23  when she said it, but you think it was

**American Court Reporting**
**toll-free (877) 320-1050**

29 (Pages 113 to 116)

Page 113

1  somehow racial?
2      A.    Yes.
3      Q.    All right.  Was Ms. Howard's
4  comment before or after this training
5  meeting with Ms. Champagne?
6      A.    I don't remember.
7      Q.    Okay.  Before or after your
8  August the 19th, 1998, training session on
9  the harassment policy?
10     A.    After.
11     Q.    You think it was after 1998?
12     A.    1998 -- I don't remember the
13 dates.
14     Q.    If you don't know, don't
15 guess.  Just say, "I don't know."
16     A.    I don't know.
17     Q.    All right.  Did you make any
18 effort to contact anyone in Human
19 Resources at Albany to report what you
20 allege Ms. Howard said?
21     A.    No.
22     Q.    Did you make any effort to
23 contact George Kazalay?

Page 114

1      A.    No.
2      Q.    At any point during your
3  employment with Albany, did you make any
4  effort to report to Human Resources any
5  racial slur that you ever heard in the
6  plant?
7      A.    No.
8      Q.    All right.  Did you make any
9  effort to report any such slurs to George
10 Kazalay?
11     A.    No.
12     Q.    Okay.  Other than Jewel
13 Johnson, Jimmy Dix, Dottie Brown, and
14 Shirley Howard, can you name any other
15 Albany International employee that you
16 have some recollection of ever having
17 heard make a racial slur in the Montgomery
18 plant?
19     A.    I don't remember.
20     Q.    Okay.  Have you ever worked
21 for Albany anywhere other than Montgomery?
22     A.    No, you know.
23     Q.    Okay.  Did you go to your shop

Page 115

1  steward about what you heard any of these
2  four individuals say?
3      A.    No.
4      Q.    All right.  I think we kind of
5  got side tracked.  We were trying to get
6  from you a list of everything that you
7  allege Jeff Johnston did to you because of
8  your race.  And we talked about a
9  three-day suspension earlier, and you
10 mentioned that he did not allow you to
11 participate in projects, he told you that
12 you couldn't read a magazine in a
13 meeting.
14         All right.  Let's talk about
15 the projects.  What specific projects did
16 Mr. Johnston not allow you to participate
17 in?
18     A.    That was the only one.  I
19 think that was the only one.
20     Q.    Which one was the only one?
21     A.    When I --
22     Q.    Being the assistant lead?
23     A.    Assistant lead.  Once I was

Page 116

1  asked to -- once I was asked to go on day
2  shift to train other employees, to work on
3  the H-500, M-3000 -- the H-500, that was
4  the fabric.  He didn't tell me this, but I
5  was told that he said, "Over his dead
6  body."
7      Q.    Well, did somebody offer you
8  the job of moving to first shift to train
9  anybody?
10     A.    Ken Thunderbird came up to me
11 and asked me to go -- if he went to George
12 Kazalay and asked George Kazalay if I
13 could go to day shift to work and train
14 the other employees to run that fabric,
15 would I.  I said if he -- if he says this
16 is okay.
17         So after that I never heard
18 anything from Ken Thunderbird.  One of the
19 employees was telling me he -- he came to
20 me and he said, "They really need you on
21 day shift so we can move" -- he was a
22 tech.  And he asked me, you know.  And he
23 told me the reason that I wasn't doing it

**American Court Reporting**
**toll-free (877) 320-1050**

Page 117

1   was because Jeff didn't want me to.
2        Q.   Who was -- is it Ken
3   Funderburk?
4        A.   Thunderbird. Thunderbird. I
5   don't know.
6        Q.   Just for ease of reference,
7   you said Ken asked you if he got George
8   Kazalay's permission, would you move to
9   first shift to train?
10       A.   Yes.
11       Q.   When did that conversation
12  occur?
13       A.   It had to be two -- between
14  2001, 2003, something like that.
15       Q.   Well, was it before or after
16  your injury in 2001?
17       A.   I don't know. But it was
18  between that time. It was in -- during
19  that time.
20       Q.   Was anybody else present for
21  this conversation with Ken where he asked
22  you about moving to first shift to train?
23       A.   Yes.

Page 118

1        Q.   Who?
2        A.   Lomack Bean.
3        Q.   And who was Mr. Bean?
4        A.   He was our technician.
5        Q.   Do you believe that Ken ever
6   took any action against you because of
7   your race?
8        A.   No.
9        Q.   Did you ever hear Ken make any
10  racial comments at work?
11       A.   No.
12       Q.   Ever hear Ken make any racial
13  slurs?
14       A.   No.
15       Q.   Now, if I understood your
16  testimony correctly, after Ken asked you
17  if you would move, that's the last you
18  heard about it from him?
19       A.   Yes.
20       Q.   Did you ever approach Ken and
21  ask him what about that training job?
22       A.   No.
23       Q.   Why not?

Page 119

1        A.   Because afterwards, Lomack and
2   I was talking, I asked Lomack -- I said,
3   "I never did hear." He said, "Well, I put
4   it" -- he said, "Tee, they ain't going to
5   give you that job. Jeff said it was over
6   his dead body."
7        Q.   When did this conversation
8   with Mr. Bean occur?
9        A.   Maybe about two weeks after
10  Mr. Thunderbird had asked him to do this?
11       Q.   Did you ever go to George
12  Kazalay and ask him about the training
13  job?
14       A.   No.
15       Q.   In this conversation with
16  Mr. Bean, where he told you that Jeff
17  Johnston made some comment about you
18  getting the training job over his dead
19  body, was anybody else present?
20       A.   No.
21       Q.   Did Mr. Bean tell you that he
22  understood Jeff Johnston was blocking you
23  from that job because of your race?

Page 120

1        A.   No, he didn't.
2        Q.   Did he give any reason why
3   Mr. Johnston would be blocking you from
4   that job?
5        A.   No.
6        Q.   Did he tell you that he had
7   heard Mr. Johnston say that?
8        A.   He didn't tell me that he
9   heard him. He just said, "Jeff said that
10  he was not going to give you the job." It
11  would be over his dead body before you get
12  this job, something to that effect.
13       Q.   All right. Were you going to
14  get paid more money to move to first shift
15  and train?
16       A.   No.
17       Q.   Was it going to change your
18  seniority in the plant in any way?
19       A.   No.
20       Q.   Okay. Do you know if anybody
21  actually got the training job?
22       A.   No.
23       Q.   So nobody ever filled the job?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 121

1    A.    It wasn't posted.  He came to
2  me personally, because I had worked the
3  M-3000.  And he thought I had did a good
4  job, so he asked me.
5    Q.    So there was never a posting
6  for a trainer job?
7    A.    No.
8    Q.    Okay.  So you didn't apply
9  and, to your knowledge, nobody ever got
10  that position?
11    A.    No.
12    Q.    Did you go to Mr. Johnston and
13  ask him if he was stopping you from
14  getting that job?
15    A.    No.
16    Q.    The assistant lead and the
17  training positions, are those the only
18  projects that you think Mr. Johnston
19  denied you involvement in?
20    A.    Yes.
21    Q.    When did this meeting with the
22  magazine occur?
23    A.    I don't know exactly when.

Page 122

1    Q.    Who was reading the magazine
2  in the meeting?
3    A.    Dottie Brown.
4    Q.    Dottie Brown.  What was
5  Ms. Brown's job at the time?
6    A.    Nap seamer.
7    Q.    Was she a union steward?
8    A.    No.
9    Q.    Okay.  And what was this
10  meeting?
11    A.    I don't remember.
12    Q.    And what was Mr. Johnston's
13  job at the time?
14    A.    I believe he was department
15  manager.  I believe.  I don't know.
16    Q.    Besides Mr. Johnston, Dottie
17  Brown, and yourself, who else was present
18  for this meeting?
19    A.    I remember Katherine Davis,
20  Mamie Long -- who else -- I believe Susan
21  Snead.
22    Q.    Susan who?
23    A.    Snead.  I don't remember who

Page 123

1  else was on the shift.
2    Q.    What was this meeting about?
3    A.    I don't remember.
4    Q.    Was it work related?
5    A.    Yes.
6    Q.    And what was the magazine that
7  Dottie Brown was reading?
8    A.    I don't remember that.  It was
9  just a pamphlet.
10    Q.    It was a pamphlet?
11    A.    It was something like a
12  pamphlet.  We would -- we would bring
13  magazines, pamphlets, in like, and we
14  would, you know, look at them on our break
15  or somewhat.  And she just had a pamphlet
16  reading it -- looking through the
17  pamphlet.  I said, "Let me see that."  She
18  slid it over.
19      When she slid the pamphlet
20  over, he just abruptly said, "Dora, I will
21  not have you looking at a magazine in my
22  meeting."
23    Q.    Had the meeting already

Page 124

1  started?
2    A.    Yes.
3    Q.    So Dottie Brown was looking at
4  this pamphlet during the meeting?
5    A.    Yes.
6    Q.    But you don't remember what
7  Mr. Johnston had -- had called the meeting
8  for?
9    A.    I don't remember.
10    Q.    Any other supervisors in the
11  meeting besides Mr. Johnston?
12    A.    I don't think so.
13    Q.    So your shift supervisor
14  wasn't present?
15    A.    I don't remember.
16    Q.    All right.  Anybody else in
17  this meeting reading any magazines?
18    A.    I don't remember.
19    Q.    At the time Ms. Brown started
20  reading it, had the meeting started?
21    A.    Yes.
22    Q.    Did Mr. Johnston tell you that
23  you couldn't read the meeting -- read the

**American Court Reporting**
**toll-free (877) 320-1050**

32 (Pages 125 to 128)

Page 125

1  magazine because of your race?
2      A.    No.
3      Q.    Did he make any references
4  during this meeting to yours or anyone
5  else's race?
6      A.    No.
7      Q.    Did Jeff Johnston make any
8  racial slurs in this meeting?
9      A.    No.
10     Q.    Did he tell any racial jokes
11  in this meeting?
12     A.    No.
13     Q.    Did you report Mr. Johnston's
14  conduct during this meeting to anyone in
15  Human Resources?
16     A.    No, I don't think so.  No.
17     Q.    Did you make any effort to
18  report this incident to George Kazalay?
19     A.    No.
20     Q.    Did you think Mr. Johnston in
21  this meeting told you not to read the
22  magazine because of your race?
23     A.    Yes.

Page 126

1      Q.    Why do you believe that he
2  didn't want you reading the magazine
3  because of your race?
4      A.    I don't know why.
5      Q.    Did you ask Mr. Johnston if
6  that was the reason he told you not to
7  read the magazine?
8      A.    No.
9      Q.    Has anybody at Albany ever
10  told you that the reason Mr. Johnston told
11  you not to read it is because of your
12  race?
13     A.    No.
14     Q.    So why do you think that your
15  race had anything to do with this magazine
16  incident?
17     A.    Because I was sitting next to
18  a white woman.  She was reading the
19  magazine.  It was no problem.  As soon as
20  I touched it --
21     Q.    And, as best you recall, this
22  occurred when Mr. Johnston was your
23  department manager?

Page 127

1      A.    I believe he was the
2  department manager at the time.
3      Q.    All right.  Other than the
4  three-day suspension, the assistant lead,
5  the training project, and this incident
6  with the meeting, any other instances that
7  you can point me to where you think
8  somehow Mr. Johnston treated you
9  differently than other employees because
10  of your race?
11     A.    Because of my race, no.
12     Q.    Okay.  Any other action by
13  Mr. Johnston at any point while you worked
14  for the company that you believe was in
15  any way influenced by your race?
16     A.    No.
17     Q.    At any point, while you worked
18  for Albany, did you ever submit an
19  application for disability insurance
20  benefits?
21     A.    Yes.
22     Q.    When?
23     A.    I don't remember the dates,

Page 128

1  but I remember the last time.
2      Q.    When was the last time?
3      A.    It was approximately --
4  probably 2002, 2003.  2002 -- 2001, 2002.
5      Q.    All right.  And to whom did
6  the application get sent?
7      A.    Well, what you do is -- I'm
8  going to explain to you what happens in
9  situations like that.
10     Q.    All right.  That would be
11  great.
12     A.    Because when you go to a
13  doctor and your doctor takes you off the
14  job, you get the paperwork from -- her
15  name was Linda Jones.  I don't remember
16  what her position was.  And then you take
17  these papers to your doctor and your
18  doctor fills this paperwork out and you
19  bring them back to the company.
20     Q.    Then what happens?
21     A.    And that's it.  And if you are
22  off past, I think, the third day, then
23  that's when your benefits will kick in.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 129

1   Other than that, you have to be off at
2   least three days before you could be paid
3   for your time off.
4        Q.   All right.  Did Ms. Jones ever
5   refuse to give you any paperwork, if you
6   asked for it, for disability insurance?
7        A.   No.
8        Q.   In '01, '02, I think you said
9   that you got the paperwork from Linda to
10   take to your doctor.
11       A.   Yes.
12       Q.   Okay.  Your doctor fills out
13   some part of the form?
14       A.   Yes.
15       Q.   Were you responsible for
16   filling out part of it?
17       A.   Yes.
18       Q.   And did Linda Jones or
19   somebody else at the company fill out
20   another part of it?
21       A.   I believe so.
22       Q.   That application, to your
23   knowledge, did it get sent to an insurance

Page 130

1   company?
2        A.   Yes.
3        Q.   Do you know what insurance
4   company?
5        A.   I don't remember.
6        Q.   Does Prudential sound right?
7        A.   Yes.  Prudential.  Prudential.
8        Q.   Did anybody at Prudential ever
9   contact you concerning any application by
10   you for disability insurance benefits?
11       A.   No.
12       Q.   Do you know what your doctors
13   said on the application for disability
14   insurance benefits?
15       A.   No.
16       Q.   Do you know if your doctor
17   indicated on the form that your injury was
18   work related?
19       A.   The time that he did, yes, he
20   did indicate it was work related.
21       Q.   Were you receiving Workers'
22   Compensation benefits for that injury?
23       A.   No.  I had to go to my private

Page 131

1   doctor.
2        Q.   Is that the injury that was
3   later determined to be Workers'
4   Compensation and was treated as a Workers'
5   Comp injury?
6        A.   No.  There was once I was --
7   what was -- I was being treated -- I was
8   going to the Work Comp doctors.  They gave
9   me an injection in my shoulder, and I went
10   to work and I passed out, because I was
11   allergic to steroid.  They gave me
12   steroids in his office.
13            And, in turn -- I think this
14   is the same time, I'm not for sure -- the
15   paramedics came and I was taken to my
16   doctor's office.  But I believe that this
17   is the -- this is the time -- I can't --
18   it is so many occasions till I don't
19   remember.
20       Q.   Okay.  Take a look at that for
21   me.  I will put a sticker on it.
22            (WHEREUPON, a document was
23   marked as Defendant's Exhibit 6 and is

Page 132

1   attached to the original transcript.)
2        Q.   Just take a minute and read
3   over that for me.
4            (Pause)
5        Q.   Have you had a chance to look
6   over what we have marked as Exhibit 6?
7        A.   Yes.
8        Q.   Do you recognize it?
9        A.   Yes.
10       Q.   Who is Jeffrey Mathis?
11       A.   That was my doctor.
12       Q.   Mr. Mathis was your private
13   doctor?
14       A.   Primary care.
15       Q.   Okay.  And when you have
16   referred a couple of times to your private
17   doctor earlier in your deposition, is
18   Mr. Mathis who you are referring to?
19       A.   Yes.
20       Q.   All right.  Now, it looks like
21   this application was filled out by
22   probably three different people.  Just so
23   the -- I can be clear, I'm just going to

**American Court Reporting**
**toll-free (877) 320-1050**

Page 133

1   go through page by page.
2         Is that your handwriting on
3   the first page?
4         A.   No.
5         Q.   All right.  Do you recognize
6   the handwriting?
7         A.   It's not my writing.  No.  No.
8         Q.   The second page looks like it
9   has the signature on it of Linda Jones.
10        A.   Okay.
11        Q.   Based on your experience with
12  the application process you have
13  described, are these -- the first couple
14  of pages, would Ms. Jones have filled
15  these out?
16        A.   Yes.
17        Q.   Let's look at page three.  Is
18  this your handwriting?
19        A.   Yes.
20        Q.   Okay.  And on the fourth page,
21  where your signature is at the bottom, is
22  that also your handwriting?
23        A.   Yes.

Page 134

1         Q.   Okay.  On the fifth page there
2    are two signatures on here; both yours?
3         A.   Yes.
4         Q.   All right.  And turn over to
5    the last -- I guess the next page also
6    looks like it has your signature in the
7    middle of the page.
8         A.   Yes.
9         Q.   Is that your handwriting on
10   that page?
11        A.   Yes.
12        Q.   At least on the -- I'm looking
13   at -- there is a stamped number in the
14   bottom right corner of two-o-seven, is the
15   page number.  It looks like this
16   (Indicating).  That page right there.
17        A.   Okay.
18        Q.   Is that your handwriting on
19   the top in those blocks?
20        A.   Yes.
21        Q.   Is that your signature?
22        A.   Yes.
23        Q.   Now, the bottom half of this

Page 135

1    page that we are looking at right now
2    looks like it says, "To be completed by
3    attending physician."
4         A.   Yes.
5         Q.   That would have been
6    Dr. Mathis?
7         A.   Yes.
8         Q.   Is any of the handwriting on
9    the bottom of that page or the next page
10   yours?
11        A.   No.
12        Q.   Look at the last page of what
13   we have marked as Exhibit 6.  Do you
14   recognize Dr. Mathis' signature?
15        A.   Yes.
16        Q.   Now, in the middle of the --
17   up towards the top there is a reference
18   that says, "Work-related illness or
19   injury."  Do you see that space?
20        A.   Yes.
21        Q.   And, to your knowledge, did
22   Dr. Mathis complete this on your behalf?
23        A.   Yes.

Page 136

1         Q.   All right.  And he indicated
2    that this was a work-related injury?
3         A.   Yes.
4         Q.   All right.  For workplace
5    injuries, do you know what the disability
6    policy said?  Were you eligible for
7    disability insurance if it was a
8    work-related injury?
9         A.   I don't understand.
10        Q.   Okay.  Do you know who made
11   the decision about whether you were
12   eligible for benefits under the disability
13   policy?
14        A.   No.
15        Q.   So you don't know who actually
16   decided whether you would or would not be
17   paid benefits under this policy?
18        A.   No.
19        Q.   All right.  When you signed up
20   for disability insurance with the company,
21   did you get any kind of booklet describing
22   the short-term and long-term disability
23   program of the company?

**American Court Reporting**
**toll-free (877) 320-1050**

35 (Pages 137 to 140)

Page 137

1    A.    I'm sure I did.
2    Q.    All right.  Did you keep a
3  copy of it?
4    A.    I don't have it now.
5    Q.    Okay.  And during the course
6  of your employment with the company, did
7  you get any updates to the disability
8  policy?
9    A.    Yes.
10    Q.    Okay.  That is going to be 7
11  when I mark it.
12      (WHEREUPON, a document was
13  marked as Defendant's Exhibit 7 and is
14  attached to the original transcript.)
15      (Pause)
16    Q.    Does that look familiar to
17  you, what we have marked as Exhibit 7?
18    A.    No.
19    Q.    Okay.  Now, at the time of
20  this document -- do you recall submitting
21  this application for disability benefits,
22  that is Exhibit 6, to Prudential?
23    A.    To Linda Jones.

Page 138

1    Q.    Your doctor didn't send this
2  to Prudential?
3    A.    I don't know.
4    Q.    Is it your understanding that
5  this document was actually sent to
6  Prudential on your behalf?
7    A.    Yes.
8    Q.    All right.  And if I have
9  asked you this already, I'm sorry.  Do you
10  recall receiving any communication from
11  anybody at Prudential concerning your
12  application for disability insurance?
13    A.    After I had been off and
14  received the -- they -- Jeff Johnston, Ted
15  Bryant, Donna Smith -- I think that's her
16  name -- Bob Hampsey, they called me up
17  into the conference room, and I listened
18  to a Tim Golden on a telephone.  And he
19  told me that they paid me, that they would
20  consider this job related.  That's the
21  only thing I heard of it.
22    Q.    Who is Tim Golden?
23    A.    I'm -- I assume he had

Page 139

1  something to do with Prudential, the
2  insurance company.
3    Q.    But you don't know who Tim
4  Golden was?
5    A.    No, I don't know him.
6    Q.    Mr. Golden told you that you
7  were paid what?
8    A.    The -- well, when I was off
9  during that time, I received benefits.
10    Q.    From?
11    A.    From Prudential.
12    Q.    For short-term disability?
13    A.    For that short-term
14  disability.
15    Q.    Did you ever submit an
16  application to Prudential for long-term
17  disability coverage through your Albany
18  plan?
19    A.    No.
20    Q.    So you never applied for LTD
21  benefits?
22    A.    No.
23    Q.    And were you -- you received

Page 140

1  short-term disability payments?
2    A.    For that, yes.
3    Q.    Okay.  Any other applications
4  for short-term disability benefits while
5  you worked for the company?
6    A.    Yes.
7    Q.    Before or after this one?
8    A.    It was before.
9    Q.    Before this one?
10    A.    Yes.
11    Q.    Did you receive short-term
12  disability benefits then?
13    A.    Yes.
14    Q.    Okay.  Have you ever been
15  denied short-term disability benefits when
16  you applied for them while you were at
17  Albany?
18    A.    The only time you didn't
19  receive benefits is when you didn't have
20  three or more days of short-term -- I mean
21  short-term disability.
22    Q.    All right.  Is there any
23  occasion where you were out for more than

**www.AmericanCourtReporting.com**
**May 12, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 141

1    three days that you applied for but were
2    denied short-term disability payments?
3        A.    No.
4        Q.    Okay.  As a member of the
5    bargaining unit at Albany, were there
6    retirement benefits negotiated in the
7    contract?
8        A.    I believe so.
9        Q.    Okay.  Do you recall what they
10   were?
11       A.    No.
12       Q.    All right.  Has anybody at the
13   company denied you your retirement
14   benefits in any way?
15       A.    Retirement benefits?
16       Q.    Yes, ma'am.
17       A.    No.
18       Q.    Okay.  Do you know what the
19   eligibility criteria were for retirement
20   benefits at Albany?
21       A.    I don't know exactly.  I know
22   you have to be fifty-five plus amount of
23   service -- years of service -- I mean

Page 142

1    service years.
2        Q.    Right.
3        A.    I don't know exactly how it --
4    how it worked.
5        Q.    All right.  Do you believe
6    anybody at the company has done anything
7    to interfere with your ability to get your
8    retirement benefits from Albany?
9        A.    Yes.
10       Q.    What did they do?
11       A.    I was terminated.
12       Q.    Okay.  When were you
13   terminated?
14       A.    October the 29th.
15       Q.    Of 2003?
16       A.    Well, let me restate.  I
17   believe it was -- I was terminated August
18   the 21st, because that's when I stopped
19   being able to come in the plant -- being
20   able to work.  Was told not to come in or
21   when to come in and not to come in.
22       Q.    Okay.  So you believe that you
23   were discharged August the 21st, 2003?

Page 143

1        A.    Yes.
2        Q.    And why do you believe that
3    you were discharged.
4        A.    Because I was told that I
5    couldn't come in the plant to work.
6        Q.    I understand that is what you
7    say that you were told.  Why do you
8    believe that you were discharged?
9        A.    Because I couldn't come to
10   work.
11       Q.    Do you believe you were
12   discharged by Albany because you are
13   black?
14       A.    No.
15       Q.    Do you believe that you were
16   discharged by Albany because of some
17   retirement benefits issue?
18       A.    I don't know why I was
19   discharged.
20       Q.    Who do you believe discharged
21   you from the company on August the 21st,
22   2003?
23       A.    Jeff Johnston.

Page 144

1        Q.    Did Mr. Johnston call you and
2    tell you you were terminated?
3        A.    No, he didn't.
4        Q.    Did anybody at Albany tell you
5    that you were terminated on August the
6    21st, 2003?
7        A.    No.
8        Q.    Why do you believe
9    Mr. Johnston terminated you on August the
10   21st, 2003?
11       A.    Because he was in control of
12   the activities that went on at the
13   company.
14       Q.    Did you participate in any
15   meetings where Mr. Johnston announced that
16   he had decided that you would be
17   discharged on August the 21st, 2003?
18       A.    No.
19       Q.    Well, why do you -- why do you
20   believe Mr. Johnston terminated you on
21   August the 21st, 2003?
22       A.    Mr. Johnston asked me on
23   several occasions was I -- could I

**American Court Reporting**
**toll-free (877) 320-1050**

Page 145

1  guaranty him whether I could come to work
2  and wouldn't be in pain. And after that,
3  I was not allowed in the building, because
4  I can't -- I couldn't guaranty him that I
5  couldn't be in pain.
6      Q.  Well, when did Mr. Johnston
7  ask you -- the dates, please -- of when
8  Mr. Johnston asked you whether you could
9  guaranty him that you could work without
10 pain?
11     A.  I don't have the dates, but it
12 was on about three different occasions.
13     Q.  What year?
14     A.  2003.
15     Q.  All right. And were you under
16 the care of any treating physicians at the
17 time?
18     A.  Yes.
19     Q.  And who would those doctors
20 have been?
21     A.  Dr. Katz, Dr. Wade. They were
22 Workers' Comp doctors. I went to so many.
23     Q.  Do you know if Dr. Katz ever

Page 146

1  told the company his medical opinion about
2  your ability to do your job?
3      A.  I don't know what Dr. Katz
4  told the company.
5      Q.  Do you know if Dr. Wade ever
6  told the company he thought you were
7  physically able to do your job?
8      A.  I don't know.
9      Q.  Do you know why Mr. Johnston
10 asked you if you could do -- if you could
11 guaranty him that you could do the job
12 without pain?
13     A.  Because I had complained --
14 constantly complained of being in pain.
15     Q.  Because of your Workers'
16 Compensation injuries?
17     A.  Yes.
18     Q.  For which you were receiving
19 medical treatment?
20     A.  I was going to doctors.
21     Q.  Approved Workers' Compensation
22 doctors?
23     A.  Yes.

Page 147

1      Q.  All right. And they were
2  treating you?
3      A.  I was going to the doctor.
4      Q.  Did any doctor ever recommend
5  treatment to you that you declined?
6      A.  No. I have never declined
7  treatment.
8      Q.  So you never had a doctor
9  recommend a treatment procedure to you
10 that you turned down for any reason?
11     A.  I was allergic to pain pills.
12 I also have become allergic to
13 inflammation. So if they wrote me a
14 prescription, or whatever, for the
15 inflammation pill, I would receive them,
16 but they would upset my stomach and they
17 would cause me to start the acid
18 regurgitation. So I could not take the
19 pill. I couldn't take the medication.
20     Q.  On August the 21st, 2003, when
21 you say that you were discharged from
22 Albany, were you able to do all of your
23 job functions at Albany?

Page 148

1      A.  Not without pain.
2      Q.  I didn't ask if you were going
3  to be uncomfortable when you did it. Were
4  you physically able to do the job on
5  August the 21st, 2003?
6      A.  Not without pain.
7      Q.  Well, I mean, my knees hurt
8  every day, but I go to work. Could you
9  have performed your job duties as a seamer
10 on August the 21st, 2003?
11     A.  With medical help and -- I
12 could not do it in pain. I had worked
13 since 1991 in pain. I have been working
14 since 1991 in pain. I was reinjured four
15 or five times after that. And I could not
16 guaranty anyone that I could not work in
17 pain. And, as a matter of fact, the
18 doctors told me that I would be working in
19 pain for the rest of my life.
20     Q.  Okay. Who at Albany told you
21 that you were discharged?
22     A.  I don't even remember.
23     Q.  Did anybody at Albany ever

**American Court Reporting**
**toll-free (877) 320-1050**

Page 149

1  tell you that you were terminated?
2      A.    They told me that I couldn't
3  come to the building.  I couldn't come in,
4  I couldn't work.
5      Q.    And you were told that on
6  August the 21st, 2003?
7      A.    The 21st I was given -- phone
8  call, came in -- I was called in on
9  occasional meetings, and I was told, "I
10 can't allow you in this plant."  I was --
11 come in one day and my card was pulled.  I
12 came in one day -- I was supposed to come
13 in one night, Jeff Johnston and -- I can't
14 think of his name, but he was the
15 department head -- they were at the door
16 waiting to send me home.
17     Q.    When was that?
18     A.    This was during the time
19 when -- the three-day suspension.
20     Q.    You were -- when you were
21 suspended for three days, did you try to
22 come anyway?
23     A.    I came to work.  I didn't know

Page 150

1  I was suspended.
2      Q.    When you came to work, you
3  were notified that you were suspended?
4      A.    I was called to the office.
5      Q.    August the 21st, 2003 --
6  strike that.  I will start over again.
7           Is it your contention in this
8  lawsuit that you were terminated by Albany
9  International on August the 21st, 2003?
10     A.    Yes.
11     Q.    All right.  By Jeff Johnston?
12     A.    Jeff Johnston was the decision
13 maker, yes.
14     Q.    How do you know Mr. Johnston
15 was the decision maker?
16     A.    Because he was the plant
17 manager.
18     Q.    Okay.  And who communicated
19 the decision to you on August the 21st,
20 2003?
21     A.    Ted Bryant.
22     Q.    Ted Bryant.  Now, I thought
23 you told me earlier, though, after August

Page 151

1  the 21st, 2003, that you still came in and
2  did some work for the company.
3      A.    They would call me and -- like
4  I said, they would allow me -- this was
5  the day that I was taken off of my job.
6  But from August the 21st till October the
7  29th, periodically, I would come in --
8  they would call me in -- told me I could
9  come in.  Then when I had a doctor's
10 appointment or I complained, I was sent
11 home or I was called at home and I was
12 told not to come in.
13     Q.    When you had a doctor's
14 appointment?
15     A.    I don't know.  But it was
16 still out -- throughout 2001, 2002, and
17 the rest of 2003.
18     Q.    Well, if you were terminated
19 on August the 21st, 2003, why do you think
20 anybody would let you come back to work?
21     A.    Because they were trying to
22 get me to get a doctor to say that I was
23 medically disabled.  They didn't want to

Page 152

1  admit that they were -- I was -- there
2  were injuries that was causing me the
3  pain.
4      Q.    Who didn't want to admit that?
5      A.    Jeff Johnston, Ted Bryant -- I
6  can't think of the other person's name
7  that was the department manager.
8      Q.    Would that have been Bob
9  Hampsey?
10     A.    Bob Hampsey.
11     Q.    Any of them -- did
12 Mr. Johnston ever tell you that he didn't
13 want to admit that you were in pain?
14     A.    He wanted me to admit that I
15 wasn't in pain.
16     Q.    That wasn't my question.  My
17 question is:  Did Mr. Johnston ever tell
18 you that, you know, he would not admit
19 that you were in pain?
20     A.    No, he didn't.
21     Q.    All right.  Did Ted Bryant
22 ever tell you that he didn't think that
23 you were in pain?

**American Court Reporting**
**toll-free (877) 320-1050**

39 (Pages 153 to 156)

Page 153

1    A.    No.
2    Q.    Did Bob Hampsey ever tell you
3  that he didn't think you were in pain?
4    A.    No.
5    Q.    And throughout this time
6  period, August the 21st of 2003, through
7  the end of October, 2003, you were being
8  treated by both Dr. Katz and Dr. Wade as
9  Workers' Compensation doctors?
10    A.    It was probably some more, but
11  I just can't remember their name.
12    Q.    But you were going to Workers'
13  Compensation doctors related to injuries
14  that you had suffered --
15    A.    Injuries?
16    Q.    -- injuries you had suffered
17  at Albany International?
18    A.    Yes.
19    Q.    The company was paying those
20  -- for those doctors' visits?
21    A.    Yes.
22    Q.    I guess I'm still confused.
23  I'm trying to determine why you believe

Page 154

1  that you were fired.
2    A.    Because I was. Anytime you
3  are dismissed or taken off of a job, what
4  do you call that?
5    Q.    Well, I'm trying to determine
6  why you believe -- what you believe
7  motivated your release from the company.
8    A.    I have just said it. I was
9  injured. I had neck pain, wrist pain,
10  back pain, knee pain, shoulder pain. I
11  was constantly having problems to try to
12  sit at the machine, to stand, to walk. I
13  had my hand in two wrist braces. I would
14  have to take my hand out of the brace to
15  do some of the work. I was told not to
16  take it out. The company had no light
17  duty.
18    Q.    Did you go to talk to your
19  union representatives about this at any
20  point in this time frame?
21    A.    Yes.
22    Q.    Who did you talk to?
23    A.    I talked to Norma.

Page 155

1    Q.    Heath?
2    A.    Heath. I talked to -- he
3  worked in the -- Danny Roland.
4    Q.    Norma Heath was a shop
5  steward?
6    A.    Yes.
7    Q.    Was Danny Roland a shop
8  steward?
9    A.    Yes.
10    Q.    Was Norma Heath the shop
11  steward for the seaming department?
12    A.    Seaming department.
13    Q.    Danny Roland, was he in the
14  weaving department?
15    A.    No. He was -- he was on the
16  dock, but I can't remember what they
17  called that area. Finishing.
18    Q.    Finishing?
19    A.    No, it wasn't finish. It was
20  on the shipping. I believe shipping.
21    Q.    Tell me about your
22  conversations with Ms. Heath as your
23  department's union steward.

Page 156

1    A.    I asked her -- I would ask
2  her, you know, "What is it that the Union
3  can do about this," that I was being
4  railroaded out of my job. And she told me
5  that the Union couldn't do anything. It
6  was nothing -- the Union didn't take
7  anything to do with Workmen's
8  Compensation.
9    Q.    Is it your contention in this
10  case that the company was trying to force
11  you out of your job because of Workers'
12  Compensation injuries?
13    A.    Yes.
14    Q.    Is that the only reason that
15  you believe that the company was trying to
16  force you out of your job?
17    A.    I don't know.
18    Q.    Well, in this lawsuit do you
19  allege that there is any reason, other
20  than your Workers' Compensation injuries,
21  that is the basis for the company's
22  efforts to push you out?
23    A.    I know that injuries was the

**American Court Reporting**
**toll-free (877) 320-1050**

40 (Pages 157 to 160)

Page 157

1   reason that I was in pain.
2        Q.    Did Mr. Johnston ever hit you
3   at work?
4        A.    No.
5        Q.    Did he ever touch you
6   inappropriately in any way?
7        A.    No.
8        Q.    Did he ever touch you?
9        A.    The job that we did, sometimes
10  you had to brush past or touch or lean if
11  you are checking on a fabric.  If he want
12  to check to see what the seam is doing,
13  how the machine is running.  The way we
14  worked, he might have.  I don't know.  But
15  I don't remember, because it is so many
16  touches.
17       Q.    But other than in the context
18  of working around the machine, is there
19  any other instance where Mr. Johnston ever
20  touched you at work?
21       A.    No.
22       Q.    Has Mr. Johnston ever
23  threatened you at work in any way?

Page 158

1        A.    He threatened to fire me.
2        Q.    I mean, did he ever threaten
3   you physically in any way?
4        A.    No.
5        Q.    Did he ever do anything to
6   make you afraid that he was going to hurt
7   you physically in some fashion?
8        A.    No.
9        Q.    Okay.  Between August the 21st
10  and October, 2003, any estimate of how
11  many days you might have worked?
12       A.    I don't know.
13       Q.    Okay.  Now, do you recall
14  having a meeting October the 29th, 2003,
15  at the Montgomery facility?
16       A.    Yes.
17       Q.    Who was present for this
18  meeting?
19       A.    Ted Bryant, Jeff Johnston, Bob
20  Hampsey, Norma Heath, and myself.
21       Q.    And how long did this meeting
22  last?
23       A.    I don't remember.

Page 159

1        Q.    Were you at work that day?
2        A.    No.
3        Q.    Who contacted you about the
4   meeting?
5        A.    I believe Ted Bryant.
6        Q.    And did he tell you what the
7   purpose of the meeting was?
8        A.    I don't know.  I don't know.
9        Q.    You don't recall him saying
10  one way or the other what the purpose of
11  the meeting was?
12       A.    I know that he called me and I
13  went to the meeting.
14       Q.    Okay.  Now, right before this
15  meeting do you recall if you had been to
16  see Jeff Wade in Birmingham?
17       A.    Yes, I had been to see Jeff
18  Wade.  I had been to see Dr. Wade.  I
19  didn't know his name.
20       Q.    He is an orthopedic doctor at
21  Brookwood Hospital.
22       A.    I think I went to a hospital
23  to his office.

Page 160

1        Q.    You went to his office?
2        A.    Yes.
3        Q.    Dr. Wade is an orthopedist
4   based in Birmingham?
5        A.    Yes.
6        Q.    All right.  And you had gone
7   to see Dr. Wade in connection with one of
8   your work place injuries?
9        A.    Yes.
10       Q.    Do you know if Dr. Wade had --
11  in advance of this meeting on October the
12  29th had communicated his conclusions
13  about you to the company?
14       A.    No.
15       Q.    During this meeting on the
16  29th did -- was there any discussion about
17  your doctor's conclusions about your
18  physical condition?
19       A.    I was told that I was sent
20  back to work.
21       Q.    Who told you that your doctors
22  had released you to work?
23       A.    I think it was Ted Bryant.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 161

1     Q.    Now, in advance of this
2  meeting on October the 29th, 2003, do you
3  know if -- were you on inactive status
4  with the company?
5     A.    I was taken off of the job.
6  What status they called it, I don't know.
7     Q.    During this time period
8  between August and October, were you
9  accruing attendance occurrences?
10    A.    I don't know.  No -- I don't
11  know.  I don't know.
12    Q.    You don't know.  Okay.
13        During this meeting on October
14  the 29th Ted Bryant tells you that your
15  doctors released you to return to your job
16  in the seaming department?
17    A.    Yes.
18    Q.    What else is said?
19    A.    I don't remember.  But it was
20  a lot said.
21    Q.    Okay.  At any point during
22  this meeting of October the 29th, 2003,
23  does anybody make any reference to your

Page 162

1  race?
2     A.    My race?
3     Q.    To your race.
4     A.    No.
5     Q.    Did anybody tell any racial
6  jokes?
7     A.    No.
8     Q.    Anybody make any racial slurs?
9     A.    No.
10    Q.    Anybody make any reference to
11  your retirement benefits with the company?
12    A.    I don't believe so.
13    Q.    As best you recall, other than
14  Mr. Bryant telling you that your doctors
15  had released you -- your Workers' Comp
16  doctors had released you to return to
17  work, tell me everything else that was
18  said in this meeting.
19    A.    Jeff Johnston told me that he
20  was giving me the opportunity to go to my
21  doctor so they could take me off the job.
22  And I told him that my -- what was going
23  on was injuries, not job related.  My

Page 163

1  medical doctors didn't see any reason to
2  take me off.
3        He insisted that I find a
4  doctor to take me off the job.  And I
5  asked him did he have one.  But before it
6  was over, he threatened to call the police
7  on me.
8     Q.    Did anybody call the police on
9  you in this meeting?
10    A.    No.
11    Q.    Did anybody in this meeting
12  tell you that, you know, the company was
13  kind of in a difficult spot because you
14  were telling them you were in pain and
15  your doctors were telling them that you
16  could do the job?
17    A.    I don't remember.
18    Q.    You understand that Dr. Wade
19  and Dr. Katz said that you could go back
20  to work and do your full job as a seamer.
21  You understand that, don't you?
22    A.    Yes.
23    Q.    And were you not -- even

Page 164

1  though your doctors said that you could do
2  the job during this meeting on the 29th,
3  you told Mr. Johnston and Mr. Bryant that
4  you were in pain, weren't you?
5     A.    I told them that I was in pain
6  and it was excruciating.  I told them that
7  I was going to the doctors, and their
8  doctors was not doing anything for me.  I
9  told them that I was getting passed
10  through the doctor's office and that no
11  matter what, they wasn't doing anything
12  for me.  They was just -- I was just
13  visiting the office, and that was it.
14  They wasn't doing anything about the pain.
15    Q.    Is it your contention that
16  Dr. Wade didn't really treat you when you
17  went to see him as an orthopedist?
18    A.    He -- I -- no, he didn't treat
19  me.  He just examined me.  He didn't treat
20  me, he just examined me.
21    Q.    What about Dr. Katz?
22    A.    Dr. Katz -- reluctantly, I
23  knew I was allergic to steroids, because



**American Court Reporting**
**toll-free (877) 320-1050**

42  (Pages 165 to 168)

Page 165

1  they had -- they had me -- I had had them
2  before.  They caused me to have heart
3  problems.  So the pain was so
4  excruciating -- he kept saying, "All I can
5  do for you is injections."  Each time I
6  had an injection -- which on three
7  different occasions I had to stop my
8  medication; aspirins and my blood pressure
9  medicine.  Each time he injected me I had
10  an anxiety attack or my heart would
11  flirt.  I even passed out.
12      Q.    Are you talking about
13  Dr. Katz?
14      A.    Dr. Katz.  I told him that I
15  was allergic to the steroids.  He says,
16  "Well, I'm going to give you something to
17  cope with the steroids."  In turn he gave
18  me Valium, and the Valium was causing me
19  to run red lights, to just sit up at a
20  light -- three or four lights and the
21  lights turning and changing, people
22  tooting their horns.
23          So during that point, I

Page 166

1  decided I wasn't going to drive, because I
2  didn't want to kill anybody, and I didn't
3  want to be killed.  So that's what
4  happened with Dr. Katz.
5          And then after that he never
6  -- the only thing he would tell me, "I
7  could treat you with injections."  He knew
8  I was allergic to injections.
9      Q.    Now, you selected Dr. Wade
10  from a Workers' Comp panel of four, didn't
11  you?
12      A.    Yes.
13      Q.    So the company gave you four
14  names?
15      A.    Yes.
16      Q.    And you picked Dr. Wade from
17  the list?
18      A.    Yes.
19      Q.    Okay.  When you had this
20  meeting with the company on October the
21  29th, 2003, did you tell Mr. Johnston and
22  Mr. Bryant and Bob Hampsey and Norma Heath
23  that you had already applied for Social

Page 167

1  Security disability benefits?
2      A.    Yes.
3      Q.    You told them that during this
4  meeting?
5      A.    Yes.
6      Q.    During this meeting you had a
7  discussion with them about whether you
8  were going to apply for long-term
9  disability benefits with the company.
10  What did you tell them about that?
11      A.    I didn't know my rights.
12      Q.    You didn't tell them that you
13  had applied for Social Security?
14      A.    I had applied for Social
15  Security.  Not with the company, but with
16  the State.
17      Q.    All right.  And you have
18  since, in fact, been declared disabled by
19  Social Security, right?
20      A.    Yes.
21      Q.    And they declared you disabled
22  all the way back to August the 21st, 2003?
23      A.    Yes.

Page 168

1      Q.    Okay.  So if I understand this
2  determination correctly -- we are going to
3  mark this as Exhibit 8.
4          (WHEREUPON, a document was
5  marked as Defendant's Exhibit 8 and is
6  attached to the original transcript.)
7      Q.    Just take a minute and read
8  over what is marked as Exhibit 8.
9      A.    Okay.
10      Q.    Have you had a chance to look
11  over this Notice of Decision-Fully
12  Favorable that we have marked as Exhibit
13  8?
14      A.    Yes.
15      Q.    Did somebody help you file
16  this?
17      A.    Yes.
18      Q.    Who?
19      A.    My daughter.
20      Q.    Okay.  At any point in this
21  process -- during your disability
22  application process -- did you provide
23  them with a list of all of your Workers'

**www.AmericanCourtReporting.com**
**May 12, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 169

1   Comp doctors?
2       A.   Yes.
3       Q.   Okay.  Now, the doctors who
4   are referenced in here, Dr. Darryl
5   Hamilton, your treating cardiologist,
6   Dr. Steven Allen, your treating
7   physician -- it looks like you saw these
8   doctors after you left Albany
9   International.
10      A.   Yes.
11      Q.   Did you receive any treatment
12  from Dr. Hamilton during your employment
13  with Albany International?
14      A.   Yes.
15      Q.   For what?
16      A.   Mitral value prolapse.
17      Q.   How long have you had that?
18      A.   Since about '97.
19      Q.   Okay.  What about Steven
20  Allen?
21      A.   I was seeing -- I only saw him
22  one time.
23      Q.   After you left Albany?

Page 170

1       A.   Yes.
2       Q.   All right.
3       A.   I think once.
4       Q.   Okay.  This is your daughter
5   who helped you with the application?
6       A.   Yes.
7       Q.   What is her name?
8       A.   DeMonica Jones.  I'm sorry, we
9   just are -- Ritchison.  DeMonica
10  Ritchison.
11      Q.   Did she get married?
12      A.   Yes.
13      Q.   Congratulations.  It's been
14  awhile.
15      A.   I forgot.
16      Q.   Based on this, it looks like
17  you have been completely unable to work
18  since August the 21st, 2003.
19      A.   I can explain that.
20      Q.   Please do.
21      A.   Because that's when I filed,
22  because that's when the company took me
23  off the job.  I was not receiving money.

Page 171

1   I wasn't earning money.  That was the time
2   that the company told me I couldn't come
3   to work.  When they asked me when was I
4   disabled, I wrote August the 21st.
5       Q.   I assume, Ms. Davis, that some
6   of these either treating doctors, or
7   medical experts that look like they
8   testified on your behalf, somehow
9   identified August the 21st as -- August
10  21st, 2003, as a date after which you were
11  incapable of performing any work.
12      A.   Uh-huh (Nodding head).  The
13  first time I was turned down.  After that
14  I was diagnosed with congestive heart
15  failure, and I was diagnosed with -- after
16  I was turned down, I was diagnosed with
17  congestive heart failure, and I was turned
18  down with the depression.  Severe
19  depression.
20      Q.   You were turned down for what?
21      A.   Disability on my first -- when
22  I first went -- applied.  First six
23  months.

Page 172

1       Q.   When you first applied for
2   disability, what reason did you list as
3   the disability?
4       A.   I listed the fibromyalgia,
5   bulging disks, chronic neck pain, back
6   pain.  I listed my wrists, but they are
7   not on here.
8       Q.   And you say Social Security
9   initially denied your request for
10  benefits?
11      A.   They denied my request.
12      Q.   Did you appeal it or file a
13  new application?
14      A.   I appealed.
15      Q.   Appealed.  And is that when
16  all of this -- it looks like you had a
17  hearing of some sort and the doctors
18  testified.
19      A.   That was July the 22nd of
20  2005.
21      Q.   Had you already been diagnosed
22  with congestive heart failure when you
23  were initially denied Social Security?  If

**www.AmericanCourtReporting.com**
**May 12, 2006**

Page 173

1    you don't know just -- that's fine.
2        A.    No.
3        Q.    So you were --
4        A.    It was after.
5        Q.    So during the time period that
6    you were appealing your Social Security is
7    when --
8        A.    I developed --
9        Q.    -- Dr. Hamilton diagnosed you
10   -- yeah. Dr. Hamilton diagnosed you with
11   congestive heart failure?
12       A.    Yes.
13       Q.    Did the Social Security folks
14   conclude in any way that you suffered some
15   mental impairment?
16       A.    The only thing I see is severe
17   depression. That's what I see on here. I
18   did see their -- I guess their
19   psychiatrist.
20       Q.    Are you undergoing any type of
21   psychiatric treatment?
22       A.    Not right now.
23       Q.    Okay. Have you undergone

Page 174

1    psychiatric treatment?
2        A.    Yes.
3        Q.    When?
4        A.    It was 2004.
5        Q.    Where?
6        A.    Montgomery Area Mental Health,
7    I believe.
8        Q.    How many times did you go?
9        A.    I don't remember that. I
10   don't know exactly.
11       Q.    Why did you go?
12       A.    Depression.
13       Q.    Has anybody diagnosed the
14   cause of your depression?
15       A.    I don't know. I don't know,
16   because I was never told.
17       Q.    All right. Did you seek
18   mental health counseling in any way
19   because of your interactions with
20   Mr. Johnston?
21       A.    Yes.
22       Q.    In what way?
23       A.    Because I was -- I was

Page 175

1    constantly humiliated, I was harassed out
2    of my job, I felt robbed.
3        Q.    Okay. Anything else?
4        A.    I worked for that company
5    twenty-four and a half years. I gave it
6    my all. I made millions for that company,
7    and to be just robbed of my job.
8        Q.    You realize there is something
9    that just appears inconsistent with being
10   declared completely disabled to work and
11   an assertion that somehow the company
12   robbed you of a job that apparently you
13   and your medical experts have -- you know,
14   it's been concluded that you couldn't do.
15       A.    I don't know how they -- I
16   don't know what -- I know that they --
17   right here she said they determined it
18   this way. When I listed fibromyalgia,
19   when I listed chronic back pain, neck
20   pain, wrists, when I listed -- let's see
21   what else -- I was denied. Not until I
22   was diagnosed with congestive heart
23   failure, severe depression, and

Page 176

1    "cardiomanopathy." After then, that's
2    when I was determined disabled.
3        Q.    The depression diagnosis, was
4    that before or after you started having
5    marital problems with your most recent
6    husband?
7        A.    What are you talking about?
8        Q.    You are currently married.
9        A.    I'm not anymore.
10       Q.    Okay. When did you get
11   divorced?
12       A.    April -- April the 4th, 2006.
13       Q.    When did you file for divorce?
14       A.    I didn't file. He filed.
15       Q.    He filed. Now, at the time
16   you were receiving treatment from the
17   Montgomery Area Mental Health Authority
18   you were having marital problems with your
19   former husband, weren't you? He was then
20   your husband. You were already having
21   problems, weren't you?
22       A.    No, I wasn't having problems,
23   because he was the one taking me to and

**American Court Reporting**
**toll-free (877) 320-1050**

Page 177

1  from the doctors and taking care of me
2  during that time.
3      Q.    All right.  Now, your
4  congestive heart failure, did any of your
5  doctors tell you what the cause of that
6  was?
7      A.    I have never been told that
8  either.
9      Q.    Have you ever asked any of
10  your treating doctors what caused your
11  congestive heart failure?
12      A.    No, I didn't.
13      Q.    Have any of your doctors ever
14  told you that Mr. Johnston caused your
15  congestive heart failure?
16      A.    No.
17      Q.    Any of your doctors ever told
18  you anything about your employment with
19  Albany International caused your
20  congestive heart failure?
21      A.    No.
22      Q.    You originally applied for
23  disability benefits on October the 13th,

Page 178

1  2003, correct?
2      A.    Yes.
3      Q.    Now, at the time you applied,
4  did you tell Social Security that you were
5  completely unable to work?
6      A.    No.  I told them that my
7  company had -- I called them, I explained
8  what was going on on my job.  I told them
9  I was not earning anything.  They was
10  taking me off my job, they didn't allow me
11  to work.
12      Q.    Did you tell Social Security
13  that you had been fired on August the
14  21st, 2003?
15      A.    I told them that I wasn't
16  working.  The last time I was on my job it
17  was August, 2000 -- 21st, 2003.  They
18  asked me the last time I worked, that's
19  what I told them.
20      Q.    So at the time you originally
21  applied for Social Security disability
22  benefits, they asked you when you last
23  worked?

Page 179

1      A.    That's what they asked.
2      Q.    You reported to them that it
3  was August the 21st?
4      A.    21st.
5      Q.    2003?
6      A.    Yes.
7      Q.    All right.  You didn't tell
8  them that you had worked any shifts
9  between August the 21st and October the
10  13th?
11      A.    I told them that this was --
12  that -- the last consistently working, and
13  I told them that I was going to and from.
14  And I told them that this is what was --
15  in other words, I was going to and from
16  the job off and on.  Just called in -- I
17  explained to them what was going on and my
18  situation.
19      Q.    Okay.  Now, during this
20  meeting on October the 29th, 2003, did
21  anybody give you any documents during that
22  meeting?
23      A.    I remember signing a piece of

Page 180

1  paper, but I don't know whether it was a
2  document or not.  It was a note written
3  and a letter threatening me that I would
4  be fired.
5      Q.    A letter threatening you --
6      A.    A letter telling me that I
7  would be terminated -- it was the
8  attendance policy.  Something pertaining
9  to the attendance policy.
10      Q.    I tell you what.
11      MS. WILLIAMS:  Can we take a
12  short break?
13      MR. POWELL:  Off the record
14  for a second.
15          12:30 PM
16          (Short recess)
17          1:40 PM
18      Q.    (BY MR. POWELL) Are you ready?
19      A.    Yes.
20      Q.    All right.  Shortly before we
21  broke for lunch, you indicated that you
22  had been somehow constantly humiliated at
23  work.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 181

1  A.  Yes.
2  Q.  By whom?
3  A.  Jeff Johnston.  I was
4 humiliated by Ted Bryant, Bob Hampsey,
5 supervisors, Barbara Smith and Nat Jones.
6  Q.  When you said you were
7 constantly humiliated by supervisors, are
8 you referring to Barbara Smith and Nat
9 Jones?
10  A.  Well, Nat Jones and Barbara
11 Smith, them two.
12  Q.  Okay.  So were you humiliated
13 by anybody other than Jeff Johnston, Ted
14 Bryant, Bob Hampsey, Barbara Smith, and
15 Nat Jones?
16  A.  As far as when I was coming
17 into the end of my leave, not being
18 there.  I was placed on wire assignments
19 which was difficult.  I was asked to do
20 things that they know was causing pain or
21 further injuries.  I was constantly
22 reminded of what -- how do you put it --
23 what I could or couldn't do.  Whenever

Page 182

1 they put -- like I would be working, they
2 would ask me to help other employees,
3 which I would be in pain, and this person
4 be standing up laughing, holding a
5 conversation.
6  Some occasions where -- when I
7 came back from injury, I was placed on a
8 machine where other people were given
9 light duty or a desk -- something to do at
10 a desk or paperwork.  A whole bunch of
11 things.
12  Q.  All right.  So when you said
13 earlier that you were constantly
14 humiliated, are these the types of things
15 that you were referring to?
16  A.  Yes.
17  Q.  Okay.  And if I understood you
18 correctly, the humiliation was caused by
19 Jeff Johnston, Ted Bryant, Bob Hampsey,
20 Barbara Smith, and Nat Jones?
21  A.  Yes.
22  Q.  Let's take them one at a
23 time.  What did Mr. Johnston do that you

Page 183

1 believe resulted in constant humiliation?
2  A.  They were in authority.
3  Q.  Just Mr. Johnston
4 specifically.
5  A.  He was in authority.  He
6 allowed work -- he knew that I had an
7 injury.  No one did anything to make my
8 job easier or to help me through or to
9 make me be able to just perform my job.  I
10 was sent to work as if though I never
11 received -- I didn't have an injury.
12  I was placed on difficult
13 fabrics.  I asked off the M-3000.  I was
14 never taken off.  I was told that I had to
15 work, I couldn't come off.  I know of
16 people that they took off of the M-3000
17 when they complained of the pain and
18 difficulties or when they were told that
19 this fabric is too difficult or I'm having
20 problems here.  If I asked off, I never
21 could -- I would always have to work that
22 fabric.
23  Q.  What exactly did Jeff Johnston

Page 184

1 do that you claim resulted in constant
2 humiliation?
3  A.  If -- he did nothing about
4 it.  He did nothing about it.  He allowed
5 these things to take place.
6  Q.  So, if I understand you
7 correctly, other people were humiliating
8 you, and Mr. Johnston didn't do anything
9 to stop it?
10  A.  No.  It wasn't other people.
11 Under these conditions -- under these
12 working conditions, I was being
13 humiliated, because nothing was done
14 about -- okay, you have a rotator tear --
15 you have a rotator tear, but you have got
16 to go work this machine.  I'm constantly
17 using this arm, pulling wires down, tieing
18 knots, pushing machines, crawling on the
19 floor, moving stands, lifting weights.
20 I'm doing everything that people that was
21 not injured do -- was doing.
22  I was helping people do things
23 that they know -- like starting up a

**American Court Reporting**
**toll-free (877) 320-1050**

Page 185

1    seam.  I start up a seam I'm going,
2    "Ouch," "Oh," just hollering, because I'm
3    in pain.  And nobody did anything about
4    it.  They just allowed me to work under
5    those conditions.
6        Q.    They asked you to do something
7    that wasn't part of your normal job
8    assignment?
9        A.    It was part of the job
10   assignment, but they knew I was injured in
11   my assignment.
12       Q.    My question is:  Did anybody
13   at the company ask you to perform a job
14   function that was not part of your normal
15   job assignment?
16       A.    To help others wasn't part of
17   my job assignment.
18       Q.    Over the course of your career
19   working in the seaming department, have
20   other employees helped you with projects?
21       A.    I needed very little help.
22       Q.    That wasn't my question.  Over
23   the course --

Page 186

1        A.    I have been helped.
2        Q.    Other employees have helped
3    you?
4        A.    Yes.
5        Q.    Have you helped other
6    employees?
7        A.    Yes.
8        Q.    Okay.  When other employees
9    have helped you, is there something
10   humiliating about that?
11       A.    It became humiliating when I'm
12   in constant pain, instead of being asked
13   to do it -- that's when it became
14   humiliating.
15       Q.    The time that you are being
16   asked to do this and you claim it was
17   humiliating, were you under any specific
18   restrictions from any doctor not to do
19   some aspect of your job?
20       A.    I have -- yes.
21       Q.    When?
22       A.    At different -- different
23   times.

Page 187

1        Q.    Okay.  I'm going to reverse
2    the order of the list, because you have
3    alleged that somehow you were constantly
4    humiliated.  You have named five people
5    that you claim did things to humiliate
6    you.
7            What I'm trying to determine
8    is what exactly each person did that
9    humiliated you.  So let's start with Nat
10   Jones.  What did Mr. Jones do that
11   humiliated you?
12       A.    He would send me to fabric.
13   He would have me to seam difficult
14   fabrics.  He would allow me to do other
15   people's rework.  He would -- it's been
16   time I seamed his girlfriend's wires.
17       Q.    Is there anything else
18   Mr. Jones did that you believe humiliated
19   you in some fashion?
20       A.    I have gone to work and been
21   on one assignment, and he would take that
22   assignment from me.  The easy
23   assignment -- when I come in, that would

Page 188

1    be my assignment.  He have taken that
2    assignment from me and given me the other
3    person's assignment that was more
4    difficult.
5        Q.    Anything else from Mr. Jones
6    that you believe humiliated you?
7        A.    I guess -- I don't know.  I
8    can't remember anything else.
9        Q.    Do you have a list anywhere?
10       A.    No, I don't have a list.
11       Q.    All right.  Based on my notes,
12   what I have that you allege Mr. Jones did
13   to humiliate you was to have you seam
14   difficult fabrics, do other employee's
15   rework on fabrics, seam his girlfriend's
16   wires.
17       A.    Yes.
18       Q.    And then he would reassign you
19   from an easy job to a hard job.
20       A.    See, we were always assigned.
21   We were always assigned -- we had an
22   assignment when we came in.  And sometimes
23   he would take that assignment, if it was

**American Court Reporting**
**toll-free (877) 320-1050**

48 (Pages 189 to 192)

Page 189

1 an easy assignment, and give it to another
2 person and put me on a more different
3 assignment.
4        Q.   Are those the four things that
5 you claim Mr. Jones did that humiliated
6 you?
7        A.   That's the four that I can
8 remember.
9        Q.   What was Mr. Jones' job at the
10 time?
11       A.   Seaming supervisor.
12       Q.   And can you tell me what year
13 any of these four events took place with
14 Mr. Jones?
15       A.   I don't remember.
16       Q.   All right.
17       A.   It was during his supervising
18 -- seaming supervisor period.
19       Q.   Now, he would have you seam
20 difficult fabrics?
21       A.   Yes.
22       Q.   What do you mean by that?
23       A.   Some fabrics we may have off

Page 190

1 beat, bad counts, or sometimes they would
2 be where it was cut too short to finish
3 it. You had to start on the edge and you
4 had to make sure you go to the other
5 edge. When you do that, it was
6 difficult. It made -- it was more
7 difficult than it would be if you just
8 hook a fabric up and seam.
9        Q.   Asking you to work on a
10 difficult fabric, is that part of your
11 normal job duties?
12       A.   It was part of all of our job
13 duties.
14       Q.   Now, being asked by Mr. Jones
15 to work on a difficult fabric, how did
16 that humiliate you?
17       A.   Because he was taking the job
18 that another qualified operator was doing
19 and he would give it to me when that
20 person was supposed to do that job
21 themselves.
22       Q.   Who was he taking the job away
23 from?

Page 191

1        A.   He has done it -- different
2 ones; Dottie, Shirley, different people.
3        Q.   Well, do you know why he
4 switched that person and gave that job to
5 you?
6        A.   That person went to him and
7 complained, "I don't want to work this
8 fabric, I don't want to do this." We had
9 people to do that, "I don't know what to
10 do this." When they didn't want to do it,
11 the less favorite person got the job.
12       Q.   Did you ever see anybody else
13 seam a different fabric?
14       A.   Yes.
15       Q.   Who?
16       A.   Katherine Davis and Jerelene
17 Forest.
18       Q.   When did Mr. Jones assign --
19 take a difficult fabric away from somebody
20 else and give it to you? When did that
21 happen?
22       A.   Throughout his -- throughout
23 his seaming supervisor.

Page 192

1        Q.   How many times did he do that?
2        A.   A lots. I can't say how
3 many. Several. A lot.
4        Q.   In asking you to seam a
5 difficult fabric, you were still seaming a
6 fabric, correct?
7        A.   Yes.
8        Q.   That's your job in the plant
9 was to seam fabrics?
10       A.   Yes.
11       Q.   Did he make any derogatory
12 remarks to you when he switched you to
13 seaming difficult fabrics?
14       A.   What do you call derogatory?
15       Q.   Did he make any comments to
16 you that upset you in any way when he
17 switched you to a difficult fabric?
18       A.   You just go to this machine
19 and you seam this fabric.
20       Q.   You got paid your normal rate
21 of pay?
22       A.   Yes.
23       Q.   Whose rework did he have you

**American Court Reporting**
**toll-free (877) 320-1050**

49 (Pages 193 to 196)

Page 193

1  do?
2      A.    Let's see.  I have done -- I
3  can't -- Jim's, Arnold's, Evelyn's,
4  Mamie's, Dottie's -- just a whole bunch of
5  people.
6      Q.    Did he ever tell you why he
7  was giving you their rework?
8      A.    They always said that I could
9  handle it.
10     Q.    Who is they?
11     A.    Like Nat or the other
12  supervisors.  They would say, "You can
13  handle it."
14     Q.    So on the occasions that
15  Mr. Jones assigned you to rework somebody
16  else's fabric, he told you that you could
17  handle it?
18     A.    Handle it, yes.
19     Q.    Do you believe Mr. Jones gave
20  you these assignments because of your
21  race?
22     A.    No.
23     Q.    Do you know why Mr. Jones gave

Page 194

1  you the rework assignments?
2      A.    He wanted the job done, and he
3  felt like I could handle it.
4      Q.    All right.  Do you believe
5  Mr. Jones assigned you to do difficult
6  fabrics because of your race?
7      A.    No.
8      Q.    Why do you believe Mr. Jones
9  gave you that job assignment?
10     A.    The other person went to him
11  and told him they didn't want to do it.
12     Q.    Did you ever hear somebody
13  tell Mr. Jones that they didn't want to do
14  it?
15     A.    Yes.  Yes.
16     Q.    Who?
17     A.    I have heard Mamie, Dottie,
18  Dot, Doris.
19     Q.    You said Mr. Jones had you
20  seam his girlfriend's wires.
21     A.    Yes.
22     Q.    Who?
23     A.    Her reworks.  Evelyn.  I done

Page 195

1  forgot her last name.
2      Q.    Morgan?
3      A.    Yes.
4      Q.    Did you ever go out with
5  Mr. Jones?
6      A.    No.
7      Q.    How many times did Mr. Jones
8  ask you to, I guess, rework Ms. Morgan's
9  wire?
10     A.    I have -- I have come in and I
11  have worked rework five days out of a
12  week.  Jean Carr, that's another one.
13     Q.    Another who?
14     A.    Person who I reworked behind.
15     Q.    Okay.  Did anybody else in the
16  seaming department do rework?
17     A.    Yes.
18     Q.    Who?
19     A.    Everybody.
20     Q.    Reworking on fabrics was
21  something that everybody in the seaming
22  department did?
23     A.    Yes.

Page 196

1      Q.    Okay.  Do you believe
2  Mr. Jones had you rework Evelyn Morgan's
3  wire because of your race?
4      A.    No.
5      Q.    Do you know why he had you
6  rework Ms. Morgan's wire?
7      A.    She didn't want to do it.
8      Q.    Did you hear Ms. Morgan say
9  that?
10     A.    Well, I have seen people --
11  Evelyn.  I have seen others say, "I don't
12  want this assignment," and they give it to
13  the next person.
14     Q.    The next person being you?
15     A.    Yes.
16     Q.    You say somehow you were
17  humiliated by Mr. Jones taking easy
18  assignments away from you and switching
19  you to a hard assignment.
20     A.    When you are in constant,
21  excruciating pain, I'm talking about pain
22  where you are trembling, and somebody
23  takes an assignment from another person

**www.AmericanCourtReporting.com**
**May 12, 2006**

Page 197

1   and give it to you, it humiliates you.  It
2   humiliated me.
3        Q.   Did Mr. Jones make any
4   announcement to the department as a whole
5   that he was switching you from an easy
6   assignment to a hard assignment?
7        A.   No.
8        Q.   So he didn't do anything to
9   hold you up to public ridicule?
10       A.   No.
11       Q.   Well, what specific easy
12  assignments did he take away from you and
13  switch you to hard assignments?
14       A.   Some fabrics you go in, you
15  start the fabric in, it runs.  Other
16  fabrics was more difficult.  They were
17  tedious.  They required a lot of
18  attention.  You had to just stay there.
19  You couldn't relax in it, because I had to
20  put a decent seam in the fabric.  I did
21  that.
22       I purposefully made sure that
23  everything that I put my hand on, I did --

Page 198

1   I worked it to my best.  I made sure that
2   it was quality work.
3        Q.   When you say Mr. Jones
4   switched you from an easy assignment to a
5   hard assignment, he was -- he still had
6   you doing a job that was within your
7   normal job description, correct?
8        A.   Yes.
9        Q.   Okay.  And at the time he was
10  switching you from these easy assignments
11  to these hard assignments, were they
12  within any medical restrictions placed on
13  you by your doctors?
14       A.   No.
15       Q.   Well, exactly which jobs did
16  he give you that were outside of any
17  restrictions put on you by your doctors?
18       A.   We had a system where you were
19  assigned fabrics, and you was assigned
20  those fabrics according to -- of
21  difficulties and -- less difficult.  You
22  didn't have one person seam all of the
23  difficult wire, you spreaded them out.

Page 199

1   Sometimes I got the most difficult wire.
2        And during the time of my
3   injuries, no one had sympathy for me.
4   They would put me on the difficult fabrics
5   as -- as if though I wasn't in pain or
6   anything that was going on in my body.
7        Q.   Well, during this time -- this
8   system that you say where -- I guess you
9   rotated on different fabrics?
10       A.   Yes.
11       Q.   All right.  Did that system
12  apply to you and to everybody else in the
13  seaming department?
14       A.   Yes.
15       Q.   So you rotated periodically
16  among the fabrics?
17       A.   Yes.
18       Q.   Okay.  Occasionally, under the
19  rotation, you would get easy fabrics?
20       A.   You would -- if I had -- if
21  this fabric is my assignment, the other
22  operators come in and their assignment --
23  because her assignment is difficult, you,

Page 200

1   in turn, take this person off their
2   assignment and you give them my assignment
3   and gave me her assignment.
4        And then you had where we was
5   supposed to start a wire and we would
6   finish that fabric.  We stayed on that
7   fabric till we finished.  We wasn't
8   supposed to switch up in the middle of the
9   fabric.  So he would switch me up
10  sometimes.
11       Q.   Did you go complain to the
12  Union?
13       A.   A lot of times I didn't
14  complain, because it wasn't doing me any
15  good to complain.
16       Q.   That wasn't my question.  Did
17  you go complain to the Union?
18       A.   Yes, I did.
19       Q.   Who did you complain to?
20       A.   I complained to the supervisor
21  first.
22       Q.   Who would have been Mr. Jones?
23       A.   Mr. Jones.

www.AmericanCourtReporting.com

**Page 201**

```
1     Q.   Okay.  And did you go to
2   anybody in the Union and ask if you could
3   file a grievance about this change in job
4   assignments?
5     A.   I have gone to shop stewards
6   about wire assignment.
7     Q.   I'm talking about with respect
8   to Mr. Jones.  Did you go to the shop
9   steward about your job assignments?
10    A.   Yes.
11    Q.   When?
12    A.   During the time of the wire
13  assignment.
14    Q.   Okay.  At the time of these
15  wire assignments with Mr. Jones, did you
16  have -- were you being treated by a
17  Workers' Compensation doctor?
18    A.   This was the process in the
19  time I became a seamer until the time that
20  I was not there anymore.  So this happened
21  down through the years.
22    Q.   Right now we are talking about
23  Mr. Jones.
```

**Page 202**

```
1     A.   Okay.  My point is, when I was
2   on limitations, wrist bands, lifting a
3   certain amount of weight, can't twist, you
4   can't bend, you are not supposed to crawl
5   today, just different things that I was --
6   restrictions.  I -- I would have to go --
7   what I'm telling you is, I would have to
8   work that machine irregardless, whether I
9   was on restrictions or anything.  If I
10  have to take the band off to fix
11  something, because it was a tedious area,
12  you couldn't put your hand in with a wrist
13  band.  You couldn't fix different things
14  with a wrist band on.  You have to take it
15  off.
16    Q.   What did Barbara Smith do that
17  allegedly constantly humiliated you?
18    A.   The last time -- the time that
19  I was constantly humiliated -- the two
20  times -- during the times of when I was on
21  restrictions, I have seen an operator get
22  up and go to the bathroom, and she asked
23  me to help load a fabric.
```

**Page 203**

```
1        I have -- during the last time
2   I was there, I think it was N-5 I was
3   working, it was the -- I'm trying to think
4   -- I can't think of the fabric.  It's a
5   very small fabric, a triple layer.
6        So I had on two wrist bands --
7   this is what I'm talking about.  When you
8   find -- have an error, you have to take it
9   out and put it in.  I could not put my
10  hand down.  I asked Barbara to call up
11  front and ask them to move me off that
12  machine.  She told me that she couldn't do
13  it.  And if you are in excruciating pain
14  and this happens, yes, there is humility.
15    Q.   Did you finish out your shift
16  this day?
17    A.   I don't know whether I did or
18  not.
19    Q.   Did you get disciplined in any
20  way on that day?
21    A.   No.
22    Q.   Did you get paid for whatever
23  hours you worked that day?
```

**Page 204**

```
1     A.   Yes.
2     Q.   Okay.  Did Ms. Smith in any
3   way hold you up to ridicule among your
4   co-workers in the plant?
5     A.   No.
6     Q.   All right.  I think you said
7   somehow she humiliated you two times.  You
8   described one.  What was the second
9   one?
10    A.   When you are -- when I was
11  working -- I told the second time -- the
12  first time was when I was on -- a person
13  -- a fabric was assigned to a person, I
14  had two wrist bands on.  This person
15  strolls off to the bathroom.  She calls me
16  over to help load the fabric.  She knows
17  that I've got two wrist bands on.
18    Q.   All right.  So there is only
19  one occasion where Ms. Smith did something
20  that humiliated you?
21    A.   That's two separate; loading
22  somebody else's fabric and seaming a wire
23  with a wrist band.
```

**American Court Reporting**
**toll-free (877) 320-1050**

Page 205

1    Q.    Well, then, I'm confused.
2 Somebody is working on a machine, they get
3 up to go to the restroom and Ms. Smith
4 calls you over to help load --
5    A.    Load the fabric.
6    Q.    -- the fabric. That's one
7 occasion?
8    A.    Uh-huh (Nodding head).
9    Q.    Then when does this second
10 occasion with seaming occur?
11    A.    I'm working on a machine --
12 I'm seaming, and I have got on two wrist
13 bands. I'm trying to seam a wire, and I'm
14 having to take the wrist bands off to make
15 sure that I'm putting the seam in the
16 fabric. And I asked her to call up
17 front -- and when I say up front, call
18 management -- to let them know that I'm in
19 a lot of pain, and this is causing more
20 pain.
21    Q.    This seaming time when you
22 asked her -- asked Ms. Smith to call up
23 front, when was that?

Page 206

1    A.    It was in the -- it was in
2 2003, because this was near the end.
3    Q.    What about the time where the
4 other employee went to the restroom and
5 she asked you to load?
6    A.    It was around the same time.
7    Q.    Do you know when in 2003?
8    A.    No.
9    Q.    Early part of 2003?
10    A.    Middle.
11    Q.    May, June?
12    A.    May, June, something like
13 that.
14    Q.    So these two incidents with
15 Ms. Smith happened in May or June of 2003?
16    A.    Yes.
17    Q.    Do you believe either of these
18 events with Ms. Smith had anything to do
19 with your race?
20    A.    Pardon?
21    Q.    Do you believe either of these
22 two events that you have just described
23 with Barbara Smith had anything to do with

Page 207

1 your race?
2    A.    My rights?
3    Q.    Race?
4    A.    Race. No.
5    Q.    These humiliating events with
6 Mr. Jones, did you make any effort to
7 report them to Ted Bryant?
8    A.    I stopped complaining, because
9 nothing was being done about it. I
10 complained, and that was the end of it. I
11 hear it, and that was it.
12    Q.    Nothing was being done to deal
13 with your being in pain from your work
14 injuries?
15    A.    That, and about me being
16 humiliated. Me going -- if I went to Ted
17 or Jeff, I was always the problem.
18    Q.    Who, at the company, did you
19 go to and tell them that you felt that any
20 other Albany employee had humiliated you?
21    A.    I didn't go to anybody.
22    Q.    So you didn't report to
23 Mr. Bryant or Jeff Johnston or George

Page 208

1 Kazalay that Nat Jones had humiliated you
2 in any way?
3    A.    No.
4    Q.    Did you report to anybody in
5 management at the company that Barbara
6 Smith had humiliated you in any way?
7    A.    No.
8    Q.    How did Bob Hampsey humiliate
9 you?
10    A.    Once -- well, it was more than
11 once, because we were given -- like
12 sometimes -- we were told that we could
13 take a break or we could step away from a
14 fabric. And during this process -- during
15 this period of the injury, and -- I don't
16 know -- I guess getting ready to move me
17 out of the plant -- I was being
18 monitored. I had -- I would -- like if I
19 go -- stood up or walked around, I was his
20 -- he would call Tim and tell Tim, "You
21 have got an employee away from the
22 fabric," or, "Why is Dora doing this," or,
23 "Why is Dora doing that."

**American Court Reporting**
**toll-free (877) 320-1050**

Page 209

1    Q.    Who was monitoring you?
2    A.    Tim Woodward.
3    Q.    Was Bob Hampsey monitoring
4    you?
5    A.    Well, he would -- he has
6    walked up to me on occasion and told me,
7    "Bob was wondering why you are standing
8    up," or, "Bob was wondering this."
9    Q.    Do you know if Mr. Hampsey
10   ever checked on other employees who had
11   walked away from their wire?
12   A.    I don't know.
13   Q.    And did Mr. Woodward say on
14   either of these occasions why Mr. Hampsey
15   had said anything about you being away
16   from your wire?
17   A.    No.
18   Q.    Were you away from your wire
19   on those occasions?
20   A.    No. I probably was sitting
21   like I'm sitting now or taking a break or
22   trying to move my head back or rest my
23   arms or stand up and relax my back or do

Page 210

1    something other than just sit there and be
2    in pain.
3    Q.    Is there anything Mr. Hampsey
4    has done towards you that humiliated you
5    other than send Mr. Woodward to check on
6    you?
7    A.    Well, once I went to the
8    doctor -- this has been awhile -- and they
9    wanted -- did the injection in my arm, the
10   steroids that I was allergic to. It was a
11   grievance process going on, so I had to go
12   up front. And we were on our way up --
13   this was Norma Heath, Shederick Abner, and
14   myself.
15        And on my way up, I think
16   Barbara had passed our checks out, so I
17   couldn't see. I gave the check to Norma
18   and said, "Look at this check. I can't
19   see it." And when we got upstairs, I
20   passed out. And I know I passed out from
21   the injection, because it was steroids.
22   It was a reaction to the steroids.
23        During that time -- before --

Page 211

1    like you could hear, and he was asked to
2    dial 911. He said he didn't have to dial
3    911.
4    Q.    Somebody from the company
5    called an ambulance for you?
6    A.    Yes. I don't know who called
7    it, but I know Shed called my daughter.
8    Q.    And who is Shed?
9    A.    Shederick Abner. He used to
10   be an employee at the plant, too.
11   Q.    Did you work in the same
12   department with Mr. Abner?
13   A.    A little while.
14   Q.    Which department was that?
15   A.    He worked in seaming.
16   Q.    He worked in the seaming
17   department for a little while?
18   A.    Yes.
19   Q.    Did Mr. Abner ever do anything
20   to humiliate you?
21   A.    No.
22   Q.    Okay. Do you keep up with
23   Mr. Abner?

Page 212

1    A.    I haven't talked to him in a
2    long time, no.
3    Q.    Okay. How do you know
4    Mr. Hampsey said, "I don't have to call
5    911?"
6    A.    I heard him.
7    Q.    I thought you were passed
8    out.
9    A.    You also heard me say, too, I
10   could hear. And when I heard him say --
11   maybe I was coming back around -- I don't
12   know what the situation was. I could hear
13   him say, "I don't have to dial 911."
14   Q.    Well, at that point do you
15   know if somebody for the company had
16   already called the paramedics for you?
17   A.    I don't know, because -- I
18   don't know -- I don't know. I just know
19   the paramedics came.
20   Q.    And you received medical
21   treatment for your allergic reaction to
22   the steroid shot?
23   A.    I received the treatments for

**American Court Reporting**
**toll-free (877) 320-1050**

54 (Pages 213 to 216)

Page 213

1  the -- yes.
2  Q.  Now, were you in a grievance
3  meeting with Mr. Hampsey when this
4  allergic reaction kicked in?
5  A.  I would say the devastations
6  of it, but it was already kicking in when
7  I couldn't see.
8  Q.  Were you a participant in a
9  grievance meeting?
10  A.  Yes.
11  Q.  What was the grievance about?
12  A.  I don't remember.
13  Q.  Who filed the grievance?
14  A.  Shederick Abner.
15  Q.  Did you file the grievance?
16  A.  I believe my name was on it.
17  I don't know.  I remember -- but I believe
18  it was, because that's why I was there.
19  Q.  Was this grievance arising out
20  of yours and Mr. Abner's work in the
21  seaming department?
22  A.  I don't remember.  Yes, it
23  derived from it.  I don't remember exactly

Page 214

1  what it was.
2  Q.  Do you remember what year this
3  happened?
4  A.  This had to be about 2000,
5  2001, something like that.
6  Q.  Okay.  Do you remember what
7  the ultimate outcome of the grievance was?
8  A.  I don't remember , because I
9  have never did -- like it was -- whatever
10  took place was -- it took place while I
11  was still sick.
12  Q.  Okay.  Anything else that you
13  think Mr. Hampsey did that in any way
14  humiliated you?
15  A.  I don't remember.
16  Q.  And you don't have a list
17  written down anywhere?
18  A.  No, I don't have a list.
19  Q.  Okay.  What is it that
20  Mr. Bryant did that in any way humiliated
21  you?
22  A.  Because he was our plant
23  manager.

Page 215

1  Q.  Ted Bryant was the plant
2  manager?
3  A.  He was our personnel manager.
4  He knew the rules, he knew what it took
5  for me to be treated right.  And he sit
6  back and he allowed it.  He allowed my job
7  to be taken away, he allowed me to hurt
8  every day.  He knew the extent of the
9  pain.  He knew.  He knew.
10  He -- when I come to work and
11  had expressed myself or talked to him on
12  the phone, he knew that I was in pain.  He
13  knew that I was hurting.
14  Q.  Well, Ms. Davis, if your
15  doctors released you to return to work --
16  A.  My doctors didn't release me.
17  Q.  They didn't?
18  A.  No.
19  Q.  Your doctors didn't tell the
20  company that you could go back to work?
21  A.  No.  Their doctors released
22  me.  The company doctors released me.
23  Q.  Your assigned Workers'

Page 216

1  Compensation doctors released you.
2  A.  Yes.  That's who released me.
3  Q.  Right.  Your assigned work --
4  approved Workers' Compensation doctors
5  said that you could go back to doing your
6  job as a seamer, correct?
7  A.  That's what they told me.
8  Q.  Okay.  So some other doctor
9  you think they should have listened to
10  instead of the ones by law that you were
11  seeing under your Workers' Comp?
12  A.  If you have four slipped
13  bulging disks in your neck, you have four
14  in your lower back, you have constant pain
15  in your wrists, you have a rotator surgery
16  where you have been told that the --
17  anyway, the surgical -- after surgery or
18  whatever -- the scars is aggravating you.
19  This is all parts of your body.  This is
20  your -- this is your spine.  You are in
21  constant pain every day, and some doctor
22  is going to release you knowing that you
23  are in constant pain and not doing

**American Court Reporting**
**toll-free (877) 320-1050**

55 (Pages 217 to 220)

Page 217

1  anything for you.  They are -- they didn't
2  do anything for me.  They passed me
3  through their office.
4       Q.   Well, are you suing the
5  doctors for malpractice in their treatment
6  of you?
7       A.   I was under their care because
8  of Appleton Wire.
9       Q.   Is it your contention
10 Mr. Bryant is a doctor?
11      A.   He was my personnel manager.
12      Q.   Well, he didn't give you any
13 medical advice, did he?
14      A.   He sent me to doctors for them
15 to give it to me.
16      Q.   You picked Dr. Wade off of a
17 list of four.
18      A.   I picked him because I had no
19 choice.  I didn't know one from the other.
20      Q.   So is it your contention that
21 merely because you were telling the
22 company that you were in pain that they
23 should ignore your -- the advice of your

Page 218

1  medical doctors that you could do your
2  job?
3       A.   I thought -- I think that they
4  should have made sure that I was medically
5  taken care of.  They should have made sure
6  that I got proper medical help.  I did not
7  know how to treat myself.  Doctors do.
8       Q.   Correct me if I'm wrong, but
9  didn't your treating doctors say that you
10 could go back to work?
11      A.   When I went to him to ask him
12 to take me off, he told me, "All they are
13 going to say -- I'm not taking you off,
14 because all they are going to say is it is
15 not job related."  He said that it was
16 nothing medically wrong with me to be off
17 my job.
18      Q.   Who is he?
19      A.   This was Dr. Mathis.
20      Q.   Your personal physician said
21 there wasn't any medical reason -- your
22 personal physician, Dr. Mathis, said there
23 was no reason for you to be off work?

Page 219

1       A.   No medical reason.  He didn't
2  say it wasn't job related.
3       Q.   Well, if there is no medical
4  reason for you to be off work, why do you
5  believe that the company had any
6  obligation to let you off work or change
7  your job in any way?
8       A.   They didn't have to change my
9  job.  All they had to do was give me
10 medical attention to attend -- to take
11 care of the medical injuries that I
12 received on Appleton Wire premises.
13      Q.   How many different doctors did
14 the company pay for you to see for your
15 injuries at work?
16      A.   I really don't know.
17      Q.   Ten, twelve?
18      A.   I haven't a clue.
19      Q.   The company paid for your
20 rotator cuff surgery, didn't they?
21      A.   Yes.
22      Q.   They paid for rehabilitation
23 for your shoulder surgery?

Page 220

1       A.   Yes.
2       Q.   Paid to send you to an
3  orthopedist in Birmingham?
4       A.   But they didn't do anything
5  for me.  The rotator --
6       Q    You mean the doctor didn't?
7       A.   They repaired the rotator
8  cuff.  Nobody repaired my lower back.  My
9  neck was not repaired.  My wrist was not
10 repaired.  I went to Dr. Palmer with Donna
11 Smith.  He told me because he had did
12 surgery on so many of the other people --
13 other ladies, he didn't see it was no good
14 to do it on my wrists.  He didn't say
15 nothing was wrong with my wrist, he just
16 said he didn't have a reason to do it,
17 because he had done it for the other
18 ladies.
19      Q.   Are you telling me that in
20 this case you think somehow the company is
21 responsible for the quality of treatment
22 that you received from licensed doctors in
23 the State of Alabama?

American Court Reporting
toll-free (877) 320-1050

56 (Pages 221 to 224)

---

**Page 221**

1    A.    Yes, sir.
2    Q.    Well, just kind of -- let's
3  start with -- let's start with Jeff Wade,
4  orthopedic surgeon.  The last time I
5  checked, he is chief of staff at Brookwood
6  Medical Center in Birmingham.
7    A.    It doesn't make him --
8    Q.    Let me ask my question.
9    A.    Go on.
10    Q.    Does he work to Albany
11  International?
12    A.    He worked for -- yes.  Yes.
13    Q.    He is employed by the company?
14    A.    No.
15    Q.    Okay.  He is a private
16  practice doctor, right?
17    A.    He was employed with them to
18  take -- to see me.
19    Q.    Are you suing Dr. Wade for the
20  quality of care that he gave you?
21    A.    Not yet.
22    Q.    Are you suing Dr. Katz for the
23  quality of care that he gave you?

---

**Page 222**

1    A.    Not yet.
2    Q.    Are you suing Dr. Mathis?
3    A.    Not yet.
4    Q.    You say not yet.  Do you plan
5  on filing suit against Jeff Wade?
6    A.    I don't know.
7    Q.    Other than Mr. Bryant's
8  apparently failing to properly supervise
9  Jeff Wade and Dr. Katz, and other
10  healthcare professionals, is there
11  anything else that Mr. Bryant did that in
12  any way humiliated you with your
13  employment with Appleton Wire?
14    A.    I don't know about properly
15  supervising them, but he is the personnel
16  manager at Appleton Wire.  And he was
17  responsible for seeing to me -- seeing to
18  the injured people receiving proper
19  medical help.
20    Q.    From whom did you get -- I'm
21  still trying to figure out what it is that
22  a personnel manager -- what is it that you
23  think he didn't do with respect to you

---

**Page 223**

1  getting treated by these doctors.
2    A.    I have to call -- I had to
3  report to him.  He called me and told me I
4  couldn't come in the building.  He was in
5  most of the meetings whenever anything
6  happened, and he was the personnel
7  manager.
8    Q.    Was Mr. Bryant ever rude to
9  you on any occasion?
10    A.    No, he is not.
11    Q.    Did he ever say anything
12  inappropriate to you?
13    A.    No.
14    Q.    Has he ever been anything
15  other than completely polite to you?
16    A.    No.
17    Q.    Okay.  Do you think he did
18  anything to you because you are black?
19    A.    I don't know.
20    Q.    Okay.  Did Mr. Bryant ever go
21  with you on any visit to a doctor?
22    A.    No.  They sent Donna Smith.
23    Q.    And who was Ms. Smith?

---

**Page 224**

1    A.    She was a nurse.
2    Q.    She is actually a medical
3  professional?
4    A.    No.  She was a nurse for
5  Appleton Wire.
6    Q.    Did she work for the company?
7    A.    I assume, yes.
8    Q.    All right.  Did Ms. Smith ever
9  do anything -- Donna Smith ever do
10  anything that humiliated you?
11    A.    Yes.
12    Q.    What did she do?
13    A.    She lied.
14    Q.    She lied?
15    A.    She told me I didn't need a
16  lawyer.  She listened to my complaints,
17  and then she went back and she goes to the
18  doctors before I could get there.  She had
19  already been in, she had already seen the
20  doctor, and when I go, I was just being
21  passed through.
22    Q.    So what is it that Ms. Smith
23  did when she went to see these doctors?

Page 225

1    A.    I have no clue.  She get their
2    late, because sometimes you sit an hour or
3    sometimes two hours before she got there.
4    And then she would go in the back.  They
5    wouldn't call you.  She will go in the
6    back and she will commute with the
7    doctors.  Then when she came out the
8    doctors would call you.  She is already in
9    your room.
10        And when you leave, they
11    wouldn't -- we used to have to bring our
12    reports back to the office.  She would
13    take -- I never received paperwork.  I
14    would never really know my diagnosis.  I
15    wouldn't know anything until one of them
16    -- Ted would call me on the phone and say,
17    "Dora, the doctor said this," or, "Dora,
18    the doctor said that."
19        Q.    Well, while you were in a
20    doctor's offices you had an opportunity to
21    ask the doctor questions, didn't you?
22        A.    I have been told -- especially
23    in Dr. Katz's office -- "No.  We give this

Page 226

1    to Ms. Smith."
2        Q.    Are you telling me Dr. Katz
3    wouldn't talk to you when you were there
4    with a visit?
5        A.    He would talk to me.  But my
6    paperwork -- when we leave, they gave --
7    you know how the doctor give you a slip of
8    paper or give you your diagnosis or give
9    you something letting you know what you
10    was in there for -- he wouldn't give
11    them to me, he gave them to Donna Smith.
12        Q.    While you were in Dr. Katz's
13    office did you have an opportunity to ask
14    Dr. Katz questions about your healthcare?
15        A.    The reason I stopped asking
16    doctors questions --
17        Q.    That wasn't any question.  Did
18    you have an opportunity --
19        A.    I'm going to let you know why
20    anyway.
21        Q.    You can tell me that in a
22    minute.
23        A.    I had the opportunity to, but

Page 227

1    they -- but he -- I had the opportunity,
2    but he would never answer me.  The last
3    time I was in there I was accused of being
4    a problem in his office, because I asked a
5    question.  I stopped asking questions from
6    all of them, because it was a problem
7    asking questions.
8        Q.    What did Mr. Johnston do that
9    you believe humiliated you?
10        A.    You haven't gotten that yet?
11    You are still asking me about
12    Mr. Johnston.
13        Q.    I'm still trying to get a list
14    of what specifically it is Mr. Johnston
15    did that you allege constantly humiliated
16    you.
17        A.    Mr. Johnston have tried to get
18    -- have tried -- anyway, he took my job.
19    He wanted me to promise him that I
20    couldn't -- that I wasn't in pain when I
21    was in constant pain.  He constantly tried
22    to get me fired or fire me.  And you don't
23    see no humiliation there?

Page 228

1        Q.    Did Mr. Johnston ever tell you
2    that you were fired?
3        A.    I don't know whether he did or
4    not.
5        Q.    Did Mr. Bryant ever tell you
6    that you were fired?
7        A.    No.
8        Q.    Did Bob Hampsey ever tell you
9    that you were fired?
10        A.    No.
11        Q.    Did Norma Heath tell you you
12    were fired?
13        A.    No.
14        Q.    The meeting on October the
15    29th, 2003; did anybody in that meeting
16    tell you that you were terminated from
17    Albany International?
18        A.    When he told me he was calling
19    the police on me, I was terminated then.
20        Q.    All right.  He said he was
21    going to call the police.  Did anybody in
22    that meeting tell you that you were
23    discharged from Albany International?

Page 229

1    A.   I don't remember.
2    Q.   Did anybody in that meeting
3  show you any papers?
4    A.   I didn't see any papers.  I
5  saw a sheet of paper where I was
6  constantly being harassed by attendance
7  stuff.  Everytime they got ready to write
8  me up or check -- they would go back
9  through the same attendance day.  I don't
10  even remember the date, because I spent my
11  time trying to forget all of this mess.
12    Q.   Trying to forget all of what
13  mess?
14    A.   This -- what I'm going
15  through.
16    Q.   Trying to forget this lawsuit?
17    A.   No, not the lawsuit.  Trying
18  to hang onto my job.  Trying to work.
19  Trying to get them to treat me like they
20  was treating everybody else, giving them
21  proper medical care.
22    Q.   Name for me other people at
23  the company who got proper medical care.

Page 230

1    A.   Jean Carr, Doris Carter,
2  Shirley Howard, Dottie -- Doris Cooley,
3  Velma Sutton, Bessie Jones.  And there are
4  probably some more, I just can't remember.
5    Q.   We will talk about that
6  document in a minute.  You can hang on to
7  it for a second.
8         Did you ever go on any visits
9  with Doris Carter to any doctor for any
10  reason?
11    A.   No.
12    Q.   What medical treatment was
13  Ms. Carter provided by Albany
14  International?
15    A.   They didn't -- they didn't
16  take her off a job.  They didn't send her
17  out wondering did she have a job.  They
18  didn't make sure that -- I worked -- they
19  didn't give voided checks on payday.
20    Q.   When did you get a voided
21  check?
22    A.   Almost three months I got a
23  voided check, because that is what they

Page 231

1  would send me, a voided check where I
2  wasn't being paid.
3    Q.   Were you working?
4    A.   They took me off the job.
5    Q.   Were you working?
6    A.   No.
7    Q.   You didn't clock in or clock
8  out for any hours at the company?
9    A.   No.
10    Q.   So why would the company owe
11  you any money if you didn't do any hours
12  of work?
13    A.   They didn't allow me to clock
14  in and out.  They pulled my time card.
15    Q.   Now, Doris Carter, did she get
16  hurt at work?
17    A.   Yes.  She had gotten hurt at
18  work on several occasions.
19    Q.   On this occasion where you
20  think they got her proper medical
21  treatment but were denying you proper
22  medical treatment, what were they treating
23  Ms. Carter for?

Page 232

1    A.   I don't know.
2    Q.   How do you know what kind of
3  treatment they gave her?
4    A.   Because, like I said, no one
5  lost their job behind work injuries but
6  me.
7    Q.   Do you know what Ms. Carter
8  was being treated for?
9    A.   No.
10    Q.   Do you know when she received
11  this treatment?
12    A.   It was during the same time
13  that I was, but I don't know what doctor
14  she was going to.
15    Q.   Do you know what she was being
16  treated for?
17    A.   No.
18    Q.   You don't know which doctor?
19    A.   No.
20    Q.   Do you know if her doctor
21  released her to work with no restrictions?
22    A.   No.
23    Q.   Shirley Howard, when was she

**American Court Reporting**
**toll-free (877) 320-1050**

59 (Pages 233 to 236)

## Page 233

1 being treated by a doctor provided by the
2 company?
3     A.    I think both of her wrists she
4 had surgery, and I think her lower back.
5 She even laughed at me. She said --
6 before she retired, she said, "Dora, you
7 mean to tell me all this time they are not
8 helping you, they are not giving you any
9 medical help." And she told me she had
10 received her --
11     Q.    Received what help?
12     A.    I think she had back surgery.
13 I'm not for sure.
14     Q.    She received what help?
15     A.    From the company. Medical
16 help.
17     Q.    What kind of medical help?
18     A.    For injuries. Both wrists.
19 Whatever you call it. Carpal tunnel
20 syndrome and lower back, I believe.
21     Q.    All right. Did she file
22 Workers' Comp claims for her wrists?
23     A.    Yes.

## Page 234

1     Q.    Was she treated by some doctor
2 provided by the company?
3     A.    Dr. Palmer was the one who
4 told me he had treated the other women.
5     Q.    Do you know if Dr. Palmer
6 treated Ms. Howard?
7     A.    Yes.
8     Q.    How do you know that?
9     A.    I believe that's who she told
10 me. I think Dr. Palmer -- yeah, that was
11 the doctor, Dr. Palmer.
12     Q.    Do you know what treatment
13 Dr. Palmer gave Ms. Howard?
14     A.    Carpal tunnel syndrome.
15     Q.    Do you know what specific
16 treatment he gave her for her injury?
17     A.    Surgery.
18     Q.    Did she come back to work
19 after the surgery?
20     A.    Yes.
21     Q.    Do you know if he placed her
22 on any type of restrictions?
23     A.    I believe so.

## Page 235

1     Q.    What were her restrictions?
2     A.    Probably -- well --
3     Q.    Do you know what?
4     A.    Filing -- I will tell you what
5 I saw. I saw them filing -- something of
6 that sort.
7     Q.    And how long did she file?
8     A.    I don't know.
9     Q.    What was her normal job?
10     A.    Seaming operator.
11     Q.    Did Ms. Howard go back to
12 being a seaming operator?
13     A.    Yes.
14     Q.    And then she subsequently
15 retired?
16     A.    Yes.
17     Q.    Do you know if the company
18 provided the doctor who treated her for
19 carpal tunnel?
20     A.    Yes.
21     Q.    Do you have some idea of why
22 it is that the company would have provided
23 qualified medical care for these other

## Page 236

1 individuals and would not have provided
2 you quality medical care?
3     A.    Discrimination.
4     Q.    For what reason?
5     A.    I have no clue.
6     Q.    Do you think that they -- the
7 company somehow intentionally picked poor
8 quality doctors because you are black?
9     A.    I don't know why they -- be
10 honest with you, a lot of times they
11 didn't -- the company didn't pick the
12 doctor. Donna picked the doctors.
13     Q.    So you think Donna was
14 intentionally sending you --
15     A.    I told Donna --
16     Q.    Do you think Donna was picking
17 doctors -- intentionally picking lower
18 quality doctors for you for discriminatory
19 reasons?
20     A.    I won't say that the doctors
21 was lower quality doctors. I just believe
22 she picked doctors that would do her
23 favors.

**www.AmericanCourtReporting.com**
**May 12, 2006**

Page 237

1    Q.    That would do what; say there
2  wasn't anything wrong with you so you
3  could go to work?
4    A.    Yes.  I believe that.
5    Q.    Did any doctor ever tell you
6  that they were doing her a favor and were
7  intentionally, in spite of knowing that it
8  was wrong, giving false medical testimony
9  on your part?
10    A.    No, they never told me.
11    Q.    Are you accusing Dr. Katz of
12  doing that?
13    A.    Yes.
14    Q.    Are you accusing Dr. Wade of
15  doing that?
16    A.    Yes, sir.
17    Q.    Any other doctors that you are
18  accusing of intentionally providing the
19  company false information about your
20  physical condition?
21    A.    I want to tell you about
22  Dr. Miller.  Dr. Miller -- he gave me a
23  nerve damage test.  And when he did the

Page 238

1  nerve damage test, he would stick me and
2  he wouldn't get a response.  Then he would
3  take the needle and just poke it in me.
4  And I would just lay there and tremble and
5  let them know the excruciating pain I was
6  in.  He didn't do anything but just finish
7  the test.
8    Q.    Who is Dr. Miller?
9    A.    Caudill Miller.  He was one of
10  Donna's picked doctor.
11    Q.    What did Dr. Miller treat you
12  for?
13    A.    Nerve damage.  He was a
14  neurologist or neuro something.
15    Q.    When --
16    A.    In the process I received two
17  nerve damage tests.
18    Q.    What process?
19    A.    Lower extremity the first
20  time, upper and lower extremities the
21  second time.
22    Q.    What year?
23    A.    2001, 2002.  Some of those

Page 239

1  times.
2    Q.    So Dr. Miller is on the list
3  of your treating doctors that you are
4  alleging intentionally gave the company
5  misleading information about your physical
6  condition?
7    A.    Let me -- he is on the list.
8  Let me tell you about Dr. Garrison.  I
9  went to him -- the first time I went to
10  Dr. Garrison, this -- I have a -- I have
11  proof.  I have a witness.  He -- when I
12  got there, the nurse, Karen, told them
13  that this is not job related.  So if you
14  are going to a doctor's office and before
15  you get -- if they see you coming, they
16  decide that it is not job related, what
17  kind of -- what kind of care do you expect
18  to get.
19    But the second visit, he told
20  me, Dora -- he told me -- he gave me some
21  generics.  I don't know the list.  He gave
22  me three different medicines, generic.  He
23  told me to go to the generic store and get

Page 240

1  these and take these.  He told me to run
2  four miles, and when I start dragging my
3  leg to come back and see him.
4    Q.    When did you go see
5  Dr. Garrison?
6    A.    This was 2003.  This was at
7  the end -- coming into the end.
8    Q.    Was he one of your Workers'
9  Comp doctors?
10    A.    He was a Workers' Comp doctor.
11    Q.    Had you ever been to
12  Dr. Garrison before?
13    A.    No.
14    Q.    First time you had ever been
15  there?
16    A.    Yes.  The first time I went,
17  it was the nurse.  The second time I went,
18  it was Dr. Garrison.  Donna Smith was at
19  his visits.
20    Q.    What kind of doctor is
21  Dr. Garrison?
22    A.    Industrial something --
23  medicine.

**toll-free (877) 320-1050**

Page 241

1      Q.    Did he give you a functional
2  capacity exam; is that what he did?
3      A.    I don't remember.
4      Q.    All right.  So we have got
5  Dr. Wade, Dr. Katz, Dr. Miller, and
6  Dr. Garrison, all of whom somehow you
7  claim gave either false or, at least,
8  misleading medical information about you
9  to the company?
10     A.    I don't know what kind of
11 information they gave to the company.  I
12 know how I was treated in their office.
13     Q.    All right.  Let's talk about
14 that.
15           (WHEREUPON, a document was
16 marked as Defendant's Exhibit 9 and is
17 attached to the original transcript.)
18     Q.    We have marked this as
19 Defendant's Exhibit 9.
20     A.    All right.
21     Q.    Whenever you are done looking
22 through it, you just let me know.
23     A.    I'm okay.  I was just looking.

Page 242

1      Q.    Have you had a chance to
2  review what has been marked as Exhibit 9
3  to your deposition?
4      A.    Yes.
5      Q.    Do you recognize this?
6      A.    I don't know whether I do or
7  not.
8      Q.    All right.  Who is Ed Kelly?
9      A.    He was a department
10 supervisor.
11     Q.    Seaming?
12     A.    Yes.
13     Q.    Would he have come after
14 Barbara Smith as the supervisor in
15 seaming?
16     A.    He was the supervisor for
17 finishing.  So we didn't have a
18 permanent -- we only had one supervisor
19 for the seaming, and they only worked day
20 shift.  The supervisor from finish would
21 come back and check on it or they were
22 responsible for seaming if we was on
23 second or third shift.

Page 243

1      Q.    All right.  Do you recall
2  reviewing this document with -- it looks
3  like Norma Heath and Mr. Kelly?
4      A.    I remember.
5      Q.    You do recall reviewing this
6  document with Ed Kelly?
7      A.    Ed Kelly -- I remember -- I
8  think I remember, yeah.
9      Q.    All right.  I see attached to
10 this what looks like a printout, two
11 pages, called an attendance report.  Do
12 you see that?
13     A.    Yes.
14     Q.    Did you ever see one of these
15 while you worked for the company?
16     A.    Yes.
17     Q.    Now, this has got your name,
18 Dora Davis.  Is that your employee number?
19     A.    Let's see.  Yes.
20     Q.    Zero zero eight nine one?
21     A.    I just remember eighty-nine.
22 I used eighty-nine.
23     Q.    And this looks like a list of

Page 244

1  all of your absences from work from August
2  the 22nd, 2003, back to August the 29th,
3  2002.  Does that look like what it is?
4      A.    I don't -- I see the dates.  I
5  see the review.  I don't remember exactly
6  when I was off and what.
7      Q.    Fair enough.  If you could
8  remember every one of your absences over a
9  twelve-month period, I would be impressed.
10           I see on here, though -- I
11 just want to ask you some -- just a few
12 questions about what is noted on here.  I
13 see some -- clearly some dates on here
14 where you are out that says Workmans'
15 Comp, correct?
16     A.    Yes.
17     Q.    And there is a column over
18 here and it says number of occurrences.
19 Do you see that column?
20     A.    Yes.  Yeah.
21     Q.    So if I am reading this
22 correctly, it looks like if you were out
23 for Workers' Comp you were not charged an

Page 245

1    occurrence; is that correct?
2        A.    That's right.
3        Q.    You were not getting an
4    occurrence under the company attendance
5    policy that could ultimately result in
6    discharge?
7        A.    Yes.
8        Q.    All right.  I also see some
9    dates on here -- it looks like three days
10   in September of 2002 where you were out on
11   family medical leave.  Do you see those?
12       A.    Yes.
13       Q.    And then there are some that
14   look like in November of '02 and then some
15   others spread out over the dates.  Is
16   there any specific instance where -- how
17   did you go about getting family and
18   medical leave at Albany?
19       A.    These occasions I had to -- I
20   had to have gone to a doctor and he took
21   me off work for some reason.  I don't
22   remember the reason.
23       Q.    Okay.  Fair enough.  Did you

Page 246

1    have to go to Linda Jones or Ted Bryant to
2    get family medical leave at Albany?
3        A.    Yes.
4        Q.    Could you go to either
5    Mr. Bryant or Ms. Jones, or who did you go
6    to?
7        A.    We went to Ms. Jones.  We only
8    went to Ted if Ms. Jones wasn't available.
9        Q.    Any occasion that you recall
10   where you asked for family medical leave
11   that the company said no?
12       A.    The only time is when I asked
13   for family leave and you -- the only
14   reason you received it was because a
15   doctor would take you off.  When I was in
16   a lot of pain, I would say, look, would --
17   I have asked them to allow me to heal, and
18   I was never granted that.
19       Q.    Well, on the occasions where
20   you asked them to give you time off to let
21   you heal, did a doctor tell the company
22   there was a medical reason that you needed
23   to be out of work?

Page 247

1        A.    No.
2        Q.    Is there any instance where
3    you asked for family medical leave from
4    Albany, backed up by a doctor's
5    representation that you needed to be off,
6    that Albany denied the request?
7        A.    No.
8        Q.    All right.  Now, we are done
9    with that one.
10           During this meeting on October
11   the 29th -- I have only got one other copy
12   of that.  Just take a minute and read over
13   that.
14           (Pause)
15       Q.    Have you had a chance to look
16   over what we are going to mark as Exhibit
17   10 to your deposition.
18           (WHEREUPON?  A document was
19   marked as Defendant's Exhibit 10 and is
20   attached to the original transcript.)
21       A.    Not yet.
22           Okay.
23       Q.    Have you ever seen that

Page 248

1    before?
2        A.    Yes.  I believe so, yes.
3        Q.    When did you see it?
4        A.    September the 29th.
5        Q.    September or October?
6        A.    October.  Sorry.
7        Q.    That's all right.
8            Who showed you this document?
9        A.    I believe Ted did.
10       Q.    Was this during the meeting on
11   October the 29th with Bob Hampsey, Norma
12   Heath, Jeff Johnston, Mr. Bryant, and
13   yourself?
14       A.    Yes.
15       Q.    Okay.  As I read this, it
16   appears to me to simply be sort of a
17   summary for you of where you stand under
18   the company's attendance policy.  I mean,
19   did this memo in any way result in any
20   disciplinary action against you?
21       A.    Yes.
22       Q.    What discipline was taken
23   against you because of this memo?

**Page 249**

1    A.    It's a warning.
2    Q.    Well, does this document
3    constitute a warning under the attendance
4    policy?
5    A.    Any time you were -- you were
6    -- this was called to your attention, and
7    they, you know, reminded you of your
8    attendance, it was a warning, but it was a
9    verbal.
10    Q.    Okay. I see at the last typed
11    paragraph, "We value your years of service
12    with our company and it is our sincere
13    hope that your future attendance record
14    stay within the acceptable guidelines of
15    our plant attendance policy."
16    A.    Yes.
17    Q.    That doesn't sound like to me
18    that they want to do anything other than
19    make sure you don't accrue enough
20    occurrences to lose your job. I mean, am
21    I missing something in this document? It
22    appears to me that this is just to remind
23    you where you are on the attendance

**Page 250**

1    policy.
2    A.    There was a -- this is part of
3    a constant harassment. I mean, they put
4    this here to all sound pretty. When you
5    are going through all of this -- the
6    warnings and the verbal -- the verbal
7    warnings, the written warnings, it is
8    constant harassment.
9    Q.    You mean receiving an
10    attendance warning constitutes harassment?
11    A.    Yes, because, see -- see, in
12    these you got a warning not year-to-year,
13    you got it year-to-date. It was like you
14    didn't do twelve years -- twelve days a
15    year, you did it year-to-date. It is like
16    before a day could come off it was half
17    into another year. It was like from 2001
18    to 2002. It was like September, 2001,
19    till September, 2002. This was a constant
20    -- like, for instance, this one right
21    here, November 8, 2002 --
22    Q.    Right.
23    A.    -- I had received probably

**Page 251**

1    about three warnings because of that
2    date. And I constantly -- everytime they
3    would give me a warning, I would remind
4    them that that was a visit to the
5    emergency room.
6    Q.    It looks like here they
7    removed a warning from your file because
8    they determined that one absence shouldn't
9    have counted against you. It looks like
10    they took a warning out. Isn't that what
11    they did?
12    A.    They took it out. This was
13    after -- I had been constantly warned on
14    this day at least three times or more.
15    Q.    But this says -- and you
16    agree -- that they took that warning out
17    of your record?
18    A.    They say they took it out.
19    Q.    All right. You were subject
20    to the same attendance policy as every
21    other employee in the Montgomery plant?
22    A.    Yes, I guess.
23    Q.    Do you have any indication

**Page 252**

1    that the policy was applied to you any
2    differently than the way it was applied to
3    any other employees in Montgomery?
4    A.    I have no clue.
5    Q.    Okay. We have marked this as
6    Exhibit 10.
7         Now, during this meeting on
8    October 29 -- let me put a sticker on
9    that.
10         (WHEREUPON, a document was
11    marked as Defendant's Exhibit 11 and is
12    attached to the original transcript.)
13    Q.    We have marked that Exhibit
14    11. Just read over it and let me know
15    when you have had a chance to look at it.
16         (Pause)
17    Q.    Have you had a chance to look
18    over what we have marked as Exhibit 11?
19    A.    Yes.
20    Q.    Have you ever seen that
21    document before?
22    A.    Yes.
23    Q.    All right. When did you see

Case 2:05-cv-01040-WKW-SRW   American Court Reporting 9/2006   Page 64 of 107
American Court Reporting
toll-free (877) 320-1050

64  (Pages 253 to 256)

Page 253

1    it?
2        A.    October the 29th.
3        Q.    Who gave it to you?
4        A.    Ted Bryant, I assume.
5        Q.    Anywhere in the text of this
6    letter did anybody at the company tell you
7    you were discharged?
8        A.    No.
9        Q.    Were you allowed to keep a
10   copy of this letter after that meeting?
11       A.    I don't remember.
12       Q.    Okay. I see on the second
13   page, next to last paragraph, it looks
14   like the company is offering to allow you
15   to remain on inactive status for some
16   period of time while you try to resolve
17   your medical issues. Do you see that?
18       A.    I see that.
19       Q.    Is something unfair about -- I
20   mean, the way this letter reads to me,
21   Ms. Davis, Mr. Bryant, Mr. Johnston and
22   the folks at Albany were bending over
23   backwards to try to find a way to

Page 254

1    accommodate your doctor saying that you
2    could work and you saying you were in
3    pain.
4        A.    It's like I say, I knew
5    nothing about an inactive status. I was
6    taken off the job.
7             Secondly, it was not my
8    doctors. I was going to doctors that they
9    assigned me to, which they knew that I was
10   there unhappy with, because no one was
11   doing anything for me.
12            When I got to that building, I
13   was told by Jeff Johnston he was going to
14   have me arrested.
15       Q.    When you got there --
16       A.    In this meeting. In this
17   meeting. I was told by Jeff Johnston he
18   was going to call the police on me.
19       Q.    Why was he going to call the
20   police on you?
21       A.    Because I wasn't agreeing to
22   the -- him. I didn't say what he liked.
23   He telling me that I would have to say

Page 255

1    that I was not in pain. He was telling me
2    that I needed to go get a doctor to take
3    me off. In terms I was telling him, "You
4    give me a doctor that will take me off. I
5    don't have a doctor that will take me
6    off."
7        Q.    During this meeting on October
8    the 29th, 2003, you resigned from Albany.
9        A.    No, I did not.
10       Q.    You didn't?
11       A.    No.
12       Q.    You didn't tell anybody at the
13   company you were resigning?
14       A.    No. I told them that I was
15   applying -- I had applied for my state
16   disability.
17       Q.    And what did you want them to
18   do, just leave you off work waiting on the
19   results of that?
20       A.    No. I wanted them to send me
21   to a reputable doctor and get me some
22   medical help. Attend to the lower disks,
23   the four disks in my lower back, the four

Page 256

1    disks in my neck, my wrists, and this
2    rotator tear scar tissue.
3        Q.    Who qualifies as a reputable
4    doctor?
5        A.    I have no clue.
6        Q.    Do you think board
7    certification is an indication of the
8    quality of a doctor?
9        A.    I don't know what they do.
10       Q.    Well, I mean, you wanted them
11   to send you to another doctor. As far as
12   I can tell from your testimony and your
13   record, they -- the company, over the
14   course of about fifteen years, had sent
15   you to a lot of doctors --
16       A.    True.
17       Q.    -- for a lot of treatment.
18            I'm trying to determine what
19   it is that you think Mr. Bryant and
20   Mr. Johnston on October the 29th, 2003,
21   still owed you in the way of medical
22   treatment.
23       A.    They did not correct the

Page 257

1  injuries. They were not corrected. The
2  four disks in my neck is still hurting me,
3  the lower back is still hurting me, the
4  wrists are still hurting me. I can barely
5  use this hand. I can't stand for it to
6  touch anything. So nothing went away.
7  The shoulder -- I'm still dropping
8  things. I'm still burning my hands when I
9  attempt. I can't open a jar.
10     Q.   I will mark this as Exhibit
11  12. Take a look at that for me.
12         (WHEREUPON, a document was
13  marked as Defendant's Exhibit 12 and is
14  attached to the original transcript.)
15     A.   I don't remember this.
16     Q.   You have had a chance to look
17  over what we have marked as Exhibit 12?
18     A.   Yes.
19     Q.   Okay. Are you saying that you
20  don't remember that document?
21     A.   I don't remember that.
22     Q.   Look down there next to
23  employee's comments; is that your

Page 258

1  signature?
2     A.   That's my signature.
3     Q.   Even though you recognize your
4  signature, you just don't remember
5  receiving this document?
6     A.   No. I have never seen that
7  before.
8     Q.   Well, how do you figure your
9  signature got on it?
10     A.   I don't know. Ask them.
11     Q.   Are you accusing Mr. Bryant of
12  forging your signature?
13     A.   He didn't forge my signature.
14  But he didn't fill that paperwork out on
15  my behalf -- in my presence.
16     Q.   How do you think your
17  signature got on there?
18     A.   I guess he -- I signed papers
19  after the fact -- before the fact.
20     Q.   Before what fact?
21     A.   Before he filled those papers
22  out.
23     Q.   You don't recall seeing this

Page 259

1  document at all?
2     A.   I have never seen this.
3     Q.   Okay. Do you ever recall
4  seeing a document that looks like that?
5     A.   I don't remember this.
6     Q.   It is referenced on the first
7  line of Exhibit 12, Voluntary Resignation
8  Form.
9     A.   This --
10     Q.   No. Exhibit --
11     A.   I know what you said. I'm
12  fixing to tell you what I'm confused
13  with.
14         This is the only sheet of
15  paper I saw. I never saw those two piece
16  of paper. When I left there I was told by
17  Ted Bryant, "We are going to send you some
18  documents." I have not seen those
19  documents. When I saw a document -- I got
20  a letter in the mail -- a certified letter
21  in the mail telling me -- I don't even
22  exactly know what it was. I have never
23  seen these papers before.

Page 260

1     Q.   You got a certified letter in
2  the mail?
3     A.   Telling me something about
4  termination.
5     Q.   Something about --
6     A.   That I was terminated.
7     Q.   You said you got a letter that
8  said you were fired?
9     A.   I was terminated. It's on
10  that sheet. I called -- who did I call --
11  I called somebody and asked them, "Okay,
12  what does termination mean." I asked them
13  what did termination mean. I told them
14  give me all of their definitions of
15  terminated.
16     Q.   Who did you call? Did you
17  call somebody in New York, somebody in
18  Montgomery? Where were they?
19     A.   I called New York once, too,
20  but I didn't get any response from New
21  York. I called -- I called -- it had to
22  be either -- if it wasn't the employment
23  office, it was -- the worker's division.

Case 2:05-cv-01040-WKW-SRW American Court Reporting 07/19/2006 Page 66 of 107
**American Court Reporting**
**toll-free (877) 320-1050**

66 (Pages 261 to 264)

Page 261

1    Somebody I called.  I don't remember
2    exactly who I called.
3        Q.   I'm just going to attach this
4    as Exhibit 13 to your deposition.
5            (WHEREUPON, a document was
6    marked as Defendant's Exhibit 13 and is
7    attached to the original transcript.)
8        Q.   You said that you got a
9    certified letter.
10           (WHEREUPON, a document was
11   marked as Defendant's Exhibit 14 and is
12   attached to the original transcript.)
13       Q.   Is that the letter that you
14   are referring to?
15       A.   Yes.
16       Q.   All right.  Do you know -- do
17   you recognize the signature on that
18   document?
19       A.   No.
20       Q.   Do you know anybody named
21   Linda Forget?
22       A.   No.
23       Q.   Any reason to believe that

Page 262

1    Ms. Forget ever did anything to you
2    because of your race?
3        A.   I have no clue.
4        Q.   All right.  If I read this
5    right, this looks like it is simply a
6    letter explaining to you what your
7    retirement benefits are from the company.
8        A.   The second paragraph.
9        Q.   Did Mr. Johnston ever yell at
10   you?
11       A.   Yes.
12       Q.   When?
13       A.   Separate occasions.
14       Q.   List them for me.
15       A.   The last one when he
16   threatened to call the police on me.
17       Q.   Okay.  So we have got he
18   shouted at you on October the 29th of
19   2003.  Are there any other occasions?
20       A.   When he told me to go in the
21   office -- see him in the office.
22       Q.   All right.  That's two.  Any
23   other occasions?

Page 263

1        A.   One time I was working the
2    machine and this woman left a banana peel
3    on the table.  I asked her to move it
4    off.  He told me to take it off.
5        Q.   Any other occasions where
6    Mr. Johnston shouted or yelled at you?
7        A.   Mostly these meetings -- those
8    meetings that I would go to.
9        Q.   Did he ever use any profanity
10   in your presence?
11       A.   I don't think so.
12       Q.   Ever use abusive language?
13       A.   Well, I felt it was abusive
14   when he accused -- wanted to call the
15   police on me.
16       Q.   Okay.
17       A.   When he told me to get the
18   banana peel.
19       Q.   He didn't actually call the
20   police on you, did he?
21       A.   No, he didn't.
22       Q.   Did anybody at Albany ever
23   have you arrested for any reason?

Page 264

1        A.   No.
2        Q.   The banana peel, when did that
3    happen?
4        A.   It was earlier.  I don't know
5    exactly the year or the date.  I came in
6    behind a woman and I had to clean up for
7    her.  I constantly reminded him that this
8    person was leaving filth.  One of our job
9    descriptions is that you clean up your
10   area.  And I went -- everytime -- I had to
11   clean up behind her.
12           So this one morning he came --
13   I believe he was a department manager.  He
14   came to the department.  I asked him -- I
15   asked him to ask her to clean up behind
16   herself, and he told me to remove the
17   banana peel.
18       Q.   Who was the employee who left
19   the banana peel?
20       A.   It was Evelyn Morgan.
21       Q.   And at the time of this banana
22   peel incident, Mr. Johnston was the
23   seaming department manager?

Page 265

1    A.    I think so.
2    Q.    After Mr. Johnston asked you
3  to move the banana peel, did you go talk
4  to Mr. Bryant in Human Resources?
5    A.    No.
6    Q.    Did you try to contact George
7  Kazalay about it?
8    A.    No.
9    Q.    We have got one handy. I will
10 mark this as Exhibit 15.
11         (WHEREUPON, a document was
12 marked as Defendant's Exhibit 15 and is
13 attached to the original transcript.)
14    Q.    Here is what I want to do.
15 I'm just -- your lawyers have provided me
16 the names of some folks who may have
17 information related to your case. I kind
18 of want to go through these folks and see
19 who they are and see what it is you think
20 they know.
21         Who is Glenda Missildine?
22    A.    She used to work for the
23 company.

Page 266

1    Q.    What did she do?
2    A.    She was a seamer.
3    Q.    And did you work with
4  Ms. Missildine in the seaming department?
5    A.    Yes.
6    Q.    And you say she used to work
7  for the company. Is she gone?
8    A.    Yes.
9    Q.    Was she gone before you were?
10    A.    Yes.
11    Q.    Do you know how far in advance
12 of your departure from Albany
13 Ms. Missildine left?
14    A.    I don't know exactly.
15    Q.    I mean, any idea? A year, two
16 years, five years?
17    A.    Maybe about five years, I
18 guess. I don't know.
19    Q.    She has been gone about five
20 years or she left about five years before
21 you did?
22    A.    Left about five years before.
23    Q.    All right. And

Page 267

1  Ms. Missildine, what is her race?
2    A.    White.
3    Q.    And what is it that you
4  believe Ms. Missildine may know about your
5  claims in this case?
6    A.    She and I worked close
7  together, and we was always helping each
8  other out. But in reference to Glenda,
9  her situation and my situation is similar.
10    Q.    In what way?
11    A.    They just did her the same
12 way. She just got out of the plant. They
13 dismissed her.
14    Q.    So it's your belief that the
15 company treated Ms. Missildine the same
16 way it treated you?
17    A.    If not, close.
18    Q.    Okay. Did she also have
19 workplace injuries?
20    A.    Yes.
21    Q.    And she was then moved out of
22 the company; is that your belief?
23    A.    Yes.

Page 268

1    Q.    Okay. Have you spoken to her
2  at all since she left the company?
3    A.    Yes.
4    Q.    Do you keep in touch with her?
5    A.    I haven't talked to her in a
6  long time.
7    Q.    Okay. Have you talked to her
8  about this lawsuit at all?
9    A.    Yes.
10    Q.    All right. When did you do
11 that?
12    A.    When I filed it.
13    Q.    When you filed the federal
14 court lawsuit, the state court lawsuit?
15    A.    Both lawsuits.
16    Q.    Okay. Do you have a phone
17 number for her? Do you know how to reach
18 her?
19    A.    Phone book. I have to look in
20 the phone book.
21    Q.    What did you tell her about
22 your lawsuit?
23    A.    I just told her that -- the

Page 269

1    things that I had gone through.  And I
2    told her -- I asked her would she be a
3    witness.
4        Q.    All right.  Did you tell her
5    that you were suing the company?
6        A.    Yes.
7        Q.    Did you tell her you were
8    suing Jeff Johnston?
9        A.    No.  No, I didn't.
10       Q.    Okay.  Jerelene Forest, who is
11   she?
12       A.    She was a co-worker.
13       Q.    And Ms. Forest's race is?
14       A.    Black.
15       Q.    She was also a seamer?
16       A.    Yes.
17       Q.    Was she still with the company
18   at the time you left?
19       A.    No.
20       Q.    And how far in advance of your
21   departure from Albany did Ms. Forest
22   leave?
23       A.    It was some months.  I don't

Page 270

1    know how many months, but it was months.
2        Q.    Do you know why she left the
3    company?
4        A.    First she went off with both
5    wrists.  She had surgery on both wrists.
6    And then personal illness.
7        Q.    Do you know what the nature of
8    that illness was?
9        A.    I don't know.
10       Q.    What is it that you believe
11   Ms. Forest knows that relates to your
12   case?
13       A.    She can attest to everything
14   that I have told you today.  Almost
15   everything.
16       Q.    Did --
17       A.    She has been a witness, and --
18       Q.    She has been a witness to
19   which events?
20       A.    All of them except for the
21   October 29th situation.
22       Q.    Did she go on the doctor
23   visits with you?

Page 271

1        A.    No, she didn't go on no
2    doctors' visits.
3        Q.    All right.  Did Ms. Forest
4    ever tell you that she believed that she
5    was in any way treated differently by
6    anybody at Albany?
7        A.    Yes.
8        Q.    Who?
9        A.    I don't remember names, but it
10   has been brought up.
11       Q.    When did she bring that up to
12   you?
13       A.    Throughout the years.
14       Q.    Anything in particular that
15   you recall her mentioning?
16       A.    Discrimination, prejudice.
17       Q.    Was Ms. Forest already
18   employed at Albany when you were hired in
19   1979?
20       A.    Yes.
21       Q.    And do you recall any specific
22   person at Albany that Ms. Forest said that
23   she thought was prejudiced?

Page 272

1        A.    She told me that all of them
2    was prejudiced.
3        Q.    Everybody in the plant?
4        A.    She told me that all of them
5    was prejudiced.  That's just -- that's
6    what she said.
7        Q.    Did she explain who them was?
8        A.    No.
9        Q.    So does that mean everybody
10   else that worked in the plant?
11       A.    I don't know.
12       Q.    All right.  Did she tell you
13   specifically what she meant when she was
14   talking about discrimination?
15       A.    Because she had problems with
16   wire assignments.  She was one of the
17   better operators.  She would be placed in
18   areas to work fabrics that others didn't
19   want to work.  She heard racial slurs.
20   She felt that it was a discriminatory, if
21   I am saying it right, practice in the
22   plant about -- against blacks and whites.
23       Q.    What practice?

toll-free (877) 320-1050

Page 273

1    A.    Favorable wire assignments,
2  hiring positions.  A black person can only
3  go this far, and that was it.
4    Q.    You mentioned that Ms. Forest
5  had some knowledge of racial slurs.  Did
6  you ever -- while you were in Ms. Forest
7  presence, did you ever hear any racial
8  slurs in the plant?
9    A.    Yes, because during the time
10  -- I'm trying to think.  Well, in the
11  seaming department, she would be familiar
12  like with most -- I can't speak for
13  Ms. Forest.  You know, I can't speak for
14  Ms. Forest.
15    Q.    Did she ever tell you what
16  racial slurs she came to have heard in the
17  plant?
18    A.    Yes.
19    Q.    What did she tell you?
20    A.    Niggers.  What is it --
21  something about the gators.  Just
22  different things.  Gator bait.  Different
23  stuff.

Page 274

1    Q.    Did she tell you who she had
2  heard use the term "Nigger"?
3    A.    She -- well, for one person --
4  I believe it was Dottie.  It was Dottie.
5    Q.    Do you remember Dottie's last
6  name?
7    A.    Brown or Hassell.  I guess
8  those are the only two she had.
9    Q.    Did she tell you ever hear Dottie
10  use that term?
11    A.    Let's see.  I don't exactly
12  remember.  You know, I don't exactly
13  remember.  I know I have heard of it, but
14  I don't remember.
15    Q.    As you sit here today, you
16  have no specific recollection of hearing
17  somebody use the term "Nigger" during your
18  employment with Albany?
19    A.    I can't say that.  I can't put
20  a finger on when I heard these terms, but
21  I have heard that term.
22    Q.    All right.  When did Jerelene
23  tell you that she had heard somebody use

Page 275

1  the term "Nigger"?
2    A.    It's been awhile.  I can't
3  tell you when, what time, or how.  But
4  it's been awhile.
5    Q.    Awhile meaning ten years,
6  fifteen years?
7    A.    It hadn't been fifteen years.
8  It hasn't been ten years.  It's maybe five
9  or six years, something like that.
10    Q.    She said that she heard it in
11  the last five or six years, or she told
12  you that five or six years ago?
13    A.    It had to be a sooner time
14  that she told me.
15    Q.    Who is Katherine Davis?
16    A.    Another co-worker.
17    Q.    Is she black or white?
18    A.    She is black.
19    Q.    Also a seamer?
20    A.    Yes.
21    Q.    Was she already with Albany
22  when you got heard?
23    A.    Yes.

Page 276

1    Q.    Was Glenda Missildine already
2  with Albany when you were hired?
3    A.    Yes.  She had been, but then
4  she came back.  She had been and came
5  back.
6    Q.    All right.  Katherine Davis,
7  was she still employed when you left the
8  company?
9    A.    Yes.
10    Q.    Does she still work for the
11  company?
12    A.    No.
13    Q.    Okay.  What is it that you
14  believe Ms. Davis knows about your claims
15  in this case?
16    A.    I don't know.
17    Q.    Have you ever talked to her
18  about your lawsuit?
19    A.    Yes.
20    Q.    Did you call each -- well, did
21  you call Jerelene Forest about your
22  lawsuit?
23    A.    Yes.

Case 2:05-cv-01040-WKW-SRW    American Court Reporting    Document 30-4    Filed 07/20/2006    Page 70 of 107
toll-free (877) 320-1050

70 (Pages 277 to 280)

Page 277

1      Q.    So you talked to Ms. Forest
2   about your case?
3      A.    Yes.
4      Q.    Did you talk to Katherine
5   Davis about your case?
6      A.    Yes.
7      Q.    During the time that Ms. Davis
8   was employed with the company, did
9   Ms. Davis report to you that she thought
10  that she had been treated differently than
11  any other employees because of her race?
12     A.    Yes.
13     Q.    Who?
14     A.    She has told me that she feels
15  like she has been treated different
16  because of race.
17     Q.    When did she tell you that?
18     A.    I really can't say exactly
19  when, but she have.
20     Q.    Do you remember -- did she
21  describe for you how it is that she had
22  been treated differently?
23     A.    I remember one time it was --

Page 278

1   she was lead, and they placed a white
2   person over her.  She had been lead,
3   because she trained me.  And they placed
4   -- they took the lead -- the company --
5   whoever was supervisor or the department
6   manager took the lead job from her and
7   gave it to a white person, who was Letha
8   Arnold.
9      Q.    When did that occur?
10     A.    This has been a long time.
11  Letha has been gone a long time.
12     Q.    1980s?
13     A.    Probably, yeah.
14     Q.    Other than this occasion in
15  the 1980s where Ms. Davis was -- Letha was
16  substituted as the lead in place of
17  Ms. Davis, any other examples Ms. Davis
18  ever gave you where she thought she was
19  treated differently?
20     A.    I don't remember.
21     Q.    Did Ms. Davis ever tell you
22  that she had heard any racial slurs in the
23  plant?

Page 279

1      A.    I don't know.
2      Q.    Dorothy Collins, did she go by
3   Dot?
4      A.    Dot.
5      Q.    White or black?
6      A.    Black -- I mean, white.
7   Sorry.  I'm tired.
8      Q.    What is it that you believe
9   Ms. Collins knows about your allegations
10  in this case?
11     A.    Basically, everything, because
12  she was with me for the grievances.  She
13  had interfered when I was attempting to be
14  fired.
15     Q.    She was your union steward?
16     A.    Yes.
17     Q.    Okay.  Shederick Abner?
18     A.    Yes.
19     Q.    Black or white?
20     A.    White -- I mean, black.  I
21  think I'm tired.  I probably need a break.
22     Q.    Are you related to Mr. Abner?
23     A.    No.

Page 280

1      Q.    Okay.  What is it that you
2   think Mr. Abner knows about your claims?
3      A.    He was working with me in the
4   department.  He was with me when the -- we
5   had to call the paramedics.  He filed
6   grievances.  And he knows that -- how I
7   was treated.
8      Q.    Well, other than this one
9   grievance meeting, did Mr. Abner sit in on
10  any other meetings that you had with Jeff
11  Johnston?
12     A.    I don't know.
13     Q.    Was Mr. Abner present for any
14  other meetings that you had with
15  Mr. Bryant?
16     A.    I don't know.
17     Q.    Now, at one point Mr. Abner
18  worked in seaming for a period of time.
19     A.    Yes.
20     Q.    And then he left seaming and
21  went to weaving?
22     A.    No.  He was in weaving.  He
23  left weaving and came to seaming.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 281

1    Q.    Did he stay in seaming?
2    A.    Until he was terminated.
3    Q.    Do you know why he was
4  terminated?
5    A.    I don't know exactly why.
6    Q.    Were you in any way involved
7  in his discharge?
8    A.    No.
9    Q.    Do you know if he grieved his
10  discharge?
11    A.    No.
12    Q.    Okay.  Other than the fact
13  that -- do you believe Mr. Abner knows
14  anything about your employment with the
15  company prior to him moving into the
16  seaming department?
17    A.    Pardon?
18    Q.    Mr. Abner worked in weaving
19  and then transferred to the seaming
20  department, correct?
21    A.    Uh-huh (Nodding head).
22    Q.    Yes?
23    A.    Yes.

Page 282

1    Q.    All right.  Prior to Mr. Abner
2  coming to work in the seaming department,
3  y'all were in different areas of the
4  plant?
5    A.    Yes.
6    Q.    In different work areas?
7    A.    Yes.
8    Q.    Okay.  So you would not really
9  have been in a position to have observed
10  Mr. Abner's work circumstances when he was
11  in weaving?
12    A.    No.
13    Q.    He could -- like wise, he
14  would not have been in a position to see
15  what was going on in the seaming
16  department?
17    A.    No.
18    Q.    All right.  But once he moved
19  to seaming, were y'all in the same work
20  group?
21    A.    Yes.
22    Q.    So y'all were on first shift
23  together, second shift; you were in the

Page 283

1  same group?
2    A.    Yes.
3    Q.    All right.  Did Mr. Abner ever
4  tell you that he thought he was treated
5  differently because of his race?
6    A.    Yes.
7    Q.    Did he explain how?
8    A.    Because of a situation that
9  happened in the seaming -- in the weave
10  room, because of wire assignments, because
11  of actions being taken, the discipline, or
12  something like that.  So to that extent.
13  But what, I don't exactly know.
14    Q.    Okay.  Did you ever encourage
15  Mr. Abner if he thought that he was having
16  problems that he should go to Human
17  Resources and talk to Mr. Bryant?
18    A.    He filed a grievance.
19    Q.    I am asking if you recommended
20  to him that he should go complain.
21    A.    I don't believe I recommended
22  him, no.
23    Q.    Have you talked to Mr. Abner

Page 284

1  about your case?
2    A.    Yes.
3    Q.    Tell me what y'all talked
4  about.
5    A.    I asked him to be a witness
6  for me.
7    Q.    And what did he say?
8    A.    Yes.
9    Q.    Okay.  And did you talk with
10  him in any detail about what you wanted
11  him to say?
12    A.    No.
13    Q.    Okay.  Did you talk to
14  Mr. Abner about any issues that he
15  previously had with the company?
16    A.    We talked about them all the
17  time.  That's before he left the job.
18    Q.    Okay.  Prior to you calling
19  him about this lawsuit, had you talked to
20  him since he left the company?
21    A.    I hadn't talked to him in a
22  long time.  I maybe talked to him once,
23  twice.  After that -- it was until --

**American Court Reporting**
**toll-free (877) 320-1050**

Page 285

1  until this came -- this suit came up.
2      Q.   Who is Barbara Smith?
3      A.   She is my supervisor -- was my
4  supervisor.
5      Q.   She is black?
6      A.   Yes.
7      Q.   She still works for the
8  company?
9      A.   Yes.
10     Q.   Have you talked to Ms. Smith
11 about your lawsuit?
12     A.   No.
13     Q.   I think we have talked about
14 Nat Jones.
15        The Donna Smith listed on
16 here.  She is the nurse that went with you
17 on doctors' visits, correct?
18     A.   Yes.
19        MS. WILLIAMS:  Can we take a
20 break?
21        MR. POWELL:  Yes, we can.  I
22 think that's a good idea.
23 (Off the record discussion, at which time

Page 286

1  the deposition was adjourned at 3:30 PM)
2      C E R T I F I C A T E
3
4  STATE OF ALABAMA)
5  JEFFERSON COUNTY)
6        I hereby certify that the above
7  and foregoing deposition was taken down by
8  me in stenotype, and the questions and
9  answers thereto were transcribed by means
10 of computer-aided transcription, and that
11 the foregoing represents a true and
12 correct transcript of the deposition given
13 by said witness upon said hearing.
14        I further certify that I am
15 neither of counsel nor of kin to the
16 parties to the action, nor am I in anywise
17 interested in the result of said cause.
18
19        DAVID L. MILLER, CSR, RMR
20        Certificate No:  AL-CSR-141
21
22 My Commission expires
23 November 30, 2009

**www.AmericanCourtReporting.com**
**May 12, 2006**

Page 287

IN THE UNITED STATE DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NUMBER
CV-2:05CV-1040-WKW

DORA DAVIS,
    Plaintiff(s),
vs.
ALBANY INTERNATIONAL, JEFF JOHNSTON,
    Defendant(s).

VOLUME II
DEPOSITION TESTIMONY OF:
DORA DAVIS

June 7, 2006
9:00 a.m.

COURT REPORTER:
DAVID L. MILLER, CSR, RMR

Page 289

1  grounds at the time of trial or at the
2  time said deposition is offered in
3  evidence, or prior thereto.
4
5
6
7                I N D E X
8  EXAMINATION BY:              PAGE NO.
9  Mr. Powell            292, 394
10  Ms. Swain                332
11  Ms. Williams             361
12  Certificate              424
13
14
15        INDEX OF EXHIBITS
16  EXHIBITS              PAGE NO.
17  DEFENDANT'S 16  Job site analysis  326
18  DEFENDANT'S 17  EEOC letter      320
19
20  PLAINTIFF'S 1   M-300 Study      381
21  PLAINTIFF'S 2   Notice to dismiss 387
22  PLAINTIFF'S 3   Order           388
23

Page 288

1        S T I P U L A T I O N
2        IT IS STIPULATED AND AGREED by and
3  between the parties throught their
4  respective counsel that the deposition of
5  DORA DAVIS, may be taken before David L.
6  Miller, Registered Merit Reporter and
7  Notary Pulbic, State at Large, at the law
8  offices of Toles & Williams, Montgomery,
9  Alabama, on June 7, 2006, commencing at
10  approximately 9:00 a.m.
11        IT IS FUTHER STIPULATED AND AGREED
12  that the signature to and the reading of
13  the deposition by the witness is waived,
14  the deposition to have the same force and
15  effect as if full compliance had been had
16  with all laws and rules of Court relating
17  to the taking of depositions.
18        IT IS FURTHER STIPULATED AND
19  AGREED that it shall not be necessary for
20  any objections to be made by counsel to
21  any questions, except as to form or
22  leading questions, and that counsel for
23  the parties may make objections and assign

Page 290

1        A P P E A R A N C E S
2
3  FOR THE PLAINTIFF(S):
4      Triana S. Williams
5      Vicky U. Toles
6      TOLES & WILLIAMS
7        1015 South McDonough Street
8        Montgomery, Alabama 36104
9
10  FOR THE DEFENDANT, ALBANY:
11      Charles A. Powell, IV
12      BAKER, DONELSON, BEARMAN, CALDWELL
13      & BERKOWITZ
14        1600 SouthTrust Tower
15        420 20th Street North
16        Birmingham, Alabama 35203
17
18  FOR THE DEFENDANT, JOHNSTON:
19      Jennifer F. Swain
20      JOHNSTON, BARTON, PROCTOR & POWELL
21        2900 AmSouth/Harbert Plaza
22        1901 Sixth Avenue North
23        Birmingham, Alabama 35203

**American Court Reporting**
**toll-free (877) 320-1050**

2 (Pages 291 to 294)

Page 291

APPEARANCES

ALSO PRESENT:
    Jeff Johnston
    Ted Bryant
    DeMonica Richeson

Page 293

1  to try to finish up your deposition in
2  your case against Albany International and
3  Jeff Johnston.
4      The format will be the same as
5  it was last time, questions and answers,
6  so we are going to operate by the same
7  ground rules we did before, okay?
8      A.  Okay.
9      Q.  All right.  Are you on any
10  medication or anything this morning that
11  would in any way impair your ability to
12  testify?
13      A.  No.
14      Q.  Other than your attorneys,
15  have you talked to anybody about your
16  deposition since we last met?
17      A.  Yes.
18      Q.  Who?
19      A.  My daughter.
20      Q.  Okay.  She is here with us
21  today?
22      A.  Yes.
23      Q.  Okay.  DeMonica --

Page 292

1      I, David L. Miller, a Registered
2  Merit Report of Birmingham, Alabama, and a
3  Notary Public for the State of Alabama at
4  Large, acting as Commissioner, certify
5  that on this date, pursuant to the Federal
6  Rules of Civil Procedure, and the
7  foregoing stipulation of counsel, there
8  came before me at the law offices of Toles
9  & Williams, Montgomery, Alabama,
10  commencing at approximately 9:00 a.m. on
11  June 7, 2006, DORA DAVIS, witness in the
12  above cause, for oral examination,
13  whereupon the following proceedings were
14  had:
15
16      COURT REPORTER:  Ms. Davis,
17  you are still under oath.
18
19  EXAMINATION BY MR. POWELL (continued):
20      Q.  Good morning, Ms. Davis.  How
21  are you?
22      A.  I'm okay.
23      Q.  All right.  We are here today

Page 294

1      A.  Richeson.
2      Q.  Okay.  What does your daughter
3  do?
4      A.  She works for Montgomery Water
5  Works.
6      Q.  Has she ever worked at Albany
7  International?
8      A.  No.
9      Q.  To your knowledge, did she
10  ever work with Jeff Johnston or Ted
11  Bryant?
12      A.  Excuse me.  She did do some
13  help a -- about a week at Albany
14  International.
15      Q.  Do you remember when that was?
16      A.  No.
17      Q.  Which department did she work
18  in?
19      A.  I think it was like throughout
20  the plant.
21      Q.  Any idea how long ago that
22  was?
23      A.  No.

**American Court Reporting**
**toll-free (877) 320-1050**

3 (Pages 295 to 298)

Page 295

1    Q.    Okay.  In the August to
2    October of 2003 time frame, had your
3    daughter worked at the plant anywhere in
4    that time frame?
5        A.    No.
6        Q.    To your knowledge, do you
7    believe that your daughter has any
8    personal knowledge of any of the events
9    identified in your complaint in this
10   lawsuit?
11       A.    No.
12       Q.    So what about your deposition
13   did you discuss with your daughter?
14       A.    We just talked about the
15   length, how long.
16       Q.    Okay.  During your last
17   deposition you had mentioned that you had
18   gotten divorced.  What is your husband's
19   name -- former husband's name?
20       A.    Former husband's?
21       Q.    Yes.  The most recent
22   husband.
23       A.    William Davis.

Page 296

1    Q.    Okay.  Where does Mr. Davis
2    live?
3        A.    He lives in Millbrook,
4    Alabama.
5        Q.    Okay.  Do you know where he
6    works?
7        A.    Yes.
8        Q.    Where?
9        A.    Montgomery Ford.
10       Q.    What does he do at Montgomery
11   Ford?
12       A.    I don't know.
13       Q.    Okay.  We talked a little bit
14   when we were here last time about some
15   previous FMLA leave that you had taken
16   from the company.  And I believe your
17   testimony was that you either went to
18   Linda Jones or to Mr. Bryant if you needed
19   to request FMLA leave from Albany
20   International, correct?
21       A.    Yes.
22       Q.    Okay.  To your knowledge, did
23   Mr. Johnston have any involvement in the

Page 297

1    FMLA process?
2        A.    I don't know.
3        Q.    Okay.  Now, you told me last
4    time you were together that Albany had
5    never denied you FMLA leave if you
6    presented the paperwork with information
7    from your doctor that you needed to be
8    off, correct?
9        A.    Yes.
10       Q.    Okay.  Do you have any reason
11   to believe that your efforts to ask for
12   FMLA leave at any point at Albany had
13   anything to do with your departure from
14   the company?
15       A.    I don't understand your
16   question.
17       Q.    Well, you allege in the
18   lawsuit, among other reasons, that you
19   were fired because you asked for FMLA
20   leave.  I want to know if you, in fact,
21   believe that any request by you for family
22   leave was the reason for your discharge?
23       A.    I know that everytime I asked

Page 298

1    for medical help I was denied it.
2        Q.    You mean everytime you asked
3    for help for your work place injuries?
4        A.    Yes.
5        Q.    Okay.  Do you believe -- on
6    these occasions -- because I know we
7    looked at some attendance records last
8    time that indicated you had been approved
9    for FMLA leave by Albany on at least one
10   or two occasions.
11       All right.  Do you allege in
12   this lawsuit that you were discharged
13   because you sought family medical leave?
14   Not Workers' Compensation issues, but do
15   you believe that you were terminated
16   because you sought family leave under the
17   FMLA?
18       A.    I would say partly.
19       Q.    Okay.  How?
20       A.    Because I was denied family
21   leave.  I asked for help -- I asked for
22   medical help.  I told them that my
23   injuries were hurting me and I was hurting

**American Court Reporting**
**toll-free (877) 320-1050**

4 (Pages 299 to 302)

Page 299

1  every day, and it was proved, and I was
2  denied.
3      Q.    And these injuries that you
4  were seeking help for, these were your
5  Workers' Compensation injuries?
6      A.    They were Workers'
7  Compensation injuries.
8      Q.    Okay.  Since you last worked
9  for Albany have you worked anywhere else?
10     A.    No.
11     Q.    Have you applied for work
12  anywhere else?
13     A.    No.
14     Q.    Have you been able to work
15  anywhere since you last worked at Albany?
16     A.    No.
17     Q.    Okay.  And have you been able
18  to work anywhere since -- I believe August
19  the 21st of 2003 is the date that you were
20  declared disabled by Social Security.
21     A.    No.
22     Q.    Okay.  As you sit here today,
23  you are not able to do your prior job as a

Page 300

1  seamer at Albany?
2      A.    With corrective surgery, I
3  might.
4      Q.    But as you sit here today, no?
5      A.    No.
6      Q.    Okay.  At any point between
7  August of 2003 and today have you been
8  able to perform all of your job duties as
9  a seamer at Albany?
10     A.    No.
11     Q.    Okay.  When you were declared
12  disabled by Social Security, did they --
13  did they start paying you benefits;
14  meaning are you getting paid some payment
15  from Social Security for your disability?
16     A.    Yes.
17     Q.    Okay.  And I think they -- I
18  think that ruling came out in 2005, is
19  when Social Security concluded that you
20  were disabled, correct?
21     A.    Yes.
22     Q.    Okay.  Did they pay you back
23  pay, a catch-up payment back to August the

Page 301

1  21st of 2003?
2      A.    Yes.
3      Q.    Okay.  Was that just a lump
4  sum payment back to August of 2003?
5      A.    Yes.
6      Q.    All right.  We had, I think,
7  last time marked this as Exhibit 15.
8  These were your initial disclosures in the
9  case.  And I'm sort of in the middle on
10  the one that I have handed you.  I really
11  want to start at number nine and just have
12  you to look down the rest of the list.
13  Just let me know when you have had a
14  chance to do that, and I will tell you
15  what I want to know.
16          (Pause)
17     A.    What was your question?
18     Q.    Okay.  The question is:  Is
19  there anybody on this list of doctors or
20  healthcare facilities from whom you sought
21  treatment for any claimed injuries as a
22  result of anything Mr. Johnston did to
23  you?

Page 302

1      A.    I don't understand that
2  question.
3      Q.    Let's see if I can rephrase
4  it.  You are seeking damages in this
5  lawsuit, okay.  What I'm trying to
6  determine is whether or not any of these
7  doctors or healthcare providers that you
8  have listed -- if any of the folks on this
9  list treated you for injuries that you
10  claim were caused by some conduct by Jeff
11  Johnston.
12     A.    Yes.
13     Q.    Okay.  Which ones?
14     A.    All of them, except for
15  Dr. Hamilton, Dr. Hackman, Dr. Jakes.
16     Q.    So it is your contention that
17  every doctor on this list in your initial
18  disclosures except Dr. Jakes, who is
19  number eleven, Dr. Hamilton, who is number
20  fifteen, and Dr. Hackman, who is number
21  sixteen, treated you for some injury that
22  you contend is caused by Jeff Johnston?
23     A.    No.  I'm saying that number

**American Court Reporting**
**toll-free (877) 320-1050**

5 (Pages 303 to 306)

Page 303

1  nine, Dr. Sweet; number ten, Dr. Katz;
2  number twelve, Dr. Wade; thirteen,
3  Dr. Hartzog.
4       I went to Jackson Hospital for
5  tests -- well, I had surgery at Jackson
6  Hospital, too. So I would say yes. And
7  Dr. -- seventeen, Dr. Cargile Miller.
8       Q.   What is it that Dr. Sweet
9  treated you for that you claim was caused
10 by Mr. Johnston?
11      A.   I was injured on the job. I
12 was refused medical help.
13      Q.   All right. Which injury did
14 Dr. Sweet treat you for?
15      A.   He -- lower back, my neck.
16      Q.   When did Dr. Sweet treat you?
17      A.   It was 2003.
18      Q.   And was this treated as a
19 Workers' Compensation injury?
20      A.   Yes.
21      Q.   Is the treatment that you
22 received from -- for your lower back and
23 neck from Dr. Sweet, is that what is at

Page 304

1  issue in your State court Workers'
2  Compensation case?
3       A.   I really don't know.
4       Q.   Okay. What exactly is it that
5  you contend that Mr. Johnston did that
6  contributed to your back or neck injuries?
7       A.   I worked for Albany
8  International. They were in charge of the
9  way that I was medically treated, and I
10 was denied treatment.
11      Q.   I will ask the question a
12 little more specifically and see if maybe
13 we can speed this up. Is there -- did you
14 seek any medical treatment specifically
15 for some action by Jeff Johnston towards
16 you?
17      A.   Medical treatment -- repeat
18 me -- repeat yourself, I mean.
19      Q.   Let me ask it this way. Is
20 there some specific injury to you that you
21 believe was directly caused by Jeff
22 Johnston?
23      A.   I believe that I worked for a

Page 305

1  company where Jeff Johnston was in charge
2  of. And through my trying -- seeking help
3  for injuries, I was refused help. The
4  company was in charge. They denied me
5  medical help or corrective surgery or
6  anything that could make my life
7  comfortable to live.
8       Q.   All right. Outside of
9  Mr. Johnston's role with the Montgomery
10 plant for Albany, is there any specific
11 action by Mr. Johnston personally towards
12 you that you think caused you any injury?
13      A.   I was asked to be taken off of
14 the machines. Mr. Johnston was still in
15 charge. He denied me the right to come
16 off of the machine, where they allowed
17 other people to be moved off of the
18 machines, which they knowed these machine
19 was causing injuries to our bodies.
20      Q.   Which machines were causing
21 the injuries?
22      A.   The M-3000.
23      Q.   M-3000, okay. And how do --

Page 306

1  what is the basis for your contention that
2  they know that the machine was causing
3  injury?
4       A.   Because we were injured on --
5  in certain -- crawling, pulling, walking,
6  standing, lifting, shoving, sitting in a
7  position all day, lifting weights, having
8  to lean.
9       Q.   Anybody that you worked with
10 at Albany in the seaming department that
11 is still there?
12      A.   Yes.
13      Q.   Who?
14      A.   A lot of people. I don't know
15 everybody that is still there.
16      Q.   More than five?
17      A.   Yes.
18      Q.   More than ten?
19      A.   I don't know.
20      Q.   All right. And would these
21 other folks in seaming -- did they also
22 work on the M-3000 machine like you?
23      A.   Yes.

**American Court Reporting**
**toll-free (877) 320-1050**

6 (Pages 307 to 310)

Page 307

1    Q.    And they are still able to
2    work?
3    A.    I assume so.
4    Q.    All right.  Now, I see right
5    below Dr. Sweet's name is Dr. Allen's
6    name.  Are they partners in a medical
7    group?
8    A.    Yes.
9    Q.    Did you see both Dr. Sweet and
10   Dr. Allen?
11   A.    No.
12   Q.    Just Dr. Sweet?
13   A.    I saw Dr. Allen later, but
14   there was a separate office when I saw
15   Dr. Allen.  Dr. Sweet was in a different
16   office.
17   Q.    All right.  We talked about
18   Dr. Katz and Dr. Wade last time.
19        Who is Dr. Hartzog?
20   A.    Dr. Hartzog -- he was a
21   Workers' Comp doctor who did surgery on my
22   rotator tear.
23   Q.    That surgery was in 2001?

Page 308

1    A.    Yes.
2    Q.    Okay.  Paid for by the company
3    as a Workers' Comp injury?
4    A.    Yes.
5    Q.    What did Dr. Miller treat you
6    for?
7    A.    My wrist.  Both wrists.
8    Q.    Your wrists?  Are those also
9    Workers' Comp injuries?
10   A.    Yes.
11   Q.    Were you treated for carpal
12   tunnel?
13   A.    Both wrists.
14   Q.    Okay.  Do you remember when
15   that was?
16   A.    Probably 2003, too.
17   Q.    Who is Dr. Hackman?
18   A.    Dr. Hackman was -- he treated
19   me once for Workers' Comp.  That's for my
20   lower back.  I went for an opinion.
21   Q.    So Dr. Hackman treated you one
22   time for your lower back?
23   A.    Yes.

Page 309

1    Q.    Was that a Workers' Comp
2    injury?
3    A.    Yes.
4    Q.    Did he treat you for anything
5    else?
6    A.    I went for a reading of
7    x-rays.
8    Q.    X-rays of what?
9    A.    My neck.
10   Q.    Your neck.  Did you get a
11   second opinion from Dr. Hackman for the
12   neck injury that Dr. Sweet had treated you
13   for?
14   A.    No.  I went for a -- personal.
15   Q.    Okay.  Was that while you were
16   employed by Albany?
17   A.    I believe it was after.
18   Q.    Who is Dr. Hamilton?
19   A.    He is my cardiologist.
20   Q.    Was he your doctor during the
21   time that you were employed by Albany?
22   A.    Yes.
23   Q.    Okay.  Was he treating you for

Page 310

1    health problems during your employment
2    with the company?
3    A.    Yes.
4    Q.    What is the nature of your
5    heart condition?
6    A.    You asked me what heart
7    diseases do I have?
8    Q.    Yes, ma'am.
9    A.    Okay.  I have cardiomyopathy,
10   mitral valve prolapse, congestive heart
11   failure, enlarged heart, hypertension.
12   Q.    Has Dr. Hamilton, to your
13   knowledge, diagnosed the cause of these
14   heart conditions?
15   A.    No, he didn't.
16   Q.    Do you believe in any way
17   Albany International is the cause of your
18   heart problems?
19   A.    Yes.
20   Q.    How so?
21   A.    When I was treated with
22   steroid treatments on my lower back, I
23   complained of not being able to take them,

**American Court Reporting**
**toll-free (877) 320-1050**

Page 311

1    because I was allergic to them.  And I
2    took them anyway, because of the pain that
3    was in my back.
4        Q.    Who gave you the steroid
5    shots?
6        A.    I believe it was a
7    Dr. Richardson under Dr. Dunavant.  I
8    believe that is -- that's been how long it
9    has been.  I don't remember.
10       Q.    Are these steroids shots part
11   of Workers' Comp treatment?
12       A.    Yes.
13       Q.    All right.  Has Dr. Hamilton
14   told you that these steroid shots caused
15   any of these heart conditions?
16       A.    Dr. Hamilton was my doctor at
17   that time.
18       Q.    Well, has any doctor told you
19   that steroid shots, as part of your
20   Workers' Compensation treatment for your
21   back pain, caused any of these heart
22   conditions that you have identified?
23       A.    No.

Page 312

1        Q.    Okay.  Then how do you draw
2    some connection between steroid shots and
3    your heart problems?
4        A.    I never had heart problems
5    until I started receiving the steroid
6    shots.
7        Q.    So that's simply your opinion
8    that there is a connection between the
9    steroid shots and your heart problems?
10       A.    I didn't -- I started having
11   heart problems afterwards -- after the
12   steroid shots.
13       Q.    All right.  And you, on your
14   own, have drawn some connection between
15   the steroid shots and your heart problems?
16       A.    I started having steroid shots
17   -- I mean, I started having heart problems
18   after the steroid shots.
19       Q.    Okay.  But no doctor has told
20   you that they have diagnosed any medical
21   link between your steroid shots and the
22   heart problems that you have identified?
23       A.    The only thing I know is each

Page 313

1    time I received steroid shots, I end up
2    with new heart -- heart diseases.
3        Q.    Have you seen anybody other
4    than Dr. Hamilton for your heart problems?
5        A.    I saw another doctor before
6    Dr. Hamilton, but I don't even remember
7    his name.
8        Q.    Okay.  What has Dr. Jakes
9    treated you for?
10       A.    Fibromyalgia.
11       Q.    And how long has Dr. Jakes
12   been treating you for fibromyalgia?
13       A.    I believe I saw him in -- it
14   was either 2004, late 2003, one or the
15   other.
16       Q.    Were you being treated by
17   Dr. Jakes during the time that you were
18   employed by Albany?
19       A.    No.
20       Q.    Who is Dr. Garrison?
21       A.    Dr. Garrison is another
22   Workers' Comp doctor.
23       Q.    What about Dr. Dalton?

Page 314

1        A.    Dr. Dalton is a personal
2    doctor.
3        Q.    What has Dr. Dalton treated
4    you for?
5        A.    He did a colonoscopy.
6        Q.    Just an exam or were you being
7    treated for some particular condition?
8        A.    Well, everytime -- when I
9    could not receive injections, when I could
10   not take the -- the muscle relaxers or the
11   inflammatory pills, I suffer from that
12   with acid reflux.
13            So she told me that it was
14   something had to be going on, the reason I
15   couldn't take this medicine.  So that's
16   when I consulted my physicians and asked
17   them to give me -- to try to find out was
18   anything going on in my body to cause me
19   not to be able to take the medicine.  She
20   suggested that I have some -- I have
21   something done about that.
22       Q.    All right.  And did Dr. Dalton
23   put you on any course of treatment

**American Court Reporting**
**toll-free (877) 320-1050**

8 (Pages 315 to 318)

Page 315

1  following this colonoscopy?
2      A.   Was nothing wrong in my colon
3  for them to treat me for.
4      Q.   Who is Dr. Turner?
5      A.   Dr. Turner is another Workers'
6  Comp doctor.
7      Q.   What did Dr. Turner treat you
8  for?
9      A.   He was the company doctor.
10  Wrists, neck, lower back.
11      Q.   What did Dr. Garrison treat
12  you for? I know you said he was a Work
13  Comp doctor.
14      A.   Lower back, I believe.
15      Q.   Dr. Mathis?
16      A.   He was my medical -- my
17  personal medical doctor.
18      Q.   Okay. There is a reference on
19  your disclosures to an ergonomic
20  evaluation of the M-3000 machine. Is that
21  a -- what is that? Is that --
22      A.   I don't know what it is.
23      Q.   Is that a job site analysis

Page 316

1  that was done of the seaming job?
2      A.   I assume. I don't know.
3      Q.   Tell a look at that for me and
4  tell me if you recognize that.
5          (WHEREUPON, a document was
6  marked as Defendant's Exhibit 16 and is
7  attached to the original transcript.)
8      A.   Yes.
9      Q.   Did you see this job site
10  analysis at any point while you worked for
11  the company?
12      A.   Yes.
13      Q.   Okay. And have you had a
14  chance to read over it?
15      A.   I have seen it.
16      Q.   Okay. And is this a -- does
17  this job function wise and workwise
18  provide a fair assessment of the seaming
19  machine operator job at Albany's
20  Montgomery plant?
21      A.   It is a description of the job
22  that we did. So this is a description of
23      Q.   So this is a description of

Page 317

1  your seaming job?
2      A.   Yes, from what I can see.
3      Q.   Okay. Now, you allege in your
4  complaint that the company knew the M-3000
5  was causing injuries.
6      A.   Yes.
7      Q.   All right. Now, you told me a
8  little while ago that your basis for that
9  was you and others got hurt on the job.
10      A.   Yes.
11      Q.   All right. Any basis for that
12  allegation other than your observation
13  that you were injured and others may have
14  been injured at work?
15      A.   When this -- when we -- when
16  the injuries start occurring, not only to
17  me, but other people, that is when the
18  company started -- I don't know what the
19  process was, but they brought somebody in
20  to evaluate this M-3000 and to check and
21  to see what we was doing and was not
22  doing.
23      Q.   Okay. Did y'all start doing

Page 318

1  anything differently after that?
2      A.   My job was the same.
3      Q.   Did y'all start any kind of
4  exercise program in the plant?
5      A.   They started an exercise
6  program, yes.
7      Q.   For everybody in the seaming
8  department?
9      A.   Every -- yes.
10      Q.   What did that exercise program
11  consist of?
12      A.   You stand and make certain
13  movements with your body.
14      Q.   Just sort of a stretching
15  program?
16      A.   Stretching process, yes.
17      Q.   So you would be sort of warmed
18  up and ready to go to work?
19      A.   No. It wasn't at the
20  beginning of the shift. It was usually
21  like some part of the day -- in the
22  morning, and then another -- like about
23  two in the evening and probably nine,

**American Court Reporting**
**toll-free (877) 320-1050**

Page 319

1   something like that, in the morning.
2       Q.   Well, did you do the
3   stretching exercises every shift?
4       A.   No.  It was every shift, but
5   we did it two times a day.  We did it
6   morning and then we do it in the
7   afternoon.
8       Q.   So you did it two times per
9   shift?
10      A.   Yes.
11      Q.   Okay.  You say morning and
12  afternoon.  If you are on third shift,
13  that would be just after midnight and --
14  but two times a shift?
15      A.   Yes.
16      Q.   Okay.  So you would work a
17  little while, stop, stretch, go back to
18  work, then stretch again, and then finish
19  your shift?
20      A.   Yes.
21      Q.   All right.
22          MS. WILLIAMS:  Do you need a
23  break?

Page 320

1          THE WITNESS:  No, not yet.
2       Q.   (BY MR. POWELL) At any point
3   while you worked for the company did you
4   -- did you ever contact the EEOC to
5   complain about any of these allegedly
6   discriminatory events that you have
7   identified?
8       A.   Yes, I did.
9       Q.   What did you do?
10      A.   Wrote a letter.
11      Q.   Wrote a letter to them.
12  Okay.
13          Does it look like that?
14          (WHEREUPON, a document was
15  marked as Defendant's Exhibit 17 and is
16  attached to the original transcript.)
17          (Pause)
18      A.   Okay.
19      Q.   Have you had a chance to look
20  over what has been marked as Exhibit 17 to
21  your deposition?
22      A.   Yes.
23      Q.   Do you recognize it?

Page 321

1       A.   Yes.
2       Q.   What is it?
3       A.   It's a letter to the Equal
4   Opportunity Commission.
5       Q.   Who wrote this letter?
6       A.   I did.
7       Q.   Did you type it?
8       A.   No.
9       Q.   Okay.  Who typed it for you?
10      A.   A friend of mine.
11      Q.   Who was that?
12      A.   Her name is Valerie.
13      Q.   What is Valerie's last name?
14      A.   Abner.
15      Q.   Would that be Shederick
16  Abner's wife?
17      A.   Yes.
18      Q.   Okay.  Now, the only version
19  of this I have is not signed.  Did you
20  actually personally sign one of these to
21  the EEOC?
22      A.   I don't remember, but -- I
23  don't remember.

Page 322

1       Q.   All right.  But what is in
2   here were your thoughts at the time about
3   your employment with Appleton Wire?
4       A.   Yes.
5       Q.   All right.  And this letter is
6   dated October 14, 2000?
7       A.   Yes.
8       Q.   Did you ever formally file a
9   charge of discrimination with the EEOC?
10      A.   No.
11      Q.   Okay.  Were you contacted by
12  anyone at the Commission to discuss this
13  letter?
14      A.   No.
15      Q.   Okay.  What prompted you to
16  send this letter to Ms. Monroe?
17      A.   Because all of the --
18  everything -- it's true.
19      Q.   So what is in here then -- you
20  have also testified about a lot of this in
21  your deposition in this case --
22      A.   I believe so.
23      Q.   All right.  Well, if you

**American Court Reporting**
**toll-free (877) 320-1050**

Page 323

1  believed all of this in October of 2000,
2  why didn't you take any formal action on
3  it six years ago?
4      A.    Because -- so far everyone I
5  have turned to -- Mr. Johnston,
6  Mr. Bryant, the Union -- is like -- in
7  here, a deaf ear. It's like no one
8  hears. And when I do get an explanation,
9  it is explained away.
10     Q.    What exactly did you ask
11 Mr. Bryant for help with?
12     A.    I have always let Mr. Bryant
13 know that when I go to the doctor's
14 office, I let them know how I'm treated.
15     Q.    Other than your Workers'
16 Compensation treatment, any other issues
17 that you have brought to Mr. Bryant's
18 attention that he has not addressed?
19     A.    I don't remember.
20     Q.    Okay. None that you can
21 remember as you sit here today?
22     A.    The situation with Tim
23 Woodward, no matter who or how I

Page 324

1  complained, no one did anything about
2  anything. And all I was trying to do was
3  stay there until I turned fifty-five years
4  old so I could retire with dignity. I was
5  not allowed to -- I was not given that
6  opportunity.
7      Q.    Well, if you are incapable of
8  working -- I mean, you have testified that
9  you are unable to work.
10     A.    Because of injuries. Job --
11 on-the-job injuries.
12     Q.    Okay. So it's your contention
13 in this case that the reason that you were
14 unable to get to age fifty-five at Albany
15 and retire with dignity is because of
16 Workers' Compensation injuries?
17     A.    Because of -- I was not
18 treated for those injuries, I was just
19 passed through doctors' offices.
20     Q.    Okay. I see on page two of
21 this letter that you claim to have been
22 subjected to mental exams without your
23 consent while being treated for an

Page 325

1  on-the-job injury.
2      A.    One time I went to -- I was
3  under Workers' Comp, and I was sent to --
4  I don't remember the building -- but I was
5  given something like a three-hour test,
6  and it was testing my mental capabilities.
7      Q.    Who gave you the test?
8      A.    If I could remember that, I
9  would tell you. I don't know.
10     Q.    This test was not conducted at
11 Albany International?
12     A.    I was sent to this company by
13 Albany International.
14     Q.    By Albany or by the Workers'
15 Compensation doctor?
16     A.    Albany International or the
17 Workers' Comp or whoever was working for
18 Albany International.
19     Q.    Well, who, by name
20 specifically, asked you to go take this
21 three-hour test?
22     A.    I don't remember.
23     Q.    Okay. And since it is

Page 326

1  referenced in an October the 14th, 2000,
2  letter, I assume that you had this test
3  sometime prior to that?
4      A.    I don't remember the dates or
5  the time. I don't remember.
6      Q.    Do you know what year?
7      A.    I don't remember.
8      Q.    I see further down in that
9  paragraph it says that you have been
10 clinically diagnosed with depression and
11 you are currently taking drug treatments
12 and counseling.
13     A.    During this time I was -- I
14 went to a program we had called -- I was
15 in a lot of pain, just like I was up until
16 the point where I was dismissed. And I
17 would -- the doctors wasn't treating me.
18 So I went to EEO --
19     Q.    EAP?
20     A.    EAP. The EAP -- I think her
21 name was Linda -- I believe Linda -- Linda
22 Jackson. It was -- I don't remember her
23 name. But, anyway, she sent me to a

**American Court Reporting**
**toll-free (877) 320-1050**

11 (Pages 327 to 330)

Page 327

1  doctor for this.
2      Q.   And how long did you get
3  treatment under Albany's EAP program?
4      A.   I had to pay for that service
5  myself.  You only go to their counselors.
6  And I had to go -- when I went to this
7  doctor, I had to pay the doctor myself.
8      Q.   The company paid for the EAP
9  portion of the counseling?
10     A.   Yes.
11     Q.   Okay.  And after you met with
12 the EAP counselor you then went to a
13 separate private --
14     A.   She sent me to a doctor --
15 which I don't even remember his name.  But
16 I know I went -- I went for a little
17 while, but it wasn't long.  But during the
18 medication I could not drive or anything.
19 My daughter drove me.
20     Q.   Okay.  Did you personally talk
21 with anyone at the EEOC in response to
22 this letter?
23     A.   No.

Page 328

1      Q.   Did you meet with anybody at
2  the EEOC about your claims?
3      A.   No.
4      Q.   Did you mail this to the EEOC,
5  or what did you do with it?
6      A.   Most likely mailed it, because
7  I didn't go to it.  I had to have mailed
8  it.
9      Q.   What was Shederick Abner's
10 involvement in this letter?
11     A.   He encouraged me.
12     Q.   To your knowledge, did he
13 write his own letter?
14     A.   I don't know.
15     Q.   Okay.  Have you ever given any
16 testimony on any of these events anywhere?
17     A.   Yes.  Most likely, I have.
18     Q.   Do you remember where?
19     A.   No.
20     Q.   I'm just going to run some
21 medication names by you and I just want a
22 general description of why you were
23 prescribed these medicines.  All right.

Page 329

1          Ketorolac, K-E-T-O-R-O-L-A-C.
2      A.   I don't know.
3      Q.   Dr. Hartzog prescribed that
4  for you.
5      A.   It was probably inflammation
6  or pain.
7      Q.   All right.  Bextra.
8      A.   It was probably inflammation
9  or pain, which I was allergic to, too.
10     Q.   Diazepom, D-I-A-Z-E-P-O-M.
11     A.   I don't know.
12     Q.   Meclizine, M-E-C-L-I-Z-I-N-E.
13     A.   I don't know.
14     Q.   Skelaxin, S-K-E-L-A-X-I-N.
15     A.   Pain or inflammation.
16     Q.   Spironolactone,
17 S-P-I-R-O-N-O-L-A-C-T-O-N-E.
18     A.   I don't know.
19     Q.   Lisinopril,
20 L-I-S-I-N-O-P-R-I-L.
21     A.   I don't know.
22     Q.   Furosemide,
23 F-U-R-O-S-E-M-I-D-E.

Page 330

1      A.   I don't know.
2      Q.   That's a Dr. Hamilton
3  medicine.
4      A.   It's probably for fluid.
5      Q.   Trazodone, that's Dr. Jakes.
6      A.   Oh, probably pain or -- pain,
7  I guess.
8      Q.   Dr. Mathis appears to have
9  prescribed Premarin.
10     A.   That's estrogen.
11     Q.   Also Dr. Mathis Protonix?
12     A.   I don't know.
13     Q.   And Meprozine, also
14 Dr. Mathis?
15     A.   I don't know, but I believe it
16 was for the acid reflux or the relief.
17     Q.   Dr. Katz appears to have
18 prescribed Alprazolam,
19 A-L-P-R-A-Z-O-L-A-M.
20     A.   Probably inflammation or pain.
21     Q.   All right.  Tizakidine,
22 T-I-Z-A-K-I-D-I-N-E.  That's Dr. Fallahi.
23     A.   Probably inflammation or --

**American Court Reporting**
**toll-free (877) 320-1050**

12 (Pages 331 to 334)

Page 331

1  it's because of the fibromyalgia.
2      Q.   Okay.  Dr. Fallahi is not a
3  name that I think I have heard before.
4  Who is Dr. Fallahi?
5      A.   I also saw him.  Fibromyalgia.
6      Q.   What about Dr. Fishnic
7  (Phonetic)?
8      A.   I don't know who that is.
9      Q.   Looks like he prescribed
10 amoxicillin, just a general antibiotic, I
11 think.
12     A.   This was probably pertaining
13 to having dental work.
14     Q.   Dr. McLamore, M-C-L-A-M-O-R-E,
15 appears to have prescribe
16 cyclobenzaprine.
17     A.   I don't know.  I went to him
18 for sinuses.
19     Q.   Dr. Sweet appears to have
20 prescribed Srbudeprion,
21 S-R-B-U-D-E-P-R-I-O-N.
22     A.   I don't know.  Possibly
23 inflammation or pain.

Page 332

1      Q.   Who is Dr. Wahid, W-A-H-I-D?
2      A.   I don't know.
3      Q.   Do you know why he prescribed
4  Naproxen for you?
5      A.   Inflammation, I guess, or
6  pain.  Something, I don't know.
7      Q.   Okay.  If you need at break at
8  any point, just let us know.
9          MS. WILLIAMS:  If we could
10 just stop right now and take a break.
11         MR. POWELL:  We can.
12             9:58 AM
13         (Short recess)
14             10:18 AM
15         MR. POWELL:  I don't have any
16 more questions for you.
17
18 EXAMINATION BY MS. SWAIN:
19     Q.   Ms. Davis, are you ready?
20     A.   Yes.
21     Q.   My name is Jennifer Swain.  I
22 represent Jeff Johnston in the lawsuit
23 that you have filed against him and

Page 333

1  Albany.
2          As Mr. Powell did, I'm going
3  to ask you a series of questions today.
4  If I ask you a question that you don't
5  understand, can you tell me that and ask
6  me to rephrase it?
7      A.   Yes.
8      Q.   If you answer a question, I
9  will assume that you understood what I was
10 asking and that's what you were answering;
11 is that fair?
12     A.   Yes.
13     Q.   You testified earlier today,
14 Ms. Davis, that it was your belief that
15 Mr. Johnston and Albany had terminated
16 your employment in some way related to the
17 Family Medical Leave Act; is that right?
18     A.   Yes.
19     Q.   And I think I understood you
20 to say that the reason why you believed
21 that is because even though you were in
22 pain and you had injuries, you didn't get
23 the medical help that you felt like you

Page 334

1  needed.
2      A.   Yes.
3      Q.   Am I correct in understanding
4  that your claim about the Family Medical
5  Leave Act is that the company was not able
6  to find a doctor who would recognize and
7  properly treat your injuries?
8      A.   I feel that under Workers'
9  Comp I was being sent to doctors and the
10 doctors wasn't properly medicating or
11 correcting the injuries that I had.
12     Q.   And you believe that that was
13 Jeff Johnston's fault?
14     A.   Yes.
15     Q.   And that's because why?
16     A.   Because he was the leader.  He
17 was over the company.
18     Q.   So what you really wanted
19 Mr. Johnston to do was to find you a
20 Workers' Comp doctor that would treat you
21 the way you felt you should be treated?
22     A.   To treat me the way I needed
23 to be treated.

**American Court Reporting**
**toll-free (877) 320-1050**

13 (Pages 335 to 338)

Page 335

1      Q.    Okay.  And it was your belief
2    that the Workers' Comp doctors should have
3    taken you off from work?
4      A.    Yes.
5      Q.    And it's your believe that the
6    Workers' Comp doctors should have told
7    Albany that you were unable to work
8    because of your injuries?
9      A.    Yes.
10     Q.    And it's your belief that
11    because the doctors didn't do that, that
12    Mr. Johnston violated the Family Medical
13    Leave Act?
14     A.    Yes.
15     Q.    Is there any other way in
16    which you think Mr. Johnston or Albany
17    violated the Family Medical Leave Act?
18     A.    When I would go to or when
19    they called me to these meetings, it was
20    never any concern about what was going on
21    in my body.  It was always are you able,
22    are you in pain, can you guarantee that
23    you cannot work in pain.  I couldn't

Page 336

1    guarantee that, because I had been working
2    in pain since 1991.
3      Q.    Okay.  My question is whether
4    there was any other way in which you think
5    Mr. Johnston or Albany violated the FMLA
6    other than not finding you a doctor that
7    would take you off of work?
8      A.    I don't know.
9      Q.    You were, as you have
10    testified previously, permitted to take
11    family and medical leave when you had a
12    doctor's certification, correct?
13     A.    Yes.
14     Q.    And in this situation around
15    the time that you claim that you were
16    discharged, the doctors that you were
17    seeing for your injuries did not certify
18    that you needed to be off from work,
19    correct?
20     A.    They did not.
21     Q.    Do you know of anyone at
22    Albany who was allowed to take Family and
23    Medical Leave Act protected leave who did

Page 337

1    not have a medical certification saying
2    that they needed to be off from work?
3      A.    I don't know.
4      Q.    Did you ever discuss the
5    Family and Medical Leave Act with
6    Mr. Johnston?
7      A.    What I -- I don't remember
8    whether it was family medical leave, but I
9    did let Mr. Johnston know that I was in
10    pain and I was in constant pain.  And each
11    visit we had, every meeting, I allowed
12    them -- I let them know the extent of the
13    pain that I was living in on a day-to-day
14    basis.
15     Q.    In response to many of those
16    conversations you were sent to Workers'
17    Comp doctors; is that right?
18     A.    Yes.
19     Q.    Those doctors would release
20    you to return to work.
21     A.    They would release me.
22     Q.    I believe you testified the
23    last time we were here -- not this

Page 338

1    morning, but before -- that it's your
2    belief that you were actually terminated
3    on August the 21st, 2003; is that correct?
4      A.    Yes.
5      Q.    So when you came to the
6    meeting on October the 29th, that you have
7    also testified about previously, was it
8    your understanding that your employment
9    had already been terminated?
10     A.    Yes.
11     Q.    Tell me about that meeting on
12    October the 29th.  You testified before
13    that Mr. Johnston had threatened to call
14    the police on you; is that right?
15     A.    Whenever I am involved with
16    Mr. Johnston in any meeting, he always
17    flares up, he always attacked me in ways
18    that it shouldn't be.  He accuses me of
19    things that I'm not guilty of.  And this
20    was one of the occasions.
21         He kept telling me, "Dora, you
22    need to find you a doctor."  I said,
23    "Well, my doctor says that -- didn't say

**American Court Reporting**
**toll-free (877) 320-1050**

Page 339

1  that I was not disabled to work." They
2  did not take me off the job.
3      Q.    When you say your doctor, your
4  personal physician?
5      A.    My personal doctors.
6      Q.    Your personal physician said
7  that --
8      A.    That --
9      Q.    -- you could return to work?
10     A.    I could return to work.
11     Q.    The Workers' Comp doctors also
12  said you could return to work?
13     A.    They said I could return to
14  work.
15     Q.    What was the context of Jeff
16  Johnston threatening to call the police?
17  Did he just say that out of the blue, or
18  was something said before that that seemed
19  to upset him?
20     A.    I walked out of the room and
21  closed the door.
22     Q.    Then what happened?
23     A.    That's when he told me that he

Page 340

1  was calling the police on me.
2      Q.    You walked out of the room and
3  closed the door and he followed you out of
4  the room?
5      A.    No.  The shop steward,
6  Norma -- I believe she followed me.  She
7  brought me back into the room.
8      Q.    Why did you walk out of the
9  room?
10     A.    Because of his accusations.
11     Q.    What accusations?
12     A.    "I can't guarantee you, Jeff,
13  that I am not in pain.  I am under your
14  physician's care."
15     Q.    Well, you have testified that
16  at the time of the October 29th meeting
17  you were not physically able to work,
18  correct?
19     A.    I said that I was in a lot of
20  pain.  I was working -- I was in a lot of
21  pain.  I was hurting from the top of my
22  head to the sole of my feet.
23     Q.    Because of that pain, you felt

Page 341

1  that you couldn't work and you wanted a
2  Workers' Comp doctor to take you off,
3  correct?
4      A.    In the process of my trying to
5  do my job, it was constant, unbearing
6  pain.
7      Q.    Because of that pain, you were
8  unable to work?
9      A.    I was -- I wanted to --
10  Workers' Comp to do what they was supposed
11  to do.  They had Workers' Comp insurance
12  that takes you off and gives you the
13  opportunity to heal.  The company denied
14  me that.
15     Q.    Did you understand during that
16  October 29th meeting that your doctors had
17  released you to return to work?
18     A.    Yes.
19     Q.    It's my understanding from you
20  that because of all of the pain that you
21  were experiencing that you could not work
22  and you needed a doctor to take you off
23  work; is that right?

Page 342

1      A.    I needed the Workers' Comp
2  doctors to do the job that Albany
3  International allowed them to do.
4      Q.    Which, in your view, was to
5  take you off from work.
6      A.    To take me off work and allow
7  my body to heal.
8      Q.    Other than finding a Workers'
9  Comp doctor who would take you off from
10  work, was there anything else that you
11  think that Jeff Johnston should have done
12  for you and did not do for you?
13     A.    The Work Comp doctors was
14  under Albany International, they did what
15  Albany International say.  They were their
16  doctors.  I only went because they sent
17  me.  They were Workers' Comp doctors.  I
18  did what their doctors say do.
19          The company knowed the extent
20  of the injuries that I had acquired.  They
21  knew that this had been going on for quite
22  some time.  The pain was constant, they
23  know it was severe, they know I got locked

Page 343

1  on the fabrics. I complained to Ted, I
2  complained to Jeff, I complained to the
3  shop steward supervisor. I complained to
4  everybody that I could have complained
5  to. No one did anything.
6      Q.  Well, what they did was she
7  sent to you a Workers' Compensation doctor
8  who did not take you off.
9      A.  These doctors were under the
10  supervision of Albany International. I
11  was told by Dr. Garrison that I -- that it
12  was something that he could do, but the
13  Workers' Comp did not approve it to make
14  my condition better.
15     Q.  Are you aware of any
16  conversations between Mr. Johnston and any
17  of your Workers' Comp doctors?
18     A.  I know that each day when I go
19  to Workers' Comp, if Donna was not with
20  me, before I get back to the company, the
21  company already knows what decisions have
22  been made before --
23     Q.  Okay.

Page 344

1      A.  -- from the doctors.
2      Q.  Here is my question. If you
3  will listen to the question and answer the
4  question I'm asking, we will get through
5  this a lot more quickly.
6          Are you aware of any
7  conversations between Jeff Johnston and
8  any of your Workers' Comp doctors?
9      A.  No.
10     Q.  Going back to the October 29th
11  meeting. You left the room, Norma Heath
12  came and asked you to come back into the
13  room; is that correct?
14     A.  Yes.
15     Q.  When you walked back into the
16  room Jeff Johnston just said, "Dora, I'm
17  going to call the police on you?"
18     A.  He told me he would call the
19  police on me.
20     Q.  Did he give you any indication
21  why he would call the police?
22     A.  He wouldn't have me slamming
23  doors or whatever.

Page 345

1      Q.  Did you slam the door when you
2  walked out of the room?
3      A.  I don't know whether I did. I
4  walked out.
5      Q.  Did Jeff Johnston actually
6  call the police?
7      A.  No, he didn't.
8      Q.  Did Jeff Johnston tell you on
9  October the 29th -- strike that.
10         Did you tell Jeff Johnston on
11  October the 29th, or Ted Bryant or whoever
12  was in this meeting, that you had decided
13  to pursue and, in fact, had applied for
14  Social Security disability benefits?
15     A.  I told them I had applied for
16  Social Security benefits.
17     Q.  Did you tell them you were
18  through with the Workers' Comp people?
19     A.  No, I didn't.
20     Q.  Did Jeff Johnston tell you in
21  the October 29th meeting that if you
22  returned to work but then had to leave
23  again or did not come into work because of

Page 346

1  pain without a doctor's excuse, that that
2  would be counted against you as an
3  occurrence?
4      A.  Yes.
5      Q.  Did you understand that you
6  could return to work, but that if you did,
7  you would have to actually come to work
8  and do the job?
9      A.  I understood that I had to
10  return -- I had to return to work.
11     Q.  And it was your feeling that
12  you could not do that?
13     A.  It is my thing that I was in a
14  lot of pain. At the time, barely
15  walking. My arms and things -- I couldn't
16  hardly move them. I couldn't drive
17  myself. I couldn't take care of my
18  myself. I couldn't even -- personally
19  take care of myself.
20     Q.  Because of?
21     A.  This company knew it, Jeff
22  Johnston knew it, Ted Bryant knowed. They
23  knew that all parts of my whole spine,

**American Court Reporting**
**toll-free (877) 320-1050**

Page 347

1  they knew my -- both wrists, they knew my
2  fingers, they knew my shoulder had erupted
3  again, the scar tissue.  They knew the
4  pain that I was in every day.  They knew.
5       And I was going and I begged
6  for help, and they didn't give it to me.
7  Instead, I don't have a job.
8       Q.  And because of all of the pain
9  that you were in, you knew that you were
10 not going to be able to go back to work --
11      A.  I knew that --
12      Q.  Let me finish the question.
13      A.  -- I had a Workers' Comp
14 situation, and I know it was Workers' Comp
15 laws, and I know Workers' Comp is supposed
16 to support me and make sure that the
17 injuries that I occurred was supposed to
18 be fixed, and they didn't do it.  And
19 instead, I don't have a job today.
20      Q.  My question is, you -- because
21 of all of the pain that you were in when
22 you were in that October 29th meeting, you
23 knew that that you were not going to be

Page 348

1  able to come back to work and do all of
2  your job functions?
3       A.  I knew if I came to work I
4  would be in pain.  I couldn't guarantee
5  Mr. Johnston that I couldn't be in pain.
6  He insisted that the only way I could come
7  back to work is not be in pain.  I could
8  not guarantee him that I wouldn't be in
9  pain.
10      Q.  Did you ever have any
11 conversation with Mr. Johnston about
12 retirement benefits?
13      A.  I don't think so.
14      Q.  Do you know whether
15 Mr. Johnston had any responsibility for
16 administering the retirement plan at
17 Albany International?
18      A.  I don't know.
19      Q.  You testified last time we
20 were here that you had received a letter
21 from someone at Albany about your
22 retirement benefits; is that right?
23      A.  I guess.

Page 349

1       Q.  You understood -- let me show
2  you what Mr. Powell marked as Defendant's
3  Exhibit 14 and ask you to take a look at
4  that.
5       A.  Yes, I remember this letter.
6       Q.  Did you understand from that
7  letter that you are eligible for
8  retirement benefits from Albany when you
9  reach age fifty-five?
10      A.  Yes.
11      Q.  Other than the fact that --
12 let me ask you this.
13      How old were you in October of
14 2003?
15      A.  Fifty-one.
16      Q.  Other than the fact that you
17 weren't able to get retirement benefits at
18 the time you actually left the company, is
19 there anything else that either Jeff
20 Johnston or Albany did that you think
21 interfered with your retirement benefits?
22      A.  Yes.
23      Q.  What is that?

Page 350

1       A.  The fact that I was taken off
2  of my job way before this time came.  The
3  fact that I was only going to receive
4  whenever I was eligible six hundred and
5  something dollars.  I was insulted about
6  the loss and having to take two hundred
7  and something instead.
8       And I know that Albany had a
9  plan where if Workers' Comp had did their
10 part, I could have easily been taken off
11 of the job, offered early retirement.  I
12 could have easily been taken off the job
13 under the -- under long-term disability,
14 and I would have received the benefits
15 that was -- I deserved.
16      Q.  What is it that you -- explain
17 to me what it is that you claim that you
18 are not eligible for in terms of
19 retirement benefits.  I'm not talking
20 about Workers' Comp benefits.
21      A.  If I received these benefits
22 when I turned fifty-five -- you didn't
23 give me all of the paperwork.  You only

17 (Pages 351 to 354)

Page 351

1  gave me part of it, because it is showing
2  where I could have been eligible for six
3  hundred and seventy-nine dollars. But in
4  the letter that I received it said I would
5  receive those benefits. I only received
6  like two hundred and something dollars of
7  that benefit. I don't see that in this
8  letter.
9      Q.    Do you have a copy of the
10 letter that you are referring to?
11     A.    No, I don't.
12     Q.    Did you not understand from
13 Exhibit 14 that you are, in fact, eligible
14 to receive the six hundred and ninety-two
15 dollars and seven cents beginning
16 September 1st, 2006 -- I'm sorry --
17 september 1st, 2016, if you wait till you
18 are sixty-five to retire?
19     A.    That's if I waited till I
20 turned sixty-five. If I retired at
21 fifty-five, I would not receive full
22 benefit.
23     Q.    You do know, don't you, that

Page 352

1  if you retired at fifty-five you would
2  have taken a smaller retirement benefit
3  irrespective of the fact that you left
4  prior to that?
5      A.    I had an option. With what
6  happened, I don't have an option -- I
7  didn't have an option. It was taken away.
8      Q.    How was the option taken away?
9      A.    Because I'm no longer at
10 Albany International.
11     Q.    Your benefits aren't going to
12 be any different.
13     A.    You are missing the point.
14     Q.    I guess I am. See if you can
15 explain it to me.
16     A.    You -- if I retire at
17 fifty-five, I lost benefits. If Workers'
18 Comp had treated me with the same
19 advantage that they did some of the other
20 people, I would have been allowed to
21 receive my long-term disability payments
22 and I wouldn't have to retire until age
23 sixty-two.

Page 353

1      Q.    So, again, what you are really
2  complaining about with respect to your
3  retirement benefits is that the Workers'
4  Comp doctors did not take you off from
5  work?
6      A.    The worker -- the Workers'
7  Comp doctor I wasn't -- I was treated
8  differently, I was treated unfair.
9      Q.    And, again, the way that you
10 were treated differently and unfairly is
11 because they didn't take you off from
12 work?
13     A.    Because they did not make sure
14 that I was properly healed or able to
15 return to my job or able to perform my
16 job.
17     Q.    Okay. Do you know whether
18 Jeff Johnston had any responsibility for
19 administering the short-term or long-term
20 disability benefit plan?
21     A.    He was -- he was over the
22 company.
23     Q.    Well, you understood that the

Page 354

1  company employed certain people to deal
2  with benefit plans, correct?
3      A.    Yes. But Jeff Johnston was
4  the one riding my back about how -- how I
5  was able to work and to work without
6  pain. That's who was harassing me.
7      Q.    That is not the question. The
8  question is whether Jeff Johnston had any
9  responsibility for administering the
10 company's short or long-term disability
11 plans?
12     A.    I believe so.
13     Q.    And that's just based on your
14 own conjecture?
15     A.    I believe so.
16     Q.    Just your personal belief?
17     A.    I believe so.
18     Q.    Did anybody at Albany ever
19 tell you that Jeff Johnston was
20 responsible for administering the short or
21 long-term disability plans?
22     A.    I didn't ask.
23     Q.    Your answer is no, no one ever

**American Court Reporting**
**toll-free (877) 320-1050**

18 (Pages 355 to 358)

Page 355

1  told you that?
2      A.  I didn't ask you.
3      Q.  Did anyone ever tell you that,
4  whether you asked or not?
5      A.  I didn't ask.
6      Q.  I understand you didn't ask.
7  Did anyone ever tell you?
8      A.  No.
9      Q.  Okay.  When you went into the
10  meeting on October the 29th, 2003, was it
11  your desire to return as of that date to
12  your full job duties at Albany?
13      A.  It was my desire that I get
14  the proper help from the doctors so I
15  could perform my job fully.  I was being
16  denied that right.
17      Q.  I'm trying to make sure I
18  understand what it was that you wanted to
19  have happen at that meeting.
20      A.  Yes.
21      Q.  What you wanted -- you knew
22  you couldn't actually work then, you
23  wanted someone to send you to a Workers'

Page 356

1  Comp doctor who would either -- who would
2  take you off work and treat your injuries;
3  is that correct?
4      A.  Yes.
5      Q.  Did you ever discuss long-term
6  disability benefits with Jeff Johnston?
7      A.  No.
8      Q.  Did you ever discuss
9  short-term disability benefits with Jeff
10  Johnston?
11      A.  No.
12      Q.  When you went to EAP for
13  depression prior to the letter that you
14  wrote the EEOC in 2000, what medication
15  did they put you on?
16      A.  I don't remember.
17      Q.  Did it work?
18      A.  I was on three different
19  medications.  I don't remember the name of
20  the medication.  One was to wake me up,
21  one was to lay me down, and one was help
22  me function during the day.  In the
23  process, the medication was overwhelming,

Page 357

1  so he had to take me off the medicine,
2  because I couldn't function.
3      Q.  So the medication did not help
4  you with depression?
5      A.  I don't know whether it helped
6  me with it.  The only thing -- it shut my
7  body down.
8      Q.  Have you been on any
9  medications for depression since leaving
10  Albany?
11      A.  The fibromyalgia doctors, they
12  tried to treat me with anti-depressants,
13  but my body could not take any of them.
14  So as of now, I take no anti-depressants.
15      Q.  Did you actually take some
16  anti-depressants that your fibromyalgia
17  doctor prescribed for a period of time?
18      A.  I was placed on two different
19  medications.  I don't remember the name.
20  I couldn't take either one, not even a
21  week.
22      Q.  What happened to you if you
23  took the anti-depressants?

Page 358

1      A.  I was shut down all day.  I
2  couldn't function.
3      Q.  Have you been able to function
4  without the anti-depressants?
5      A.  I live in constant pain every
6  day, all day.
7      Q.  Do you consider yourself to be
8  an emotionally stable person?
9      A.  Yes.
10      Q.  And has that been true at all
11  times since you left your employment with
12  Albany International?
13      A.  No.
14      Q.  At what point were you not
15  emotionally stable?
16          Will you answer the question?
17          MS. WILLIAMS:  Are you okay?
18      A.  I have not been able to think
19  about what happened to me.  It destroyed
20  me, ma'am.  To constantly think about what
21  I went through, how I worked twenty-four
22  and a half years on that job, how I gave
23  it my all, how I was one employee that

**American Court Reporting**
**toll-free (877) 320-1050**

19 (Pages 359 to 362)

Page 359

1  they could count on.
2        And for me to be sitting here
3  to explain myself to you right now, I
4  don't know whether you call it stable or
5  not, but it is not comfortable to think
6  about it. So if you call me stable, then
7  I'm stable. If you call me unstable, then
8  I'm unstable.
9        Q.    I'm not calling you anything.
10  I'm asking you whether you are emotionally
11  unstable.
12        A.    I don't know.
13        Q.    What doctors have treated you
14  for depression since you left Albany?
15        A.    Montgomery Area Mental Health.
16        Q.    Anybody else?
17        A.    I couldn't take the medicine.
18  They didn't administer the medicine, just
19  counseling. I cannot take -- or my body
20  will not accept the depressive --
21  anti-depressants.
22        Q.    When did you begin going to
23  Montgomery Area Mental Health?

Page 360

1        A.    It was in 2004.
2        Q.    Are you still being treated
3  there?
4        A.    No.
5        Q.    When did you stop going to
6  Montgomery Area Mental Health?
7        A.    Probably late 2004, early
8  2005. I don't know.
9        Q.    Did anybody other than
10  Montgomery Area Mental Help ever treat you
11  for depression since you left Albany?
12        A.    No.
13        Q.    Did anyone other than the EAP
14  and the doctor that you went to just
15  following that treat you for depression
16  prior to your leaving Albany?
17        A.    No.
18        Q.    Did you ever ask anyone at
19  Albany whether your employment had been
20  terminated?
21        A.    No.
22        Q.    Did you file any grievance
23  over what you claim was a termination?

Page 361

1        A.    I was out of the building.
2        Q.    Is that a no?
3        A.    No.
4        Q.    Norma Heath was your union rep
5  during the October 29th, 2003, meeting; is
6  that correct?
7        A.    Yes. She was there.
8        Q.    Was she there during the
9  entire meeting?
10        A.    Yes.
11        Q.    Have you spoken with her since
12  leaving Albany?
13        A.    No.
14        MS. SWAIN: Lets take a
15  break.
16              10:47 AM
17        (Short recess)
18              11:02 AM
19        MS. SWAIN: I'm done.
20
21  EXAMINATION BY MS. WILLIAMS:
22        Q.    Ms. Davis, I have a couple of
23  questions for you.

Page 362

1        Can you tell us how many times
2  you have been injured at the company? Do
3  you remember each time that you have been
4  injured?
5        A.    I remember about five times.
6  About five.
7        Q.    And during those five times,
8  were you actually sent to see the Workers'
9  Compensation doctors for those injuries?
10        A.    Yes.
11        Q.    Okay. And tell us, again,
12  those doctors' names.
13        A.    The first time -- well, I will
14  state it like this. The first time I went
15  -- when I first got injured, I saw my
16  personal doctor.
17        Q.    What is your personal doctor's
18  name?
19        A.    It was Dr. Fallahi.
20        Q.    Okay.
21        A.    Then I was sent from
22  Dr. Fallahi to, I believe it was,
23  Dr. Goodman. I'm not sure. I believe it

**American Court Reporting**
**toll-free (877) 320-1050**

Page 363

1 was Dr. Goodman. Then I was sent to a
2 Dr. Dunavant. I saw a Dr. Ryan. I
3 believe it was Dr. Richardson who did the
4 injections in my lower back. Who else?
5 That was for the first injury and rehab.
6     The second injury I think it
7 was also Dr. -- I can't remember the
8 second one.
9     Q.   If you can't remember, that is
10 fine.
11     A.   I think Dr. Goodman was the
12 company doctor for quite some time, but I
13 can't remember for how long. Then we went
14 to a Dr. Ulma (Phonetic), who was the
15 company doctor. And from Dr. Ulma to
16 Dr. Turner, the company doctors. And
17 these doctors would send me to
18 specialists. I saw a Dr. Kemp, he was
19 pain management, Dr. Miller, Dr. Katz,
20 Dr. Holt, Dr. Hartzog, Dr. Ulma, it was --
21 Dr. Wade. I don't remember.
22     Q.   Okay.
23     A.   I don't remember.

Page 364

1     Q.    During the time that you were
2 seeing these doctors, did any of the
3 doctors actually make any statements
4 regarding your condition -- medical
5 condition or your medical treatment that
6 you were actually receiving?
7     A.    Explain that.
8     Q.    Did they tell you -- did the
9 doctors tell you anything about your
10 treatment, why they were treating you and
11 the reason for the injuries, or anything
12 of that nature?
13         MR. POWELL: Object to the
14 form.
15     A.    When I went to Dr. Dunavant,
16 this was for my lower back. I was
17 receiving the injections. I complained
18 about I couldn't -- I couldn't complete --
19 I did two injections, but I couldn't do
20 the third one. I explained to him what
21 the injection was doing. They were making
22 me have heart pain, they were making my
23 heart beat rapid.

Page 365

1         When I went to his office that
2 day, he told me that -- I told him. He
3 said he didn't understand why I couldn't
4 finish the treatment. I told him -- I
5 clearly explained to him why. He told me
6 that he didn't see anything wrong anyway.
7         So I asked him -- I said, "You
8 stuck me in my spine three times and you
9 didn't see anything wrong with me." So I
10 told him when I got home that I will call
11 the insurance company and I will report
12 what he told me. I did report it to the
13 insurance company and I did report it to
14 Linda Jones. And this was Liberty -- I
15 think it was Liberty Mutual, the insurance
16 company at that time.
17         Okay. With Dr. Hartzog, I had
18 surgery. I was scheduled for surgery at
19 eleven o'clock that day. I don't know
20 what went wrong. I was brought in the
21 back about three o'clock. I was prep'd,
22 or whatever you called it, for surgery --
23 but, anyway, when I woke up it was five

Page 366

1 thirty. I hadn't had surgery. So I had
2 to be reprep'd and -- in other words, I
3 had the surgery, but it was like about ten
4 o'clock when I left there that night.
5         When they got ready to take me
6 out of the surgery, get me -- dress me to
7 leave, I sneezed and I started urinating.
8 I urinated from then till about, off and
9 on, three o'clock in the morning. I asked
10 the nurse -- I said, "Would you go get
11 Dr. Hartzog and let him know that
12 something is wrong. This is not normal."
13         She told me that, "Well, he is
14 going to send you home anyway. Your
15 company -- Workers' Comp said this is
16 outpatient, you go home." And this is
17 what happened to me.
18         I reported this -- the company
19 had a nurse to call, I guess, to check to
20 see what was going on or how did the
21 surgery come. I explained to her what
22 happened, I explained to Linda Jones what
23 happened.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 367

1          On another occasion, I went to
2   see Dr. Garrison -- first, Michael
3   Turner. I would go and I would tell him a
4   complaint about the pain that I was in.
5   Sometimes he would give me restrictions,
6   sometimes he didn't. The last time I was
7   in his office he told me that either I was
8   crazy or he was.
9          So then I was told by Donna
10  Smith that I wouldn't be seeing Dr. Turner
11  anymore. After that I was sent to
12  Dr. Garrison. I saw Dr. Garrison the
13  first time, and he sent me back to work.
14         I went back to work on this
15  occasion. Barbara Smith saw me limping
16  and she called up front and, in turn, Gay
17  Drake called the doctor. They sent me to
18  the doctor. When I left home I went to
19  Dr. Garrison's office. He was not there.
20  I had to go back across town to
21  Dr. Sweet's office. Dr. Sweet took me off
22  the job.
23         Okay. When I went back for my

Page 368

1   next exam, they sent me back to
2   Dr. Garrison. When I went to
3   Dr. Garrison, he -- that's when he told me
4   about the -- giving me the herbs -- a list
5   of herbs, telling me to run around the
6   track four times, when I started dragging
7   my leg, to come back to him. But in this
8   visit he also told me, too, that it was
9   something that he could do for me but the
10  Workers' Comp would not approve it.
11         I don't know whether I'm
12  answering the questions or whether I'm
13  rambling.
14    Q.    You are doing fine.
15    A.    But I -- it has been a history
16  throughout -- since I received injuries of
17  the treatment that I received from the
18  doctors. I have complained to the company
19  on several -- well, whoever was in charge
20  on several occasions. Nothing has been
21  done about it. Nothing.
22         I was still sent to these
23  doctors and these doctors just passed me

Page 369

1   through their office. They didn't do
2   anything to correct whatever was going on
3   in my body. They just allowed me to go
4   on. The pain just constantly build. I
5   worked. I worked. I went in and I worked
6   in pain, no matter what. I worked. The
7   pain got so excruciating that I could not
8   promise Mr. Johnston that I could not work
9   in pain.
10    Q.    Ms. Davis, you testified
11  earlier that the Workers' Compensation
12  doctors would not take you off the job.
13  Why do you think that they would not take
14  you off?
15         MS. SWAIN: Objection.
16    A.    Well, I believe that the
17  Workers' Comp doctors -- they told me that
18  they were under the company. Dr. Hartzog
19  told me that when I had rotator tear
20  surgery -- the next day he sent me back to
21  work. I had morphine in my arm and a
22  pillow under my arm.
23         I told Dr. Hartzog -- I said,

Page 370

1   "Dr. Hartzog, I won't be able to drive."
2   He said, "Don't you have an automatic."
3   That's exactly what he said to me. He
4   also told me -- I said, "Well, my company
5   don't have anything for me to do with the
6   pillow under my arm," and my company don't
7   -- I can't even tend to my personal -- if
8   I go to the bathroom, I can't even take
9   care of myself.
10         He told me that he was -- my
11  company said that they had -- in other
12  words, it was left up to the company to
13  decide whether I be at work or not be at
14  work.
15    Q.    Okay. So, based on your
16  treatment by him, did you return to work?
17    A.    Yes.
18    Q.    Okay. Did you at any point or
19  at any time tell any employee of Albany
20  International that you were not willing to
21  work?
22         MS. SWAIN: Object to the
23  form.

Page 371

1    A.   No.  No.
2    Q.   Okay.  Did you, in fact,
3  return to work?
4    A.   Yes.
5    Q.   I'm going to show you what was
6  previously marked as Defendant's Exhibit
7  Number 6.  Give you a few minutes to look
8  at it.  (Hands document)
9    A.   All right.
10   Q.   Okay.  Do you remember
11 reviewing this form earlier?
12   A.   Yes.
13   Q.   And can you tell us exactly
14 what this form is.
15   A.   This is short-term disability
16 claim.
17   Q.   Did you at some point complete
18 this form?
19   A.   Yes.
20   Q.   And, as you have seen, there
21 are several pages -- eight pages of this
22 form.  Did you complete all eight pages?
23   A.   No.

Page 372

1    Q.   Can you tell us which pages
2  you completed?
3    A.   I think -- I think pages -- I
4  don't know -- I know I did this one.  I
5  see my name signed to two.  There is a
6  portion -- I believe these two
7  (Indicating).
8    Q.   You completed two pages of the
9  eight pages; is that correct?
10   A.   I believe so.
11   Q.   All right.  Let me direct your
12 attention to page two of this document,
13 about middle ways.  Can you tell us
14 exactly what that says?  Can you see
15 that?
16   A.   Oh, yeah.  It says, "Has the
17 employee indicated that the absence is
18 work related," and it says no.
19   Q.   Did you check that box?
20   A.   No.
21   Q.   Okay.  And can you read that
22 for us -- the second part of that.
23   A.   "Has a Workers' Compensation

Page 373

1  claim been filed?"  "Yes."
2    Q.   Is there anything else
3  indicated near that block?
4    A.   It says, "For prior injury."
5    Q.   Did you complete that block?
6    A.   Yes, I guess -- no.  I don't
7  know whether I did or not.  I don't know.
8    Q.   At the bottom of the page
9  there is a name that says Linda Jones.
10 Did she actually complete the document,
11 those two -- first two pages?
12        MS. SWAIN:  Objection.
13   A.   Yes.
14   Q.   Okay.  Who is Ms. Jones?
15   A.   She handled medical records,
16 claims, stuff of that sort.  I don't know
17 what her title was.
18   Q.   Okay.  And would you know
19 why -- or do you know why the box next to,
20 "Has the employee indicated that the
21 absence is work related" -- and it is
22 checked no -- do you know why that was
23 checked?

Page 374

1    A.   No.
2    Q.   Okay.  Would you know why the
3  Workers' Compensation box is actually
4  checked yes?
5    A.   Because it was a Workers' Comp
6  injury that I was going to the doctor for.
7    Q.   But is there any indication,
8  based on Ms. Jones' completion of the
9  first two pages, that this is a Workers'
10 Compensation injury?
11        MR. POWELL:  Object to the
12 form.
13        MS. SWAIN:  Objection.
14   A.   This (Indicating).  Yes.
15   Q.   There is?
16   A.   Yes.
17   Q.   Is it for a prior injury?
18   A.   Yes.
19   Q.   But this particular instance,
20 was this work related?
21   A.   No -- yes.  It was work
22 related, yes.
23   Q.   Okay.  It was work related?

**American Court Reporting**
**toll-free (877) 320-1050**

23 (Pages 375 to 378)

Page 375

1    A.    Yes.
2    Q.    Okay.  So why is the block
3  that says that it is not work related
4  checked; do you know?
5    A.    I don't know.
6    Q.    Okay.  But once you completed
7  pages, I think, four and five of the
8  document, it was your intention to
9  complete the form because it was work
10  related?
11       MS. SWAIN:  Objection to the
12  form.
13    A.    Yes.
14    Q.    Now, just a little while ago
15  Ms. Swain actually asked you if you
16  thought that you were emotionally stable.
17  Do you know what emotionally stable means?
18    A.    No.
19    Q.    Okay.  I am going to show you
20  what has been previously marked as
21  Defendant's Exhibit Number 9.  Do you
22  remember reading that document?
23    A.    Yes.

Page 376

1    Q.    And attached to that document
2  is actually an attendance report.  Do you
3  remember reviewing that as well?
4    A.    Yes.
5    Q.    And on this particular sheet
6  or attendance report, does it include the
7  days that you have actually worked?
8    A.    I believe it is showing
9  partial days.
10    Q.    Okay.
11    A.    Some are partial days.
12    Q.    Were you working those days?
13       MS. SWAIN:  Objection.
14    A.    Partial days -- I don't know.
15  I don't know.  I don't know.  No.
16    Q.    You were not working?
17    A.    Some -- some days are partial
18  days --
19    Q.    Okay.
20    A.    -- that I was at work.
21    Q.    Let me direct your attention
22  to October the 17th of 2002, and October
23  the 18th, 2002; do you see that?

Page 377

1    A.    Okay.
2    Q.    Can you tell me what is the
3  description of the work on those days?
4       MS. SWAIN:  Objection.
5    A.    I don't know -- I don't know
6  if -- like the Workers' Comp situation --
7  more than likely I left to go to a doctor
8  or I was going to therapy.
9    Q.    Was that based on work-related
10  injuries?
11    A.    Yes.
12    Q.    Okay.  And if you would look
13  at October the 8th -- I think there are
14  two blocks for October the 18th 2002; is
15  that correct?
16    A.    Okay.
17    Q.    What is the description for
18  that day, the second October 18?
19    A.    I don't know.
20    Q.    October the 18th --
21    A.    October the 18th.
22    Q.    -- description.
23    A.    Yeah.  See, it says Workers'

Page 378

1  Comp and an absence.
2    Q.    Okay.  Can you remember an
3  absence on that day?
4    A.    No.
5    Q.    Okay.  But there was a
6  Workers' Compensation -- something going
7  on that day; is that correct?
8       MS. SWAIN:  Objection.
9    A.    Yes.
10    Q.    And you were granted Workers'
11  Compensation based on this document for
12  that day?
13       MS. SWAIN:  Objection.
14       MR. POWELL:  Same objection.
15    A.    Yes.
16    Q.    But not granted for the entire
17  day; is that correct?
18    A.    Not the entire day.
19    Q.    Okay.  Is that the pattern and
20  practice of Albany International?
21       MR. POWELL:  Objection to the
22  form.
23       MS. SWAIN:  Objection.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 379

1    A.    Yes.
2    Q.    Okay.  Can you describe -- or
3  what is the procedure for taking Leave of
4  Absence at Albany?
5    A.    To take Leave of Absence a
6  doctor would have to declare that I am
7  sick or he is taking me off for an illness
8  or giving me recovery time.
9    Q.    Okay.
10    A.    And, in turn, I would have to
11  go to Linda Jones to get a document to
12  take to the doctor to fill out.  And the
13  doctor mailed that portion to her, the
14  portion that he fills -- that he fills
15  out.  But it has to be declared by a
16  doctor that I'm not able to work that day
17  or ever how many days that I'm not
18  working.
19    Q.    Okay.  What is the procedure
20  for short-term and long-term disability?
21       MR. POWELL:  Object to the
22  form.
23       MS. SWAIN:  Objection.

Page 380

1    A.    Short-term disability is when
2  I'm out -- like during any work period I
3  have to be off sick.  Long-term
4  disability -- I don't even know how that
5  works.  But I know it is when -- there is
6  an insurance that we pay into.  When you
7  become disabled to work, you are to be
8  paid -- this was a benefit, because you
9  are having -- been determined disabled
10  long-term.
11    Q.    Was there a requirement that
12  you be off for so many days to get that?
13       MR. POWELL:  Object to the
14  form.
15    A.    I don't know.
16    Q.    Okay.
17    A.    I don't know.
18    Q.    You testified earlier that
19  this machine -- that the M-3000 was
20  causing injuries.  How do you know that
21  that machine was causing injuries?
22    A.    Because I was -- I was -- I
23  was injured on the machine on several

Page 381

1  occasions.  We had something placed in my
2  locker -- a document letting me know the
3  things that the M-3000 was doing and
4  causing injuries to our bodies.
5    Q.    Do you know who placed that
6  document there?
7    A.    No.
8    Q.    I'm going to show you what we
9  will mark as Plaintiff's Exhibit Number 1.
10       (WHEREUPON, a document was
11  marked as Plaintiff's Exhibit 1 and is
12  attached to the original transcript.)
13    Q.    Do you recognize that
14  document?
15    A.    Yes.
16    Q.    Is that the document that you
17  were referring to?
18    A.    Yes.
19    Q.    Is that the complete
20  document?  Get you to review it.
21    A.    I believe so.
22    Q.    Okay.  And what did you learn
23  in that document?

Page 382

1       MR. POWELL:  Object to the
2  form.
3    A.    That --
4       MS. SWAIN:  Same objection.
5    A.    -- repetitive motion had
6  caused a lot of the injuries that we had
7  acquired on the job while performing and
8  doing this job.
9    Q.    And did you bring that to the
10  attention of any of the employees of
11  Albany International?
12       MR. POWELL:  Object to the
13  form.
14       MS. SWAIN:  Objection.
15    A.    Yes.  Other employees knows
16  about it.
17    Q.    Okay.  And what was done based
18  on that?
19       MS. SWAIN:  Objection.
20       MR. POWELL:  Same.
21    A.    So far, nothing, I don't
22  think.
23    Q.    Did the company do anything in

**American Court Reporting**
**toll-free (877) 320-1050**

Page 383

1  response to the study that was done in
2  2003?
3        MS. SWAIN:  Objection.
4        A.    I believe that's when we
5  started doing the exercising.  They
6  started the exercising, you know.  Like
7  you get up a portion of the day to
8  stretch, and then you do it both -- two
9  times a day, morning and evening.
10       Q.    And all employees were
11  required to do the exercises?
12       A.    Yes.
13       Q.    Okay.  Did you complete the
14  exercises?
15       A.    I was not able to do -- I
16  could do some of the exercises, but I was
17  not able to do all of the exercises.
18       Q.    Was anyone present when the
19  exercises were performed?
20       A.    Yes.
21       Q.    Can you tell us who was
22  present.
23       A.    Day shift, Tim Woodward or

Page 384

1  either Barbara Smith.  Evening shift would
2  be -- third shift, we were basically --
3  you know, the lead person would turn the
4  machine off, turn the tape on, then we
5  would do the exercise.
6        Q.    Okay.  So did they monitor the
7  employees doing the exercise?  Did they
8  take notes?
9        A.    I don't know.
10       Q.    Okay.  You testified earlier
11  that you have suffered from some
12  depression; is that correct?
13       A.    Yes.
14       Q.    And is that depression caused
15  by the work environment at Albany?
16            MR. POWELL:  Object to the
17  form.
18            MS. SWAIN:  Objection.
19       A.    Yes.
20       Q.    Can you tell us what has
21  actually caused the depression.
22            MR. POWELL:  Object to the
23  form.

Page 385

1            MS. SWAIN:  Objection.
2        A.    Constantly being injured,
3  constantly being harassed, constantly
4  asking for help and being denied.  I have
5  worked -- and I stated that I worked
6  twenty-four and a half years there.  I
7  worked hard.  I did my job to the best of
8  my ability.
9            I did things that some
10  operators weren't able to do.  And out of
11  all of the work -- how hard I did, I
12  worked.  My job was just taken from me.
13  All of my benefits, dignity, just a whole
14  bunch of humiliation.  I was robed.
15       Q.    Ms. Davis, I think initially
16  when the deposition actually began defense
17  counsel actually showed you a complaint
18  that has been -- actually been filed in
19  State court.  It's previously marked as
20  Defendant's Exhibit Number 1.  Do you
21  remember reviewing that document?
22       A.    Yes.
23       Q.    And can you tell us what it

Page 386

1  is?
2        A.    It's a complaint that I filed
3  with Mr. Abel on the Workers' Comp.
4        Q.    Okay.  And let me direct your
5  attention to page three of that document.
6  Do you remember reviewing that page as
7  well?
8        A.    Yes.
9        Q.    And I think defense counsel
10  previously asked if the sole reason for
11  actually filing that complaint was for
12  Workers' Compensation benefits; is that
13  correct?
14            MS. SWAIN:  Objection.
15            MR. POWELL:  Object to the
16  form.
17       A.    Yes.
18       Q.    Okay.  And was that the sole
19  reason -- or is Workers' Compensation
20  benefits the sole reason for filing that
21  complaint?
22       A.    No.
23       Q.    Okay.  And who is the attorney

**American Court Reporting**
**toll-free (877) 320-1050**

Page 387

1  that represents you on that?
2     A.   Mr. Abel.
3     Q.   I will show you what we will
4  mark as Plaintiff's Exhibit Number 2.
5        (WHEREUPON, a document was
6  marked as Plaintiff's Exhibit 2 and is
7  attached to the original transcript.)
8     Q.   Can you tell us what that
9  document is.
10    A.   It's the complaint that I
11 filed against Albany International on --
12       MR. POWELL:  What Plaintiff's
13 2?
14       MS. SWAIN:  Have you got a
15 copy of that?
16       MS. WILLIAMS:  (Hands
17 document)
18       MS. SWAIN:  Thank you.
19    A.   -- for dismissal.  I'm not
20 sure if I am saying it right.
21    Q.   Can you tell us what that
22 document is?
23    A.   It's a Notice of Dismissal.

Page 388

1     Q.   Okay.  And was that previously
2  filed by the attorney that is representing
3  you on that case?
4     A.   Yes.
5     Q.   Okay.  Does that actually
6  dismiss count two of his State complaint?
7     A.   I don't understand.
8     Q.   The Notice of Dismissal that
9  you are holding, is that to dismiss one of
10 the counts of your complaint in State
11 court?
12    A.   Yes.
13    Q.   Okay.  I will show you what we
14 are going to mark as Exhibit Number 3.
15       (WHEREUPON, a document was
16 marked as Plaintiff's Exhibit 3 and is
17 attached to the original transcript.)
18       MS. WILLIAMS:  I don't have
19 enough copies.  Is it attached to the back
20 of your document already?
21       MS. SWAIN:  What is it?
22       MS. WILLIAMS:  It's the order.
23       MS. SWAIN:  Yes.

Page 389

1     Q.   (BY MS. WILLIAMS) I will show
2  you what is marked as Plaintiff's Exhibit
3  Number 3.  Can you tell us what that
4  document is.
5     A.   It's an order that count two
6  of plaintiff's complaint is dismissed.
7     Q.   Okay.  So that is signed by
8  which judge?
9     A.   William P. Shashy.
10    Q.   Judge Shashy.  Okay.
11       Have you gone over these
12 documents with your attorney that is
13 representing you in State court?
14    A.   No.
15    Q.   You have not?
16    A.   No.
17    Q.   You have not received a copy
18 of these?
19    A.   No.
20    Q.   Ms. Davis, you were also
21 previously asked about any specific acts
22 that either Ted Bryant or Jeff Johnston
23 was involved in that you thought

Page 390

1  constituted some form of discrimination or
2  harassment.  Do you remember doing that?
3     A.   Yes.
4     Q.   Okay.  And is that a complete
5  list of everything that has actually
6  occurred?
7        MS. SWAIN:  Objection.
8        MR. POWELL:  Same objection.
9     A.   I don't remember.  I don't
10 remember.
11    Q.   Okay.  Well, can you tell us
12 today what are the specific acts that Jeff
13 Johnston actually committed against you or
14 in your presence that constituted
15 discrimination and/or harassment?
16       MR. POWELL:  Object to the
17 form.
18       MS. SWAIN:  Objection.
19    A.   He has, on a constant basis,
20 belittled me in front of groups -- our
21 group session, our group meetings.  He has
22 mostly -- everytime I open my mouth to
23 talk to him, he always exercises power.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 391

1  He was always letting me know that he
2  could take my job. He was always finding
3  fault.
4       Basically, most of the things
5  that I did I said. Ever since day one,
6  with the incident with the two other
7  operators, it is a constant form of
8  harassment with him or from him since I
9  have been in the company.
10      I actually spent my time
11 trying to stay away from Mr. Johnston,
12 because any time it was -- I had to be in
13 the midst or around him, it was always him
14 finding fault or something wrong with what
15 I did or didn't do.
16      Q.  What are the specific acts
17 that Ted Bryant did? Can you tell us
18 those?
19      A.  Ted Bryant is personnel
20 manager. Ted Bryant allowed all of the
21 stuff that I'm going through to happen.
22 Ted Bryant, as an employer -- I felt like
23 I was supposed to be protected just like

Page 392

1  he protected the rest of the employees. I
2  was denied protection.
3       The things that we were going
4  through -- I was going through, Ted Bryant
5  knew the rules, he knew the conditions of
6  Workmen's Comp, he knew what they didn't
7  and did do. He didn't exercise that
8  power.
9       Q.  What do you mean by protect
10 the employees?
11      A.  With what I was going through,
12 they knew that -- they knew of the
13 multiple injuries that I received. And it
14 was not like to one part of my body, it
15 was to all of the major parts of my body.
16 The body -- the parts that caused my body
17 to function on a day-to-day basis.
18      He knew that I was constantly
19 in pain. I complained. I let them know.
20 And he didn't do anything about it.
21      Q.  Okay. Let me rephrase this.
22 How did he protect the other employees?
23      A.  You have people that were

Page 393

1  injured. They were taken off of the job,
2  they were given light duty, they were sent
3  to doctors. The doctors performed
4  surgeries. They don't have to spent the
5  rest of their life in constant pain like I
6  do every day.
7       I explained to them that I was
8  sleeping on seven pillows. I had to prop
9  my body in every direction that I could to
10 even get a halfway decent sleep at night.
11 I told them this. And all of this is
12 going on because they knew that they
13 controlled those doctors. Those doctors
14 did not take care of me. They did not.
15      Right now, I sleep on seven
16 pillows. I'm propped up every direction
17 you can be propped up. And this was
18 before I was diagnosed with fibromyalgia.
19 It was way before. I let them know. I'm
20 sorry.
21      MS. WILLIAMS: No more
22 questions. Let's take a break.
23      THE WITNESS: I'm sorry.

Page 394

1       MS. WILLIAMS: I'm done. No
2  more questions.
3       MR. TOLES: Let's take a break
4  for a minute and get her together.
5       11:40 AM
6       (Lunch recess)
7       1:15 PM
8       MS. WILLIAMS: Back on the
9  record. We are done with questioning.
10      MR. POWELL: Okay.
11
12 REEXAMINATION BY MR. POWELL:
13      Q.  Ms. Davis, I want to follow up
14 on some questions that your lawyer asked
15 you before we took a break earlier. Your
16 lawyer showed you what she had marked as
17 Exhibit 1, a document entitled Portland
18 M-3000 Ergonomic Project, March, 2003. I
19 believe your testimony earlier was that
20 somebody put this in your locker.
21      A.  Yes.
22      Q.  All right. But you do not
23 know who put it in your locker?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 395

1    A.   No.
2    Q.   When did they put it in your
3 locker?
4    A.   I don't know.
5    Q.   Do you know when in relation
6 to -- you know, before or after August of
7 2003?
8    A.   I don't know exactly. I don't
9 know.
10    Q.   All right. Do you know of
11 anybody else in the Montgomery plant who
12 received a copy of this document?
13    A.   No.
14    Q.   After finding this in your
15 locker, did you give this to anybody at
16 Albany in Montgomery?
17    A.   No.
18    Q.   All right. You didn't go ask
19 your supervisor in the seaming department
20 about this document?
21    A.   No.
22    Q.   Did you give it to any of the
23 Union stewards?

Page 396

1    A.   No.
2    Q.   Did you give it to Mr. Bryant?
3    A.   No.
4    Q.   Give to it Mr. Johnston?
5    A.   No.
6    Q.   All right. You were asked a
7 number of questions about some doctors,
8 and in connection with Dr. Donovan you
9 testified that you reported to Liberty
10 Mutual and to Linda Jones what I
11 understood was a comment by Dr. Donovan
12 that he didn't see anything wrong with
13 your back.
14    A.   Yes.
15    Q.   Okay. When did Dr. Donovan
16 make that comment to you?
17    A.   It was the first injury.
18 Around '91, '92, something within that
19 time frame.
20    Q.   And in the 1991, 1992 time
21 frame was Liberty Mutual the Workers'
22 Compensation insurer?
23    A.   I believe so.

Page 397

1    Q.   And at any point since 1991 or
2 1992, have you been sent to see
3 Dr. Donovan for any treatment?
4    A.   Yes.
5    Q.   When?
6    A.   It was in the time frame of --
7 between 2000, 2001 -- I mean, 2003.
8    Q.   What did you go see
9 Dr. Donovan for in the 2002, 2003 time
10 frame?
11    A.   Dunavant -- Donna took me back
12 for a lower back pain and neck pain.
13    Q.   Did you get any more steroid
14 injections at that point?
15    A.   He refused to see me.
16    Q.   So you didn't actually see the
17 doctor?
18    A.   He came in and told me that he
19 wouldn't see me.
20    Q.   All right. And did you then
21 go to some other doctor for treatment?
22    A.   No. We left and -- I don't
23 know exactly what happened after then. I

Page 398

1 left his office.
2    Q.   Okay. When did you report
3 this comment by -- well, strike that. Let
4 me ask you this.
5      What is the doctor's last
6 name?
7    A.   I think it is Dunavant. The
8 doctor -- which doctor?
9    Q.   I had written it down as
10 Donovan.
11    A.   I believe it was Dunavant. I
12 believe it was Dunavant.
13    Q.   When did you report to
14 Ms. Jones this comment by Dr. Dunavant?
15    A.   It was after the day that I
16 visited his office.
17    Q.   1991, 1992?
18    A.   1991, 1992, one of those
19 dates. During that time.
20    Q.   During that time. Okay.
21      You also testified earlier
22 about you had some surgery with
23 Dr. Hartzog.

**American Court Reporting**
**toll-free (877) 320-1050**

29 (Pages 399 to 402)

Page 399

1    A.    Yes.
2    Q.    Is that for -- what was that
3  one for?
4    A.    For right shoulder rotator
5  tear.
6    Q.    Rotator cuff.  Okay.
7          When was that surgery?
8    A.    2001.
9    Q.    And I believe what you
10  testified earlier was that a nurse of
11  Dr. Hartzog indicated that in spite of you
12  reporting some problems with urinating
13  after the surgery, that Comp had said you
14  were going to have to leave the hospital
15  anyway?
16    A.    No.  When I was in the
17  hospital -- before I left the hospital --
18    Q.    Yes, ma'am.
19    A.    -- the nurse that was
20  dismissing me -- I started just
21  urinating.  And after -- in the process I
22  told her to call the doctor.  And she said
23  it wouldn't do any good to call the

Page 400

1  doctor, because I was going to have to
2  leave the hospital.
3    Q.    Do you remember the nurse's
4  name?
5    A.    No, I don't.
6    Q.    What hospital?
7    A.    Jackson Hospital.
8    Q.    Did you personally make any
9  effort to contact the doctor about this
10  incident?
11    A.    When I went back to
12  Dr. Hartzog, I reported to him what
13  happened.
14    Q.    And what did he say?
15    A.    I don't remember what he said.
16    Q.    And when did you report this
17  comment by the nurse to Ms. Jones?
18    A.    It probably was during the
19  time after the surgery.
20    Q.    How long were you in the
21  hospital for rotator cuff surgery?
22    A.    Eleven to ten -- how many
23  hours is that?

Page 401

1    Q.    One day, though?
2    A.    It wasn't a day.
3    Q.    All right.
4    A.    It was from eleven in the
5  morning till ten that night.
6    Q.    They didn't keep you
7  overnight?
8    A.    No.
9    Q.    Then were you treated -- did
10  you go through rehabilitation for the
11  shoulder?
12    A.    Yes.
13    Q.    All Workers' Comp?
14    A.    Yes.
15    Q.    Other than Linda Jones, who
16  else at the company have you complained to
17  about your Workers' Comp doctors?
18    A.    I complained to Ted Bryant, I
19  complained to Linda Jones, I complained to
20  shop stewards.
21    Q.    Anybody else?
22    A.    Probably co-workers.
23    Q.    All right.  I thought we had

Page 402

1  gotten a list from you last time of
2  everything that you claimed that
3  Mr. Johnston had done to you.  But you
4  answered a question from your lawyer in a
5  fairly generic fashion, so I wanted to --
6  what you identified in response to a
7  question by Ms. Williams was that
8  Mr. Johnston belittled you in group
9  meetings, that he exercised his power,
10  that he let you know he could take your
11  job, and he was always finding fault with
12  you.
13    A.    Yes.
14    Q.    At any point in any group
15  meeting between you and Mr. Johnston, did
16  he ever make any reference to race?
17    A.    No.
18    Q.    Did he ever make any racially
19  inappropriate remarks in your presence?
20    A.    I don't remember.
21    Q.    Did he ever tell any racially
22  inappropriate jokes in your presence?
23    A.    No.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 403

1    Q.    When was the first group
2  meeting where you claim Mr. Johnston
3  belittled you?
4    A.    I don't remember.
5    Q.    When was the last one?
6    A.    October 29th, 2003.
7    Q.    Okay.  Prior to October the
8  29th, 2003, when was the next most recent
9  group meeting where Mr. Johnston belittled
10  you?
11    A.    I don't know a date.  I don't
12  have -- I don't know the date.
13    Q.    Do you know where it occurred?
14    A.    Once on the floor, once in the
15  meeting.
16    Q.    All right.  So the settings
17  where Mr. Johnston belittled you in group
18  meetings were the October 29th, 2003,
19  meeting, one time on the floor, and one
20  time in some other meeting?
21    A.    This didn't happen one, two,
22  three times.  This happened more than one,
23  two, three times.

Page 404

1    Q.    How many?
2    A.    This was something -- I can't
3  tell you how many, but I know that it was
4  something that occurred often enough for
5  me to be upset or to feel discriminated or
6  not being treated like the next person.
7    Q.    All right.  Other than the one
8  time on the floor, the one time in a
9  meeting on October the 29th, 2003, can you
10  identify any other particular event or
11  meeting where you claim Mr. Johnston
12  belittled you?
13    A.    I can't -- I don't know
14  exactly when.  I don't remember exactly
15  when.  But it was periods of time where I
16  did my best to stay away from
17  Mr. Johnston, because any time I was in
18  Mr. Johnston's presence, Dora was the one
19  singled out.
20    Q.    You were singled out from
21  every other employee in the Montgomery
22  plant?
23    A.    I was treated different.

Page 405

1    Q.    From every other employee in
2  the Montgomery --
3    A.    It was -- Mr. Johnston picked
4  on me as much as possible.  Mr. Johnston
5  let me know that he could have my job.  So
6  I stayed away as much as possible from
7  Mr. Johnston so that I could hold my job
8  or keep my job.
9    Q.    Well, did you see Mr. Johnston
10  behave in a similar fashion towards any
11  other employee of Albany International?
12    A.    I saw what Mr. Johnston did to
13  me.
14    Q.    Did you see Mr. Johnston
15  behave in the same manner toward any other
16  employee of Albany International?
17    A.    No.
18    Q.    All right.  So are you the
19  only employee of the company that you
20  observed Mr. Johnston belittle?
21    A.    I don't know.
22    Q.    I'm asking what you personally
23  saw at Albany.  Are you aware of any other

Page 406

1  employee of the company that Mr. Johnston
2  belittled in the fashion that you claim
3  that he belittled you?
4    A.    No.
5    Q.    Okay.  You worked with both
6  male and female employees, correct?
7    A.    Yes.
8    Q.    You worked with both black and
9  white employees?
10    A.    Yes.
11    Q.    You are the only employee that
12  you observed Mr. Johnston treat this way?
13    A.    Yes.
14    Q.    The one time on the floor
15  where he belittled you, which event was
16  that?
17    A.    This was when the person left
18  banana peels on the machine.
19    Q.    We talked about that in detail
20  last time.  And the one time in the
21  meeting; is that the magazine meeting?
22    A.    The magazine, and then it
23  was -- the other occasion was when he

**American Court Reporting**
**toll-free (877) 320-1050**

31 (Pages 407 to 410)

Page 407

1   called me in the office.
2        Q.   And who was the -- I know you
3   called Dot Collins on the phone. Who was
4   the other employee with you on that
5   occasion?
6        A.   Jerelene Forest.
7        Q.   Okay. Now, when you testified
8   in response to Ms. Williams' question that
9   Mr. Johnston exercised power, what did you
10  mean by that?
11       A.   He exercised his -- his job
12  title where he was supervisor, whether it
13  was department manager, production
14  manager, or plant manager.
15       Q.   Was there something
16  inappropriate about Mr. Johnston carrying
17  out his job duties?
18       A.   The way he treated me.
19       Q.   When you say he exercised his
20  power in the way that he treated you, are
21  you referring to anything other than these
22  events where you claim he belittled you?
23       A.   I'm claiming the belittlement

Page 408

1   treatments, I'm claiming on one occasion I
2   was not even in the plant and I got wrote
3   up for somebody knocking a hole in a
4   fabric. I'm claiming that.
5        Q.   When did that happen?
6        A.   This happened during his time
7   of department manager, seaming department
8   manager.
9        Q.   That would be the mid 1990s?
10       A.   It was late 1990s. It wasn't
11  mid '90s. He became the -- I think it was
12  '95 when he became the seaming
13  supervisor.
14       Then one occasion he -- I was
15  working on this machine with two other
16  operators, and they were pulled off of the
17  machine and someone had put the wrong
18  chemicals on when they serviced the
19  machine. I was forced to work on that
20  machine until it damaged my health where I
21  ended up in the emergency room with fifty
22  percent of oxygen in my bloodstream. I
23  actually passed out, and the ambulance had

Page 409

1   to come and take me to the hospital.
2        Q.   Is that the fume incident that
3   we talked about last time?
4        A.   I don't know.
5        Q.   Okay. When did that occur?
6   What was Mr. Johnston's job at the time?
7        A.   He was department supervisor
8   -- I mean, department manager. I begged
9   off the machine. I told him the machine
10  was making me sick.
11       Another operator came -- the
12  lead person came to the machine. As soon
13  as she sat down on the machine she had
14  short wind and tightening of the breath.
15  She didn't have to go back to the
16  machine.
17       The tech came and he was
18  trying to fix the problem. He couldn't
19  fix the problem, because he couldn't
20  breathe.
21       Q.   Why do you believe
22  Mr. Johnston belittled you?
23       A.   Mr. Johnston didn't like me.

Page 410

1        Q.   Did he tell you that he didn't
2   like you?
3        A.   No. He just treated me like
4   he didn't like me.
5        Q.   Do you know why he didn't like
6   you?
7        A.   Because I -- he had to
8   apologize to me.
9        Q.   Other than having to apologize
10  to you, is there any other reason that you
11  believe Mr. Johnston didn't like you?
12       A.   I just believe he didn't like
13  me because of the way he treated me.
14       Q.   Okay. And do you believe that
15  he belittled you because he was made to
16  apologize to you?
17       A.   I just believe he didn't like
18  me.
19       Q.   Do you think he belittled you
20  because of your race?
21       A.   That's part of the reason.
22       Q.   What are the other reasons?
23       A.   He didn't like me.

**American Court Reporting**
**toll-free (877) 320-1050**

32 (Pages 411 to 414)

Page 411

1    Q.    Okay.  You didn't see him
2  belittle other black employees in the
3  plant, did you?
4    A.    No, I didn't.
5    Q.    Why do you believe your race
6  made a difference to Mr. Johnston?
7    A.    You would have to ask
8  Mr. Johnston that, because I have no clue.
9    Q.    You filed the lawsuit, so I'm
10  asking you why --
11    A.    What he did happened to me.
12  I'm telling you what happened to me.
13    Q.    I understand.  I'm asking
14  you --
15    A.    I don't know why.
16    Q.    Do you allege in this case
17  that he belittled you because of your
18  race?
19    A.    Yes.
20    Q.    Okay.  What is your basis for
21  believing that your race made a difference
22  to him?
23    A.    What he did to me happened to

Page 412

1  me.
2    Q.    I understand that.
3    A.    Okay.
4    Q.    Why do you believe your race
5  made -- was a factor in his behavior
6  towards you?
7    A.    The situation was between me
8  and other white women.  I was the black
9  person and I was the one who was belittled
10  in two situations with Mr. Johnston; the
11  magazine situation and the firing
12  situation.
13    Q.    The firing situation meaning
14  the October 29th meeting?
15    A.    Meaning when he was trying to
16  take me upstairs to get my job.
17    Q.    With Jerelene Forest, that
18  event?
19    A.    Yes.
20    Q.    All right.  And he was
21  department manager for both -- for the
22  magazine and the Jerelene Forest incident?
23    A.    Yes.

Page 413

1    Q.    Okay.  You said Mr. Johnston
2  let you know he could take your job.  How
3  many times did he do that?
4    A.    With the magazine situation,
5  with the time I had to take Jerry in the
6  office with me, and October the 29th.
7    Q.    Other than those three
8  occasions, is there any other time during
9  your employment with Mr. Johnston where he
10  let you know he could take your job?
11    A.    I don't remember.
12    Q.    Okay.  Did Mr. Johnston ever
13  actually take your job?
14    A.    Yes.
15    Q.    When?
16    A.    October the 29th, 2003.
17    Q.    All right.  I thought you
18  testified earlier that you were terminated
19  on August the 21st, 2003.
20    A.    I said I felt like I was
21  terminated August the 21st, because that's
22  when I was asked to not punch in.  And
23  then this was an ongoing situation.

Page 414

1    Q.    Okay.  You have testified in
2  response to one of Ms. Williams' questions
3  that Mr. Johnston was always finding fault
4  with you in some way.
5    A.    If I was asked to work on the
6  project, I was denied because of
7  Mr. Johnston.  If it come to wire
8  assignments, another employee wanted this,
9  they got the wire assignment.  When I
10  worked on that machine that I almost died
11  with, Mr. Johnston was in charge of taking
12  the other two operators off.  One was Nat
13  Jones' supervisor, the other one was a
14  white woman.
15    Q.    Who was Nat Jones' supervisor?
16    A.    A girlfriend, and the other
17  one was a white woman.
18    Q.    Well, Mr. Jones' girlfriend,
19  was she white or black?
20    A.    She was black.
21    Q.    Okay.  So the two other
22  operators who were taken off of the
23  machine, both were women, and one was

**American Court Reporting**
**toll-free (877) 320-1050**

Page 415

1  black and one was white?
2       A.   Yes.
3       Q.   I'm trying to understand how
4  it is Mr. Johnston was finding fault with
5  you.
6       A.   I have explained to you, and I
7  don't understand why you can't find fault,
8  because I have been talking to you for
9  almost two days and I have complained for
10  two days, and you don't see any fault that
11  he found with me.
12       Q.   I'm asking you to -- for you
13  to tell me which specific events where it
14  is Mr. Johnston found fault with your work
15  performance.
16       A.   He didn't allow me to go -- to
17  do projects.  He said that I wouldn't do
18  anymore projects.  I didn't do anymore
19  projects.  If I asked to be moved off of
20  the machine, I couldn't be moved off of
21  that machine.  The same machine that was
22  hurting everybody else, somebody -- they
23  would be moved off.  I was not moved off.

Page 416

1  I was actually made to work on that
2  machine.
3            If I was accused of something,
4  he never tried to find out what was the
5  problem, he just chastised me.
6       Q.   Any other instances where you
7  believe that Mr. Johnston found fault with
8  you?
9       A.   I don't remember.
10       Q.   Okay.  Now, you mentioned when
11  you were asked a question by Ms. Williams
12  and you added Mr. Bryant to the list who
13  somehow did something inappropriate to
14  you.
15       A.   Mr. Bryant was personnel
16  manager.  Mr. Bryant was over all of us.
17  He is the one that held the meetings,
18  taught us this, said that, said that.  He
19  was in charge of personnel.  He could have
20  reported Mr. Johnston, but he did not
21  report Mr. Johnston for his action.
22       Q.   For what actions?
23       A.   For the actions that he took

Page 417

1  towards me.
2       Q.   When --
3       A.   Taking my job.
4       Q.   When did you go to Mr. Bryant
5  to complaint about Jeff Johnston?
6       A.   Listen, I talked to Mr. Bryant
7  all the time.  I talked to Mr. Bryant all
8  the time.  I have talked to him on the
9  phone, I have been in his office to talk
10  to him.  I have explained to him what was
11  going on in the doctor's office and with
12  -- in other situations, and he didn't do
13  anything about it.
14       Q.   When did you go to Mr. Bryant
15  to complain about Jeff Johnston?
16       A.   All the time.
17       Q.   When?
18       A.   All the time.  I don't
19  remember.  I don't have dates.  I don't
20  remember the dates.  I don't remember
21  hours.  I don't remember days.
22       Q.   Identify a specific event that
23  you went to Ted Bryant about involving

Page 418

1  Jeff Johnston.
2       A.   I don't remember.
3       Q.   Can you name a single one in
4  all of the years that you worked in the
5  Montgomery plant with Ted Bryant and Jeff
6  Johnston?
7       A.   I don't remember.
8       Q.   You can't name any?
9       A.   I don't remember.
10       Q.   Okay.  But you went to
11  Mr. Bryant?
12       A.   I have gone to Mr. Bryant.
13       Q.   I see.  Okay.  You testified
14  that Mr. Bryant had denied you
15  protection.  Is that in connection with
16  the level of treatment that you received
17  for the Workers' Compensation injuries?
18       A.   Mr. Bryant was sitting in on
19  the meetings.  He knows exactly what
20  happened in the meetings, okay.
21       Q.   Well, you filed the lawsuit.
22       A.   Yes.
23       Q.   You are now -- you have now

**American Court Reporting**
**toll-free (877) 320-1050**

Page 419

1  testified in response to a question by
2  your lawyer that somehow Mr. Bryant denied
3  you projection.
4      A.   He did.
5      Q.   I am trying to get from you a
6  list of the specific instances where you
7  claim Mr. Bryant denied you some
8  projection in the plant.
9      A.   From August the 21st to
10 October the 29th, Mr. Bryant was in every
11 meeting that was held. He took notes, he
12 knew what Jeff Johnston was doing. He
13 heard Jeff Johnston when he wanted me to
14 promise that I can work with no pain. He
15 heard -- he was there when Jeff Johnston
16 jumps from the table, pushed his chair
17 back and talked to me in anger. He was
18 there.
19     Q.   How many meetings was -- were
20 you in with Mr. Bryant between August the
21 21st of 2003 and October of the 29th,
22 2003?
23     A.   I don't know exactly.

Page 420

1      Q.   All right. Prior to August
2  the 21st, 2003, is there any instance that
3  you can identify where you claim Ted
4  Bryant denied you some protection in the
5  plant?
6      A.   I don't remember.
7      Q.   On these occasions where you
8  claim Mr. Bryant denied you projection,
9  why do you believe he did that?
10     A.   I have no clue.
11     Q.   Do you believe Mr. Bryant
12 denied you some projection in the plant
13 because of your race?
14     A.   I don't know.
15     Q.   Do you believe Mr. Bryant
16 denied you some projection in the plant
17 because of Workers' Compensation claims?
18     A.   I don't know.
19     Q.   Now, at the time Mr. Bryant
20 allegedly denied you some projection in
21 the plant, you weren't making any effort
22 to go to George Kazalay to complain, were
23 you?

Page 421

1      A.   It didn't do me no good to go
2  to Mr. Kazalay. Mr. Kazalay didn't do
3  anything about anything. When I called
4  Mr. Kazalay's office he said there was a
5  chain of command. Part of that chain of
6  command was Jeff Johnston.
7      Q.   Well, you told me about the
8  chain of command story in connection with
9  an event involving Mr. Woodward several
10 years earlier. My question to you was:
11 Did you ever go to George Kazalay to
12 report to Mr. Kazalay that you thought
13 somehow Ted Bryant had failed to project
14 you in the plant?
15     A.   No.
16     Q.   Did you ever make any effort
17 to call anybody at Albany's corporate
18 headquarters to report some concern with
19 Ted Bryant?
20     A.   I called corporate, yes, when
21 I was taken off of my job. And I was -- I
22 called them. No one returned my call.
23     Q.   You called corporate when?

Page 422

1      A.   It was 2003.
2      Q.   Before or after October the
3  29th, 2003?
4      A.   I don't remember.
5      Q.   Who did you call at corporate?
6      A.   The CEO. I don't know his
7  name. I just know the CEO.
8      Q.   And did you leave a message
9  for him to return your call?
10     A.   I believe I did the first
11 time.
12     Q.   Well, what was the nature of
13 the message?
14     A.   I don't remember.
15     Q.   Did you leave it on voicemail,
16 leave it with the secretary?
17     A.   A voicemail.
18     Q.   Well, as best you recall, what
19 did you say on the voicemail?
20     A.   I don't remember. I just
21 asked for them to return my call.
22     MR. POWELL: I don't think I
23 have any further questions. Jennifer

**American Court Reporting**
**toll-free (877) 320-1050**

35 (Pages 423 to 424)

Page 423

1  might.
2       MS. SWAIN:  I don't have any
3  questions.
4       I do want, Ms. Davis, to put
5  you on notice, and your lawyers as well,
6  that I think it is clear that the facts
7  that you have alleged in this lawsuit do
8  not support the claims made in the
9  complaint.
10      And because of that, on behalf
11 of Jeff Johnston, I want to ask you
12 voluntarily to dismiss your claims and put
13 you on notice that he will seek fees if he
14 has to continue fighting this lawsuit
15 under Rule 11, the Alabama Accountability
16 and Litigation Act, and the fee shifting
17 provisions, but the statutes you sued
18 under.
19      MS. WILLIAMS:  Anything else?
20      MS. SWAIN:  No.
21      MS. WILLIAMS:  Okay.  Thank
22 you.
23             1:44 PM

Page 424

1       FURTHER DEPONENT SAITH NOT
2          C E R T I F I C A T E
3  STATE OF ALABAMA)
4  JEFFERSON COUNTY)
5
6       I hereby certify that the above
7  and foregoing deposition was taken down by
8  me in stenotype, and the questions and
9  answers thereto were transcribed by means
10 of computer-aided transcription, and that
11 the foregoing represents a true and
12 correct transcript of the deposition given
13 by said witness upon said hearing.
14      I further certify that I am
15 neither of counsel nor of kin to the
16 parties to the action, nor am I in anywise
17 interested in the result of said cause.
18
19          DAVID L. MILLER, CSR, RMR
20          Certificate No:  AL-CSR-141
21
22 My Commission expires
23 November 30, 2009

**www.AmericanCourtReporting.com**
**June 7, 2006**